UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JENNY RUBIN, et al. | ) | |
|     Plaintiffs—Judgment Creditors | ) | Case No.: |
| | ) | 1:05-mc-10079-GAO |
| v. | ) | |
| | ) | |
| THE ISLAMIC REPUBLIC OF IRAN, et al. | ) | |
|     Defendants—Judgment Debtors | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MUSEUM OF FINE ARTS, HARVARD UNIVERSITY, et al. | ) | |
|     Trustee Process Respondents. | ) | |

**MEMORANDUM OF LAW OF HARVARD PARTIES
IN SUPPORT OF MOTION TO QUASH SUMMONS AND
TO DISSOLVE ATTACHMENT BY TRUSTEE PROCESS**

**BACKGROUND**

On April 28, 2005, the plaintiffs-judgment creditors ("Rubin parties") obtained a summons from this Court after moving for an order of attachment by trustee process against Trustee Process Respondents Harvard University, the President and Fellows of Harvard College, Harvard University Art Museums, the Busch-Reisinger Museum, the Fogg Art Museum, the Sackler Museum, the Semitic Museum, and the Peabody Museum ("Harvard parties").[1] The Rubin parties have obtained a large default judgment against the Islamic Republic of Iran, the

---

[1] Harvard University, Harvard University Art Museums, the Busch-Reisinger Museum, the Fogg Art Museum, the Sackler Museum, the Semitic Museum, and the Peabody Museum are not legal entities subject to suit. The President and Fellows of Harvard College is the legal entity that comprises the various named schools and museums and is the only proper party to this litigation. *See* Berkman Declaration. Accordingly, all parties other than the President and Fellows of Harvard College should be dismissed from this proceeding.

1

Iranian Ministry of Information and Security, and three Iranian individuals who were Iranian government officials.[2] They now seek to execute upon assets of the government of Iran, and allege "[u]pon information and belief"[3] that antiquities belonging to the government of Iran are in the possession of Harvard University or one of its museums.

Specifically, the Rubin parties speculate that at least six antiquities on display at the Sackler Museum at Harvard University that relate to the ancient civilization at Persepolis, which was located within the boundaries of modern-day Iran, "may be the property of Iran." *See* Memorandum in Support of Plaintiffs' Motion for Order of Attachment by Trustee Process at 3-4.[4] At no point prior to the institution of this attachment proceeding, however, did the Rubin parties approach officials of Harvard University or its museums to inquire whether Harvard possessed any property belonging to Iran.[5] Moreover, information about the Persepolis reliefs on public display at the Sackler Museum, found immediately next to those reliefs, explains that the reliefs were obtained by Harvard in 1937 by bequest from Grenville L. Winthrop, whose legacy to Harvard forms much of the core of the collection of the Harvard University art museums. *See* Abrahams Decl. ¶ 7.

As set forth in the accompanying declarations and answer to the Rubin parties' summons and motion for attachment, the Harvard parties possess no Iranian antiquities that belong to the government of Iran or any of the other judgment debtors. But even if, contrary to fact, Harvard

---

[2] Those Iranian officials are Ayatollah Ali Hoseini Khamenei, the Supreme Leader of the Islamic Republic of Iran; Ali Akbar Hashemi-Rafsanjani, former President of Iran; and Ali Fallahian-Khuzestani, former Iranian Minister of Information and Security.

[3] *See* Memorandum in Support of Plaintiffs' Motion for Order of Attachment by Trustee Process at 3-4.

[4] Plaintiffs do not even claim to have a good faith basis for asserting that Harvard possesses any property belonging to the Ministry of Information and Security or the three individual judgment debtors.

