# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
Joseph J. Cicippio, et al.,   )
                              )
          Plaintiffs,         )
                              )
v.                            )  Civil No. 96-1805 (TPJ)
                              )  Hon. Thomas Penfield Jackson
The Islamic Republic of Iran, )
                              )
          Defendant.          )
                              )
```

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
QUASH PLAINTIFFS' WRITS OF ATTACHMENT DELIVERED TO
BANK OF AMERICA

INTRODUCTION

On or about July 18, 2000, plaintiffs delivered five writs
of attachment to Bank of America, purporting to attach Account
#2086355542 and Account #39910000120887 ("Bank of America
writs"), in an effort to satisfy its judgment against the Islamic
Republic of Iran ("Iran") in this case.  Bank of America,
garnishee, has responded by informing plaintiffs that, while Iran
"may have an interest" in the two accounts in question,[1] neither
account is "subject to garnishment or attachment" for the reasons

---

[1]    One of the account numbers contained in the writs
delivered to Bank of America (#3910000120887), see infra, is
different than the number of the bank account in issue in this
proceeding (#39910000120887).  Because Bank of America, in its
Answers To Interrogatories In Attachment, states that Iran "may
have an interest" in Account #39910000120887, and does not
contend that plaintiffs' instant writs are defective because they
identify the wrong account number, the United States does not
herein state a technical objection to plaintiffs' writs.

set forth by another judge in this Court in Flatow v. Islamic
Republic of Iran, 76 F. Supp. 2d 16 (D.D.C. 1999) (quashing writ
of attachment against same bank accounts served by victim of
Iranian terrorism).[2]  See Answers to Interrogatories in
Attachment (Attachment A herein).  On August 1, 2000, the United
States provided notice that it intended to file a statement of
interest pursuant to 28 U.S.C. § 517, regarding the Bank of
America writs.  The United States hereby respectfully submits
this Memorandum of Points and Authorities in support of its
motion to quash the Bank of America writs.  The United States
submits this motion and accompanying memorandum, as its statement
of interest pursuant to 28 U.S.C. § 517, solely to protect its
own interests in this matter and to advise the Court of its legal
obligations with respect to the writs of attachment under both
U.S. law and international agreements.  In articulating those
legal obligations, the United States does not appear on behalf of
Iran and expressly condemns the acts that brought about the
judgment in this case.

In May 2000, pursuant to the same judgment, plaintiffs
delivered five writs of attachment to the Secretary of the
Treasury, purporting to seize the "Foreign Military Sales Trust

---

[2]    An appeal of that decision is pending before the United
States Court of Appeals for the District of Columbia Circuit.
See Flatow v. Islamic Republic of Iran, et al., No. 00-5011,
consolidated with No. 99-5398.

Account, Identification Code 11-8242-0-7-155" ("Foreign Military Sales writs"). The government's motion to quash these writs, filed June 27, 2000, is still pending.[3]

While the United States is sympathetic to plaintiffs' interest in satisfying their substantial judgments against Iran, the Bank of America writs should be quashed immediately. The Iranian Assets Control Regulations, 31 C.F.R. Part 535, as well as the Vienna Conventions on Diplomatic and Consular Relations, the Foreign Sovereign Immunities Act, and the Foreign Missions Act, make the accounts immune from attachment. As discussed below, important foreign policy interests of the United States lie behind the blocking of Iranian assets and preservation of those assets free from encumbrances and attachments. Plaintiffs' interests as private litigants cannot take precedence over the United States' national security and foreign policy interests.

BACKGROUND

As recounted in the United States' Memorandum in support of its motion to quash plaintiffs' Foreign Military Sales writs (filed June 27, 2000), on August 27, 1998, this Court entered judgments for plaintiffs against Iran for a total of $65,000,000 for compensatory damages arising out of terrorists' kidnapping,

---

[3]     Plaintiffs and the United States stipulated to extend the deadline for plaintiffs' response to the United States' motion to quash the Foreign Military Sales writs until July 28, 2000. Plaintiffs subsequently moved, unopposed, to extend the deadline further until September 5, 2000.

imprisonment, and torture of plaintiffs David Jacobsen, Frank

Reed, and Joseph Cicippio in Lebanon.  See Cicippio, et al. v.

Islamic Republic of Iran, 18 F. Supp. 2d 62, 64, 70 (D.D.C.

1998).[4]  Jurisdiction for the judgment, which was entered after

defendants were declared in default, is predicated upon 28 U.S.C.

§ 1605(a)(7).  Id. at 67.

