# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

JENNY RUBIN, et al.,

    Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

    Defendants.

Case No. 03-cv-9370

Judge Blanche M. Manning

FILED JUL 28 2004
Judge Blanche M. Manning
United States District Court

DOCKETED AUG 0 3 2004

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States of America files this Statement of Interest, pursuant to 28 U.S.C. § 517,[1] in order to advise the Court of its views as to whether plaintiffs may seek to execute against the judgment rendered in their favor against the Government of Iran in <u>Jenny Rubin, et al. v. Islamic Republic of Iran, et al.</u>, Civil Action No. 01-1655 (D.D.C.) (RMU), by attaching or otherwise restraining the transfer of certain ancient Persian artifacts held by the University of Chicago's Institute for Oriental Studies for purposes of academic research and study.

The United States deplores the acts of terrorism that gave rise to the injuries suffered by the <u>Rubin</u> plaintiffs and has deep sympathy for their suffering. However, the government also has a significant interest in ensuring that laws and regulations related to foreign economic sanctions are properly construed by the courts, since this may have a far-reaching impact not only on how sanctions programs are administered but, more broadly, on the conduct of the foreign relations of the United States. Moreover, as explained in the attached declaration of Mark Clodfelter, Assistant Legal Adviser for International Claims and Investment Disputes, U.S. Department of

---

[1] 28 U.S.C. § 517 authorizes the Attorney General to attend to the interests of the United States in any proceeding in which the United States is not a party. The submission of a Statement of Interest does not constitute an intervention in this action but is the equivalent of an amicus curiae brief. See <u>Flatow v. Islamic Republic of Iran</u>, 305 F.3d 1249, 1252-53 & n.5 (D.C. Cir. 2002).



State ("Clodefelter Decl."), attached as Ex. A, one of the collections of artifacts subject to plaintiffs' restraining notice is also the subject of a claim by Iran against the United States in proceedings before the Iran-U.S. Claims Tribunal, and thus, the United States has a significant interest in ensuring its proper disposition. For these reasons, the United States sets forth here what it believes to be the correct explanation of the scope of Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, Title II, § 201, 116 Stat. 2322 (Nov. 26, 2002), and the attachment provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610, as they relate to the artifacts at issue in these proceedings.[2]

Specifically at issue is whether the ancient Persian artifacts held by the University of Chicago are subject to attachment or execution in plaintiffs' attempt to satisfy their judgment against Iran. Assuming that the artifacts are property belonging to the Government of Iran or to an agency or instrumentality of Iran,[3] as set forth below, they are not "blocked assets," and thus are not subject to attachment under TRIA; nor are they subject to attachment under any other provision of law. Plaintiffs' Citation Notice against the University of Chicago, accordingly, should be dissolved, and the artifacts should be determined exempt from execution.

---

[2] For the Court's convenience, the text of TRIA is attached hereto as Ex. B.

[3] The University of Chicago explains that the National Museum of Iran and the Iranian Cultural and Heritage Organization own the reversionary interest in the artifacts once the University of Chicago has completed its research and study. See Affidavit of Matthew Stolper, appended to University of Chicago's Notice of Filing, dated June 16, 2004 ("Stolper Aff."), ¶ 9. The United States assumes herein, for purposes of argument only, that the National Museum of Iran and the Iranian Cultural and Heritage Organization are "agencies or instrumentalities" of Iran as those terms are to be interpreted under TRIA and the FSIA, but takes no position on their actual status or upon the standards that might apply to determining their status. Because as explained herein, the artifacts are not "blocked assets" under TRIA, and are not otherwise subject to attachment under the FSIA, the issue of whether these entities are properly considered "agencies or instrumentalities" under either of these statutory schemes need not be reached. Moreover, because the issues discussed herein are dispositive of plaintiffs' Citation Notice, the United States does not reach, and takes no position on, other issues that might have been briefed by the parties.