[5] *See* Abrahams Decl. ¶ 8; Armstrong Decl. ¶ 8; Fisher Decl. ¶ 8.

were in possession of antiquities belonging to the government of Iran, as a matter of law the judgment creditors would not be entitled to subject that property to trustee process or any other form of attachment.  Property of the government of Iran is immune from attachment under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1609.  No exception to the FSIA applies in this case that would permit judgment creditors to attach any antiquities from ancient Iran that are in the possession of the Harvard parties.  Accordingly, this Court should quash the summons and dissolve the attachment by trustee process.  See Fed. R. Civ. P. 69(a) (proceedings shall be in accordance with state practice and procedure "except that any statute of the United States governs to the extent that it is applicable"); *Auer v. Costa*, 23 F. Supp. 22, 23 (D. Mass. 1938) (court granted motions to discharge attachment because "the attached [property] belongs to a foreign government" and "the property of a foreign government is exempt from seizure or attachment in domestic courts"); 48 Mass. Prac. Series, Collection Law § 5:82 (3d ed.) ("A party may move for dissolution of an attachment by trustee process on the ground that the property attached was exempt from attachment") (citing *Toomey v. Toomey*, 1997 Mass. App. Div. 181 (1997) (trustee process defendant sought and won dissolution of attachment on grounds that attachment interfered with Congress's purposes and objectives in ERISA)).

# ARGUMENT

A. **EVEN IF HARVARD'S IRANIAN ANTIQUITIES WERE THE PROPERTY OF IRAN—AND THEY ARE NOT—THEY WOULD BE IMMUNE FROM ATTACHMENT UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT.**

The default rule governing the property of a foreign sovereign, under both federal law and international law, is that it is immune from attachment and execution.[6] Section 1609 of Title 28 of the United States Code, entitled "Immunity from attachment and execution of property of a foreign state," provides that "the property in the United States of a foreign state shall be immune from attachment[,] arrest and execution except as provided in sections 1610 and 1611 of this chapter." Moreover, the *only* permissible grounds for attachment of the property of a foreign sovereign are the express exceptions to attachment immunity set forth in sections 1610 and 1611. *See De Letelier v. Republic of Chile*, 748 F.2d 790, 793 (2d Cir. 1984). Thus, if (as is the case here) it is clear as a matter of law that none of those exceptions applies, then there is no legal basis for any attachment proceeding.

Only one of the FSIA's exceptions to immunity, § 1610(a)(7), is even potentially relevant here. That section provides:

> The property in the United States of a foreign state, . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, . . . if— . . .
>
> (7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

---

[6] Harvard has standing to raise arguments under the FSIA in response to an attempt to attach property in its possession. *See Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 233 (5th Cir. 2004), *cert. denied*, 125 S. Ct. 1841 (2005).

28 U.S.C. § 1610(a)(7). The default judgment in this case appears to relate to a claim for which Iran was not immune under 28 U.S.C. § 1605(a)(7). But even so, plaintiffs are not entitled to attach any property in the possession of Harvard in execution of their judgment against Iran unless that property was "property . . . of a foreign state [Iran] . . . used for commercial activity in the United States." The Iranian antiquities in Harvard's collections that the Rubin parties seek to attach are neither. They are not the property of Iran, as established in the accompanying declarations; and they are also not "used for commercial activity in the United States," as required under § 1610(a)(7).

1.  **The Exception To Immunity In § 1610(a) Requires That The Property Be Used By The Foreign Sovereign For A Commercial Activity In The United States.**

Under section 1610(a), a foreign sovereign's property loses its immunity from attachment only when that property is used for a commercial activity in the United States *by the foreign government*. Several courts have held, and the U.S. Departments of State and Justice agree, that § 1610(a) does not abrogate the immunity from attachment of foreign sovereign property based on any use that might have been made of the property by a third party.[7] This construction of § 1610(a)(7) is also consistent with the legislative history and purposes of the FSIA as well as customary international law. The government of Iran has never used the Iranian antiquities held in Harvard's museums for any commercial activity in the United States. Therefore, the exception does not apply, and the property is immune from attachment.