On June 5, 2000, the Clerk of the Court issued five writs of

attachment, one for each plaintiff, purporting to attach "any

money, property or credits" of defendants, including specifically

(1) "Bank of America account number 3910000120887, entitled

'Blocked Iranian Diplomatic and Consular Property Renovation

Account c/o Blocked Assets Administration, U.S. Department of

Treasury,'" and (2) "'U.S. Department of State, Office of Foreign

Missions, Iranian Renovation Account,' Bank of America Acount No.

2086355542. "  See Attachment B hereto.  These writs were then

delivered to the Bank of America on or about July 18, 2000.

These same two bank accounts previously were subject to

writs of attachment served by the plaintiff in Flatow v. Islamic

Republic of Iran, et al., CV 97-396 (RCL) (D.D.C.) on then-

NationsBank.  The Court in Flatow granted the United States'

motion to quash these writs, as well as writs purporting to

---

[4]      The judgments against Iran were entered as follows:
David Jacobsen, $9,000,000; Frank Reed, $16,000,000; Joseph
Cicippio, $20,000,000; Elham Cicippio, $10,000,000; and Fifi
Delati-Reed, $10,000,000.

attach three parcels of real estate owned by Iran, finding that "the properties and accounts are immune from attachment under the Foreign Sovereign Immunities Act." Flatow, 76 F. Supp. 2d at 18.[5] Accordingly, Bank of America, in responding to the writs delivered by the instant plaintiffs, informed plaintiffs that the bank accounts in issue were not subject to attachment. See Answers To Interrogatories In Attachment (Attachment A).[6]

The two identified bank accounts are assets that are blocked pursuant to Executive Order 12170 and its implementing regulations, the Iranian Assets Control Regulations ("IACR"), see 31 C.F.R. § 535.201. Declaration of R. Richard Newcomb, Director of the Office of Foreign Asset Control ("Newcomb Decl."), ¶ 7 (Attachment C herein). The President issued Executive Order 12170 on November 14, 1979, in response to the taking of the U.S.

---

[5]     With respect to the first of the two accounts, account #39910000120887, the Court in Flatow found that this account was "properly characterized as United States property, which is immune from attachment by virtue of sovereign immunity." Flatow, 76 F. Supp. 2d at 24. Bank of America, in its answers to plaintiffs' interrogatories, specifically referred to the Court's reasoning in Flatow in contending that the first account is not subject to attachment. Attachment A. The United States, as discussed below, agrees that the first account is not subject to attachment, but for reasons other than those found by the Court and advanced by Bank of America. See infra Part III.

[6]     The two bank accounts also are subject to writs of attachment served on Bank of America by plaintiffs in Anderson, et al. v. Islamic Republic of Iran, et al., Civ. No. 99-698 (TPJ), on April 21, 2000. The United States' motion to quash the Bank of America writs in Anderson, filed on July 7, 2000, is still pending.

embassy and hostages in Tehran. Id., ¶ 4; Declaration of David
Carpenter, Assistant Secretary of State for Diplomatic Security
and Director of the Office of Foreign Missions ("Carpenter
Decl."), ¶ 4 (Attachment D herein). Under the Executive Order
and the Regulations, all Iranian government property, including
bank accounts, which were or came within the possession of
persons subject to the jurisdiction of the United States between
November 14, 1979, and January 19, 1981, were blocked, or frozen,
except pursuant to any authorization or license issued by the
Office of Foreign Assets Control ("OFAC"). See 31 C.F.R. §
535.201, .208, .579(a)(1); Newcomb Decl. ¶ 5. Following the
severance of diplomatic relations between the United States and
Iran in 1980, the U.S. Department of the Treasury authorized the
transfer of funds from certain of these blocked Iranian accounts
to an account set up at American Security Bank (Account No. 20-
863-5-542, or the "Second Account"), which was also a blocked
account. Newcomb Decl. ¶ 8; Carpenter Decl. ¶¶ 9-11.

The State Department established the Second Account in
furtherance of the United States' treaty obligations under the
Vienna Conventions on Diplomatic and Consular Relations to
protect Iranian diplomatic and consular real property in the
United States, which came into the State Department's custody in
1980. See Carpenter Decl. ¶¶ 7, 9-11. The State Department had
determined that the United States' obligation to protect the real

property could best be discharged by leasing the properties to
generate a source of funds to pay for continued repair and
maintenance of the properties.  Id. ¶ 9.  Initial repairs,
however, would be funded from certain existing Iranian
diplomatic, consular, and other official government accounts,
rather than from U.S. taxpayer funds.  Id.  Accordingly, after
establishing the Second Account, the State Department was
licensed to use the funds gathered therein "solely to pay
appropriate charges and expenses associated with the
preservation, renovation, and operation of properties owned by
the Government of Iran . . . and located in the United States."