## BACKGROUND

1.  **Plaintiffs' Underlying Action Against Iran.**

Plaintiffs herein are the survivors of a terrorist attack orchestrated by Hamas in Jerusalem in 1997. Plaintiffs sued various defendants, including the Government of Iran, in United States District Court for the District of Columbia on July 31, 2001, alleging that Hamas was directly responsible for the attack, and that Iran was liable to plaintiffs for the attack because it provided material support to Hamas. Jurisdiction over plaintiffs' civil claims against Iran was based on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601 et seq., which provides the exclusive source of subject matter jurisdiction in federal courts over all civil actions against foreign states. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-35 (1989).[4] On March 6, 2002, the Clerk entered default against the Government of Iran, among others. On August 2, 2002, plaintiffs' case was consolidated for further proceedings with those of another group of plaintiffs making similar allegations arising out of the same incident. See Campuzano, et al. v. Islamic Republic of Iran, et al., Civil Action No. 00-2328 (RMU).

---

[4] In general, unless one of the FSIA's exceptions applies, foreign states enjoy immunity from the jurisdiction of the federal courts. See 28 U.S.C. § 1604. Section 1605(a) of the FSIA, as amended in 1996, sets forth one of these exceptions, and provides in pertinent part that a foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case

> ... in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support of resources ... for such an act ... engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency ...

See 28 U.S.C. § 1605(a)(7). This exception to the immunity of a foreign state under the FSIA applies where the claimant or victim is a national of the United States, and where the foreign state has been designated as a state sponsor of terrorism under applicable law. Id. § 1605(a)(7). Iran has been designated as a state sponsor of terrorism since 1984. See Determination Pursuant to Section 6(i) of the Export Administration Act of 1979 – Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

On September 10, 2003, the United States District Court for the District of Columbia entered final judgment in favor of these plaintiffs – as well as the plaintiffs in Campuzano – finding that plaintiffs had established "by the requisite 'evidence satisfactory to the court' and by clear and convincing evidence, the court's subject-matter jurisdiction and the liability of the defendants for plaintiffs' personal injuries. . . . " Findings of Fact and Conclusions of Law, entered in Campuzano, No. 00-2328, at 22 (attached as Ex. C). The Court awarded the Rubin plaintiffs, collectively, $71.5 million in compensatory damages, and an additional $37.5 million each in punitive damages. See Order and Judgment, attached as Ex. D. Although the compensatory damages judgments were awarded against all defendants, jointly and severally, the punitive damages judgments were not awarded against Iran.

Plaintiffs now seek to collect on their judgment by restraining the transfer of ancient Persian artifacts held by the University of Chicago's Oriental Institute, presumably on the theory that, whatever their present custodianship, these artifacts belong to the Government of Iran and thus may be executed against in satisfaction of their judgment. See Citation Notice, Ex. E. In support of this effort, plaintiffs rely specifically on Section 201 of TRIA and Section 1610 of the FSIA. See Amended Plaintiffs' Urgent Motion for Contempt Sanctions Against Citation Third Party Respondents, Docket No. 8, filed June 18, 2004, at 3.

2. **The Artifacts Held by the University of Chicago.**

According to the submissions filed by the parties, the artifacts held by the University of Chicago are comprised of two distinct collections: the Persepolis Fortification Texts and the Chogha Mish materials, both belonging to the National Museum of Iran ("Museum") and the Iranian Cultural Heritage Organization ("Organization"). See Affidavit of Raymond Tindal, appended to University of Chicago's Notice of Filing, dated June 16, 2004 ("Tindal Aff."), ¶ 3.

The Persepolis Texts were recovered by archeological excavations in 1933, and have been held by the University of Chicago on a long-term loan since their discovery. See Stolper Aff. ¶¶ 8-9; see also Protocol, dated January 5, 2004, attached as Ex. F. Portions of these Texts have been returned to Iran on three occasions: in 1948, in 1954, and most recently, in 2004. Id. ¶ 10. Apparently with the acquiescence of the Museum and the Organization, see Stolper Aff. ¶ 9; Protocol, Ex. F, additional materials from the Persepolis Texts collection remain in the custody of the University of Chicago and are subject to further study. The Chogha Mish artifacts were excavated at a different location in Iran in the early 1960's. See Clodfelter Decl., Ex. A, ¶ 4; Tindal Aff. ¶ 4. A portion of these artifacts were returned to Iran in 1970, but additional artifacts from this collection remain in the custody of the Oriental Institute. Clodfelter Decl. ¶ 5. Both collections of artifacts are held solely for scholarly research, and have not been made the subject of any commercial use or activity. Tindal Aff. ¶ 8; Stolper Aff. ¶ 16.