The starting point in construing § 1610(a) is the principle that "immunity belongs to the foreign sovereign and whether immunity is waived properly depends upon the actions of the

---

[7] Although Harvard's own activities are irrelevant to the FSIA inquiry for the reasons described above and in the following pages, Harvard, as a nonprofit institution dedicated to education and research, reserves the right to demonstrate that its own uses of the Iranian antiquities are purely noncommercial.

foreign sovereign." *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1113 (N.D. Ill. 2004). Accordingly, the only federal courts that have given full consideration to the question have both held that the § 1610(a) exception only applies when the foreign sovereign uses the property for a commercial activity. Any use that a third party might have made of the property is legally irrelevant.

In *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16 (D.D.C. 1999), a judgment creditor sought to attach parcels of real estate in Washington, D.C., that had formerly served as Iran's embassy and diplomatic residences. *Id.* at 19. The United States took custody of and leased the buildings, using the proceeds for maintenance. *Id.* at 21. The judgment creditor argued that leasing the buildings was a commercial activity, and so the property was not immune because it had been used for a commercial activity in the United States (though not by Iran). The United States argued in response that "for purposes of the FSIA, only the foreign state's actions are relevant, not those of the United States." *Id.* The court agreed, holding that the "applicability [of § 1610(a)(7)] turns on the foreign state's actions with respect to commercial use," and granted the United States' motion to quash the writ of attachment. *Id.* at 23.

In *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108 (N.D. Ill. 2004), the same judgment creditors now before this Court attempted to attach ancient Persian texts held by the University of Chicago's Oriental Institute. The judgment creditors sought discovery relating to the University's commercial uses of the texts. The University objected to discovery on the ground that only Iran's commercial uses of the property, and not the University's, were relevant under the FSIA. The court agreed with the University, holding that "the proper focus of the commercial activities inquiry . . . is not Citation Respondents [the University of Chicago], but

6

Defendant Iran.  Under Section 1610(a), it is the actions of the foreign sovereign that determine whether immunity is waived." *Id.* at 1112-13.

The Fifth Circuit, in dictum, employed an insightful example that illustrates why the principle expressed in the *Rubin* and *Flatow* decisions are correct:

> [W]hat matters under the statute is how the *foreign state* uses the property, not how private parties may have used the property in the past.  Any property the foreign state purchases from a private supplier will necessarily be used for a commercial purpose by that supplier.  If a foreign state buys real estate to use for an embassy, for example, the real estate will have been used for a commercial purpose by its former owner. . . . If we were to allow a private party's commercial use of the property to count for §1610(a), we would erase the commercial/noncommercial use distinction for almost all of a foreign state's tangible property.

*Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 256–57 n.5 (5th Cir. 2002) (citation omitted).  "Courts ought to construe statutes, whenever possible, 'in a commonsense manner, honoring plain meaning, and avoiding absurd or counter-intuitive results.'" *United States v. Green*, 407 F.3d 434, 442 (1st Cir. 2005) (citation omitted).  This Court should therefore construe § 1610(a) to avoid the absurd result identified by the Fifth Circuit and hold that the exception to attachment immunity for foreign sovereign property is triggered only by commercial use of the property *by the foreign sovereign*.

This construction is also consistent with the position of the Executive Branch, which has a particularly weighty interest in proper construction of the FSIA, given that statute's implications for foreign and diplomatic relations with other states.  The United States has maintained that the "commercial activity" exception of § 1610(a) applies only when the foreign sovereign, not a third party, uses the property in question for commercial activity.  See Ex. A, Department of Justice Memorandum of Points and Authorities in Support of Motion to Quash Plaintiffs' Writs of Attachment Delivered to Bank of America, at 17-19, *Cicippio v. Islamic*

7

*Republic of Iran*, No. 96-1805 (D.D.C.) ("[I]t is the foreign state's own activities, not those of the United States [there, the third party in possession], that determine whether particular property is 'used for a commercial activity' within the meaning of section 1610(a)."); *see* also Ex. B, Statement of Interest of the United States of America in *Rubin v. Islamic Republic of Iran* at 12, No. 03-cv-9370 (N.D. Ill.). Obviously, the United States is familiar with the nation's obligations under international law and is also well placed to evaluate what construction of an ambiguous statute will comport with that law and serve the nation's foreign policy interests.