Id., ¶ 11 & Exh. 4.; Newcomb Decl. ¶ 9.  Arrangements were to be
made by the State Department and the Treasury Department's OFAC
for eventual payback of the funds from any funds generated by
lease or other appropriate use of the property.  Carpenter Decl.
¶ 11 & Exh. 4.

As a condition of the latter license, the State Department
was required to deposit all income generated by lease or other
appropriate use of the real estate back into the Second Account.
Id.; Newcomb Decl. ¶ 10.  The license provided that all such
income constitutes blocked property under the Iranian Assets
Control Regulations.  Carpenter Decl. ¶ 11 & Exh. 4; Newcomb
Decl. ¶ 10.  Any money in the Second Account not required for
"immediate disbursal" was to be kept in an interest-bearing

-7-

account or certificate of deposit.  Exh. 4 to Carpenter Decl.  In
addition, on a yearly basis, funds from rental proceeds, held in
the Second Account, that exceeded the anticipated maintenance
costs for the custodial properties were to be transferred to
another American Security Bank account (account number
39910000120887, or "First Account").  Carpenter Decl. ¶ 14;
Newcomb Decl. ¶ 10.  The First Account is a blocked account.
Newcomb Decl. ¶¶ 7, 10.

The funds originally transferred into the Second Account
came from diplomatic and consular accounts of the Government of
Iran, and also from two accounts held in the name of the National
Iranian Navy.  Newcomb Decl. ¶ 8.  In February 1996, the Navy
funds were transferred from the First Account in settlement of
claims to those funds by Iran against the United States.  Id., ¶
11.  At present, therefore, both the First and Second Accounts
contain only funds that originated from diplomatic or consular
accounts or that have been generated from the lease of diplomatic
or consular property.

To preserve the value of the blocked diplomatic and consular
real property, the State Department made any necessary repairs
and renovations of the Iranian real property in its custody (as
listed in Exhibit 5 to the Carpenter Declaration) except for one
property.  Carpenter Decl. ¶ 12.  The building on the latter
property was determined to be unsalvageable and was demolished.

-8-

Id.  The renovated properties were then leased out and subsequent
rental proceeds deposited back into the Second Account.  Id. ¶
13.  Except for temporary interruptions between tenants, the
renovated properties have been leased since December 1985.  Id.
On a yearly basis, transfers of funds have been made from the
Second Account to the First Account.  Id. ¶ 14; Newcomb Decl. ¶
10.  When American Security Bank was acquired by NationsBank and
NationsBank was acquired by Bank of America, the First and Second
Accounts were automatically transferred to each successive bank
(retaining the same account numbers).  Carpenter Decl. ¶ 15.

ARGUMENT

     The bank accounts at issue cannot be attached because they
are blocked pursuant to the IACR, which expressly prohibit
attachment of blocked funds.  31 C.F.R. § 535.203(e).  In
addition, because the funds in the bank accounts are diplomatic
and consular funds and funds derived from the lease of Iran's
diplomatic and consular property, attachment would be
inconsistent with the United States' obligations under the Vienna
Conventions to protect diplomatic and consular property.  These
obligations remain even where diplomatic relations between two
countries have been severed.  Third, again because the original
funds in the bank accounts are diplomatic and consular funds,
there is no applicable exception under the Foreign Sovereign
Immunities Act ("FSIA") that would authorize overriding the usual

immunity from attachment granted to a foreign government's

noncommercial assets.  See 28 U.S.C. §§ 1609, 1610.  Lastly, with

regard to the account in the custody of the Office of Foreign

Missions ("OFM"), i.e., the Second Account, attachment is

prohibited by the terms of the Foreign Mission Act.  See 22

U.S.C. § 4308(f).

All of these prohibitions remain in place even after the
1998 amendment to the FSIA purporting to allow attachment of,
inter alia, blocked property, since the President signed a waiver
of the provisions of the amendment on October 21, 1998.  See
Attachments E - G.

I.   The Bank Accounts Are Blocked Accounts Exempt From
     Attachment Under The Iranian Assets Control Regulations

The bank accounts at issue in this case were and remain

blocked by Executive Order 12170, 44 Fed. Reg. 65729 (1979)

issued pursuant to the International Emergency Powers Act

("IEEPA"), 50 U.S.C. §§ 1701 et seq.  Newcomb Decl. ¶ 5; 31

C.F.R. § 535.201.  With regard to attachment of blocked property,

the regulations issued pursuant to the executive order state that

> [u]nless licensed or authorized pursuant to this part
> any attachment, judgment, decree, lien, execution,
> garnishment, or other judicial process is null and void
> with respect to any property in which on or since the
> effective date there existed an interest of Iran.