With respect to the second of these two collections, the Chogha Mish collection, Iran has filed a claim against the United States in the Iran-U.S. Claims Tribunal, alleging that the United States had breached its obligations to arrange for the return of Iranian property to Iran following the signing of the Algiers Accords which ended the Iranian Hostage Crisis in 1981. Clodfelter Decl. ¶¶ 4, 6. In 1990, the United States made clear that it was prepared to negotiate arrangements for the transfer of the remaining Chogha Mish artifacts. Id. ¶ 6. In 2001, Iran requested that the artifacts be transferred to the Hague – where the Iran-U.S. Claims Tribunal is located – and discussions between the United States and Iran regarding the details of the transfer are pending. Id.

## ARGUMENT

Plaintiffs' attempts to restrain, attach, or execute against the Persian artifacts held by the University of Chicago must be rejected because neither TRIA nor the FSIA – the two statutes upon which plaintiffs specifically rely – provide any authority for plaintiffs' Citation Notice. Specifically, the artifacts in question are not "blocked assets" as defined by TRIA, and therefore, are not available for attachment under that statute. Moreover, because the artifacts are held by the University of Chicago solely for purposes of research and study, and are not used by Iran for commercial activity in the United States, they are also not available for attachment under the FSIA. Because there is no other vehicle by which the property of a foreign sovereign might be attached or subjected to execution by a civil plaintiff, these artifacts should be found to be wholly exempt from the citation issued by plaintiffs.

## I. THE ARTIFACTS ARE NOT "BLOCKED ASSETS" OF IRAN.

The Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002), see Ex. B, addresses the attachment of foreign property in connection with judgments obtained under Section 1605(a)(7) of the FSIA against terrorists, terrorist organizations, and State sponsors of terrorism. Section 201(a) of TRIA authorizes the attachment of certain "blocked assets" as compensation for victims of terrorism as follows:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of title 28, United States Code, <u>the blocked assets of that terrorist party</u> (including the blocked assets of any agency or instrumentality of that terrorist party) <u>shall be subject to execution or attachment</u> in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA, Section 201(a) (emphases added). TRIA defines "blocked asset" as

(A) any asset <u>seized</u> or <u>frozen</u> by the United States under Section 5(b) of the

Trading with the Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702).

TRIA § 201(d)(2)(A) (emphases added). As described herein, the artifacts held by the University of Chicago do not constitute blocked assets as defined by TRIA. For this reason, plaintiffs find no support in TRIA for their attempt to restrain, attach, or otherwise execute against these artifacts.

The International Emergency Powers Act ("IEEPA") – referenced in TRIA's definition of "blocked assets" – is the principal statutory authority under which the President has imposed various sanctions programs against foreign states, including Iran. Since the passage of IEEPA in 1977, the President has had broad authority in times of declared national emergency to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit" (among other actions) a wide variety of interests and transactions concerning "any property in which any foreign country or national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B).

The first U.S. sanctions with respect to Iran were imposed under this statutory scheme on November 14, 1979, when, in response to Iran's seizure of the U.S. Embassy in Tehran and the taking hostage of 52 U.S. citizens, President Carter issued Executive Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979), attached as Ex.G, in which he declared a national emergency and ordered blocked all property of the Government of Iran.[5]

To implement Executive Order 12170 and subsequent Executive Orders involving Iranian interests in the United States,[6] the Office of Foreign Assets Control ("OFAC") of the U.S.

---

[5] Specifically, Executive Order 12170 states "I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran, which are or become subject to the jurisdiction of the United States or which are or come within the possession or control of persons subject to the jurisdiction of the United States.