Finally, a construction of § 1610(a)(7) as abrogating attachment immunity only when a foreign sovereign has used the property in question for a commercial activity is consistent with the background and purposes of the FSIA. The FSIA was enacted in large part in response to foreign sovereigns' engaging in commercial activity. Congress concluded that, when foreign nations participated in the marketplace in the manner of private actors, other persons doing business with them were entitled to have access to judicial remedies. *See* H.R. Rep. No. 94-1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605 ("In a modern world where foreign state enterprises are every day participants in commercial activities, [the FSIA] is urgently needed legislation."); Letter from Acting Legal Advisor Jack B. Tate to the Attorney General, May 19, 1952 (the "Tate Letter"), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 714 (1976) ("[T]he Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts."); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) ("[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of

the FSIA.").[8]  The most natural reading of § 1610(a) in light of its purposes, therefore, is that immunity for foreign sovereign property is lost only when the foreign sovereign has used the property for commercial activity.  Any broader reading would not be consistent with the purposes of the FSIA—to ensure that persons doing business with foreign nations acting in a commercial capacity have access to the usual judicial remedies available for commercial disputes.  See *Rubin*, 349 F. Supp. 2d at 1113 n.1 (applying *Weltover* analysis to § 1610(a) and concluding that only the foreign state's actions are relevant); *Flatow*, 76 F. Supp. 2d at 23 (same).

Dictum in one case, *Sesostris S.A.E. v. Transportes Navales, S.A.*, 727 F. Supp. 737 (D. Mass. 1989), does not contradict the reasoned decisions in *Rubin* and *Flatow*, *supra*.  *Sesostris* involved a charter ship (the Unamuno) that was attached in a dispute between two private entities.  A third entity, BCI, claiming to be a Spanish governmental entity with an ownership interest in the ship, appeared before the court and asked that the ship be released.  The court permitted the release after BCI posted a $100,000 security with the court, from which, the parties agreed, any judgment in favor of Sesostris would be paid.  When Sesostris prevailed in a foreign arbitration of the dispute, it sought to collect its award from the $100,000 security.  BCI then opposed the collection effort by Sesostris, arguing that it was entitled to sovereign immunity for the ship.  The district court rejected BCI's argument, concluding, first, that BCI had failed to establish an ownership interest in the ship, and second, that BCI had failed to show that it was

---

[8] In its findings and declaration of purpose and throughout the legislative history, Congress spoke of "foreign states['] . . . commercial property," 28 U.S.C. § 1602, and "ordinary commercial assets" of a foreign state, H.R. Rep. No. 94-1487, at 7.  A natural reading of these words would have them apply only to property put to commercial use by the sovereign itself.

immune as the "'foreign central bank or central banking authority' of Spain." *Id.* at 743. The court then remarked:

> [T]he property at issue in this case *appears* to fall within one of the statutory exceptions to immunity. Where the property was 'used for commercial activity' and the commercial activity is the basis for the claim, there is no immunity from arrest or attachment. 28 U.S.C. § 1610(a)(2). In this case, the Unamuno was used for the commercial activity described by the charter parties and this action is based on a breach of the charter parties. Consequently, the Unamuno would not be immune from arrest or attachment under FSIA.

*Id.* at 744 (emphasis added).