31 C.F.R. § 535.203(e) (emphasis added).  This language

unequivocally voids the writs of attachment at issue here.  More

generally, the executive order and regulations prohibit any

dealing in blocked property of the Government of Iran unless

authorized by the Treasury Department.  31 C.F.R. § 535.201.

Although the Court need go no further than the plain language of the executive order and regulations before voiding the writs of attachment, it should be noted that giving force to these prohibitions avoids improper infringement on or interference with the President's powers in the area of foreign policy.  As the Supreme Court has recognized, blocking is an important foreign policy tool that provides a critical "'bargaining chip' to be used . . . when dealing with a hostile country."  Dames & Moore v. Regan, 453 U.S. 654, 673 (1981).  As explained by the Supreme Court in that case:

> This Court has previously recognized that the congressional purpose in authorizing blocking orders is 'to put control of foreign assets in the hands of  the President . . . .'  Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency.

Id.  The Court went on to uphold a Presidential order nullifying previously authorized prejudgment attachment on blocked Iranian property, writing that

> it is difficult to accept petitioner's argument  [that the President did not have such power]  because the practical effect of it is to allow individual claimants throughout the country to minimize or wholly eliminate this 'bargaining chip' through attachments, garnishments, or similar encumbrances on property. Neither the purpose the statute was enacted to serve nor its plain language supports such a result.

Id. at 673-74; cf. Crosby v. National Foreign Trade Council, 120 S. Ct. 2288, 2296 (2000) (state law that resulted in "less economic and diplomatic leverage" of President was pre-empted by

federal law) (citing Dames, 453 U.S. at 673).

The Supreme Court's admonition is particularly pertinent to the current circumstances. The United States originally blocked all property in which the Government of Iran had an interest in response to the 1979 hostage crisis. See Executive Order 12170. The controversy between Iran and the United States over their respective diplomatic and consular properties has not been resolved and is now the subject of a claim brought by Iran before the Iran-United States Claims Tribunal. Carpenter Decl. ¶ 17. Continued blocking of Iran's property, including the bank accounts, by the United States is important to preserving the United States' position and its rights with regard to its own diplomatic and consular property in Iran.[7]  Id.  Moreover, given

---

[7] As Mr. Carpenter discusses in his declaration (¶ 18), the United States' management of the Iranian diplomatic and consular property in the present case is consistent with its management of Vietnamese property under similar circumstances. As in the present case, the United States blocked and took custody of Vietnamese diplomatic and consular real property and accounts, renovated and rented out the real properties, and deposited the rental proceeds back into blocked accounts. Id. These assets were faithfully maintained by the United States for over 20 years. Eventually, a global agreement was reached with Vietnam involving both the real properties and the accounts. Id. As Mr. Carpenter states, the excellent condition in which the United States had maintained the Vietnamese property provided leverage for obtaining an advantageous settlement for the United States, and funds in the blocked accounts that the United States had been maintaining were used by Vietnam to compensate the United States for property it was unable to return. Id. Such an advantageous settlement would probably not have been reached if the accounts had been encumbered or reduced to pay off unrelated court judgments.

that the dispute between these two sovereign countries is before

an international tribunal, involvement by this Court in effecting

a seizure or attachment of any of the property at issue would be

particularly inappropriate.  See Adams v. Vance, 570 F. 2d. 950,

955 (D.C. Cir. 1978)  (courts must be wary of intruding into

foreign affairs to, among other things, "'. . . avoid fixing of

our government's course' by premature interposition")  (quoting

Nielsen v. Secretary of Treasury,  424 F.2d 833, 855 (D.C. Cir.

1970)).  For these reasons, this Court should enforce 31 C.F.R. §

535.203(e) and quash the writs of attachment delivered to Bank of

America.

II.  Attachment Would Be Contrary To The Principles Of The Vienna
     Conventions Regarding Treatment Of Diplomatic And Consular
     Property

     Attachment of the bank accounts in issue, in addition to

being foreclosed by Executive Order 12170, would be contrary to

U.S. obligations to protect and respect diplomatic and consular

property pursuant to the Vienna Conventions on Diplomatic and

Consular Relations.  Article 45(a) of the Vienna Convention on

Diplomatic Relations provides that, "[i]f diplomatic relations

are broken off between two States . . . (a) the receiving State

must, even in the case of armed conflict, respect and protect the

premises of the mission, together with its property and

archives."  T.I.A.S. 7502, 23 U.S.T. 3227 (1961).  Article 27 of

the Vienna Convention on Consular Relations contains the same

obligation with respect to consular premises and property.