[6] The President's blocking order freezing Iranian assets was followed by Executive Order 12205, which imposed additional specific prohibitions on trade and financial transactions. 45

-7-

Department of the Treasury – the component of the federal government responsible for implementing foreign sanctions programs – promulgated the Iranian Assets Control Regulations ("IACR"). 45 Fed. Reg. 24432 (Apr. 9, 1980), codified at 31 C.F.R. Part 535. The IACR states, in pertinent part, that "[no] property subject to the jurisdiction of the United States or which is in the possession or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized." 31 C.F.R. § 535.201.

On January 19, 1981, Iran and the United States resolved the hostage crisis with the signing of the Algiers Accords. See Declaration of the Government of the Democratic and Popular Republic of Algeria ("General Decl.") (available at the website for the Iran-U.S. Claims Tribunal, www.iusct.org), attached as Ex. H. Under the Algiers Accords, the United States agreed, inter alia, to "restore the financial position of Iran, insofar as possible, to that which existed prior to November 14, 1979," and further agreed "to commit itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction." General Decl. ¶ A; see also id. ¶ 9 (memorializing U.S. commitment to "arrange . . . for the transfer to Iran of all Iranian properties which are located in the United States. . . .").

For the purposes of implementing the commitments made in this agreement, the President issued several Executive Orders directing the marshaling and transfer of the majority of once-blocked assets to Iran and to escrow accounts to facilitate settlement of claims involving Iran under a claims settlement process provided for in the Algiers Accords. See, e.g., E.O. 12276, 46 Fed. Reg. 7913 (Jan. 19, 1981) ("Direction Relating to Establishment of Escrow Accounts"); E.O. 12277, 46 Fed. Reg. 7915 (Jan. 19, 1981) ("Direction to Transfer Iranian Government Assets");

---

Fed. Reg. 24099 (Apr. 7, 1980).

-8-

E.O. 12278, 46 Fed. Reg. 10895 (Jan. 19, 1981) ("Direction to Transfer Iranian Government Assets Overseas"); E.O. 12279, 46 Fed. Reg. 7919 (Jan. 19, 1981) ("Direction to Transfer Iranian Government Assets Held by Domestic Banks"); E.O. 12280, 46 Fed. Reg. 7921 (Jan. 19, 1981) ("Direction to Transfer Iranian Government Financial Assets Held by Non-Banking Institutions").

Included among these orders was Executive Order 12281, 46 Fed. Reg. 7923 (Jan. 19, 1981) (titled "Direction to Transfer Certain Iranian Government Assets"; referred to herein as "Transfer Directive"), attached as Ex. I. The Transfer Directive directs that

> All persons subject to the jurisdiction of the United States in possession or control of properties, not including funds or securities, owned by Iran or its agencies, instrumentalities, or controlled entities, are licensed, authorized, directed and compelled to transfer such properties, <u>as directed after the effective date of this Order by the Government of Iran</u>, acting through its authorized agent.

Id. (emphasis added). As a result of this order, and the implementing regulation issued by OFAC, 31 C.F.R. § 535.215, nearly all previously-blocked properties, including those at issue here, namely, the artifacts held by the University of Chicago's Oriental Institute, were no longer subject to blocking under the Iranian Assets Control Regulations, but instead could be transferred at any time upon the request of the Government of Iran.

United States persons who engage in certain transactions relating to Iranian properties located in the United States, however, remain subject to the Iranian Transactions Regulations ("ITR"), see 31 C.F.R. Part 560, which implement a number of Executive Orders which were promulgated years after the signing of the Algiers Accords and the lifting of most of the blocking prohibitions. See, e.g., Executive Order 13059, 62 Fed. Reg. 162 (Aug. 2, 1997). These Executive Orders and the ITR prohibit a wide range of commercial and financial transactions with Iran, including for example, the exportation of goods to Iran. See 31 C.F.R. § 560.204; see generally Weinstein v. Islamic Republic of Iran, 299 F. Supp. 2d 63, 68 (E.D.N.Y. 2004)

-9-

(appeal pending) (describing these Executive Orders and the Iranian Transactions Regulations). These restrictions – part of a trade embargo initiated in 1987 and significantly broadened in 1995 – do not result in the blocking of any assets, but instead are an exercise of the President's power under IEEPA to regulate transactions with foreign countries.