Even if the court in *Sesostris* might have considered the commercial use of the Unamuno by parties other than BCI, the purported foreign sovereign entity, in remarking that the "commercial activity" exception to attachment immunity in § 1610(a), "appear[ed] to" apply in that case, this Court should not follow that dictum here.[9] First, the court in *Sesostris* simply did not address the principal point made in this motion—namely, that the application of the "commercial activity" exception to attachment immunity in § 1610(a) turns on the use of the property for commercial activity by the foreign sovereign, and not its use by any third party. That point was apparently not briefed by the parties or otherwise considered by the court. Moreover, when the court stated that the commercial activity exception "appears" to apply, it

---

[9] Of course, this Court is not bound by the decisions of other district judges in the District of Massachusetts. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 431 n.10 (1996) (district court judges in a single district "sit[] alone and render[] decisions not binding on the others"); *Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 & n.7 (3d Cir. 1991) (collecting cases).

10

indicated that its decision was not to be taken as a definitive ruling as to the application of the "commercial activity" exception in § 1610(a) in that case.[10]

Second, any statement by the *Sesostris* court about the scope of the "commercial activity" exception in § 1610(a) was clearly unnecessary to its decision.  The court had already accepted two other arguments sufficient to defeat the sovereign immunity claim:  BCI had not established that the Unamuno was its property, or that it was an entity entitled to foreign sovereign immunity.  In addition, the court's passing reference to commercial use of the ship pursuant to the charter agreement was unnecessary because the ship had been used by BCI, the (purportedly) foreign sovereign entity, for a commercial activity:  BCI issued a mortgage on the ship and later took possession of it after posting a $100,000 bond.  727 F. Supp. at 738, 740.  BCI subsequently "appeared as the mortgagee in possession of the Unamuno and clearly claimed 'an interest relating to the property . . . which is the subject of the action.'"  *Id.* at 742 n.6.  As the *Rubin* court observed, that financial transaction by BCI would have been sufficient to establish that BCI had used the ship for a commercial activity.  *See Rubin*, 349 F. Supp. 2d at 1113 ("[T]he *Sesostris* dicta addresses the issue of commercial financing by a financial institution that is wholly-owned by a foreign sovereign.  In such a case, it is obvious that the foreign sovereign engaged in commercial activity.").

This Court should therefore follow the holdings of *Rubin* and *Flatow*—as well as the interpretation of the Executive Branch—and conclude that property of a foreign sovereign is

---

[10] Indeed, had the *Sesostris* court fully considered the application of § 1610(a), it would have concluded that that provision was entirely irrelevant to the case before it.  The question presented to the court in *Sesostris* was whether the ship was immune from *prejudgment* attachment.  *See* 727 F. Supp. at 743.  The exceptions in § 1610(a) apply only to immunity from *postjudgment* attachment, and the exceptions to immunity from prejudgment attachment appear separately in § 1610(d).

11

subject to attachment under § 1610(a)(7) only when that property has not been used for a commercial activity by the foreign sovereign.

**2.     The Exception To Immunity In § 1610(a)(7) Is Inapplicable Because Any Ambiguity In The Language Must Be Resolved, In Accordance With International Law, In Favor Of Foreign Sovereign Immunity.**

International law confirms that the judgment creditors may not execute against any property in Harvard's possession unless it was used by the foreign sovereign, Iran, for a commercial activity. International law is relevant to this case for two reasons.[11] First, the law of foreign sovereign immunity is a creature of international law and the relations between nations. In setting out its "findings and declaration of purpose" in the FSIA, Congress observed that "*[u]nder international law*, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602 (emphasis added). The legislative history of the FSIA makes clear that Congress's purpose was to codify international law. H.R. Rep. No. 94-1487, at 7, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605 ("The bill . . . would accomplish four objectives: First, the bill would codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law."); *see also* Tate Letter, *reprinted in Alfred Dunhill*, 425 U.S. at 711–15

---

[11] The federal courts of appeals uniformly have held that international law is relevant to the interpretation of the FSIA. *E.g.*, *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1294 (11th Cir. 1999) ("We may look to international law as a guide to the meaning of the FSIA's provisions. . . . Congress intended international law to inform the courts in their reading of the statute's provisions."); *Trajano v. Marcos* (*In re Estate of Ferdinand E. Marcos Human Rights Litig.*), 978 F.2d 493, 498 (9th Cir. 1992) ("Congress intended the FSIA to be consistent with international law. . . ."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981) ("[C]urrent standards of international law concerning sovereign immunity add content to the 'commercial activity' phrase of the FSIA.").