T.I.A.S. 6820, 21 U.S.T. 77 (1967).

Thus, the United States has an international legal
obligation under the Vienna Conventions to protect foreign
missions, consular premises, and their property in the United
States in the event that diplomatic relations between the United
States and a foreign country, such as Iran, are severed.   The
International Court of Justice has described the obligations
codified by these treaties as "vital for the security and well-
being of the complex international community" and held that
"scrupulous[]" respect for these obligations is "essential" to
the ordered progress of international relations.   Case Concerning
U.S. Diplomatic and Consular Staff in Tehran (Judgment), 1980
I.C.J. 3, 43.   Additionally, the President explained in the
context of signing the 1999 appropriations bill which amended the
Foreign Sovereign Immunity Act, see infra at Part V, that
attachment and execution against foreign diplomatic and consular
property "would place the United States in breach of its
international treaty obligations" and "would put at risk the
protection we enjoy at every embassy and consulate throughout the
world by eroding the principle that diplomatic property must be
protected regardless of bilateral relations."   Statement by the
President on Omnibus Appropriations Act, at 7-8 (Oct. 24, 1998)
("Statement by President"), reprinted at 1998 WL 743759.

-14-

Certainly, the "property" which the United States has an interest in protecting pursuant to the Vienna Conventions includes the diplomatic and consular funds left behind by Iran upon the severance of relations between the two countries, and funds from the lease of Iran's diplomatic and consular real properties.  See Carpenter Decl. ¶ 16.  Accordingly, under the Vienna Conventions, the funds are immune from attachment to satisfy a civil judgment.  See Liberian Eastern Timber Corp. v. Government of the Rep. of Liberia, 659 F. Supp. 606, 608 (D.D.C. 1987) ("LETCO") (Article 25 of the Vienna Convention on Diplomatic Relations prohibits attachment of embassy bank account); Foxworth v. Permanent Mission of the Rep. of Uganda to the United Nations, 796 F. Supp. 761, 763 (S.D.N.Y. 1992) (attachment of bank account of Uganda's permanent mission to United Nations would conflict with U.S. obligations under Vienna Convention on Diplomatic Relations).  The funds are immune from attachment for the additional reason that, in the instant case, the United States uses the funds to meet its obligations under the Vienna Conventions to protect the diplomatic and consular real estate that is also now in the United States' custody.

In addition to interfering with the United States' ability to comply with its obligations under the Conventions, attachment of the bank accounts would impair the United States' ability to obtain reciprocal compliance from Iran.  The United States

continues to block the Iranian property at issue so as to be able to use the property as a "bargaining chip" in negotiations with Iran, including negotiations over U.S. diplomatic and consular property in Iran. Carpenter Decl. ¶¶ 16-17. Allowing attachment of this property will interfere with the United States' ability to negotiate on this issue.

The obligations of the Vienna Conventions cannot be construed narrowly because, in the final analysis, international legal obligations are observed on the basis of reciprocity. In the present circumstances, the United States has an interest in protecting the diplomatic and consular property pursuant to the Vienna Conventions, and, as found by the President, see infra, it is in the national security interest of the United States to protect such property from attachment and execution. The Court should respect these determinations.[8]

III. The Bank Accounts Are Exempt From Attachment Under The Foreign Sovereign Immunities Act

The FSIA, in conjunction with a Presidential waiver of certain of its provisions as authorized by the 1999 appropriations bill, see infra Part V, also prohibits attachment of the Bank of America accounts. Under the FSIA, the property of

---

[8]    With regard to the proper interpretation of the Vienna Conventions, the United States notes that, in construing treaties, the courts must give great weight to the interpretation given the treaty by the Executive Branch. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961).

a foreign state in the United States is immune from attachment or execution, unless otherwise provided by one of the statute's enumerated exceptions. 28 U.S.C. § 1609; Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d 16, 20 (D.D.C. 1999). Here – in the light of the President's decision to waive the provisions of 28 U.S.C. § 1610(f)(1)(A), see infra Part V – the FSIA does not provide an exception allowing attachment or execution of the bank accounts; the accounts are therefore immune from attachment under the statute.