The effect of the Transfer Directive issued in 1981 to implement the Algiers Accords was to remove the artifacts at issue here from the scope of the Iranian blocking orders. See Weinstein, 299 F. Supp. 2d at 67 ("Pursuant to the Algiers Accords, most Iranian assets were unblocked."). Thus, these artifacts are no longer "blocked assets" as described in TRIA. To the contrary – unlike those assets that fall within TRIA's definition of blocked assets which are seized or frozen by the President's exercise of his IEEPA authority – the properties subject to the Transfer Directive are neither seized nor frozen. Rather, they are subject to being transferred to Iran, at any time, at the direction of the Iranian Government. Indeed, with respect to the Choga Mish collection, as described above, Iran has directed the return of the artifacts and the United States and Iran are actively engaged in discussions concerning the transfer of these artifacts in the course of resolving claims brought by Iran before the Iran-U.S. Claims Tribunal. See Clodfelter Decl. ¶¶ 4, 6. Similarly, Iran recently accepted the return of a portion of the Persepolis Texts collection, see Stolper Aff. ¶ 10.[7] Additional artifacts from the Persepolis Texts collection remain in the custody of the University of Chicago, pursuant to the continuing acquiescence and direction of Iran.

---

[7] Although OFAC issued a license on March 8, 2004, authorizing this transfer to take place, see Ex. J, the license evidences only that certain transactions, such as the exportation of goods to Iran, require authorization. See, e.g., 31 C.F.R. § 560.204. The issuance of the license does not suggest that the artifacts are blocked under the Iranian Assets Control Regulations, 31 C.F.R. Part 535. In fact, the license explicitly references 31 C.F.R. Part 560, the Iranian Transactions Regulations, not part 535, the regulations relating to the blocking regime. See id.; see also Weinstein, 299 F. Supp. 2d at 74 ("the Court rejects plaintiffs' argument . . . that the term "blocked assets" [within the meaning of TRIA] includes all assets "regulated" or "licensed" under IEEPA by OFAC").

See Stolper Aff. ¶ 9; Protocol, Ex. F.

Because these artifacts fall outside of TRIA's definition of blocked assets, they are not subject to attachment under that Act. Accordingly, to the extent plaintiffs rely upon TRIA to provide the legal authority for their citation, the artifacts should be determined to be exempt from attachment.

## II. THE ARTIFACTS ARE NOT SUBJECT TO ATTACHMENT UNDER THE FSIA.

Apart from TRIA, the Foreign Sovereign Immunities Act provides the exclusive source of subject matter jurisdiction in federal courts over all civil actions against foreign states, including efforts to seek to attach or execute against the assets of a foreign sovereign. See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-35 (1989); see also Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d 16, 20 (D.D.C. 1999) ("the property of a foreign state in the United States is immune from attachment or execution, unless an exception under [the FSIA] provides otherwise"). Two relevant provisions of the FSIA define the manner in which foreign state assets might be attached to satisfy a judgment entered against a foreign state under 28 U.S.C. § 1605(a)(7): Section 1610(a) and Section 1610(f). Neither of these provisions, however, provides these plaintiffs a vehicle through which to seek attachment of the artifacts at issue in these proceedings.