(reviewing the practice of more than twenty nations to justify its conclusion that immunity should not apply to foreign sovereign's commercial acts).

Second, the FSIA must be construed in a manner that would render it consistent with, rather than in conflict with, international law. As the Supreme Court has stated, "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.); see also *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 124 S. Ct. 2359, 2366 (2004) ("[C]ustomary international law [is] law that (we must assume) Congress ordinarily seeks to follow. . . . This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws."). Thus, to the extent the language of § 1610(a) is ambiguous on the question presented here, that language should be construed in a way that would be consistent with the law of nations.

Customary international law provides that the property of a foreign sovereign loses its immunity from attachment only when that property is used *by the foreign state* for a commercial activity. The background presumption of international law, of course, is that property of a foreign sovereign is immune from attachment by the courts of any other sovereign. *See, e.g., Restatement (Third) of Foreign Relations Law of the United States* § 451 (1993) ("Under international law, a state . . . is immune from the jurisdiction of the courts of another state, except with respect to claims arising out of activities of the kind that may be carried on by private persons."). Unless an exception to this principle rooted in international law is applicable, therefore, attachment of a foreign sovereign's property would violate international law. But while international law does permit, under certain circumstances, the attachment of property that

13

has been used *by the foreign sovereign* for commercial activity, no rule of customary international law permits attachment of foreign sovereign property based on the use of that property by *some other party*. Accordingly, for the FSIA to be consistent with customary international law, § 1610(a)(7) must be construed to prohibit attachment in this case, where no property has been used by Iran for commercial activity.

Article 19(c) of the United Nations Convention on Jurisdictional Immunities of States and Their Property, which was opened for signature on January 17, 2005 (but has not yet been signed by the United States or entered into force), provides that "[n]o post-judgment measures of constraint, such as attachment, arrest, or execution, against property of a State may be taken in connection with a proceeding before a court of another State unless and except to the extent that . . . it has been established that the property is specifically in use or intended for use *by the State* for other than government non-commercial purposes . . . ."[12] (Emphasis added.) This text restates a well-settled rule of customary international law. The treaty originated in Draft Articles submitted to the United Nations by its expert legal body, the International Law Commission (ILC), whose publications and opinions are often deemed to provide authoritative statements as

---

[12] The text of the treaty is annexed to U.N. Doc. A/RES/59/38, *available at* http://www.un.org/law/jurisdictionalimmunities.

to the content of customary international law.[13]  Article 18(c) of the ILC's Draft Articles is materially identical to the final text of Article 19(c), quoted above.  The ILC extensively surveyed foreign and international case law, treaties, and national legislation, before concluding that the property of a foreign sovereign loses its immunity only when used *by the sovereign* for commercial activity.  *See* ILC Final Draft Articles and Commentary on Jurisdictional Immunities of States and their Property (1991), *reproduced in* Andrew Dickinson *et al.*, *State Immunity: Selected Materials and Commentary* at 81, 147 cmt. 7, 176-77 n.171 (2004) (attached in pertinent part as Exhibit C) (seventy-seven lines of citations, with references to other U.N. documents providing additional citations, surveying foreign state practice and international agreements, relied upon in formulating Article); *see also Restatement* § 102 cmt. i ("International agreements constitute practice of states and as such can contribute to the growth of customary law . . . .").  By contrast, research fails to reveal any source of international law expressly