The exception contained in 28 U.S.C. § 1610(a)(7) does not allow attachment of the bank accounts in issue. Section 1610(a)(7) states, "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune  from attachment . . . if . . . the judgment relates to a claim for which the foreign state is not immune under [28 U.S.C. § 1605(a)(7)]." Assuming disputed property actually belongs to a "foreign state," as the United States has argued,[9] it is the foreign state's own activities, not

---

[9]    In Flatow, the court disagreed with the United States' characterization of the First Account as Iranian property which was "blocked" and regulated by the Iranian Assets Control Regulations. Flatow, 76 F. Supp. 2d at 24. Rather, the court found that the "First Account is more properly characterized as United States property, which is immune from attachment by virtue of the doctrine of sovereign immunity." Id. (citing Buchanan v. Alexander, 45 U.S. (4 How.) 20, 21 (1846), and other cases); supra note 6. Accordingly, the court did not reach the issue of whether the FSIA provided for attachment of the First Account.

those of the United States, that determine whether particular property is "used for a commercial activity" within the meaning of section 1610(a). As the Supreme Court stated in discussing the waiver of jurisdictional immunity in the FSIA in <u>Republic of Argentina v. Weltover</u>, 504 U.S. 607, 614 (1992), actions are "commercial" within the meaning of the FSIA "when <u>a foreign government acts</u>, not as a regulator of a market, but in the manner of a private player within it" (emphasis added). "The issue is whether the particular actions that <u>the foreign state performs</u> . . . are the type of actions by which a private party engages in 'trade and traffic or commerce[.]'" <u>Id.</u> (emphasis added). Although the Court was not addressing the precise issue involved here, this language suggests that it would hold that only the actions of the foreign state itself could operate to waive immunity. This interpretation comports with the rationale behind the FSIA's exceptions to jurisdictional immunity and attachment and execution immunity – a foreign state should be found to have waived these immunities only when <u>it</u> has taken some action outside the realm of sovereign actions and itself acts as a private party.

The operative inquiry in the instant case, therefore, is not whether the United States used the accounts at issue for a commercial activity, but whether the original funds were used by <u>Iran</u> for commercial activities. The original Iranian accounts

-18-

from which the funds still in the Bank of America account were transferred were diplomatic and consular accounts.[10]  Newcomb Decl. ¶¶ 8, 11.  Such diplomatic and/or consular accounts are in general immune from attachment under the FSIA.  See LETCO, 659 F. Supp. at 610 (holding that the fact that the embassy account was used for some "incidental" or "auxiliary commercial purposes did not cause the entire account "to lose its mantle of sovereign immunity") (refusing to follow Birch Shipping Corp. v. Embassy of the United Rep. of Tanzania, 507 F. Supp. 311 (D.D.C. 1980)); but see Birch Shipping Corp., 507 F. Supp. at 512.[11]  Because Iran did not use the original funds which are now located in the bank accounts for a commercial activity, the FSIA forbids attachment of these accounts.[12]

---

[10]    Any funds relating the National Iranian Navy accounts were withdrawn pursuant to settlement agreement in February 1996.  Newcomb Decl. ¶ 11.

[11]    Birch may be distinguished from LETCO and from the present case because, in Birch, the embassy admitted that the embassy account was used solely to pay salaries and "incidental purchases and services."  507 F. Supp. at 312.

[12]    The United States has never acted as an agent for Iran with respect to the real properties for which the bank accounts were established.  Indeed, Iran objected to the leases of the real properties and sought to have them terminated in the Iran-U.S. Claims Tribunal.  In denying Iran's request, the Tribunal noted the United States' position that Iran's diplomatic and consular property had been leased at various periods since 1983, "in order to prevent their falling into an irreversible state of disrepair."  See Islamic Republic of Iran v. United States, Case Nos. A4/A7/A5 (I:F and III); Dec. 129-A4/A7/A15-FT, at 1-2 (June 23, 1997, Iran-United States Claims Tribunal) (Attachment H hereto).

Even were the activities of the United States relevant for purposes of determining whether the "commercial activity" exception contained in section 1610(a)(7) was met, the exception still would not apply to the bank accounts in issue.  As the District Court recently found in the Flatow case with respect to the Second Account, this account was licensed by the Treasury Department to the State Department's OFM for the payment of maintenance and repair expenses relating to diplomatic properties of the Government of Iran.  See infra at Part IV.  The United States' use of the funds in the Second Account to preserve and protect diplomatic properties, pursuant to the United States' responsibilities under the Foreign Missions Act, "is more properly characterized as sovereign than commercial."  Flatow, 76 F. Supp. 2d at 24.