### A. Section 1610(a) Provides No Authority for Attachment of the Artifacts.

When the Foreign Sovereign Immunities Act was amended in 1996 to add Section 1605(a)(7) allowing civil suits to proceed against designated terrorist states for specified acts, the FSIA authorized execution against the property of foreign states only if it was "used for

-11-

commercial activity in the United States." 28 U.S.C. § 1610(a)(7).[8]

The artifacts at issue in these proceedings do not fall within the terms of this attachment provision. As attested to by officials from the University of Chicago, the artifacts at issue here have been maintained for decades in the custody of an academic institution solely for the purposes of scholarly research and study. See Tindel Aff. ¶ 8; Stolper Aff. ¶ 16; see also Protocol, Ex. F (describing University of Chicago's continued retention of the artifacts for the purpose of "study and research of the tablets"). They are not used by Iran for any commercial activity whatsoever. See Flatow, 76 F. Supp. 2d at 22 (for purposes of section 1610(a), "to determine whether a foreign state's actions are commercial, courts must examine 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the types of actions by which a private party engages in trade and traffic or commerce.'") (emphasis omitted) (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)). Thus, Section 1610(a) provides no support for plaintiffs' attempt to attach the artifacts.

B.  Section 1610(f) Provides No Authority for Attachment of the Artifacts.

In 1998, Congress amended the FSIA to allow for the collection of a judgment against a terrorist state under Section 1605(a)(7) by attachment of "any property with respect to which financial transactions are prohibited or regulated pursuant to," inter alia Section 5(b) of the

---

[8] In relevant part, this section provides as follows:
The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, <u>used for a commercial activity in the United States</u>, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if– . . . (7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.
28 U.S.C. § 1610 (emphasis added). "Foreign state," for purposes of this provision, is defined to include the state's political subdivisions and agencies or instrumentalities. See 28 U.S.C. § 1603(a).

Trading with the Enemy Act, 50 U.S.C. App. § 5(b), or Sections 202 and 203 of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, 1702. This provision was codified in the FSIA at 28 U.S.C. § 1610(f)(1)(A). At the same time, however, Congress authorized the President to waive the requirements of Section 1610(f)(1)(A), see 28 U.S.C. § 1610(f)(3), and the President immediately did so on the ground that this provision "would impede the ability of the President to conduct foreign policy in the interests of national security and would, in particular, impede the effectiveness of such prohibitions and regulations on financial transactions." See Presidential Determination No. 99-1, 63 Fed. Reg. 59201 (Oct. 21, 1998).[9] The effect of the President's waiver of Section 1610(f)(1)(A) was to bring the state of the law with respect to the attachment of property of foreign states under the FSIA back to the status quo ante, which as described in Part A, supra, provides no support for plaintiffs' attempt at attachment. See Flatow, 76 F. Supp. 2d at 27 (as a result of the President's waiver, "Section 1610(f)(1) is without operative effect and cannot authorize the attachment plaintiff seeks"). Thus, Section 1610(f) also provides no support for plaintiffs' attempt to attach the artifacts held by the University of Chicago.

## CONCLUSION

For the reasons stated herein, there is no source of law that authorizes plaintiffs' attempt to collect on their judgment against the Government of Iran by attaching or otherwise seeking to execute against the ancient Persian artifacts held by the University of Chicago. These artifacts, accordingly, should be determined to be exempt from attachment.

---

[9] The President renewed this waiver in Presidential Determination No. 2001-03, 65 Fed. Reg. 66483 (Oct. 28, 2000).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

PATRICK FITZGERALD
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

/s/ R. Bhattacharyya
RUPA BHATTACHARYYA
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave, N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

Dated: July 27, 2004

CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2004, a copy of the foregoing Statement of Interest of the United States was served by overnight mail on counsel of record addressed as follows:

Timothy M. Murphy, Esq.
TIMOTHY M. MURPHY, P.C.
3758 West Montrose
Chicago, IL 60618

David J. Stachman, Esq.
McINTYRE, TATE, LYNCH & HOLT
321 South Main Street, Suite 400
Providence, RI 02903

Thomas A. Doyle, Esq.
Hillary P. Krantz, Esq.
BAKER & McKENZIE
130 East Randolph Drive
Chicago, IL 60601

Lawrence W. Newman
Jacob M. Kaplan
BAKER & McKENZIE
805 Third Avenue
New York, NY 10022

RUPA BHATTACHARYYA
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

# SEE CASE FILE FOR EXHIBITS