---

[13]  U.S. courts regularly look to the publications of the ILC for authoritative statements of international law.  *See, e.g., Compagnie Noga D'Importation Et D'Exportation, S.A. v. Russian Federation*, 361 F.3d 676, 689 & n.13 (2d Cir. 2004) (citing ILC Draft Articles on State Responsibility as sole authority for an "axiomatic principle of international law," while recognizing that Articles are not primary or constitutive source of international law authority); *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296–97 (11th Cir. 1999) (citing ILC pronouncements on the authority of an ambassador to waive immunity); *Flatow v. Islamic Republic of Iran*, 202 F.R.D. 35, 37 (D.D.C. 2001) (citing ILC Draft Articles on Jurisdictional Immunities of States and Their Property in support of proposition that "foreign countries rarely enforce punitive damages awards against foreign states"); *see also College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 699 (1999) (Breyer, J., dissenting) (citing ILC Report for a proposition of international law relating to sovereign immunity and commercial activities).

supporting the proposition that commercial use of foreign sovereign property by a third party is sufficient to vitiate the property's immunity from attachment.[14]

The UN Convention and the commentary accompanying the draft ILC articles reflect a crystallized principle of customary international law: foreign sovereign property loses its immunity to attachment when, but only when, the property is used by the foreign sovereign for commercial activity. As the *Restatement (Third) of Foreign Relations Law* explains, "a rule . . . that has been accepted as such by the international community of states (a) in the form of customary law; (b) by international agreement; or (c) by derivation from general principles common to the major legal systems of the world" is an appropriate "source[] of international law" for U.S. courts to consult. *See Restatement* § 102(1). "In determining whether a rule has become international law, substantial weight is accorded to (a) judgments and opinions of international, judicial and arbitral tribunals; (b) judgments and opinions of national judicial tribunals; (c) the writings of scholars; (d) pronouncements by states that undertake to state a rule of international law, when such pronouncements are not seriously challenged by other states."

---

[14] Many countries' statutes simply state the proposition as the FSIA does—that the property of a foreign sovereign used for commercial activity is not immune. *E.g.*, European Convention on State Immunity, art. 26 (optional provision), *reprinted in* Dickinson at 20 ("Notwithstanding [general executory immunity] . . ., a judgment . . . may be enforced . . . against property of the State, . . . used exclusively in connection with . . . [an industrial or commercial] activity"); State Immunity Act (Canada), R.S., 1985, c. S-18, art. 12(1)(b), *reprinted in* Dickinson at 493 ("property of a foreign state that is located in Canada is immune from attachment and execution . . . except where . . . the property is used or is intended for a commercial activity"); Foreign States Immunities Act (South Africa), No. 87 of 1981, art. 14(3), *reprinted in* Dickinson at 518 (immunity from execution provision "shall not prevent the issue of any process in respect of property which is for the time being in use or intended for use for commercial purposes."). Some countries' statutes make clear that only commercial activity by the sovereign will vitiate immunity. *See* Foreign States Immunities Act 1985 (Australia), No. 196 of 1985, art. 32(3)(a), *reprinted in* Dickinson at 482 ("[the general executory immunity provision] does not apply in relation to commercial property . . . . [C]ommercial property is property . . . that is in use *by the foreign State* concerned substantially for commercial purposes . . . ." (emphasis added)); *see also* Ian Brownlie, *Principles of Public International Law* 338–39 (6th ed. 2003) (weight of authority has moved away from absolute immunity from execution to the view that "property in use or intended for use *by the state* for commercial (or non-governmental) purposes will not be immune from measures of enforcement" (emphasis added)).

*Id.* § 103(2).  Under these standards, it is readily apparent that, under international law, only foreign sovereign property that is used by the foreign sovereign for a commercial activity may be subject to attachment.