Moreover, construing the FSIA's "commercial activity" attachment exception to apply to the bank accounts would make little sense as a matter of statutory construction, in light of Congress's provision for potential attachment of these accounts under 28 U.S.C. § 1610(f)(1)(A).  As discussed below, because the accounts are regulated pursuant to the IEEPA, Executive Order 12170, and the IACR, section 1610(f)(1)(A) contemplates that the accounts may be subject to attachment, absent Presidential waiver of the requirements of this provision.  Infra at Part V.  Thus, if the President decided not to exercise his authority to waive

the requirements of section § 1610(f)(1)(A) – a situation which
does not present itself in the instant case[13] – a construction of
section 1610(a)(7) that "permit[s] the attachment of blocked
Iranian accounts . . . would render Section 1610(f)(1)(A)
superfluous." Flatow, 76 F. Supp. 2d at 24.  As the Flatow court
noted, it is "unlikely that Congress enacted two separate
provisions of the same statute in order to achieve the same
result.  That is, if blocked accounts were already subject to
attachment under Section 1610(7), Congress would have had no need
to enact an entirely new provision, Section 1610(f)(1)(A), to
authorize the attachment of these very same funds." Id.

    In sum, the accounts at issue include diplomatic and
consular funds, plus the rental proceeds from the lease by the
United States of the diplomatic and consular real properties,
generated to provide additional funds for maintenance and upkeep
on the real properties in furtherance of the United States'
international obligations to protect the property.  In these
circumstances, the funds have not been used by Iran for a
commercial purpose, and are immune from attachment under the
FSIA.

_____

    [13]    On the same day that the President signed Public Law
No. 105-277, which amended the FSIA to include, inter alia, the
provision found at 28 U.S.C. § 1610(f)(1)(A), he also signed a
waiver pursuant to the authority conferred on him by the amending
section.  Accordingly, the requirements of § 1610(f)(1)(A) are
currently inoperative due to Presidential waiver.  Infra at Part
V.

IV.   The Foreign Missions Act Explicitly Prohibits Attachment Of
      The Second Account Because It Constitutes Property Being
      Held By The Office Of Foreign Missions For The Use Of A
      Foreign Mission

      Finally, the "Second" Bank of America Account is also
subject to the prohibition against attachment of property held by
OFM set out in the Foreign Missions Act, 22 U.S.C. §§ 4301, et
seq.  Section 4305(c) of the Foreign Missions Act authorized OFM
to "protect and preserve any property of [a] foreign mission" if
that mission has ceased conducting diplomatic, consular and other
governmental activities and has not designated a protecting power
(or other agent) approved by the Secretary to be responsible for
the property of that foreign mission.  22 U.S.C. § 4305(c).  OFM
has control over Iran's diplomatic and consular property,
including the funds in the Second Account, according to this
provision.  Carpenter Decl. ¶¶ 4, 14, 15.  Another provision of
the Foreign Missions Act, section 4308(f), prohibits the
attachment of or execution upon such mission property being held
by the Department of State.  Specifically, 22 U.S.C. § 4308(f)
provides that

      [a]ssets of or under the control of the Department of
      State, wherever situated, which are used by or held for
      the use of a foreign mission shall not be subject to
      attachment, execution, injunction, or similar process,
      whether intermediate or final.

(emphasis added).  The funds at issue are solely funds of the

Iranian mission being held by the United States as a response to

Iran's breach of its obligations under Vienna Conventions.  The

sole use of the funds made by the United States is to preserve

and maintain other mission property.  For these reasons, the

funds fall within the exception of section 4308(f) and are immune

from attachment.

V.    The 1998 Amendment To The Foreign Sovereign Immunities Act

      Allowing Attachment of Blocked Property In Certain

      Circumstances Is Inapplicable Here Because The President Has

Waived The Effect Of The Amendment.

The Omnibus Appropriations Bill for Fiscal Year 1999 (Public Law No. 105-277), signed by the President on October 21, 1998, supra at Parts II & III, contains, among other things, the appropriations for the Treasury Department.   A provision of this enactment amends the FSIA to provide that certain property, including property blocked pursuant to IEEPA, may now be subject to attachment.   Pub. L. No. 105-277, § 101(h), Title I, § 117 ("Section 117") (Attachment E hereto, at 1199-1201).   In pertinent part, Section 117 provides that,

> [n]otwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. § 4308(f), . . . any property with respect to which financial transactions are prohibited or regulated pursuant to . . . sections 202 and 203 of [IEEPA] . . . shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state . . . claiming such property is not immune under [28 U.S.C. §] 1605(a)(7).