### 3. No Iranian Antiquities In The Possession Of The Harvard Parties Have Been Used For A Commercial Activity By Iran.

In light of the applicable legal standards set forth above, it is clear that the FSIA provides no basis for plaintiffs' effort to attach Iranian antiquities in the possession of Harvard.  The accompanying Abrahams, Armstrong, and Fisher declarations make clear that Iran has not used any of the Iranian antiquities in Harvard's possession for any commercial activity in the United States, as § 1610(a)(7) requires for foreign sovereign property to lose its immunity from attachment.  Indeed, Iran has not used any Iranian antiquities in Harvard's possession for *any* purpose in the United States.  Harvard has never communicated with the government of Iran or any of its instrumentalities or officials about the uses to which any of the Iranian antiquities in its collection are put.  Harvard has never taken direction from the government of Iran or any of its instrumentalities or officials about the uses to which any of the Iranian antiquities in its collection may be put.  Nor has Harvard remitted any funds to Iran for any purpose arising out of Harvard's possession or use of Iranian antiquities in its collection.  Accordingly, the FSIA makes clear that the Rubin parties have no basis for attachment or execution on any Iranian antiquities in the possession of Harvard, even if one were to assume that those antiquities were owned by the government of Iran.

**B.  THERE IS NO AUTHORITY OTHER THAN THE FSIA UNDER WHICH THE JUDGMENT CREDITORS MIGHT EXECUTE AGAINST ANY IMMUNE PROPERTY OF IRAN.**

No statute other than the FSIA provides even an arguable basis for overcoming the presumption that property of Iran is immune from execution.  Section 201(a) of the Terrorism Risk Insurance Act of 2002 (TRIA), Pub. L. No. 107-297, 116 Stat. 2322 (2002), permits execution against the "blocked assets" of a "terrorist party" in some circumstances.[15]  It does not permit judgment creditors to execute against Harvard's Iranian antiquities, even if those antiquities are the property of Iran, because the antiquities are not "blocked assets."

In 1979, in response to Iran's seizure of the U.S. embassy in Tehran, President Carter issued Executive Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979), by which he "order[ed] blocked all property and interests in property of the Government of Iran . . . ."  However, pursuant to the United States' obligations under the Algiers Accords, the President subsequently issued (among others) Executive Order No. 12,281, 46 Fed. Reg. 7923 (Jan. 19, 1981):

> All persons subject to the jurisdiction of the United States in possession or control of properties, not including funds or securities, owned by Iran or its agencies, instrumentalities, or controlled entities, are licensed, authorized, directed and compelled to transfer such properties, as directed after the effective date of this Order by the Government of Iran, acting through its authorized agent.

---

[15] Section 201(a) of TRIA provides:
> [I]n every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

The statute defines "blocked asset" as "any asset seized or frozen by the United States under section 5(b) of the Trading with the Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act."  § 201(d)(2).

Even if one were to assume (contrary to fact) that the antiquities in possession of Harvard on which the Rubin parties seek execution are the property of Iran, they were removed from the scope of the blocking orders by this Order.  See *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 67 ("Pursuant to the Algiers Accords, most Iranian assets were unblocked."); Statement of Interest of the United States of America, *Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill.) (filed July 28, 2004) (Ex. B), pp. 9–10 (ancient Iranian texts on loan from Government of Iran are no longer blocked assets in light of Exec. Order No. 12,281).

Accordingly, because any sovereign property of Iran would presumptively be immune from attachment by any court in the United States, and because no provision in either the FSIA or the TRIA would permit attachment of any Iranian antiquities in the possession of the Harvard parties, the Iranian antiquities in Harvard's possession would not be subject to attachment even if they belonged to Iran.

## **CONCLUSION**

The Court should quash the summons issued by third party creditors to the Harvard parties and dissolve the attachment on any property in the possession of the Harvard parties.  In addition, all parties other than the President and Fellows of Harvard College should be dismissed from this proceeding (*see* p.1 n.1, *supra*).

Respectfully submitted,

THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By its attorneys,

/s/ Paul R.Q. Wolfson
Paul R.Q. Wolfson (admitted pro hac vice)
Mark C. Fleming (BBO #639358)

WILMER CUTLER PICKERING HALE AND
DORR LLP
2445 M Street NW
Washington DC 20037
Tel: (202) 663-6390
Fax: (202) 663-6363
Paul.wolfson@wilmerhale.com

Dated: June 27, 2005