See Attachment E, at 1199; see also 28 U.S.C. § 1610(f)(1)(A). This new provision would, absent other action, allow attachment of certain property, including property blocked pursuant to IEEPA and/or held by the State Department's OFM pursuant to 22 U.S.C. § 4305(c), in cases where a foreign state has been found liable for certain terrorist actions.

In a signing statement addressing the entire 1999 appropriations bill, the President explained that, by allowing attachment and execution against foreign diplomatic and consular

-23-

property,

> section 117 would place the United States in breach of
> its international treaty obligations.  It would put at
> risk the protection we enjoy at every embassy and
> consulate throughout the world by eroding the principle
> that diplomatic property must be protected regardless
> of bilateral relations.  Absent my authority to waive
> section 117's attachment provision, it would also
> effectively eliminate use of blocked assets of
> terrorist states in the national security interests of
> the United States, including denying an important
> source of leverage.  In addition, section 117 could
> seriously affect our ability to enter into global
> claims settlements that are fair to all U.S. claimants,
> and could result in U.S. taxpayer liability in the
> event of a contrary claims tribunal judgment.

Statement by President, at 7-8, reprinted at 1998 WL 743759.

For these reasons, on the same day he signed Section 117

into law, the President executed a waiver of the requirements of

Section 117 pursuant to express congressional authority.  See

Flatow, 76 F. Supp. 2d at 25-27 (holding that Section 117 did not

allow attachment of same Bank of America accounts).  Subsection

(d) of Section 117 provides that "[t]he President may waive the

requirements of this section in the interest of national

security."  See Attachment E, at 1201.  The President's waiver

pursuant to Section 117(d) stated that allowing attachment and

execution on certain property of terrorist-list states, including

property blocked pursuant to IEEPA, "would impede the ability of

the President to conduct foreign policy in the interest of

national security and would, in particular, impede the

effectiveness of such prohibitions and regulations upon financial

transactions."  Attachment F; see also Statement by the Press
Secretary (Oct. 21, 1998) (Attachment G hereto).  The President's
waiver applies to all of the substantive provisions of Section
117, Attachment F; Flatow, 76 F. Supp. 2d at 26, and is not
subject to judicial review, see Dalton v. Specter, 511 U.S. 462,
476 (1994) ("How the President chooses to exercise the discretion
Congress has granted him is not a matter for [judicial]
review.").

     Any argument that the President's waiver under Section 117
should be narrowly construed and, therefore, does not apply to
the substantive provisions contained in Section 117(a) (codified
at 28 U.S.C. § 1610(f)(1)(A)), must be rejected, because Congress
has provided no clear statement that it intended to circumscribe
the President's traditionally broad power over the nation's
foreign relations.  Pursuant to IEEPA and his general authority
over foreign relations, the President has considerable discretion
to order the blocking of foreign assets.  See generally,
Palestine Information Office v. Schultz, 853 F.2d 932, 937 (D.C.
Cir. 1988) ("'[m]atters relating "to the conduct of foreign
relations . . . are so exclusively entrusted to the political
branches of government as to be largely immune from judicial
inquiry or interference"'") (quoting Regan v. Wald, 468 U.S. 222,
242 (1984)).  As in any area in which the Constitution's
separation of powers establishes a particular balance of power

-25-

between the Executive and Legislative Branches, Congress must enact a particularly clear statement when it seeks to alter that delicate balance.  See Armstrong v. Bush, 924 F.2d 282, 289 (D.C. Cir. 1991) ("When Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear.").  Here, in enacting Section 117, Congress provided no affirmative evidence of intent to restrain the President's foreign affairs powers, specifically the President's authority to establish and maintain blocking programs.  On the contrary, the presence of the waiver provision reflects Congress's recognition of the need for Executive flexibility over the conduct of foreign relations and the protection of national security.  In the absence of a clear textual statement to the contrary, any ambiguity in the statute's language should be construed in favor of Executive power over foreign relations and national security.

For all of these reasons, the Court should decline to act contrary to the will of the President in this area.

CONCLUSION

For the foregoing reasons, the two identified accounts at Bank of America are immune from attachment and execution and the Court should quash the writs of attachment delivered to Bank of America.

Respectfully Submitted,

DAVID W. OGDEN
Acting Assistant Attorney General

WILMA A. LEWIS
United States Attorney

THOMAS J. PERRELLI
Deputy Assistant Attorney General


VINCENT M. GARVEY
DAVID S. MENDEL
Attorneys, Department of Justice
Civil Division
901 E Street, N.W.,  Rm 866
Washington, D.C.  20530
Tel:  (202) 514-5079
Fax:  (202) 616-8460
Attorneys for the United States

Dated: August 16, 2000