# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| JENNY RUBIN, | ) |
| DEBORAH RUBIN, | ) |
| DANIEL MILLER, | ) |
| ABRAHAM MENDELSON, | ) |
| STUART E. HERSCH, | ) Case No.: 1:05-MC-10079 |
| RENAY FRYM, | ) |
| NOAM ROZENMAN, | ) |
| ELENA ROZENMAN and | ) |
| TZVI ROZENMAN | ) |
|  | ) |
| Plaintiffs — Judgment Creditors, | ) |
| v. | ) |
|  | ) |
| THE ISLAMIC REPUBLIC OF IRAN, | ) |
| (a/k/a Iran, The Republic of Iran, Republic of Iran, | ) |
| The Government of Iran, Iranian Government, and | ) |
| Imperial Government of Iran), | ) |
| THE IRANIAN MINISTRY OF INFORMATION | ) |
| AND SECURITY, | ) |
| AYATOLLAH ALI HOSEINI KHAMENEI, | ) |
| ALI AKBAR HASHEMI-RAFSANJANI and | ) |
| ALI FALLAHIAN-KHUZESTANI | ) |
|  | ) |
| Defendants – Judgment Debtors, | ) |
| v. | ) |
|  | ) |
| MUSEUM OF FINE ARTS, a not-for-profit corporation | ) |
| (a/k/a Boston MFA), HARVARD UNIVERSITY, | ) |
| PRESIDENT AND FELLOWS OF HARVARD | ) |
| COLLEGE, HARVARD UNIVERSITY ART MUSEUMS, | ) |
| BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM, | ) |
| SACKLER MUSEUM, SEMITIC MUSEUM, and | ) |
| PEABODY MUSEUM OF ARCHAEOLOGY AND | ) |
| ETHNOLOGY | ) |
|  | ) |
| Trustee Process Defendants. | ) |

_____)

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ESTABLISHING THAT NO PERSON OTHER THAN IRAN MAY ASSERT IRAN'S SOVEREIGN IMMUNITY DEFENSES UNDER §§ 1609 AND 1610 OF THE FSIA

The Trustee Process Defendants have filed Responses to Plaintiffs' trustee process summonses, as well as a Motion to Quash Summons and to Dissolve Attachment By Trustee Process, which seek to extinguish this proceeding summarily on the grounds that Iran's assets are immune from attachment and execution under §§ 1609 – 1610 of the Foreign Sovereign Immunities Act ("FSIA").

Pursuant to Fed.R.Civ.P. 56(a), the Plaintiffs hereby move for entry of partial summary judgment against the Trustee Process Defendants establishing that no person other than the defendant, Islamic Republic of Iran ("Iran") has standing to assert Iran's sovereign immunity defenses to attachment and execution under §§ 1609 – 1610 of the FSIA.

The determination of whether anyone other than Iran may assert Iran's sovereign immunity defenses to attachment and execution is a purely legal question.  There is no genuine issue as to any material fact to warrant a trial or fact-finding on this issue.  Thus, Plaintiffs are entitled to partial summary judgment in their favor on this issue as a matter of law.

In support of this Motion, Plaintiffs rely upon the pleadings filed in this proceeding, the attached Memorandum, the *Affidavit of David J. Strachman,* the *Affidavit of Georgia J. Asimakopoulos* dated April 26, 2005, the *Affidavit of Georgia J. Asimakopoulos* dated July 25, 2005 and other Exhibits filed concurrently herewith.

## Concise Statement Of Material Facts Of Record
## <u>As To Which The Plaintiffs Contend There Is No Genuine Issue To Be Tried.</u>

Pursuant to Local Rule 56.1, Plaintiffs submit the following concise statement of material facts of record as to which they contend there are no genuine issues to be tried:

1.        Plaintiffs are American citizens who were harmed by a triple suicide bombing carried out by the terrorist group Hamas on September 4, 1997, at an outdoor

pedestrian mall in Jerusalem, Israel. <u>Rubin v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258 (D.D.C. 2003).

2.        Plaintiffs brought suit in the United States District Court for the District of Columbia ("D.C. Court") under 28 U.S.C. §1605(a)(7) against Iran and other parties for their provision of training and other material support and assistance to the Hamas terrorists who carried out the bombing attack. <u>Rubin v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258 (D.D.C. 2003)

3.        On September 10, 2003, the D.C. Court entered judgment under 28 U.S.C. §1605(a)(7) in favor of Plaintiffs and against Iran and the other defendants, jointly and severally, in the total amount of $71,500,000.00 in compensatory damages ("judgment"), and for punitive damages against all defendants except The Islamic Republic of Iran ("Iran"), in the amount of $187,500,000.00. The total owed on the judgment is $259,000,000.00. A copy of the judgment as registered in this Court is appended hereto as "Exhibit A".

4.        To date, the Plaintiffs have recovered $399,001.00 upon the judgment. Defendants have failed to pay the balance owed under the judgment. <u>See</u> Affidavit of David J. Strachman, ("Exhibit B").

5.        The amount of the judgment for compensatory damages due and unpaid is $71,100,999.00 excluding post-judgment interest.

6.        On February 10, 2005, the Plaintiffs registered their judgment with this Court, pursuant to 28 U.S.C. §1963. Docket No. 1.

7.        On March 28, 2005, the Plaintiffs filed a Motion for Order of Attachment by Trustee Process as to the Trustee Process Defendants listed in the caption above (collectively hereinafter: ("the Trustee Process Defendants").[1] Docket No. 2.

---

[1] Other claims against the Trustee Process Defendants have been raised in the past in respect to antiquities and

8.          On or about April 15, 2005, the Plaintiffs served Iran with documents evidencing the registration of their judgment against Iran in this Court along with the Motion for Order of Attachment by Trustee Process with the pleadings and exhibits thereon.  See Affidavit of Georgia J. Asimakopoulos, ¶2, dated April 26, 2005, ("Exhibit D").

9.          On or about April 28, 2005, the Summonses to the Trustee Process Defendants were approved by and filed with the Court.

10.          On May 16, 2005, the Plaintiffs served the Summonses on the Trustee Process Defendants.  Docket Nos. 6, 7.

11.          On June 3, 2005, Trustee Process Defendant the Museum of Fine Arts ("MFA") filed a Response to the trustee process summons asserting that any property of Iran in its possession is immune from execution pursuant to § 1610 of the FSIA.  MFA Response at 3.

12.          On June 27, 2005, Trustee Process Defendants Harvard University, President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archaeology and Ethnology (hereinafter collectively "Harvard") filed a Response to the trustee process summons asserting that any property of Iran in its possession is immune from execution pursuant to § 1610 of the FSIA.  Harvard Response at 2.

13.          On June 27, 2005, Harvard filed a Motion to Quash Summons and to Dissolve Attachment By Trustee Process ("Motion to Quash") seeking a dispositive ruling that any property of Iran in its possession is immune from execution under §§ 1609 – 1610 of the FSIA.

---

artifacts from other parts of the world.  Descriptions of these efforts are attached collectively hereto as "Exhibit C".

14.    All Trustee Process Defendants are seeking to extinguish this proceeding summarily, on the grounds that Iran's assets are immune from attachment and execution under §§ 1609 – 1610 of the FSIA.

15.    On June 27, 2005, the Plaintiffs served upon all Trustee Process Defendants Requests for the Production of Documents in aid of execution in order to determine ownership of the Iranian antiquities.  See Plaintiffs' Requests for the Production of Documents "Exhibit E".

16.    On or about the 14th, 15th and 25th day of July 2005, the Plaintiffs served copies of the Trustee Process Summonses to Harvard and the MFA and Process Receipt and Returns upon Iran.  See Affidavit of Georgia J. Asimakopoulos, ¶2, dated July 25, 2005 ("Exhibit F").

17.    Trustee Process Defendants have not communicated with the government of Iran since the initiation of this proceeding, and have never been requested by Iran to assert legal defenses on Iran's behalf.  *Memorandum of Law of Harvard Parties in Support of Motion to Quash Summons and to Dissolve Attachment by Trustee Process,* p. 17; *Verified Response of the Museum of Fine Arts* at 2.


**Local Rule 7.1(A)(2) Certification.**

The undersigned counsel for the Plaintiffs certifies that he has conferred with counsel for the Trustee Process Defendants and has attempted in good faith to resolve or narrow the issues herein.


**Request for Oral Argument.**

Plaintiffs respectfully request oral argument on this Motion, which Plaintiffs believes will assist the Court in its disposition hereof.

WHEREFORE, Plaintiffs pray that this Court:

(1)     Enter an order for partial summary judgment in favor of Plaintiffs and against the Trustee Process Defendants establishing that no person other than the defendant Islamic Republic of Iran has standing to assert Iran's sovereign immunity defenses to attachment and execution under §§ 1609 – 1610 of the FSIA; and

(2)     Grant Plaintiffs such other and further relief as the Court deems just and proper.


Respectfully Submitted,

Jenny Rubin, et al.


By their attorneys,

/s/ Richard J. Grahn_____
Richard J. Grahn, Esq., (BBO #206620)
Edward V. Colbert, III, Esq., (BBO #566187)
Georgia J. Asimakopoulos, Esq., (BBO #658232)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800



/s/ David J. Strachman, Esq.          (GJA)
David J. Strachman, Esq., (BBO #660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI  02903
(401) 351-7700


Dated:  July 25, 2005

**EXHIBIT A**

Certification of Judgment (AO 451 Rev - DC 3/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

05MBD 10079

**Jenny Rubin, et al**

  Plaintiff(s)

v.                                               Civil Action No.    **01-1655(RMU)**

**The Islamic Republic of Iran, et al**
  Defendant(s)

## CERTIFICATION OF JUDGMENT
## FOR REGISTRATION IN ANOTHER DISTRICT

  I, NANCY MAYER-WHITTINGTON, Clerk of this United States District Court certify that the

attached judgment is a true and correct copy of the original judgment entered in this action on

9/11/03 _____ , as it appears in the records of this court, and that:

☒  No notice of appeal from this judgment has been filed, and no motion of any kind listed in Rule 4(a) of the Federal Rules of Appellate Procedure has been filed.

☐  No notice of appeal from this judgment has been filed, and any motions of the kinds listed in Rule 4(a) of the Federal Rules of Appellate Procedure have been disposed of, the latest order disposing of such a motion having been entered on: _____ .  *

☐  An appeal was taken from this judgment and the judgment was affirmed by mandate of the Court of Appeals issued on: _____ .

☐  An appeal was taken from this judgment and the appeal was dismissed by order entered on: _____ .

  IN TESTIMONY WHEREOF,   I sign my name and affix the seal of this Court on
_November 20, 2003_  .

                                          NANCY MAYER-WHITTINGTON, Clerk

                              By: _____
                                                    Deputy Clerk

*  (NOTE:  The motions listed in Rule 4(a), Fed. R. App. P., are motions: for judgment notwithstanding the verdict; to amend or make additional findings of fact; to alter or amend the judgment; for a new trial; and for an extension of time for filing a notice of appeal.)

FILED
IN CLERKS OFFICE.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA** FEB 10  P 1: 22

U.S. DISTRICT COURT
DISTRICT OF MASS

JENNY RUBIN,
DEBORAH RUBIN,
DANIEL MILLER,
ABRAHAM MENDELSON,
STUART E. HERSH,
RENAY FRYM,
NOAM ROZENMAN,
ELENA ROZENMAN,
and TZVI ROZENMAN,

          Plaintiffs,

          v.

THE ISLAMIC REPUBLIC OF IRAN
(aka Iran, The Republic of Iran, Republic of Iran,
The Government of Iran, Iranian Government, and
Imperial Government of Iran),
THE IRANIAN MINISTRY OF
INFORMATION AND SECURITY,
AYATOLLAH ALI HOSEINI KHAMENEI,
ALI AKBAR HASHEMI-RAFSANJANI,
and ALI FALLAHIAN-KHUZESTANI,

          Defendants.

: Civil Action No.: 01-1655 (RMU)

: Document Nos.: 14, 20

**FILED**

SEP 1 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

11/17/03

**ORDER AND JUDGMENT**

For the reasons set forth in the accompanying Findings of Fact and Conclusions

of Law, it is this *10th* day of September, 2003,

**ORDERED** that judgment be and is entered on behalf of plaintiff Jenny Rubin

against all defendants, jointly and severally, for compensatory damages in the amount of

$7,000,000; and it is

**FURTHER ORDERED** that judgment be and is entered on behalf of plaintiff

Daniel Miller against all defendants, jointly and severally, for compensatory damages in

the amount of $12,000,000; and it is

23

**ORDERED** that judgment be and is entered on behalf of plaintiff Abraham Mendelson against all defendants, jointly and severally, for compensatory damages in the amount of $12,000,000; and it is

**FURTHER ORDERED** that judgment be and is entered on behalf of plaintiff Stuart Hersh against all defendants, jointly and severally, for compensatory damages in the amount of $12,000,000; and it is

**ORDERED** that judgment be and is entered on behalf of plaintiff Noam Rozenman against all defendants, jointly and severally, for compensatory damages in the amount of $15,000,000; and it is

**FURTHER ORDERED** that judgment be and is entered on behalf of plaintiff Deborah Rubin against all defendants, jointly and severally, for compensatory damages in the amount of $2,500,000; and it is

**ORDERED** that judgment be and is entered on behalf of plaintiff Renay Frym against all defendants, jointly and severally, for compensatory damages in the amount of $6,000,000; and it is

**FURTHER ORDERED** that judgment be and is entered on behalf of plaintiff Elena Rozenman against all defendants, jointly and severally, for compensatory damages in the amount of $2,500,000; and it is

**ORDERED** that judgment be and is entered on behalf of plaintiff Tzvi Rozenman against all defendants, jointly and severally, for compensatory damages in the amount of $2,500,000; and it is

**FURTHER ORDERED** that judgment be and is entered on behalf of plaintiffs Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Hersh, and Noam Rozenman

against all defendants except for Iran, jointly and severally, for punitive damages in the amount of $37,500,000 for each of these plaintiffs; and it is

ORDERED that the plaintiffs' motion to modify the case caption is granted; and it is

FURTHER ORDERED that the plaintiffs may arrange for this Judgment and Order to be translated into Farsi and, at the plaintiffs' request, the Clerk of the Court shall cause a copy of the translated Judgment and Order and the accompanying Findings of Fact and Conclusions of Law to be transmitted to the U.S. Department of State for service upon the defendants through diplomatic channels.

SO ORDERED.

Ricardo M. Urbina
United States District Judge

(N)

23

Service List for *Campuzano v. Islamic Republic of Iran,* Civil Action No. 00-2328

Jacob A. Stein
Stein Mitchell & Mezines
1100 Connecticut Ave, NW
Washington, DC 20036
*Counsel for the Plaintiffs*

Service List for *Rubin v. Islamic Republic of Iran,* Civil Action No. 01-1655

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main St, Suite 400
Providence, RI 02903
*Counsel for the Plaintiffs*

AO 458 (Rev. 10/95)  Appearance

# UNITED STATES DISTRICT COURT

DISTRICT OF

FILED
IN CLERKS OFFICE

2005 FEB 10 ⊃ 1: 22

MASSACHUSETTS
U.S. DISTRICT COURT
DISTRICT OF MASS

**APPEARANCE**

Rubin, et al.

v.

The Islamic Republic of Iran, et al.

Case Number:

# 05 MBD 10079

To the Clerk of this court and all parties of record:

Enter my appearance as counsel in this case for
Plaintiffs

I certify that I am admitted to practice in this court.

| | |
|---|---|
| 2/9/04 | |
| Date | |

Signature

David J. Strachman                           660136
Print Name                                   Bar Number

321 South Main Street, Suite 400
Address

Providence            RI            02903
City                  State         Zip Code

(401) 351-7700              (401) 331-6095
Phone Number               Fax Number

**EXHIBIT B**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN | Case No.: 1:05-MC-10079 |

Plaintiffs — Judgment Creditors,

v.

THE ISLAMIC REPUBLIC OF IRAN,
(a/k/a Iran, The Republic of Iran, Republic of Iran,
The Government of Iran, Iranian Government, and
Imperial Government of Iran),
THE IRANIAN MINISTRY OF INFORMATION
AND SECURITY,
AYATOLLAH ALI HOSEINI KHAMENEI,
ALI AKBAR HASHEMI-RAFSANJANI and
ALI FALLAHIAN-KHUZESTANI

Defendants – Judgment Debtors,

v.

MUSEUM OF FINE ARTS, a not-for-profit corporation
(a/k/a Boston MFA), HARVARD UNIVERSITY,
PRESIDENT AND FELLOWS OF HARVARD
COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,
BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,
SACKLER MUSEUM, SEMITIC MUSEUM, and
PEABODY MUSEUM OF ARCHAEOLOGY AND
ETHNOLOGY

Trustee Process Defendants.

## AFFIDAVIT OF DAVID J. STRACHMAN

1.    My name is David J. Strachman, Esq.  I am counsel to plaintiffs in this action as well as in Civil Action No. 01-1655-RMU described below.

2.    On September 10, 2003, Plaintiffs obtained a judgment from the United States District Court for the District of Columbia (Civil Action No. 01-1655-RMU) for compensatory damages against The Islamic Republic of Iran et al., on September 10, 2003, in the amount of $71,500,000.00, and for punitive damages against all defendants, except The Islamic Republic of Iran, in the amount of $187,500,000 (the "Judgment").  A copy of the Judgment as registered in this Court is appended hereto as "Exhibit A."

3.    To date, the plaintiffs have recovered $399,001.00 upon the Judgment. Defendants have failed to pay the balance owed under the Judgment, and owe additional amounts to Plaintiffs for accrued interest, and attorneys' fees and costs.

4.    On information and belief, there is no liability insurance available to satisfy the Judgment.

5.    The requested trustee process attachments are necessary to assure that the Judgment will not prove to be uncollectible.

6.    The information contained in this Affidavit is based upon my personal knowledge and information known by me, or upon information which I believe to be true.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 23 DAY OF MARCH 2005.**

David J. Strachman, Esq., BBO #660136
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI  02903

EXHIBIT C



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

*The Boston Globe*

## NEW MFA LINK SEEN TO LOOTED ARTIFACTS SCHOLARS CITE WORKS ACQUIRED SINCE 1984

**Author(s):**   Walter V. Robinson, Globe Staff **Date:** December 27, 1998 **Page:** A1 **Section:** Metro

It was just a year ago that the Boston **Museum** of **Fine Arts** turned aside a public demand from the government of Guatemala to return scores of pre-Columbian artifacts that had been looted from ancient Mayan grave sites in that country.

In its defense, the **museum** argued that the artifacts entered the United States legally between 1974 and 1981 -- before the MFA committed itself in 1983 to international standards designed to curb the widespread plundering of antiquities. Yet since 1984, the MFA has acquired scores of Greek and Roman antiquities that have no record of prior ownership, according to a Globe inquiry. That is a dead giveaway, scholars say, that most of the objects were illegally excavated and smuggled, mainly from Italy, in the 14 years since the **museum** says it has abandoned dealings in the illicit market.

Among the artifacts are three valuable Greek vases, commonly found in 2,300-year-old grave sites in the Apulian section of southeastern Italy. In a telltale admission, the **museum** described the three vases as among a "host" of newly discovered artifacts in a 1993 book it published on the MFA's ancient Greek vases.

With assistance from several classical scholars, the Globe focused on the origin of 71 classical artifacts that were donated or sold to the MFA by outsiders from mid-1984 to mid-1987. Only 10 of the 71 items have any recorded ownership history, or provenance.

The remaining 61 objects, including the three valuable vases cited in the MFA volume, have no pedigree at all, strong circumstantial evidence that most of them had been recently unearthed by grave robbers, according to archeologists.

For the MFA, the findings underscore the institution's continuing challenge -- how to reconcile the august image it projects with persistent questions about the integrity of its collecting practices.

Like several other major **museums**, scholars say, the MFA cannot argue that it was unaware that it was acquiring valuable objects that were most likely removed recently from the ground. Even one of the MFA's major benefactors told the Globe the **museum** often turned a blind eye to evidence the artifacts had dubious origins. And two of its dealers said they cannot vouch for the origin of some of the objects they sold the MFA.

Indeed, Alan Shestack, who was the MFA's director from 1987 to 1994, acknowledged last week that during his tenure the **museum** took insufficient steps to ensure that its acquisitions had not been looted. "We were not as rigorous as we might have been in those days," Shestack said in an interview.

At the time, Shestack said, questions were seldom raised about the origin of undocumented artifacts the MFA was acquiring.

That leaves Shestack at odds with the current MFA director, Malcolm Rogers. Rogers has said he has no misgivings about the classical antiquities the **museum** obtained that came with no ownership history. Unlike Shestack, Rogers has repeatedly refused to discuss the MFA's collecting ethics.

For the **museum**, which Rogers recently described as New England's preeminent cultural institution, the Guatemalan and classical acquisitions are bookends on a troublesome year. To the MFA's critics, the two cases underscore the extent to which the MFA, and some of its peer institutions, are ethically tone deaf and oblivious to rapidly shifting international standards.

With increasing frequency, countries like Turkey, Italy, and poverty-stricken Guatemala are pressing legal claims against major **museums** -- sometimes with help from the US government. At the same time, officials in countries that sit atop ancient cultures have ratcheted up accusatory rhetoric that "Western elites" are guilty of cultural imperialism, colonialism, and racism for preying on grave sites in their countries.

As for the MFA, even some of the dealers the **museum** has purchased artifacts from acknowledged that the antiquities market is far from pristine.

For example, two of New York's best-known dealers who have sold classical artifacts to the MFA, Torkom Demirjian and Jerome M. Eisenberg, admitted that they sometimes have no way of knowing whether the objects they sell to collectors and **museums** were recently plundered.

"There is no tag on any piece saying, ' I am legally excavated and legally exported,' " Eisenberg said in an interview. Asked, for instance, about a dozen undocumented artifacts that came to the MFA after being sold by Sotheby's and Christie's, the two major auction houses, Eisenberg said: "If you buy it at auction without a provenance, it was probably illegally excavated."

Demirjian, who was the dealer in one celebrated case involving looted artifacts and is a passionate critic of laws that inhibit the antiquities trade, said he does not believe that artifacts he has sold or donated to the MFA had been recently looted. But, he added, "It wouldn't matter to me if they were illegally excavated."

Rogers, who has been the MFA director since 1994, turned down repeated requests for an interview -- a posture he adopted after the Globe reported last December that the MFA acquired the pre-Columbian artifacts even though its attorney knew they had been illegally removed from Guatemala.

Rogers would respond only to inquiries in writing. But his responses often sidestepped the questions posed by the Globe.

To many scholars, the evidence is compelling.

"There is no doubt that there is a pattern by the MFA of acquiring looted material that was illegally excavated in Italy," said Boston University archeologist Murray C. McClellan. "They have not lived up to their own standards, and they have to be called to account for that."

Unlike Rogers, others who have dealt with the MFA were more willing to discuss its acquisitions. One MFA benefactor, who has had extensive dealings with its classical department over the years, said the MFA has taken artifacts from him knowing they had been looted.

When the department "sees a piece they really want, the provenance doesn't become as important as it should be," said the benefactor, who discussed the issue on condition that his name not be used.

The benefactor, though he said he does not deal directly with smugglers, said the dealers he buys from do. But over the years, he said, the **museum**'s classical department cared little where the piece originated -- unless the acquisition was "likely to create a fuss." On some pieces, he added, the MFA was complicit in helping to alter provenance information to make the objects appear to be clean.

But McClellan, who is hopeful the **museum** can be persuaded to change course and abide by its ethical code and international conventions, described the allegedly illicit acquisitions as "willful ignorance, not a conscious conspiracy."

McClellan and other classical archeologists who looked over the Boston **museum**'s acquisitions expressed chagrin about many of the pieces, saying the evidence, though circumstantial, strongly suggests the artifacts were looted in recent years from sites in the Mediterranean, most of them in Italy.

Among the objects with no provenance are numerous vessels from Apulia, marble busts, and a Greek vase that originated in Tuscany. Another piece with no pedigree is a rare Mycenaean terracotta idol from about 1,300 B.C. that McClellan called "one of the most important pieces of religious art of the Second Millennium."

"If it had not been looted, and we knew where it came from, it would be world-famous for its historical significance. As it is, it's merely a curiosity in a corner of the **museum**," McClellan said.

Public attention to the MFA's acquisition of antiquities comes amid growing international focus on cultural property issues, tougher laws in source countries, and UN-led international conventions intended to curb the widespread plunder for profit that has decimated ancient sites.

Hardest hit have been countries like Guatemala, Italy, Greece, Turkey, and poor nations in Africa, such as Mali. Also vulnerable have been war-torn nations like Iraq, Cambodia, Afghanistan, and Bosnia.

But the outcry, led by archeologists, has been countered, often in heated debate, by some **museums**, dealers, and collectors who insist that laws against the antiquities trade are unreasonably harsh, leading to a thriving black market that prompts some **museums** to mask the origin of their acquisitions.

What's more, countries such as Italy and Greece, lacking evidence pointing to the precise site where an object was looted, seldom press claims. And US legislation in 1983 that implemented the UN agreement contains loopholes that protect collectors and **museums** from forfeiture laws. Some judges, though, have begun to pay greater deference to the notion that objects looted abroad can be classified as stolen property in American courts, a trend that has unsettled the **museum** world.

Most **museums**, including the MFA, have adopted guidelines since 1970 that recognize the legal right of countries like Italy and Turkey to protect ancient grave sites, an obligation that Shestack advocated in a speech in 1986, the year before he took the MFA's helm.

Shestack argued then that **museums**, by continuing to acquire problematic antiquities, "would not only be risking our reputation, but would be encouraging or at least seeming to be encouraging, or winking at, illicit activity in the international art market."

But it was on Shestack's watch, from 1987 to 1994, that the MFA acquired many of the classical antiquities that archeologists say were probably taken from grave sites in Italy. Others have been acquired since Rogers took his place. They include some 7th century B.C. cups from burial grounds near Rome that raised suspicions at the MFA, but were nonetheless accepted in 1996 -- a gift from a longtime overseer.

At the center of the storm over the **museum**'s ethics is Cornelius C. Vermeule III, the MFA's longtime curator of classical antiquities who retired in 1996. A scholar world-renowned for his connoisseurship, and a beloved figure at the MFA and in the local art world, Vermeule developed a swashbuckling reputation for his acquisition habits.

Even in retirement, Vermeule's decisions still preoccupy lawyers. It was Vermeule who arranged the MFA's questionable acquisition of the top half of a Heraclean figure the Turkish government wants reunited with the bottom half that sits in a Turkish **museum**. In another case involving the alleged theft of precious Athenian coins from Turkey, it was Vermeule who had the MFA authenticate them for the owners, despite evidence they might be "hot."

And like many curators of his generation, who scoured the world for prized pieces long before the plundering of ancient grave sites was officially proscribed, Vermeule continued to buy artifacts as if the rules had never changed, according to McClellan, the BU archeologist. By many accounts, Vermeule had virtual autonomy within the MFA.

In 1993, with the help of a $30,000 grant from the National Endowment for the **Arts**, Vermeule's department published a book signaling that it was still playing by old rules. The 1993 book, "Vase Painting in Italy," matter-of-factly suggests that three of the Apulian vases it prizes most highly were newly discovered.

Two of the vases, attributed to the Darius Painter, a name given by scholars to one of the finest artisans in the Greek civilization that flourished in Apulia about 2,300 years ago, have been hailed in one MFA annual report as "two of the greatest South Italian vases in America."

In the **museum**'s book, the MFA's curators wrote: "Recent years have seen a host of new vases by the Darius Painter with rare or unique mythological subjects . . ." The MFA vases, acquired in 1987, 1989, and 1991, "are among the most splendid of the new mythological works," according to the book.

The vase acquired in 1991 is jointly owned by the MFA and by Leon Levy and Shelby White, New York collectors whose collecting habits have long been controversial.

To archeologists, the language in the book is an unwitting admission that the MFA knew the prized vases were probably stolen from grave sites. In his written response to the Globe's questions, Rogers acknowledged that none of the three vases had any known owners before the **museum** acquired them.

"**Museums** like the MFA should know better," said David W. J. Gill, an archeologist at the University of Wales at Swansea and an international authority on antiquities looting. Plainly, Gill said, the reference in the book "means the objects were newly surfaced, and since they had no declared history, any **museum** curator should have been highly suspicious of them."

Gill and a colleague, Christopher Chippindale, have done pioneering research on undocumented antiquities. For example, after the New York Metropolitan **Museum** of Art exhibited Levy and White's classical collection in 1990, a study by the two men disclosed that of the 230 objects in the show, 217 had no known history before the collecting couple acquired them.

Vermeule and White did not respond to requests for interviews. The MFA said it would not permit Vermeule's successor, John Herrmann, to be interviewed.

White, in a recent article in the International Journal of Cultural Property, wrote that she and her husband do not buy artifacts that are stolen from **museums** or unearthed from "known" archeological excavations.

In the wheat-growing region in Apulia, virtually all of the loot comes from thousands of "unknown" grave sites, sealed tombs of the Greeks' ancient dead that often contain painted vases of the type favored by Levy and White and the MFA.

"It's difficult for the Italian government to prove the vases were stolen since there is no documentation to prove they were in the ground," lamented Marina Mazzei, the Italian archeologist in charge of government efforts to slow the looting in Apulia. "So just like so many vases, they magically appear on the market, as if they came from nowhere."

Mazzei, during a visit last spring to the pockmarked wheatfields with a Globe reporter, said the tombaroli, or tomb robbers, have taken tens of thousands of vases over the last 15 years, so brazenly that they often employ mechanical excavators. The dramatic rise in looting in the early 1980s, Mazzei said, coincided with the growing popularity of the vases with American and European collectors and **museums**.

But with few resources, and vast territory to police, she said, Italian authorities are almost powerless to stop the looters.

Besides, she said, with unemployment so high in southern Italy, "there is a high level of crime directed at the living. So to many laymen, stealing from tombs is not considered criminal, because the tombaroli disturb the dead, and not the living."

Organized rings of thieves smuggle much of the plunder into Switzerland, with its lax statutes and reputation as an international fencing crossroads. There, the plunder is sold to collectors and dealers.

Just across the Italian-Swiss border, in scenic vacation towns like Lugano and Ascona, antiquities shops are ubiquitous, and some dealers openly admit that their wares have been recently excavated. In one shop last spring, a score of Apulian vases, some of **museum** quality and bearing prices as high as $40,000, were displayed in glass cases.

Lying on the floor in a corner was a piece of Roman armor identified by the shop owner as from the 1st

century A.D. It was still caked in mud.

"It's from a 100-year-old Italian collection," the dealer said with a smile and a wink.

The inexorable link between generous Italian supply and insatiable collector demand has long raised questions about what the principals know, or choose to know, about the origin of the objects they acquire.

Eisenberg, a major figure in the antiquities trade, said he would not "knowingly buy a piece that's been smuggled." In fact, he argued in an interview that the vast majority of antiquities are of no use to archeologists and ought to be traded freely like modern artworks.

"Ninety-eight percent of items that are excavated offer no new or useful information for archeologists. So collectors and **museums** should be able to acquire these objects," said Eisenberg, whose views anger many archeologists. Strict laws against export, he added, force the art market to hide information and, sometimes, prompt **museums** to doctor provenance information.

As for "minor pieces" that most collectors buy, Eisenberg said, "We know they come out illegally. But no one bothers about them."

Of the major pieces he has sold, to the MFA and other clients, he acknowledged: "There is a likelihood that some material may have been smuggled. No one knows ultimately where these things come from."

The MFA, though it made some of its acquisition records available to the Globe, refused to disclose the identities of dealers who have sold classical antiquities to the **museum**.

But dealers seeking tax deductions often donate artifacts to curators they sell objects to. The MFA's list of donor-dealers amounts to a "who's who" of dealers, and some collectors, who have been involved in controversy over the origin of some of their acquisitions.

They include London dealer Robin Symes, Demirjian, White and Levy, and the late Lawrence Fleischman, a major purchaser of undocumented antiquities whose collection was acquired in 1995 by the J. Paul Getty **Museum**.

Two major collectors who face claims by foreign governments seeking the recovery of artifacts are also among MFA donors: Maurice Tempelsman, the New York financier and companion to the late Jacqueline Kennedy Onassis; and Jonathan H. Kagan, one of the defendants in Turkey's lawsuit demanding the return of the Athenian coins.

Kagan has donated numerous undocumented antiquities to the MFA, including nine ceramic cups from the 7th century B.C. that McClellan says were probably unearthed from the same tomb complex, in Latium, the site of an ancient culture near Rome that predated the Greek colonization of Italy.

Through his lawyer, D. Lloyd Macdonald, Kagan declined a request for an interview.

Also among the dealers who have sold classical artifacts to the **museum** is Robert E. Hecht Jr., a Paris-based antiquities specialist who was once declared persona non grata by the Italian and Turkish governments for his alleged role in selling plundered antiquities.

Hecht, the Globe reported in April, played a central role in a $1.8 million sale to New York's Metropolitan **Museum** of Art of a 3d century B.C. silver trove. Italian authorities have an affidavit from the professional grave robber who helped unearth the objects from Morgantina, a Greek city-state in Sicily.

During an April telephone interview, Hecht defended the trade in looted antiquities and ridiculed laws, like Italy's, that seek to prevent the plundering of grave sites.

The MFA refused to divulge its relationship with Hecht, or even acknowledge that they had done business with

him. But the voluble Hecht boasted in the interview that in mid-1997 he sold the MFA a rare silver cup, called a skyphos, at a price reported to exceed $400,000.

Asked where the silver artifact originated, Hecht replied: "What does it matter?"

Unlike most of the MFA's classical acquisitions examined by the Globe, the skyphos has a listed provenance. The MFA said Hecht told them the piece was once in an American collection and provided the **museum** with a letter from a third party attesting to the fact that Hecht has had the skyphos since the 1950s.

The **museum** refused to make the letter public.

If there is no public evidence the MFA has changed its habits, other institutions have.

Shestack, who is now the deputy director of the National Gallery of Art in Washington, said that because of the increased international and public focus on grave robbing, "**Museums** are much more aware of the consequences of this kind of collecting. They are much more fastidious."

But during the seven years he ran the MFA, Shestack conceded, the **museum** relied on its dealers for written assurance that the artifacts the MFA bought were clean.

"The legal counsel, then, was not as sensitive to these issues. The dealers often didn't want to tell us anything about the prior ownership," Shestack said. "The lawyers almost always said that if a dealer signed a guarantee the work was clean, then everything was OK.

"No one ever said, 'We're not going to buy it if it doesn't have a clear provenance,' " he added.

Ironically, Shestack said, the **museum** did demand a thorough legal review of the pre-Columbian collection offered to the MFA by Landon T. Clay, one of its trustees. The review, at an estimated cost of $30,000, concluded that there was no reason for the MFA not to take it. Last December, the lawyer who did the review admitted in an interview that he knew in 1987 that Guatemalan law forbade export of the artifacts.

In his 1986 speech calling for higher ethical standards, Shestack recalled, "I cried out for stringent laws that would give **museum** directors a reason for not doing the evil thing. So then when the directors encourage you to acquire certain things, you can say, 'No, I can't. I'll go to jail.' "

He added: "But if there's a gray area in the law, you don't have an out." The gray area, he noted, remains.

Oddly, Shestack's candid recollection contradicts Rogers, who in both the Guatemala and classical areas has insisted there has been nothing amiss in the **museum**'s behavior. Partly, there are legal reasons for that: The Guatemalan government has just hired New York attorneys Lawrence M. Kaye and Howard Spiegler, two aggressive litigators who handle Turkey's claims, to seek restitution of the pre-Columbian artifacts.

Even with the legal threat, some lawyers and art historians say Rogers has a responsibility to assure its public that the **museum**'s behavior sets a moral standard for the community it serves.

"The MFA needs to make an unambiguous statement that it will no longer acquire undocumented antiquities," said McClellan, the BU archeologist. "This is one more opportunity for the MFA to say, 'Our eyes have been opened. We take responsibility for what's happened. We've done wrong in the past, but we'll now do better.' But they seem unwilling to say that publicly."

Other **museums**, most notably the once avaricious Getty, no longer acquire undocumented antiquities. And the Getty has done so unambiguously.

Marion True, the Getty's curator of ancient art, who now devotes much of her time to helping countries in the Mediterranean rim devise strategies to stop looting, told a conference at Rutgers University last month that the Getty ceased buying undocumented antiquities because it was not possible to be certain they were clean.

"This is because of the all-too-common practices among so-called reputable dealers of forging provenance documents and signing false statements on warranties," she said. The Getty, True added, chooses to spend money on other projects, "rather than continue to struggle through the mire of deception that pervades the market."

SIDEBAR:

Dug from Italian soil / **Museum** of **Fine Arts** treasures

Classical scholars say these artifacts now in MFA collections, were probably looted by Italian grave robbers since 1983. But the MFA says it has no misgivings about art it has acquired in recent years. The **museum** says it abides by laws and ethical codes designed to decrease the trafficking of plundered antiquities.

PLEASE REFER TO MICROFILM FOR CHART DATA.

Perform a new search



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

The Boston Globe

## MUSEUM DEFENDS ARTIFACTS COLLECTION DUE DILIGENCE CITED IN MFA ACQUISITIONS

**Author(s):** Walter V. Robinson, Globe Staff **Date:** December 29, 1998 **Page:** A1 **Section:** Metro

The Boston **Museum** of **Fine Arts**, responding to a Globe report that it has acquired scores of classical antiquities in recent years that may have been plundered from grave sites, yesterday said it exercises "appropriate diligence" when it acquires artwork.

But Cornelius C. Vermeule III, the retired curator who oversaw most of the acquisitions, said yesterday that he does not know whether some of the objects might have been freshly looted from grave sites when the **museum** acquired them. In the report, in the Sunday Globe, a former MFA director said the **museum** seldom raised questions about the origin of antiquities it acquired. And two antiquities dealers who have sold objects to the **museum** said they cannot always say that objects they sell have not been recently looted.

With assistance from 11 archeologists, the Globe studied 71 classical artifacts the **museum** acquired, by donation or purchase, between mid-1984 and mid-1987. Only 10 had a history of any prior owner. The remaining 61 had no history at all, strong circumstantial evidence, the scholars said, that they had recently been looted by grave robbers, mostly in Italy.

In a two-paragraph statement, the MFA said that when it considers acquiring objects for its collection, the artifacts are reviewed "to ensure that their addition to the **Museum**'s collection is both legal and appropriate."

In the brief statement, the MFA chose not to take issue with what the Globe reported. Asked about that late yesterday, Dawn Griffin, MFA spokeswoman, said the **museum** does not agree that it acquired the artifacts without exercising due diligence." before acquiring artifacts.

Asked whether it was possible that some of the 61 undocumented artifacts might have been freshly looted, Vermeule replied, "I don't know."

Vermeule took issue with MFA director Malcolm Rogers for consistently refusing to discuss the acquisitions, even though his predecessor, Alan Shestack, acknowledged in an interview last week that the MFA had been less than rigorous in ensuring that artifacts it acquired were not recently plundered. Shestack was director from 1987 to 1994.

"The **museum** and Malcolm Rogers should talk about these things. Otherwise it will look like we've been bounding through the marketplace picking up everything in sight," Vermeule said.

The Globe reported that the **museum** acquired the undocumented objects after it committed itself in 1983 to observe international standards designed to slow the plunder of antiquities.

Mario Bondioli Osio, the president of Italy's Interministerial Commission for the Recovery of Art, expressed frustration yesterday at cases like that involving the MFA, saying his government cannot mount a successful legal claim without having evidence of where and when an artifact was looted.

As one way to minimize the demand for looted artifacts, Italy recently began making yearlong loans to US **museums** of classical antiquities that are much more important and valuable than most **museums** could afford to purchase, according to Bondioli Osio.

The MFA now faces a likely lawsuit from the government of Guatemala, seeking the return of a collection of pre-Columbian artifacts the MFA acquired in 1988. The **museum**'s lawyer has acknowledged that he knew the

objects were illegally exported from Guatemala. But the MFA has insisted that they were legally imported into the United States.

The Globe also reported that Turkey's government is pressing for the return of the top half of a "Weary Herakles" statue whose bottom half is in a Turkish **museum** in Antalya.

Murray C. McClellan, a Boston University classical archeologist, said last night that he views the fact that the MFA did not take issue with the Globe's story as an indication that the **museum** might take greater precautions in the future.

"Now we'll see whether they really do exercise due diligence," he said.

McClellan said the potential lawsuits, by Turkey and Guatemala, would amount to a tragic waste of resources. But given the **museum**'s statement, he said, "I would be shocked if they would make a major blunder, like Guatemala or the Herakles, again.

**Perform a new search**



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

The Boston Globe

## RESTORING LOOTED ART

**Date:** December 12, 1997 **Page:** A38 **Section:** Editorial Page

The possibility that plundered art is on display at the **Museum** of **Fine Arts** dismally marks the influence of greed. But behind this troubling allegation is a chance for smart, practical responses.

Globe reporters Walter V. Robinson and John Yemma broke the news that a new permanent gallery at the MFA includes pre-Columbian artifacts that archeologists and Guatemalan officials say were looted and illegally exported. The origin of artifacts from Mali is also being questioned. **Museum** officials say the works were acquired legally. The truth is hidden at the heart of a global looting maze. Wearily outraged archeologists describe the big picture. The trade in looted art is as torturous as the drug market. Looters ignore countries' laws, irreparably destroy sites, and collude with collectors. Single objects turn up, but stripped from their archeological setting they have lost much of their historic and scientific value. The archeologists, nonetheless, have a tempered optimism about what can be done.

**Museums** can be agents for change. Their exhibits can bring possibly looted objects to the public's attention, creating an opportunity to investigate acquisition challenges and settle ownership disputes. That doesn't mean shipping every Botticelli back to Italy. Instead, it should lead to the kind of partnerships suggested by Susan K. McIntosh of Rice University in Houston.

**Museums** and countries could forge mutually beneficial relationships that could cut out looters and unscrupulous middlemen, she says. Guatemala is among the countries eager to enact sophisticated management of their cultural heritage. In partnerships, nations could lend their artifacts in exchange for technical support from **museums** or foundations. It is one win-win way to help countries that don't have the resources to care properly for their artifacts.

Education is another tool, says Patricia Hart Mangan, a professor of anthropology at Mount Holyoke College in South Hadley. Looters are often local citizens. Archeological training can teach the importance of preserving single objects and entire excavation sites.

**Museums** and other cultural institutions can help by being a conduit for curriculums. Archeologists working at excavation sites can hold information sessions about their work. Such efforts are a small way of educating people away from looting. And a trained populace can help archeologists gather information. Guatemala and El Salvador are two countries that understand the need for such training.

Mark McMenamin, a professor of geology at Mount Holyoke, suggests setting up a registry that would document where and when artifacts were found. Even if objects were sold, lost, or destroyed, vital scientific records would be preserved by such a registry. The information would help fill in the global archeological picture.

In addition to stemming looting, **museums** can help with the huge demand for protecting yet-to-be-excavated sites. Many of these are well known, making them ripe for protection. And some might even be held in reserve until archeological techniques and tools have developed to the point where they will be less damaging to sites and artifacts.

A changing international scene -- more protective laws and countries' heightened archeological awareness -- means that **museums** and cultural institutions have to undergo changes in how they do business.

Constructive change on the international scene will mean sacrifices. Internal **museum** acquisition policies will have to made stronger, with greater scrutiny as to provenance. Emphasis should shift from owning an artifact to safeguarding its larger cultural context. And ownership challenges from countries of origin will have to be thoroughly investigated in order to encourage widespread cooperation.

American **museums** have a weak record on looted art. But assigning blame should take a back seat to the scientifically precious work of unearthing artifacts' pasts. What's needed is a thoughtful course of action that can be a model for the future.

Perform a new search



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

The Boston Globe

## QUESTIONABLE COLLECTION MFA PRE-COLUMBIAN EXHIBIT FACES ACQUISITION QUERIES

**Author(s):** John Yemma and Walter V. Robinson, Globe Staff **Date:** December 4, 1997 **Page:** A1 **Section:** National/Foreign

YAXHA, Guatemala -- A thousand or more years ago in the jungles of central America, Mayan inhabitants of cities such as Yaxha buried their revered leaders within massive pyramids, adorning the bodies with precious jade and placing prized polychrome pottery beside them.

Starting tomorrow, the public can see **fine** Mayan jade, pottery and burial urns in a new permanent exhibition at the Boston **Museum** of **Fine Arts** -- a collection that has provoked scorn among some archeologists, protests from government officials in Central America and ethical questions about the **museum**'s acquisition policies. Many of the pre-Columbian objects, a gift of MFA trustee Landon T. Clay, came to Boston after having been looted from graves and illegally exported, according to Guatemalan officials and archeologists who specialize in Mayan objects.

"They are pages ripped out of the history book of our nation," Guatemala's vice minister of culture, Carlos Enrique Zea Flores, said recently as he showed a Globe reporter archeological sites in remote parts of northern Guatemala that have been targeted repeatedly by looters.

The Mayan artifacts are not the only controversial items in the exhibition. A companion gallery of ancient African art includes two terra cotta figures from the west African country of Mali loaned to the MFA by William E. Teel, a member of the **museum**'s board of overseers. Archeologists say these figures, which are estimated to be between 400-700 years old, came from the area around Djenne, which has been extensively looted, sometimes by entire villages hired by intermediaries for antiquities dealers in Belgium and France. At least since 1969, Mali has banned the export of such items.

Susan K. McIntosh, a Rice University anthropologist and expert in Mali archeology, said after seeing a photo of one of the terra cotta figures, a ram or pregnant ewe, that its implications are "devastating." That is because, she said, it is in a style unknown to archeologists, and therefore likely to have been looted from a recently excavated site unknown to scholars.

Malcolm Rogers, director of the MFA, said that Teel would not disclose -- even to the **museum** -- how and when he obtained the figures. Rogers added that he had "no qualms" about exhibiting them or other pieces in the gallery. He also insisted that the MFA, through "lavish due diligence," was content that it had acquired all of the Mayan items legally and ethically almost a decade ago.

Archeologists are unsure of the exact site from which the Mayan objects were exhumed, though several suggested they bear the markings of the Tintal or Nakbe complexes in Guatemala's Mirador River basin, where heavy looting has occurred.

Stripped to its basics, this is a dispute between archeologists, who abhor the removal of ancient artifacts, and **museums**, which have trucked them home with impunity for centuries. But the debate in recent years has shifted onto a different stage: Its new players include developing countries seeking to protect their patrimony, strict new laws and international conventions designed to prevent the widespread looting that has plagued countries like Guatemala and Mali, and activist archeologist s willing to help developing countries locate looted items.

So extensive has the grave robbery in Guatemala and Mali been in recent years that the United States enacted emergency import restrictions on antiquities from those two countries -- for Guatemala in 1989 and Mali in 1993. [CORRECTION - DATE: Saturday, December 6, 1997: CLARIFICATION: A Page One story in Thursday's papers on a controversy over artifacts at the **Museum** of **Fine Arts** left an unclear impression of

the terms of the federal law aimed at stopping the importation of looted objects. Th e 1983 law banned imports if a foreigh nation requests such a ban. Guatemala sought a ban in 1989; it went into effect in 1991.] Mali's emergency declaration was directly related to the plundering of terra cotta figures from the Djenne area.

"The **museum** is opening a new gallery to present material that was so heavily looted that the US government had to step in. What does that say?" asked Ricardo Elia, an archeologist at Boston University. Elia, among others, believes there is mutual benefit for wealthy collectors and **museums**, on the one hand, and the looters who funnel objects to them.

MFA officials said they are confident the pieces from Guatemala, which Clay donated in 1988, entered the United States before the import restrictions took effect and before a 1983 law that bound the United States to the provisions of a 1970 UNESCO convention aimed at stopping the international trafficking in looted artifacts.

However, the **museum** rejected a Globe request to review import documents on the Guatemalan and Malian items and either would not or could not provide specific information about ownership of the pieces before they came into the United States.

Moreover, **museum** correspondence obtained by the Globe suggests that the MFA's lawyers disregarded Guatemalan law and the MFA subsequently misrepresented some facts in rejecting a Guatemalan demand that it return the Mayan objects.

For instance, Weld S. Henshaw, of Choate, Hall & Stewart, the MFA's longtime attorney who conducted a 1987 legal inquiry before Clay's donation was accepted, admitted this week that he had been unaware of a 1947 Guatemala law prohibiting the export of such artifacts without a permit.

Yesterday, however, Henshaw said that he was aware in 1987 of another Guatemalan law requiring export permits, and that the artifacts were exported without a permit. He said he made a judgment that the MFA was entitled to accept them because the Guatemalan government had up until then raised no objection to their being in the United States. Guatemalan officials, preoccupied at the time with a civil war, have said that they were unaware then that the collection was even in the United States.

Asked whether his second explanation was more damning than his first recollection, Henshaw said: "Maybe it's more damning, but it's correct."

With pre-Columbian art fetching record prices at auction houses like Sotheby's -- one gold piece sold there last week for $563,500 -- the incentive to continue plundering the ancient world's monuments and burial grounds remains strong, say experts familiar with the widespread looting that goes on, almost with impunity, in developing countries.

In an interview last week, Brent Benjamin, the MFA's deputy director for curatorial affairs who is overseeing the exhibition, acknowledged that **museum** acquisition of such items "is potentially a contributing factor" in the looting.

The MFA, by most estimates, is not alone in underzealously checking the origin of some of the antiquities that it claims to have acquired legally. Amid the current competition for antiquities, some other **museums** ask virtually no questions of benefactors. Still others, including Harvard's **museums**, are so concerned about the questionable backgrounds of many pieces that they rarely entertain any offer from prospective donors.

Nor is the issue of Clay's 1988 bequest, known in the antiquities trade as the "November Collection," a new one. Until now, however, it has been played out privately -- in 1989 correspondence from Boston University archeologist Clemency Chase Coggins expressing concern that Clay's gift was tainted; and in former MFA director Alan Shestack's written assurances, to her and to the Guatemalan government, that the **museum**, Clay and the previous owner of the artifacts, John B. Fulling, had acted honorably and lawfully.

In a May 25, 1989, letter, for instance, Shestack assured Coggins that the collection was not "exported from its country of origin or anyplace else in violation of that country's laws." Nor, he said, had it come from any "recent" destruction of any archeological site.

Shestack's assurances were drawn from Henshaw's 1987 research. But Henshaw said yesterday that he was aware at the time that Guatemalan law expressly forbade the export of archeological artifacts without a permit. In addition, Fulling acknowledged that he never obtained export permits.

In defending the Clay acquisition, Shestack wrote that Choate, Hall & Stewart had employed the International Foundation for Art Research, a clearinghouse for stolen art reports, to see if the items had been reported as looted.

"This resulted in a completely clear record," Shestack wrote Coggins. In his letter to Marta Regina de Fahsen, Guatemala's vice minister of culture in 1990, Shestack said, "The IFAR search was entirely negative."

But Constance Lowenthal, IFAR's director, said recently that IFAR registers only objects that can be specifically identified. Archeological treasures that come out of the ground seldom fit that category, she said, unless a dealer or collector has reported them stolen.

"You cannot describe what you never saw," said Lowenthal. She said it was inappropriate for the MFA to suggest that a simple records check by IFAR would make the acquisition legally defensible.

Shestack, who left the MFA in 1994 and is now deputy director of the National Gallery of Art in Washington, said through a family member that he would not discuss the issue. Clay, through the **museum**, said he would have no comment.

Fulling said he bought the artifacts from Guatemalan dealers in the 1970s, and had no idea how recently they had been excavated. He said he ceased importing the items "some years ago" when the US Customs Service asked him to stop, apparently, he said, after complaints from Guatemalan authorities.

Under Guatemalan law both then and now, archeological items exported without a permit automatically become Guatemalan government property. And US courts, most recently in a 1993 case in which Guatemala recovered looted Mayan items, have sometimes ruled that a national patrimony law like Guatemala's can trigger the use of a US criminal statute, the National Stolen Property Act.

Henshaw, while acknowledging that his 1987 review was "probably not perfect," asserted that Guatemala's failure to file any claim at all except for a single 1989 letter leaves the **museum** on firm legal and ethical ground in claiming the collection.

Guatemalan officials, however, said they were unaware of the contents of the November collection until seeing a list in 1988 at the time of the **museum**'s accession.

"I didn't know anything about it," said de Fahsen, the Guatemalan cultural affairs official. "But when they wrote down where they belonged -- from the Peten in Guatemala -- that was the moment I knew I could do something."

De Fahsen said after Shestack rebuffed her request for the pieces she forwarded the matter to her foreign ministry. Political instability prevented further followup, she said.

"It's a complicated situation," Benjamin said of Clay's gift. "You've got a very valuable trustee, a generous trustee who's given works of art and financial support to the **museum** for a very long period of time." At the same time, he added, these sorts of antiquities "are notorious for having been robbed from graves, for having been stolen and all that kind of stuff."

Benjamin acknowledged that the **museum** might not make the same decision about accepting such pieces today, saying "the standard for these things changes."

Items from both the Clay and Teel collections have been shown before -- in small exhibit areas of the **museum** and in exhibits at **museums** in other cities. This, however, is the first time that they have been organized into a permanent gallery, which includes African, pre-Columbian and Oceanic art.

In addition to the two terra cotta figures from Mali, Teel has also loaned valuable Nigerian artifacts, some up to 2,500 years old. Nigeria has also experienced widespread looting; even its **museums** have been pillaged because of civil strife.

McIntosh, the Rice University anthropologist and member of a presidential committee on cultural property, said dealers sometimes pay to equip entire villages in Mali with pickaxes and shovels to destroy burial sites in search of a few valuable items.

McIntosh led one archeological excavation near Djenne in 1981 that produced significant findings that the area had been settled about 200 B.C. and urbanized by 500 A.D. But with the dramatic increase in the looting of other sites over the last two decades, she said, "there is no chance for understanding how these objects functioned in ancient societies. When you see an entire grave, undisturbed, all the people with their possessions in context, you understand who the person was who owned these objects. You can really tell the story of humanity only through this kind of information, seen in context."

But with countless archeological sites looted, she said, "So much of this history of this part of West Africa will be lost forever."

Coggins, the BU archeologist and Mayan specialist, made much the same point about Clay's collection: "Every single object in there represents incalculable loss to our knowledge of the Mayans. Without the context in which the pieces were found they are useless. They are just a monument to the ego of the collector and the **museum**. It is nothing else. It is just a disastrous loss."

Looting goes back as far as civilization. All empires have plundered the treasures of weak nations. What is different today is that developing nations are beginning to make serious efforts to recover their cultural patrimony.

The government of Guatemala, for example, plans to dispatch an envoy as early as next week to examine the MFA exhibition, much of which will bear **museum** labels noting their origin in Guatemala. Zea Flores, the Guatemalan cultural official, said his country intends to seek the return of the objects.

Preoccupied with economic and civil crises until recently, nations like Guatemala, Honduras and Mexico have been monitoring auctions and **museum** exhibits in North America and Europe, often with the aid of sympathetic archeologists.

The minister of culture of Honduras, Rodolfo Pastor, has been pressing Harvard for the return of an object known as the Peccary Skull, a pig skull etched with **fine** Mayan images that was unearthed in the Honduran city of Copan late in the 19th century. The piece was brought to Harvard with the permission of the Honduran government at the time.

"One hundred years ago we didn't know the value of these things," Pastor said. "But now they are important to our identity and culture."

However, MFA officials a decade ago and today contend that whatever the provenance of these ancient artifacts, they are safer in the **museums** of North America and Europe than in Guatemala and Mali.

In his 1990 letter rejecting Guatemala's claim to the November Collection, Shestack noted that "Boston is a major cultural center of the United States" and "the collection is in a place of honor and safety where, over time, it can provide the public with tangible evidence of the great beauty of Mayan art and an appreciation of the extraordinary high level of Mayan civilization of so many years ago."

Even some of archeologists critical of the MFA -- Coggins included -- agree that Guatemala, which is still recovering from a 36-year civil war that long hobbled its efforts to protect, much less recover, its cultural artifacts, is ill-equipped to safeguard its treasures.

This is obvious from a tour of the National **Museum** of Archeology in Guatemala City, which has a tiny staff and is poorly policed. But that is not the point, say Pastor and Zea Flores. Both say that it is up to Guatemala

to deal with such problems, not the MFA.

"Regarding the argument that things are better off in a place of honor in Boston, it is worse than chauvinistic, it is condescending," said Pastor. "It supposes that being in Boston honors us and honors ancient art. Why should that be such an honor?"

SIDEBAR

In the underworld of the looters, a growing violence

YAXHA, Guatemala -- Two months ago, a murderous band of looters slipped through the dense jungle that surrounds this abandoned Mayan city and removed a massive stone monument from its 1,500-year-old resting place at the base of a sacred pyramid.

Last year, an armed raiding party held up Yaxha workers and robbed them of eight polychrome pots.

"You can see how violent they are," said Wolfgang Wurster, a German archeologist who has been working at the Yaxha dig. "The looters assaulted an ongoing excavation. This is unheard of."

Operating in the same underworld as drug traffickers and gun-runners, looters are a plague on the Mayan sites in Guatemala, Mexico, Honduras and Belize as well as in Africa, Southeast Asia and other parts of the developing world.

"These people are the mafia," said Guatemala's vice minister for culture, Carlos Enrique Zea Flores, as he examined the site of the missing monument at Yaxha late last month.

Archeologists describe jungle ruins throughout the Mayan region that are scarred with looters' trenches, riddled with hastily dug holes and strewn with the shards of discarded pottery.

"The scale of the plundering would amaze you," said Richard Hansen, a UCLA researcher who has been documenting the looting in Guatemala's Mirador River basin. "It is a hard-core, mafia-style operation. Tons of this stuff get smuggled out to Europe every year."

The most sought-after pieces are codex-style ceramics, such as the pots on display in the new ancient Americas gallery of the Boston **Museum** of **Fine Arts**, said Hansen. Looters might get $200 to $500 for a single vessel; collectors will pay more than $100,000 for such pieces.

This, he says, makes the illegal traffic in Mayan treasures a $10 million-a-month business. As with drug money, looters' money fuels corruption -- bribes to police, government officials and customs agents.

Even some archeologists are known to be involved in looting operations. The Honduras minister of culture, Rodolfo Pastor, said he and Zea know of at least one archeologist who regularly smuggles items out of the country; so far they have failed to stop him.

Most of the pieces that leave, however, are the product of rings of locals working for warlords who also may be marijuana growers, noted Ian Graham, an archeologist with Harvard's Peabody **Museum** of Archeology and Ethnology. Graham, who has been working in Guatemala's Peten region since 1957, said the threat of violence from looters is a growing danger to archeologists.

Looting of archeological sites is directly driven by the demand for these artifacts by collectors in the United States, Europe and Japan, according to an official with the United Nations agency in charge of protecting the world's cultural heritage.

"The price of these pieces keeps rising, and the amount of damage from these sites is increasing all the time," said Lyndel Prott of the cultural property division of UNESCO in Paris. "It is difficult to believe there is no connection."

Prott describes how antiquities dealers follow a code of confidentiality that makes it impossible to trace pieces back to suppliers.

In this country, importation of looted treasures is prohibited under a 1983 federal law that obligates the United States to a UNESCO convention. Most items that eventually make it to the United States are either smuggled in or routed first to nations such as Britain that do not recognize the UNESCO convention.

By now, the 1,500-year-old Yaxha monument to the priest-kings who ruled the Mayan jungles almost certainly has been sliced into pieces and sold to antiquities dealers. Soon it may be acquired by a connoiseur, who in turn may one day donate it to a **museum** -- and get a federal tax deduction for doing so.

This article and related links are available on Globe Online at http://www.boston.com. The keywords are looted art.

Perform a new search



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

The Boston Globe

# CHOPPING AWAY CULTURE MUSEUMS ROUTINELY ACCEPT ARTIFACTS STRIPPED OF CONTEXT BY LOOTERS

**Author(s):**  Ricardo J. Elia **Date:** December 21, 1997 **Page:** D1 **Section:** Focus

Visitors to the new galleries of pre-Columbian, African, and Oceanic art at Boston's Museum of Fine Arts will admire the dazzling Moche goldwork, fine Maya pottery, and enigmatic African terra cottas. But they'd better not ask where these artifacts were found, how they were obtained, or what they mean.

They won't find any answers at the museum. Only questions. The MFA opening raises troubling questions about the involvement of museums that collect ancient art originating in plundered archeological sites. Among the questions:

-- How could the museum, in good conscience, acquire objects from two of the most heavily looted regions of the world: the Maya heartland in Central America and the Inland Niger Delta of Mali?

-- How does collecting looted archeological objects affect our ability to understand ancient cultures and their art?

-- Why does the MFA refuse to disclose the various documents, including import and export papers, relating to the acquisition of the artifacts in the exhibition? These questions reveal more about the culture of art museums than about any ancient cultures.

There's no question that the Maya vessels, Mali terra cottas, and other antiquities in the exhibition were looted from archeological sites. It's the art world's dirty little secret: Virtually every archeological object acquired from abroad by collectors and museums in the United States in the last 30 years is the product of clandestine digging and smuggling.

The reason is simple. Decades ago, the governments of most antiquities-rich countries, including Guatemala, Peru, Mali, Nigeria, Greece, Turkey, Egypt, and China, enacted laws claiming ownership of archeological sites and objects. They try to control the excavation of sites and the export of antiquities, though they often fail.

Most private collectors and museums choose to ignore legal efforts to curb the theft of cultural heritage. Their willingness to traffic in stolen antiquities finances a vast international network of thieves, smugglers, dealers, and auction houses circumventing the best efforts of local authorities in order to maintain a flow of objects out of despoiled archeological sites.

Most art-importing countries, including the United States, do not generally enforce the anti-looting and export laws of other countries. If a looted archeological object can be successfully smuggled out of its country of origin, it may be perfectly legal to acquire it in this country. Hence the MFA's claim that the artifacts were legally imported may be correct, but that does not imply that they were also legally excavated and legally exported.

In many parts of the world, looting has reached crisis proportions. Thieves digging for marketable antiquities destroy archeological sites and, in the process, the information they contain about ancient cultures. This irreplaceable loss of knowledge is the most important consequence of looting -- not the theft of an art object from one country and its transfer to another.

The debate about the MFA exhibition has focused on the question of ownership: Do the Maya pots belong to the MFA or to Guatemala? But the ownership issue misses the most important point: Collectors buying from looters feeds a process that obliterates our ability to learn anything meaningful about the very cultures whose art is being gathered.

Several of the MFA's Maya pots come from Guatemala's Peten region, one of the most heavily looted areas in the world. Guatemala reports that more than 85 percent of the sites inspected in the area have been plundered. Richard Hansen, a scientist at the University of California at Los Angeles who works in the Peten region, lists 22 of 26 known Maya sites as being irreparably damaged by looting, most of it in the last 30 years.

Looting is part of an economic system that operates under the laws of supply and demand. The demand for antiquities begins with collectors. They buy from dealers and auction houses, which operate through networks of looters and smugglers that procure the artifacts. A looter who digs out a Maya pot in the Peten, for example, may receive up to $500 for the vessel, while a collector may pay more than $100,000 for the same pot; much of the difference goes to the dealer. Simply put, collecting causes, and finances, looting.

Museums buy antiquities, too, but they also profit when collectors donate objects to the museum. It's a win-win situation for donor and museum: The museum gets the artifact, the donor gets the glory and a tax write-off. Everyone else loses: the country of origin, robbed of its heritage, and the public, deprived of the chance to learn about past cultures.

Looting produces an ever-growing inventory of undocumented antiquities that have surfaced in auction houses, private collections, and museums. I recently examined the published records of eight eminent collections of pre-Columbian antiquities -- more than 2,300 objects -- assembled in the United States. The records show that not a single one was obtained through legal archeological excavations.

An example from the MFA exhibit is a group of terra-cotta sculptures from the Inland Niger Delta of Mali, another heavily looted region. Here the scale of looting can be gauged by tracking the location of known Mali terra cottas in the world. A recent study revealed that out of 341 known examples, 91 percent were in collections and dealers' shops outside Mali and had no documented origin. Fewer than 10 percent had been recovered archeologically in Mali. Not surprisingly, little is known about the functions of these sculptures.

Because of the way they were acquired, all of the antiquities in the new MFA galleries come without an archeological origin. As a result, the museum cannot answer some very basic questions: Which archeological sites did they come from? Were they found in tombs, shrines, or houses? What associated artifacts were found? What is the date of the material? How can we be sure there are no fakes?

Artifact descriptions accompanying the exhibit seem specific, but they are written in a code used by museums to describe plundered objects for which no concrete information is available. For example, several of the Maya pots are described as "Peten Region, Guatemala." Translated, that description actually means: "Looted Maya pot bought on the art market that looks similar to other pots found in archeological sites in the Peten Region of Guatemala."

Descriptions of the Mali terra cottas also convey potentially misleading information. One, a "pregnant ewe," is described as "excavated from a burial ground." Visitors might assume this sculpture was archeologically excavated, but it was not; if dug up, it was by looters. And which "burial ground" did it come from? If the museum knows, it should identify the site. More likely, it is a dealer's description, hearsay conveyed as fact. Such misinformation reflects an intellectual dishonesty that typifies museum presentations of undocumented art.

The MFA's response to the present controversy is revealing. Clearly shocked at being asked to explain its longstanding acquisition practices, the museum offered excuses about legalities while ignoring the important ethical question of how a museum can serve the public interest by being party to the destruction of cultural heritage.

Implicit in the comments of the MFA is the assumption that looting occurs independently of outside forces. Refusing to take responsibility for its involvement in the illicit trade, the museum acts as if there is no connection between collecting and looting. Yet museums that acquire undocumented artifacts are not only beneficiaries of looting, but also act in effect as its agents.

The museum also seems to assume that it is entitled to secrecy in its acquisition of such antiquities. The art market has traditionally operated under a veil of secrecy about the source of objects. One wonders, for example, when and under what circumstances the Mali terra cottas loaned to the exhibit were acquired. The

MFA says that the collector, William E. Teel, refuses to disclose any information about their acquisition, a reticence that does not seem to trouble the museum.

But times have changed. International ethical standards for museums require a higher degree of public disclosure and accountability. Museums are expected to publish acquisitions policies, something the MFA refuses to do. And they must take positive steps to ensure that they do not acquire illicitly obtained objects, whether by purchase, gift, bequest, or loan. So far, the MFA policy seems to be "See no evil, hear no evil, speak no evil."

MFA director Malcolm Rogers insists there is a place in the museum for such antiquities. "They are works of tremendous beauty, and they have vibrant cultural tales to tell," he says. But an artifact without history is largely mute.

Indeed, there is precious little educational merit in the new galleries. Without historical context, the objects retain little more than aesthetic appeal. They are archeological artifacts transformed through theft into fine art commodities. Unfortunately, the aesthetic interest is precisely what collectors and museums value most.

Art museums cannot claim to serve the public interest until they reject participation in the culture of "no questions asked" acquisition. That means putting the public interest before the interests of a few collectors and donors who sit on museum boards. It also means agreeing to disclose fully the records of all acquisitions and, at least for the time being, refraining from collecting antiquities -- not only pre-Columbian and African artifacts, but Greek and Roman, Egyptian, Near Eastern, and South Asian ones, all areas where the MFA is continuing to collect.

Once museums put their ethical houses in order, they should play a more active role in assisting countries that are rich in art but poor in resources, expertise, and simple enforcement. Museums might sponsor conservation programs, curatorial training, or even archeological excavations. These efforts might not result in gifts of antiquities to the museums, but opportunities for loans of objects and traveling exhibitions would certainly be reasonable to expect in return.

Change will not come easily. The MFA, like many art museums, must break some longstanding habits. Working to protect the cultural heritage of other countries might not be as easy as acquiring it. It would certainly mean a shift in focus on the part of museum curators, with less time spent wooing potential donor collectors, and more time spent sharing expertise and resources.

The price of a single Mali terra cotta may reach as high as $250,000 on the art market. That's more than 10 sub-Saharan countries manage to spend on archeology each year. Perhaps the museums could convince the collectors of the world that spending money to preserve the world's archeological heritage is nobler than acquiring its plundered remnants.

Perform a new search



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

The Boston Globe

## HARVARD MUSEUM ACQUISITIONS SHOCK SCHOLARS

**Author(s):** Walter V. Robinson and John Yemma, Globe Staff **Date:** January 16, 1998 **Page:** A1 **Section:** Metro

For more than a generation, Harvard's venerable museums have operated under a strict policy designed to prevent the acquisition of artifacts from the network of grave-robbers, smugglers and shady dealers trafficking in archeological plunder.

"A bad reputation, once gained, is difficult to improve," said the Harvard committee that wrote the 1971 policy pledging that Harvard would no longer accept "by purchase, bequest, or gift" objects of questionable pedigree But in recent years the university's **Arthur M**. **Sackler** Museum's acquisition of some classical antiquities -- including 182 Greek vase fragments bought in 1995 and recently showcased in a second-floor gallery -- have shocked scholars because of the likelihood the 5th century B.C. pieces were looted from tombs in Italy.

In addition, Harvard's museums have been acquiring undocumented objects from an international dealer so notorious for dealing in looted artifacts that he was barred from Italy for almost a decade. The museums' director said he sees no reason to sever ties to the dealer.

It is "heartbreaking," said archeologist Claire Lyons, vice president for professional responsibility of the Archeological Institute of America, that "such a prestigious academic museum, whose curators and director are also faculty members, is not up to speed on current ethical norms."

In an interview with the Globe, James Cuno, director of Harvard's art museums -- which include the Fogg and the Busch-Reisinger -- strongly defended the acquisitions, saying there is no evidence any of the items was stolen or removed from the country of origin after 1971, the year Harvard's acquisitions code took effect.

"The decision I took was, I thought, a very ethical one and I would stand by it and do it again," he said. "If we hadn't acquired them, they might be in some private collection lord knows where. No one would know about them; no one would learn from them. Then what service would I have done?"

That Harvard might have compromised its ethical standards has provoked debate within its fine arts faculty. A 1996 **Sackler** exhibition prompted a formal objection on ethical grounds by Irene J. Winter, then chair of the fine arts department. The exhibition comprised bronzes on loan from collectors -- including Harvard benefactors Leon Levy and Shelby White -- whose purchases of undocumented antiquities have prompted as much debate as the prices they pay.

In her 1996 letter to Cuno, Winter raised questions about the dubious origin of several of the pieces, including one bronze owned by Levy and White, which, she noted, had been "purchased in clear contravention of international convention, for which its purchasers have shown consistent disregard over the years." Levy and White have insisted that their acquisitions have been proper.

The Harvard policy envisions the same rigorous standards for loans as for acquisitions.

But there, too, Cuno said the curator could find no evidence the loaned items were suspect. And he insisted that Harvard can continue to buy on the antiquities market if it can find no evidence the items were plundered in recent years.

Harvard policy, however, asks for "reasonable assurance" that an object was not exported from its country of origin after 1971 in violation of the laws of that country. And it is on that issue where Cuno and his critics differ: He says an "innocent until proven guilty" policy is sufficient.

But many art historians and archeologists, noting that up to 80 percent of antiquities on the market were looted in recent decades, insist on tougher standards. "Ethically, given the enormous amount of looted material on the market, we are obligated to presume these items to be guilty until they are demonstrated to be innocent, and therefore the burden of proof should be on the purveyor of the object," Winter said.

With its decision to acquire the vase fragments, Harvard has created a vivid case study of the tensions between museums and archeological preservationists.

Harvard professor and museum curator David G. Mitten recommended in 1995 that Cuno acquire the fragments from a New York dealer who had obtained them over time from J. Robert Guy, an archeologist at Britain's Oxford University. Guy has two, many say conflicting, roles: He is among the world's preeminent experts on Greek vase fragments, and he has longstanding business relationships authenticating classical vases for dealers who have been implicated in buying antiquities plundered in Italy -- where most Greek vases and fragments are found. Indeed, London antiquities dealers several years ago arranged funding for Guy's Oxford fellowship -- prompting howls of outrage from Oxford faculty members.

Cuno acknowledged that despite Guy's expertise, he provided Harvard with no documentation regarding the origin of the fragments. Nor could he say where they came from -- a dead giveaway, archeologists say, that the items are unclean. Cuno said Guy had obtained them from friends, including dealers, over several decades -- a suggestion they might have been in Guy's possession before Harvard's policy took effect in 1971.

Repeated efforts to reach Guy for comment were unavailing. But archeologists who know Guy say he is in his 40s and could not have begun collecting until the 1980s.

In 1985, Guy authenticated a celebrated 6th century B.C. Greek jar for Sotheby's, the London auction house. Just after its sale for about $180,000, it was disclosed by British journalist Peter Watson that the jar had been looted and smuggled out of Italy to a dealer, Giacomo Medici. A year ago, Medici was arrested by Italian police in Switzerland, where a warehouse was discovered with 10,000 looted antiquities from Italy worth more than $30 million.

Guy has done similar work for other European dealers, including London dealer Robin Symes and Swiss dealer Herbert Cahn, who have been involved in frequent controversies over charges that the antiquities they sell are looted. In Britain and Switzerland it is not illegal to buy or sell antiquities that have been illegally looted.

No one has suggested that Guy acted illegally, rather that working for dealers like Symes makes him part of an international network that encourages destruction of archeological sites.

Cuno said Harvard's decision to buy the fragments, given the lack of documentation, ultimately rested on the view that Guy's reputation was so established that he would not risk selling looted artifacts.

But some of Guy's colleagues, also experts in the field, said they are virtually certain that the fragments, whose importance to collectors has grown markedly since the 1980s, were removed from Italy since then in violation of Italian law, which since 1939 has prohibited the export of antiquities.

Gloria Ferrari-Pinney, a University of Chicago archeologist who plans to join Harvard's faculty later this year, said that in the absence of documentation, "then you have to assume they were acquired illegally. And Italy is such a major source of these vase fragments."

Some museums began to change their rules, if not necessarily their practices, in response to a 1970 UNESCO treaty. Harvard was among the first. The US Senate ratified the treaty in 1972, but implementing legislation was not passed until 1983.

Loopholes in the law, however, have emboldened some museums, and Harvard is a study in miniature compared to the extensive acqusitions of undocumented artifacts by major institutions like the Metropolitan Museum of Art in New York. Last month, the Globe reported that the Boston Museum of Fine Arts in 1988 accepted a donation of Mayan antiquities even though its attorney knew the items were illegally removed from Guatemala.

But Harvard, with its history and reputation, reasoned in 1971 that its new stance could help "eliminate or at least diminish the power of the black market." The consequences of inaction, a team of academics who drafted the policy wrote, were unacceptable.

Mitten, who urged acquisition of the vase fragments, also has purchased several undocumented classical antiquities from Robert E. Hecht -- some of them, including 70 ancient Greek coins, as recently as last year.

In the 1970s, the Italian government declared Hecht persona non grata and ordered him out of the country for nine years for his alleged involvement in the illicit trade in antiquities. For similar reasons, he was banned from Turkey during the 1980s.

Mitten, a professor at Harvard for 37 years, has cordial relations with Hecht. "I don't think there is any reason to question" Hecht's credentials," Mitten said. "We have bought from Bob Hecht and will continue to do so. He's very square with us. We have every reason to believe him."

Thomas P. Hoving, former director of the Metropolitan Museum of Art, has quite a different view of Hecht, having weathered a 1972 scandal involving the purchase of a 2,500-year-old Greek vase from Hecht for more than $1 million, only to have evidence surface that it had been looted in Italy. The true origin of the vase was never proven, and Italy ultimately dropped criminal charges against Hecht in the case.

"Nobody would accept anything from Robert Hecht unless they were really looney," Hoving said. "In his entire career maybe there are two or three pieces he had that, by chance, were legitimate, that fell onto the truck. But the rest, no way."

But even now, said Cuno, who insists that he had never heard of the man until the Globe made inquiries, Hecht's ownership of an antiquity "is not enough to prevent" Harvard from buying from him. As for the vase fragments, Cuno said: "We have done a great service in acquiring them. And we would do it again."

The acquisitions underscore a deeper philosophical divide: Despite Harvard's archeology-friendly policy on paper, the willingness of Harvard and other institutions to acquire such items, in the view of many archeologists, only encourages further plundering of historically rich sites.

"It's out of the ground," argued Cuno. "It's out of the country [of origin]. It's on the market. We're a public institution. Our job is to encourage research and preservation. If you don't acquire it, where would it go? Back to the netherworld of private holdings in conditions inimical to its preservation."

Indeed, Cuno insisted that countries like Italy are equally to blame for looting, with their tight restrictions, lax enforcement, and official corruption. And he rejected the view that plundered items should automatically be returned to the country of origin, saying such "politically correct" solutions amount to "ethnic cleansing -- taking it from the world culture to a parochial culture. What really is best for the world? Return the items and reinforce a parochial, atomized view of world culture or encourage the exposure of these items to scholarship elsewhere?"

Nancy Netzer, a Boston College art historian and director of BC's McMullen Museum of Art, offered an opposing view. "Museum directors, and I include myself, are a greedy lot: If they like it, they want it. But you have to impose some discipline and walk away when a piece smells bad. If it is a piece of cultural property, especially if it recently came out of the ground, you have to figure out where it came from, when it left, and how it left. If you cannot satisfy yourself, you have to walk away from it. We have to be bound by more than just the law. There's the ethics, too."

Globe Online

Complete coverage of looted antiquities is available on Globe Online at http://www.boston.com. The keywords are looted art

Perform a new search

EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN<br><br>         Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>(a/k/a Iran, The Republic of Iran, Republic of Iran,<br>The Government of Iran, Iranian Government, and<br>Imperial Government of Iran),<br>THE IRANIAN MINISTRY OF INFORMATION<br>AND SECURITY,<br>AYATOLLAH ALI HOSEINI KHAMENEI,<br>ALI AKBAR HASHEMI-RAFSANJANI and<br>ALI FALLAHIAN-KHUZESTANI<br><br>         Defendants — Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY,<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,<br>BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,<br>SACKLER MUSEUM, SEMITIC MUSEUM, and<br>PEABODY MUSEUM OF ARCHAEOLOGY AND<br>ETHNOLOGY<br><br>         Trustee Process Defendants. | Case No.: 1:05-MC-10079 |

## AFFIDAVIT OF GEORGIA J. ASIMAKOPOULOS

Upon oath, Georgia J. Asimakopoulos deposes and states as follows:

1.    I am an attorney admitted to practice in the Commonwealth of Massachusetts and admitted to practice before this Court. I work at the law offices of Looney & Grossman LLP, 101 Arch Street, Boston, Massachusetts, 02110. I represent the plaintiffs, Jenny Rubin et al., along with Richard J. Grahn, Esq. and Edward V. Colbert, Esq., in this proceeding.

2.    On April 15, 2005, I delivered copies of the following pleadings in the matter of <u>Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al.</u>, via DHL courier service, to The Islamic Republic of Iran, Tracking No. 8352761421, and The Iranian Ministry of Information & Security, Tracking No. 8352761432, notifying the defendants that a hearing has been scheduled on April 26th, 2005 at 2:15 pm at the United States District Court for the District of Massachusetts:

        A.    Plaintiff's Motion for Order of Attachment by Trustee Process;

        B.    Memorandum in Support of Plaintiff's Motion for Order of Attachment by Trustee Process;

        C.    Affidavit of David J. Strachman;

        D.    Certificate Regarding Trustee Process;

        E.    Certification of Judgment for Registration in Another District;

        F.    Notice of Hearing for Case Management Conference.

Attached as "Exhibit A" to this Affidavit are copies of the correspondence to the Islamic Republic of Iran and The Iranian Ministry of Information & Security referring to the enclosed above referenced pleadings. Attached as "Exhibit B" to this Affidavit are copies of the DHL Shipment Air Waybills.

3.    As of April 25th, 2005, DHL's website tracking information indicates that both shipments are
      on hold in Teheran, Iran.  Attached as "Exhibit C" to this Affidavit are copies of the DHL
      tracking slips found on the DHL website.

4.    During numerous telephone conversations with DHL representatives, I was informed that both
      shipments have been refused by their receiver.  Attached as "Exhibit D" to this Affidavit are
      copies of the email and fax sent to me by two DHL representatives.


Signed this 26th day of April, 2005 under the Pains and Penalties of Perjury.

Georgia J. Asimakopoulos

# Looney & Grossman LLP
### Attorneys at Law

Georgia J. Asimakopoulos
Voicemail: Ext. 505
Email:
gasimakopoulos@lgllp.com

101 Arch Street
Boston, Massachusetts 02110-1112
Telephone (617) 951-2800
Telecopier (617) 951-2819
www.lgllp.com

April 15, 2005

VIA DHL COURIER SERVICE
*(Tracking No. 8352761432)*

The Iranian Ministry of Information & Security
Pasdaran Avenue
Golestan Yekom
Teheran, Iran

Re: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al.
United States District Court, District of Massachusetts, 1:05-mc-10079-GAO.

To Whom It May Concern:

Enclosed please find copies of the following pleadings being served upon you on behalf of plaintiffs in the above captioned matter:

1.      Plaintiffs' Motion for Order of Attachment by Trustee Process;

2.      Memorandum in Support of Plaintiffs' Motion for Order of Attachment by Trustee Process;

3.      Affidavit of David J. Strachman;

4.      Certificate Regarding Trustee Process;

5.      Certification of Judgment for Registration in Another District

6.      Notice of Hearing for Case Management Conference.

Please be aware that a hearing has been scheduled on **4/26/05 at 2:15 PM** at the United States District Court for the District of Massachusetts, in Courtroom 9, 1 Courthouse Way Boston, Massachusetts 02210.

# Looney & Grossman LLP

The Iranian Ministry of Information and Security
April 15, 2005
Page 2

Sincerely,

Georgia J. Asimakopoulos

Enclosures
GJA

cc:   Richard J. Grahn, Esq. (w/o encl.)
      Edward V. Colbert, Esq. (w/o encl.)
      David J. Strachman, Esq. (w/o encl.)

# Looney & Grossman LLP
### Attorneys at Law

101 Arch Street
Boston, Massachusetts 02110-1112
Telephone (617) 951-2800
Telecopier (617) 951-2819
www.lgllp.com

Georgia J. Asimakopoulos
Voicemail: Ext. 505
Email:
gasimakopoulos@lgllp.com

April 15, 2005

VIA COURIER SERVICE
(Tracking No. 8352761421)

The Islamic Republic of Iran
Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Teheran, Iran

Re: <u>Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al.
United States District Court, District of Massachusetts, 1:05-mc-10079-GAO.</u>

To Whom It May Concern:

Enclosed please find copies of the following pleadings being served upon you on behalf of plaintiffs in the above captioned matter:

1.  Plaintiffs' Motion for Order of Attachment by Trustee Process;

2.  Memorandum in Support of Plaintiffs' Motion for Order of Attachment by Trustee Process;

3.  Affidavit of David J. Strachman;

4.  Certificate Regarding Trustee Process;

5.  Certification of Judgment for Registration in Another District

6.  Notice of Hearing for Case Management Conference.

Please be aware that a hearing has been scheduled on **4/26/05 at 2:15 PM** at the United States District Court for the District of Massachusetts, in Courtroom 9, 1 Courthouse Way Boston, Massachusetts 02210.

# Looney & Grossman LLP

The Islamic Republic of Iran
April 15, 2005
Page 2

Sincerely,

Georgia J. Asimakopoulos

Enclosures
GJA

cc:    Richard J. Grahn, Esq. (w/o encl.)
       Edward V. Colbert, Esq. (w/o encl.)
       David J. Strachman, Esq. (w/o encl.)

Shipper's Copy

DESTINATION CODE

ORIGIN

835 2761 432

835 2761 432

**DHL**
EXPRESS

Process and Track your shipment online: http://www.dhl-usa.com

1-800-CALL-DHL, in USA only

**1 | Payer account number and shipment value protection details**

Charge to [X] Shipper  [ ] Receiver  [ ] 3rd Party

| [ ] Cash |
| [ ] Check |
| [ ] Credit Card |

Payer Account No.

Shipment Value Protection (see reverse)

[ ] Yes Declared Value for Carriage (in US $)

Not all payment options are available in all countries.

**2 | From (Shipper)**

Shipper's Account Number                Contact Name

Shipper's Reference (up to 35 characters)

Company Name

John J. Asimakopoulos

Address

Post/ZIP Code (required)                Phone, Fax, or E-mail (required)

**3 | To (Receiver)**

Company Name

The Iranian Ministry of Information and Security

Delivery Address DHL Cannot Deliver to a PO Box

Pasdaran Avenue
Golestan Yekom
Tehran, Iran

                                        Country

Post/ZIP Code (required)                Phone, Fax, or E-mail (required)

**4 | Shipment Details**

Total Number
of Packages

Total Weight
[ ] DHL Express Document
packaging used. enter X0

Dimensions (in inches)
Pieces    Length    Width    Height

lbs

@ ___ x ___ x ___
@ ___ x ___ x ___
@ ___ x ___ x ___

**5 | Full Description of Contents**

Give Content and Quantity DHL Does Not Transport Cash

Documents

**6 | Dutiable Shipments Only (Customs requirement)**

Attach the original and four copies of a Commercial Invoice or Pro Forma.
Export License No./Symbol (if applicable) Receiver's VAT/RST or Shipper's EIN/SSN

Value for Customs (in US $)
(as on Commercial/Pro Forma Invoice)

Schedule B Number / Harmonized Code (if applicable)

TYPE OF EXPORT  [ ] Permanent    [ ] Repair/Return    [ ] Temporary

Destination Duties/Taxes if left blank, Receiver pays deductions.
[ ] Receiver    [ ] Shipper    [ ] Other ___

The commodities, technology or software were exported from the U.S. are in compliance with the U.S. Bureau of Export Administration. Diversion to countries contrary to U.S. law is prohibited.

**7 | Shipper's Authorization (signature required)**

I/we agree that DHL's standard terms apply to this shipment and limit DHL's liability for loss or damage to US $100. The Warsaw Convention may also apply. I/we authorize DHL to complete other documents necessary to export this shipment. I/we understand that Shipment Value Protection is available on request, for an extra charge, I/we agree DHL DOES NOT TRANSPORT CASH and the recipient or 3rd party refuses to pay, I/we understand that DHL DOES NOT TRANSPORT CASH.

Signature (required)

Date  ___ / ___ / ___

**8 | Products & Services**

DOMESTIC EXPRESS
[ ] Priority
[ ] Standard

GLOBAL MAIL
[ ] Priority
[ ] Standard

[ ] U.S. Express Envelope
[ ] USA Express
[ ] Other ___

[ ] IPA
[ ] ISAL
[ ] DoorMail

WORLDWIDE EXPRESS
[ ] Intl Express Envelope

Service Options (Extra charges may apply)
[ ] Saturday
[ ] Delivery
[ ] Special
[ ] Pickup
[ ] Hold For Pickup
[ ] Delivery only
[ ] Other ___
[ ] Delivery Notification

Not all products or service options are
available in/from all locations.

DIMENSIONAL/CHARGEABLE WEIGHT        lbs

SERVICES        CHARGES

Drop Box #        TOTAL

TRANSPORT COLLECT STICKER No.

PAYMENT DETAILS (Check, Card No.)

No.:

Type ___        Expires ___

Auth.

PICKED UP BY

Route No.

Time        Date

**DHL Worldwide Express**

Process and Track your shipment online http://www.dhl-usa.com

1-800-CALL-DHL (in USA only)

ORIGIN

835 2761 421

835 2761 421

DESTINATION CODE

**1 Payer account number and shipment value protection details**

Charge to ☑ Shipper  ☐ Receiver  ☐ 3rd Party

Payer Account No.

Shipment Value Protection *(see reverse)*

☐ Yes *Declared Value for Carriage (in US $)* _____

☐ Cash
☐ Check
☐ Credit Card

Not all payment options are available in all countries.

**2 From (Shipper)**

Shipper's Account Number                    Contact Name

Shipper's Reference *(up to 35 characters)*

Georgia J. Asimakopoulos

Company Name

Address

Post/ZIP Code (required)            Phone, Fax, or E-mail (required)

**3 To (Receiver)**

Company Name

The Islamic Republic of Iran

Contact Name

Ministry of Foreign Affairs

Delivery Address DHL Cannot Deliver to a PO Box

Khomeini Avenue
United Nations Street
Teheran, Iran

Country

Post/ZIP Code (required)            Phone, Fax, or E-mail (required)

**4 Shipment Details**

Total Number of Packages

Total Weight
If Unit Express Document
packaging used, enter XD

lbs

Dimensions *(in inches)*
Pieces    Length    Width    Height

**5 Full Description of Contents**

Give Content and Quantity DHL Does Not Transport Cash

Documents

**6 Dutiable Shipments Only (Customs requirement)**

Attach the original and four copies of a Commercial Invoice or Pro Forma.
Export License No./Symbol (if applicable) Receiver's VAT/GST or Shipper's EIN/SSN

Value for Customs (in US $)
(as on Commercial/Pro Forma Invoice)

Schedule B Number / Harmonized Code (if applicable)

**TYPE OF EXPORT**  ☐ Permanent  ☐ Repair/Return  ☐ Temporary

Destination Duties/Taxes If left blank, Receiver pays duties/taxes

☐ Receiver  ☐ Shipper  ☐ Other _____

This commodities, technology or software to be exported from the U.S. are in compliance with the U.S. Bureau of Export Administration. Diversion to unstable contrary to U.S. law prohibited.

**7 Shipper's Authorization (signature required)**

I/we agree that DHL's standard terms apply to this shipment and that DHL's liability for loss or damage to US $100. The Warsaw Convention may also apply (see reverse). I/we authorize DHL to confiscate other documents necessary to export this shipment. I/we understand that Shipment Value Protection is available on request, for an extra charge. I/we agree that DHL DOES NOT TRANSPORT CASH.

Signature (required)                    Date

**8 Products & Services**

**DOMESTIC EXPRESS**
☐ U.S. Express Envelope
☐ USA Overnight
☐ Other _____

☐ GLOBAL MAIL
☐ Priority
☐ Standard
☐ IPA
☐ ISAL
☐ DoorPak

**WORLDWIDE EXPRESS**
☑ Int'l Express Envelope  ☐ Non-Dutiable  ☐ WorldFreight
☐ Dutiable  ☐ Other

Service Options *(extra charges may apply)*
☐ Saturday
☐ Delivery
☐ Special
☐ Hold for Pickup/
To inform only
☐ Delivery Notification

Not all products or service options are available in all locations.

DIMENSIONAL/CHARGEABLE WEIGHT          lbs

SERVICES          CHARGES

Drop Box #          TOTAL:

TRANSPORT COLLECT STICKER No.

PAYMENT DETAILS (Check, Card No.)

No.:

Type          Expires

PICKED UP BY

Route No.

Time          Date



The Group     Investor
Relations



Services

# Tracking
## Good Morning



The Group | Investor Relations

Contact | Site Map Settings Help

ast Track

DHL Air Waybill

Go.    More tracking options

▸ Search

Web Shipping
Book a Pick-up
Tracking
Order Supplies
DHL Interactive
Trade Automation Service

These are the results of your query

Times given are local to the service area in which the shipment checkpoint is recorded.

| Air Waybill Number | Origin Service Area | Destination Service Area | Status |
|---|---|---|---|
| 8352761421 | Boston, MA - USA | Tehran - Iran (Islamic Republic of) | Shipment on hold |

Deutsche Post World Net
MAIL EXPRESS LOGISTICS FINANCE

### 8352761421 - Detailed Report

| Date | Time | Location Service Area | Checkpoint Details |
|---|---|---|---|
| April 15, 2005 | 20:35 | Boston, MA - USA | Shipment picked up |
| April 16, 2005 | 01:53 | Cincinnati Hub, OH - USA | Transferred through Cincinnati Hub - USA |
| April 16, 2005 | 06:22 | Cincinnati Hub, OH - USA | Departed from DHL facility in Cincinnati Hub - USA |
| April 17, 2005 | 14:10 | Bahrain - Bahrain | Arrived at DHL facility in Bahrain - Bahrain |
| April 17, 2005 | 17:09 | Bahrain - Bahrain | Departed from DHL facility in Bahrain - Bahrain |
| April 17, 2005 | 19:17 | Express Logistics Centre, Dubai - United Arab Emirates | Arrived at DHL facility in Express Logistics Centre, Dubai - United Arab Emirates |
| April 17, 2005 | 22:40 | Express Logistics Centre, Dubai - United Arab Emirates | Departed from DHL facility in Express Logistics Centre, Dubai - United Arab Emirates |
| April 18, 2005 | 06:29 | Tehran - Iran (Islamic Republic of) | Arrived at DHL Facility |
| April 19, 2005 | 12:03 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 20, 2005 | 08:08 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 21, 2005 | 09:42 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 23, 2005 | 10:05 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 24, 2005 | 09:08 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 25, 2005 | 09:12 | Tehran - Iran (Islamic Republic of) | Shipment on hold |

Try a new search.

©2005    ▸ DHL International GmbH. All Rights Reserved



| Services | | | | | Careers | |
|---|---|---|---|---|---|---|
| **Tracking** | | | | | The Group | Investor Relations |
| **Good Morning** | |  | | | Contact | Site Map Settings Help |

ast Track

DHL Air Waybill

[ Go ]    More tracking options

▶ Search

Veb Shipping

Book a Pick-up

Tracking

Order Supplies

DHL Interactive

Trade Automation Service

These are the results of your query

Times given are local to the service area in which the shipment checkpoint is recorded.

| Air Waybill Number | Origin Service Area | Destination Service Area | Status |
|---|---|---|---|
| 8352761432 | Boston, MA - USA | Tehran - Iran (Islamic Republic of) | Shipment on hold |

8352761432 - Detailed Report

| Date | Time | Location Service Area | Checkpoint Details |
|---|---|---|---|
| April 15, 2005 | 20:36 | Boston, MA - USA | Shipment picked up |
| April 16, 2005 | 01:53 | Cincinnati Hub, OH - USA | Transferred through Cincinnati Hub - USA |
| April 16, 2005 | 06:22 | Cincinnati Hub, OH - USA | Departed from DHL facility in Cincinnati Hub - USA |
| April 17, 2005 | 14:10 | Bahrain - Bahrain | Arrived at DHL facility in Bahrain - Bahrain |
| April 17, 2005 | 17:09 | Bahrain - Bahrain | Departed from DHL facility in Bahrain - Bahrain |
| April 17, 2005 | 19:17 | Express Logistics Centre, Dubai - United Arab Emirates | Arrived at DHL facility in Express Logistics Centre, Dubai - United Arab Emirates |
| April 17, 2005 | 22:40 | Express Logistics Centre, Dubai - United Arab Emirates | Departed from DHL facility in Express Logistics Centre, Dubai - United Arab Emirates |
| April 18, 2005 | 06:29 | Tehran - Iran (Islamic Republic of) | Arrived at DHL Facility |
| April 19, 2005 | 10:21 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 20, 2005 | 08:04 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 21, 2005 | 09:21 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 23, 2005 | 09:40 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 24, 2005 | 08:33 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| April 25, 2005 | 08:43 | Tehran - Iran (Islamic Republic of) | Shipment on hold |

Try a new search.

©2005    ▶ DHL International GmbH. All Rights Reserved

## Georgia Asimakopoulos

**From:** Aaron Bachler (DHL US) [Aaron.Bachler@dhl.com]
**Sent:** Friday, April 22, 2005 1:09 PM
**To:** Georgia Asimakopoulos
**Subject:** airbill 8352761432

The shipment was refused by the receiver on or about April 19. Our DHL facility has indicated they are needing a contact name or phone number for the receiver. Currently the shipment is on hold at our DHL facility in Tehran.

Aaron Bachler
Shipment Inquiry Agent
1-866-345-5758
Email: Aaron.Bachler@dhl.com
Fax: 1-928-832-8682



FROM: **Stacie Downton**

DATE: _4-25-05_                          PHONE: (877) 297-6031 **EXT. 4925**

                                         FAX: (928) 223-9573

COMPANY: _____

CONTACT: _Georgia_____

(DOM) INTL (CIRCLE ONE)
FAX #: _617-951-2819_

DHL AIRWAYBILL #: _8352761421_

THERE ARE ____1____ PAGES ATTACHED TO THIS COVER PAGE.

_____       HARD COPY PROOF OF DELIVERY
                   SEE LINE # _____

_____       REQUESTED LETTER

_____       COPY OF DHL AIRWAYBILL

_____       MISCELLANEOUS

_____       REQUEST FOR ADDITIONAL INFORMATION

COMMENTS:

_____

_____

_____

_____

*PLEASE CALL ME IF I CAN BE OF FURTHER ASSISTANCE!*



April 25, 2005

Looney & Grossman LLP
Attention: Georgia J Asimakopos
101 Arch St Flr.9
Boston MA 02110
Fax 617-951-2819

| | |
|---|---|
| Airwaybill | 8352761421 |
| Date Shipped | April 15, 2005 |
| Shipper | Looney & Grossman LLP |
| Consignee | Islamic Republic Of Iran |
| City, State, Zip | Tehran |
| Country | Iran |

Dear Ms. Asimakopos,

In response to your inquiry concerning the above referenced shipment, DHL
Express has traced this shipment through our shipping cycle and has ascertained
the following:

The receiver for Ministry Affairs in Iran has refused to accept this shipment.
Please give instructions on how to proceed with this shipment.

DHL sincerely regrets any inconvenience that may have resulted with regards to
this shipment. We value our relationship with our customers and hope you will
allow us to continue providing services to your company.

Sincerely,

Stacie Downton
Service Inquiry Representative

EXHIBIT E

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN<br><br>   Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>(a/k/a Iran, The Republic of Iran, Republic of Iran,<br>The Government of Iran, Iranian Government, and<br>Imperial Government of Iran), et al.<br><br>   Defendants – Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY,<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,<br>BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,<br>SACKLER MUSEUM, SEMITIC MUSEUM, and<br>PEABODY MUSEUM OF ARCHAEOLOGY AND<br>ETHNOLOGY<br><br>   Trustee Process Defendants. | Case No.:<br>1:05-mc-10079-GAO |

## PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS TO HARVARD UNIVERSITY, PRESIDENT AND FELLOWS OF HARVARD COLLEGE, HARVARD UNIVERSITY ART MUSEUMS, BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM, SACKLER MUSEUM, SEMITIC MUSEUM, AND PEABODY MUSEUM OF ARCHAEOLOGY AND ETHNOLOGY

The Plaintiffs pursuant to Fed. R. Civ. P. 34, hereby request that Trustee Process

Defendants, Harvard University, President and Fellows of Harvard College, Harvard

University Art Museums, Busch-Reisinger Museum, Fogg Art museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archaeology and Ethnology, (collectively hereinafter "Harvard University") produce to the Plaintiffs and to make available for inspection and copying at a place and time mutually convenient to the parties, within thirty (30) days following the service of this request, the following described documents.

## DEFINITIONS

The definitions and rules of construction set forth in Rule 34 of the Federal Rules of Civil Procedure are hereby incorporated and apply to this request for the production of documents.

1.    "Acquire" and/or "Acquisition" shall mean to acquire by division, gift, purchase or any other means.

2.    "Antiquities" shall mean any and all objects, artwork, antiques, artifacts, archaeological materials, bronzes, historical instruments, coins, figurines, monuments, textiles, monumental architectural sculptures, pottery sculptures, relics, ruins, ceramics, seals, shards, statues, stones, metalwork, manuscripts, texts, vessels and all other objects originating in Iran.

3.    "Communication" shall mean the transmittal of information in the form of facts, ideas inquiries or otherwise.

4.    "Document" shall have the same meaning as in Rule 34(a) of the Federal Rules of Civil Procedure, and in particular shall include notes (handwritten and typed), internal memoranda, facsimiles, telexes, electronic mail, files maintained on or in computer hard drives, servers, portable diskette drives, laptop computers, floppy diskettes, and on

or in off-site backup computer files, other electronic data (including any exchange of information between computers and all information stored in an electronic form or computer database), tape recordings (and transcripts thereof), letters, drafts, non-identical copies, audit papers, ledgers, and books of accounts.

5.    "Excavation" shall refer to any and all archaeological activity including but not limited to digs and restorations projects in which Harvard University participated in any fashion in any location in Iran, including but not limited to Aminabad, Asterabad, Behbahan, Choga Banut, Choga Mish, Do Tulan, Damghan, Darwazeh Tepe, Gremliza, Highland Fars, Iranian Plateau, Isfahan, Istakher, Kermanshah, Khorassan, Kouh-i-Sorsoreh, Luristan, Naqsh-i-Rustam, Nishapur, Persepolis, Rayy, Sareb, Sorkh Dum, Susiana, Susa, Surkh Dum-i-Luri, Tall-i-Bakun, Tall-e-Ghazir, Tappeh Asiab, Tappeh Sohz, Tepe Giyan, Tepe Hissar, Tokhmakh Tepe, Tureng Tepe, Umma, Ur and Zagros.

6.    "Iran" and "Iranian" shall refer to Khuzestan, Persia, Islamic Republic of Iran, Iran, The Republic of Iran, The Government of Iran, Iranian Government, Imperial Government of Iran, and any agency or instrumentality of said entities including but not limited to the Iranian Ministry of Education, Iranian Cultural Heritage Organization, Iran National Museum, Iranian National Museum, Ministry of Culture and Islamic Guidance, Hajj, Endowments and Charity Affairs Organization.

7.    "MFA" shall refer to the Museum of Fine Arts or the Boston MFA located in Boston, Massachusetts.

8.    "Refer" or "relate" or "referring" or "relating" or "referencing," used in conjunction with documents, means all documents which comprise, reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request or were reviewed in conjunction with, or were created, generated or

maintained as a result of the subject matter of the request.

9.    "Respondent" shall refer to Harvard University, the Third Party Respondent in the above-captioned action, its current and past attorneys, accountants, officers, directors, agents, employees, representatives, members, predecessors-in-interest, successors-in-interest, or any other person who acted or purported to act on its behalf or under its direction or control.

10.    "U.K." shall refer to the United Kingdom, Great Britain, the Government of Britain, the British Government and any agency or instrumentality of said entities including but not limited to the British Legation, the Ministry of Public Instruction or the British Department of State.

11.    "University of Chicago" shall refer to the University of Chicago and its affiliated museum, the Oriental Institute.

12.    "U.S." shall refer to The United States of America, The U.S.A., The Government of the United States of America, The U.S. Government, and any agency or instrumentality of said entities including but not limited to the United States of America Department of State.

13.    "You" and "your" shall mean Harvard University, the Third Party Respondent in the above-captioned action, and its past and current attorneys, accountants, officers, directors, agents, employees, representatives, members, predecessors-in-interest, successors-in-interest, or any other person who acted or purported to act on its behalf or under its direction or control.

## INSTRUCTIONS

1.    In answering and responding to these requests, you shall produce all of the

materials requested below, wherever located, which are in you possession, custody or control.

2.    If you withhold any document, or any portion of any document, under a claim of privilege, you shall produce, in accordance with Rule 26 of the Federal Rules of Civil Procedure, a written privilege log that sets forth: (i) the author of the Document; (ii) the type of Document, e.g., letter or memorandum; (iii) the date of the Document; (iv) all recipients of the Document; (v) such other information as is sufficient to identify the Document; and (vi) the nature of the privilege asserted.

3.    All documents are to be produced in their entirety without redaction and should include all attachments and enclosures. If a portion of any document responsive to these requests is withheld under claim of privilege, any non-privileged portion of such document must be produced, with the portion claimed to be privileged redacted.

4.    This document request is continuing in nature. If, after producing any documents in response to this document request, you obtain or become aware of additional responsive information, you are required to provide such information or documents by way of a supplemental production.

5.    The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa.

6.    "And" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

7.    "All" shall include "each" or "any" and vice versa and should be understood in its most inclusive sense to bring within scope of the discovery request all responses that might otherwise be construed to be outside of their scope.

## REQUESTS FOR DOCUMENTS

1.     All documents and communications relating to or identifying all lawsuits, legal proceedings, and/or court actions to which you have been a party, participant, interested party, claimant, or were otherwise involved either as an individual, representative or other capacity, at any time involving antiquities (Iranian and non-Iranian) including but limited to:

    a.    the complaint and any amendments thereto;

    b.    any documents proffered and/or executed by Respondents, including, but not limited to, affidavits or certifications.

2.     All Field Reports of excavations conducted by the Respondent in Iran.

3.     All Field Registers of excavations conducted by the Respondent in Iran.

4.     All documents and communications referring to any inventory of antiquities in the possession and/or control of the Respondent, including but not limited to, documents and communications with information regarding the description and geographical origin of the antiquity, and its catalog number (if any); the name of the current legal and equitable owner(s); the date of acquisition by the owner(s); the exact method of acquisition by the owner(s); and the current location of the antiquity.

5.     All documents and communications referring to, discussing or alleging any antiquities Respondent acquired, directly or indirectly, from any excavations during the 1930's.

6.     All documents and communications referring to, discussing or alleging any excavations in which Respondent participated during the 1930's, including but not limited to, any excavation in which Respondent participated with the MFA, the

University of Pennsylvania Museum, the Philadelphia Museum of Art, the British Museum and/or the University of Chicago.

7.      All documents and communications referring to, discussing or alleging Respondent's participation in any excavations at Persepolis, Hersin, Darwazeh Tepe, Kermansha and/or Luristan.

8.      All documents and communications referring to, discussing or alleging Iran's approval of Respondent's participation in any excavations, including but not limited to, excavations in Persepolis, Hersin, Kermansha, Darwazeh Tepe and/or Luristan, and/or to the removal therefrom of any antiquities.

9.      All documents and communications referring to, discussing or alleging any agreements or arrangements, including but not limited to any violation and/or termination of such agreements or arrangements, between Iran and any of the following: (a) Respondent; (b) the British Museum; (c) the University of Pennsylvania Museum; (d) the Philadelphia Museum of Art; (e) the University of Chicago; (f) the MFA (g) the U.K. and/or (h) the U.S. relating to any excavations or any antiquities removed therefrom, including but not limited to excavations in Persepolis, Hersin, Kermansha, Darwazeh Tepe and/or Luristan.

10.     All documents and communications referring to, discussing or alleging any agreements or arrangements made between or among any of the following:  (a) Respondent; (b) the British Museum; (c) the University of Pennsylvania Museum; (d) the Philadelphia Museum of Art; (e) the University of Chicago; (f) the MFA (g) the U.K. and/or (h) the U.S. relating to any excavations or antiquities acquired therefrom, including but not limited to excavations in Persepolis, Hersin, Kermansha, Darwazeh

Tepe and/or Luristan, and/or the disclosure of any such agreements or arrangements to Iran.

11. All documents and communications referring to the division of antiquities, or plan, agreement and/or arrangement to divide antiquities, including but not limited to any plan, agreement and/or arrangement (a) drawn up by Sir Aurel Stein and/or (b) between Respondent and Iran and/or any other individual or entity, including but not limited to, the University of Pennsylvania Museum, the Philadelphia Museum of Art, the MFA, the University of Chicago, the British Museum, the U.S. and/or the U.K.

12. All documents and communications referring to the acquisition and/or receipt by Respondent of any antiquity previously owned or possessed by Ernest Herzfeld ("Herzfeld"), Erich F. Schmidt ("Schmidt"), Sir Aurel Stein, and/or their estate, heirs or fiduciary.

13. All documents and communications referring to, discussing or alleging Respondent's, Herzfeld's, Schmidt's and/or Sir Aurel Stein's legal right to remove any antiquities from Iran.

14. All documents and communications referring to, discussing or alleging the theft and/or unlawful/unauthorized acquisition of antiquities (Iranian and non-Iranian) by Respondent, Herzfeld, Schmidt and/or Sir Aurel Stein.

15. In respect to the employment and/or retention of Sir Aurel Stein by Respondent and/or the professional relationship between Respondent and Sir Aurel Stein (collectively hereinafter: "Sir Aurel Stein's employment or relationship"), provide all documents and communications referring to the terms of Sir Aurel Stein's employment or relationship, including but not limited to, the terms of the inception, termination and/or

modification of Sir Aurel Stein's employment or relationship and to the reasons for such inception, termination and/or modification.

16.    All documents and communications referencing any antiquity currently on loan from Respondent to any individual or institution, including but not limited to any antiquity temporarily deposited at the British Museum by Sir Aurel Stein.

17.    All documents and communications referencing any antiquities currently on loan to the Respondent from any individual or institution, including but not limited to the British Museum.

18.    All documents and communications referring to any antiquities Respondent has in its possession and/or control and/or to the provenance and method of acquisition of such antiquities, received by bequest of Grenville L. Winthrop, including but not limited to the series of limestone relief fragments from the palaces of Persepolis.

19.    All of Respondent's publications and catalogues listing and/or identifying antiquities that are or were in Respondent's possession at any time, including without limitation all documents referencing the antiquities excavated by Robert Braidwood, George Cameron, Pinhas Delougaz, Dr. F.G.L. Gremliza, Herzfeld, Helene Kantor, Donald McCown, Hans Nissen, Schmidt, Sir Aurel Stein and Charles Redman.

20.    All documents and communications evidencing and/or referring to the provenance and method of acquisition of all antiquities which the Respondent acquired, directly and/or indirectly, from the excavations and/or efforts of Robert Braidwood, George Cameron, Pinhas Delougaz, Dr. F.G.L. Gremliza, Herzfeld, Helene Kantor, Donald McCown, Hans Nissen, Schmidt, Sir Aurel Stein and Charles Redman.

21.    All documents and communications evidencing and/or referring to the provenance and method of acquisition of all antiquities which the Respondent acquired,

directly and/or indirectly from Grenville L. Winthrop, Arthur Upham Pope, Eshagh Sakhaei and Isaak Sakhaei.

22.    All documents or communications referring to or discussing Iran's antiquities laws.

23.    All documents and communications evidencing and/or referring to expenses incurred by Respondent in any excavations in which it participated, in the removal of any antiquities from Iran and/or in the acquisition of any antiquities.

24.    All documents, manuals, policies, guidelines, standards of procedures, directives, best practices, or the like, in effect at Harvard University at the present time or at any time since the 1930s, relating to provenance research of any antiquities acquired or received, whether on temporary or permanent loan or otherwise.

Respectfully Submitted,

Jenny Rubin, et al.

By their attorneys,

Richard J. Grahn, Esq., (BBO #206620)
Edward V. Colbert, III, Esq., (BBO #566187)
Georgia J. Asimakopoulos, Esq., (BBO #658232)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800

/s/ David J. Strachman, Esq.        (GJA)
David J. Strachman, Esq., (BBO #660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700

Dated:  June 27, 2005

## CERTIFICATION OF SERVICE

I hereby certify that on the 27th day of June, 2005, I served a true copy of the
**Plaintiff's Request for Production of Documents** within via first class mail on:

Paul R.Q. Wolfson
WILMER CUTLER PICKERING
HALE & DORR LLP
2445 M Street NW
Washington, DC  20037

Mark C. Fleming
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA  02109

Georgia J. Asimakopoulos



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN<br><br>Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>(a/k/a Iran, The Republic of Iran, Republic of Iran,<br>The Government of Iran, Iranian Government, and<br>Imperial Government of Iran), et al.<br><br>Defendants – Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY,<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,<br>BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,<br>SACKLER MUSEUM, SEMITIC MUSEUM, and<br>PEABODY MUSEUM OF ARCHAEOLOGY AND<br>ETHNOLOGY<br><br>Trustee Process Defendants. | Case No.:<br>1:05-mc-10079-GAO |

## PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS TO THE MUSEUM OF FINE ARTS

The Plaintiffs, Rubin et. al., (the "Plaintiffs") pursuant to Fed. R. Civ. P. 34,

hereby request that Trustee Process Defendant, the Museum of Fine Arts a/k/a Boston

MFA, (the "MFA") produce to the Plaintiffs and to make available for inspection and copying at a place and time mutually convenient to the parties, within thirty (30) days following the service of this request, the following described documents.

## DEFINITIONS

The definitions and rules of construction set forth in Rule 34 of the Federal Rules of Civil Procedure are hereby incorporated and apply to this request for the production of documents.

1.    "Acquire" and/or "Acquisition" shall mean to acquire by division, gift, purchase or any other means.

2.    "Antiquities" shall mean any and all objects, artwork, antiques, artifacts, archaeological materials, bronzes, historical instruments, coins, figurines, monuments, textiles, monumental architectural sculptures, pottery sculptures, relics, ruins, ceramics, seals, shards, statues, stones, metalwork, manuscripts, texts, vessels and all other objects originating in Iran.

3.    "Communication" shall mean the transmittal of information in the form of facts, ideas, inquiries or otherwise.

4.    "Document" shall have the same meaning as in Rule 34(a) of the Federal Rules of Civil Procedure, and in particular shall include notes (handwritten and typed), internal memoranda, facsimiles, telexes, electronic mail, files maintained on or in computer hard drives, servers, portable diskette drives, laptop computers, floppy diskettes, and on or in off-site backup computer files, other electronic data (including any exchange of information between computers and all information stored in an electronic form or computer database), tape recordings (and transcripts thereof), letters, drafts, non-identical

copies, audit papers, ledgers, and books of accounts.

5.    "Excavation" shall refer to any and all archaeological activity including but not limited to digs and restorations projects in which the MFA participated in any fashion in any location in Iran, including but not limited to Aminabad, Asterabad, Behbahan, Choga Banut, Choga Mish, Do Tulan, Damghan, Darwazeh Tepe, Gremliza, Highland Fars, Iranian Plateau, Isfahan, Istakher, Kermanshah, Khorassan, Kouh-i-Sorsoreh, Luristan, Naqsh-i-Rustam, Nishapur, Persepolis, Rayy, Sareb, Sorkh Dum, Susiana, Susa, Surkh Dum-i-Luri, Tall-i-Bakun, Tall-e-Ghazir, Tappeh Asiab, Tappeh Sohz, Tepe Giyan, Tepe Hissar, Tokhmakh Tepe, Tureng Tepe, Umma, Ur and Zagros

6.    "Harvard University" shall refer to Harvard University, President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum and Peabody Museum of Archaeology and Ethnology.

7.    "Iran" and "Iranian" shall refer to Khuzestan, Persia, Islamic Republic of Iran, Iran, The Republic of Iran, The Government of Iran, Iranian Government, Imperial Government of Iran, and any agency or instrumentality of said entities including but not limited to the Iranian Cultural Heritage Organization, Iran National Museum, Iranian National Museum, Ministry of Culture and Islamic Guidance, Hajj, Endowments and Charity Affairs Organization.

8.    "Refer" or "relate" or "referring" or "relating" or "referencing," used in conjunction with documents, means all documents which comprise, reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request or were reviewed in conjunction with, or were created, generated or

maintained as a result of the subject matter of the request.

9.    "Respondent(s)" refers to the MFA, the third party Respondent in the above-captioned action, its current and past attorneys, accountants, officers, directors, agents, employees, representatives, members, predecessors-in-interest, successors-in-interest, or any other person who acted or purported to act on its behalf or under its direction or control.

10.    "University of Chicago" shall refer to the University of Chicago and its affiliated museum, the Oriental Institute.

11.    "U.S." shall refer to The United States of America, The U.S.A., The Government of The United States of America, The U.S. Government, and any agency or instrumentality of said entities including but not limited to the United States of America Department of State.

12.    "You" and "your" shall mean the MFA, the third party Respondent in the above-captioned action, and its past and current attorneys, accountants, officers, directors, agents, employees, representatives, members, predecessors-in-interest, successors-in-interest, or any other person who acted or purported to act on its behalf or under its direction or control.

## INSTRUCTIONS

1.    In answering and responding to these requests, you shall produce all of the materials requested below, wherever located, which are in you possession, custody or control.

2.    If you withhold any document, or any portion of any document, under a claim of privilege, you shall produce, in accordance with Rule 26 of the Federal Rules of

Civil Procedure, a written privilege log that sets forth: (i) the author of the Document; (ii) the type of Document, e.g., letter or memorandum; (iii) the date of the Document; (iv) all recipients of the Document; (v) such other information as is sufficient to identify the Document; and (vi) the nature of the privilege asserted.

3.     All documents are to be produced in their entirety without redaction and should include all attachments and enclosures. If a portion of any document responsive to these requests is withheld under claim of privilege, any non-privileged portion of such document must be produced, with the portion claimed to be privileged redacted.

4.     This document request is continuing in nature.  If, after producing any documents in response to this document request, you obtain or become aware of additional responsive information, you are required to provide such information or documents by way of a supplemental production.

5.     The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa.

6.     "And" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

7.     "All" shall include "each" or "any" and vice versa and should be understood in its most inclusive sense to bring within scope of the discovery request all responses that might otherwise be construed to be outside of their scope.

## REQUESTS FOR DOCUMENTS

1.     All documents and communications relating to or identifying all lawsuits, legal proceedings, and/or court actions to which you have been a party, participant,

interested party, claimant, or were otherwise involved either as an individual, representative or other capacity, at any time involving antiquities (Iranian and non-Iranian) including but limited to:

        a.    the complaint and any amendments thereto;
        b.    any documents proffered and/or executed by Respondent, including, but not limited to, affidavits or certifications.

2.    All Field Reports of excavations conducted by the Respondent in Iran.

3.    All Field Registers of excavations conducted by the Respondent in Iran.

4.    All documents and communications referring to any inventory of antiquities in the possession and/or control of the Respondent, including but not limited to, documents and communications with information regarding the description and geographical origin of the antiquity, and its catalog number (if any); the name of the current legal and equitable owner(s); the date of acquisition by the owner(s); the exact method of acquisition by the owner(s); and the current location of the antiquity.

5.    All documents and communications referring to, discussing or alleging any antiquities Respondent acquired, directly or indirectly, from any excavations during the 1930's.

6.    All documents and communications referring to, discussing or alleging any excavations in which Respondent participated during the 1930's, including but not limited to, any excavation in which Respondent participated with the University of Pennsylvania Museum, the Philadelphia Museum of Art, Harvard University and/or the University of Chicago.

7.    All documents and communications referring to, discussing or alleging Respondent's participation in any excavations at Persepolis, Ray and/or Naqsh-i-Rustam

or to any antiquities removed therefrom that are currently in the possession and/or control of Respondent.

8.     All documents and communications referring to, discussing or alleging the Iran's approval of Respondent's participation in any excavations, including but not limited to, excavations in Persepolis, Ray and/or Naqsh-i-Rustam, and/or to the removal therefrom of any antiquities that are currently in the possession and/or control of the Respondent.

9.     All documents and communications referring to, discussing or alleging any agreements or arrangements, including but not limited to any violation and/or termination of such agreements or arrangements, between Iran and any of the following: (a) Respondent; (b) the University of Pennsylvania Museum; (c) the Philadelphia Museum of Art; (d) the University of Chicago; (e) Harvard University and/or (f) the U.S. relating to any excavations or any antiquities removed therefrom, including but not limited to excavations in Persepolis, Ray and/or Naqsh-i-Rustam.

10.     All documents and communications referring to, discussing or alleging any agreements or arrangements made between or among any of the following:  (a) Respondent; (b) the University of Pennsylvania Museum (c) the Philadelphia Museum of Art; (d) the University of Chicago; (e) Harvard University and/or (f) the U.S. relating to any excavations or any antiquities acquired therefrom, including but not limited to excavations in Persepolis, Ray and/or Naqsh-i-Rustam, and/or the disclosure of any such agreements or arrangements to Iran.

11.     All documents and communications referring to the division of antiquities, or plan, agreement, and/or arrangement to divide antiquities, including but not limited to

any plan, agreement and/or arrangement (a) drawn up by Erich F. Schmidt ("Schmidt"); and/or (b) between Respondent and Iran and/or any other individual or entity, including but limited to, the University of Pennsylvania Museum, the Philadelphia Museum of Art, Harvard University and/or the University of Chicago.

12.    All documents and communications referring to the acquisition and/or receipt by Respondent of any antiquity previously owned or possessed by Ernest Herzfeld ("Herzfeld"), Schmidt, and/or their estate, heirs or fiduciary.

13.    All documents and communications referring to, discussing or alleging Respondent's, Herzfeld's and/or Schmidt's legal right to remove any antiquities from Iran.

14.    All documents and communications referring to, discussing or alleging the theft and/or unlawful/unauthorized acquisition of antiquities (Iranian and non-Iranian) by Respondent, Herzfeld and/or Schmidt.

15.    In respect to the employment and/or retention of Schmidt by Respondent and/or the professional relationship between Respondent and Schmidt (collectively hereinafter: "Schmidt's employment or relationship"), provide all documents and communications referring to the terms of Schmidt's employment or relationship, including but not limited to, the terms of the inception, termination, and/or modification of Schmidt's employment or relationship and to the reasons for such inception, termination, and/or modification.

16.    All documents and communications referencing any antiquity currently on loan from the Respondent to any individual or institution.

17.     All documents and communications referencing any antiquities currently on loan to the Respondent from any individual or institution.

18.     All documents and communications referring to antiquities Respondent has in its possession and/or control and/or to the provenance and method of acquisition of such antiquities, received from the University of Chicago, whether on permanent loan or otherwise, including but not limited to the large stone relief of a lion attacking a bull believed to have been excavated by the University of Chicago at Persepolis.

19.     All of Respondent's publications and catalogues listing and/or identifying antiquities that are or were in Respondent's possession at any time, including without limitation all documents referencing the antiquities excavated by Robert Braidwood, George Cameron, Pinhas Delougaz, Dr. F.G.L. Gremliza, Herzfeld, Helene Kantor, Donald McCown, Hans Nissen, Schmidt, Sir Aurel Stein and Charles Redman.

20.     All documents and communications evidencing and/or referring to the provenance and method of acquisition of all antiquities which the Respondent acquired, directly and/or indirectly, from the excavations and/or efforts of Robert Braidwood, George Cameron, Pinhas Delougaz, Dr. F.G.L. Gremliza, Herzfeld, Helene Kantor, Donald McCown, Hans Nissen, Schmidt, Sir Aurel Stein and Charles Redman.

21.     All documents and communications evidencing and/or referring to the provenance and method of acquisition of all antiquities which the Respondent acquired, directly and/or indirectly from Arthur Upham Pope, Eshagh Sakhaei and Isaak Sakhaei.

22.     All documents and communications evidencing and/or referring to expenses incurred by Respondent in any excavations in which it participated, in the removal of any antiquities from Iran and/or in the acquisition of any antiquities.

23.    All documents, manuals, policies, guidelines, standards of procedures, directives, best practices, or the like, in effect at the MFA at the present time or at any time since the 1930s, relating to provenance research of any antiquities acquired or received, whether on temporary or permanent loan or otherwise.

24.    All documents and communications referring to or discussing Iran's antiquities laws.

Respectfully Submitted,
Jenny Rubin, et al.

By their attorneys,

Richard J. Grahn, Esq., (BBO #206620)
Edward V. Colbert, III, Esq., (BBO #566187)
Georgia J. Asimakopoulos, Esq., (BBO #658232)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800


/s/ David J. Strachman (GJA)
David J. Strachman, Esq., (BBO #660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700

Dated:  June 27, 2005

CERTIFICATION OF SERVICE

I hereby certify that on the 27th day of June, 2005, I served a true copy of the **Plaintiff's Request for Production of Documents** within via first class mail on:

Robert J. Muldoon, Jr.
(Counsel for Trustee Process Defendant, MFA)
Sherin & Lodgen LLP
101 Federal Street
Boston, Massachusetts 02110
(617) 646-2000

Georgia J. Asimakopoulos

EXHIBIT F

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br><br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN<br><br>           Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>(a/k/a Iran, The Republic of Iran, Republic of Iran,<br>The Government of Iran, Iranian Government, and<br>Imperial Government of Iran),<br>THE IRANIAN MINISTRY OF INFORMATION<br>AND SECURITY,<br>AYATOLLAH ALI HOSEINI KHAMENEI,<br>ALI AKBAR HASHEMI-RAFSANJANI and<br>ALI FALLAHIAN-KHUZESTANI<br><br>           Defendants – Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY,<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,<br>BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,<br>SACKLER MUSEUM, SEMITIC MUSEUM, and<br>PEABODY MUSEUM OF ARCHAEOLOGY AND<br>ETHNOLOGY<br><br>           Trustee Process Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.:<br>1:05-MC-10079-GAO |

## AFFIDAVIT OF GEORGIA J. ASIMAKOPOULOS

Upon oath, Georgia J. Asimakopoulos deposes and states as follows:

1.  I am an attorney admitted to practice in the Commonwealth of Massachusetts and admitted to practice before this Court. I work at the law offices of Looney & Grossman LLP, 101 Arch Street, Boston, Massachusetts, 02110. I represent the plaintiffs, Jenny Rubin et al., along with Richard J. Grahn, Esq. and Edward V. Colbert, Esq., in this proceeding.

2.  On July 14, 2005, I delivered copies of the following pleadings in the matter of Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al., to The Iranian Ministry of Information & Security and The Islamic Republic of Iran (the "Defendants—Judgment Debtors") via DHL courier service, Tracking Nos. 835 2761 465, 835 2761 454 and 835 2761 443 and/or via Federal Express mail, Tracking Nos. 8323 6976 3469 and 7911 3638 5163, and/or via Facsimile on July 15, 2005:

    A.  **Summons and Process Receipt and Return to Trustee Process Defendants Harvard University, The President and Fellows of Harvard College, The Harvard University Art Museums, The Busch-Reisinger Museum, The Fogg Art Museum, The Semitic Museum, and The Peabody Museum of Archaeology and Ethnology; and**

    B.  **Summons and Process Receipt and Return to Trustee Process Defendant The Museum of Fine Arts**

3.  On July 22, 2005, I delivered copies of the above-referenced pleadings to Defendants—Judgment Debtors via Federal Express mail, Tracking No. 8323 6976 3470.

4.  Also enclosed with the above-referenced pleadings were true and correct copies of the following pleadings that previously have been filed in the above captioned matter:

    A.  Certification of Judgment for Registration in Another District
    B.  Plaintiffs' Motion for Order of Attachment by Trustee Process

C.  Memorandum in Support of Plaintiff's Motion for Order of Attachment by Trustee Process
D.  Certificate Regarding Trustee Process
E.  Affidavit of David J. Strachman
F.  Affidavit of Georgia Asimakopoulos
G.  Stipulation
H.  Verified Response of Museum of Fine Arts to Judgment Creditors' Summons
I.  Rule 7.1 Disclosure Statement of Trustee Process Defendant Museum of Fine Arts
J.  Plaintiffs' Request for Production of Documents to the Museum of Fine Arts
K.  Plaintiffs' Request for Production of Documents to Harvard University, President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archaeology & Technology
L.  Trustee Process Respondents Harvard Parties' Answer in Response to Judgment Creditors Summons
M.  Declaration of James A. Armstrong
N.  Declaration of Luann Wilkins Abrahams
O.  Declaration of Genevieve Fisher
P.  Motion of Harvard Parties to Quash Summons and to Dissolve Attachment by Trustee Process
Q.  Memo of Law of Harvard parties in Support of Motion to Quash Summons and to Dissolve Attachment by Trustee Process with Exhibits A, B & C.
R.  Declaration of Ellen Fels Berkman
S.  Corporate Disclosure Statement of Trustee Process Respondents Harvard Parties
T.  Assented to Motion of Plaintiffs for an Extension of time to Oppose Trustee Process Defendants' Motion to Quash Summons and to Dissolve Attachment by Trustee Process

Attached as "Exhibit A" to this Affidavit is a copy of the Amended Certificate of Service referring to the delivery of the above-referenced pleadings.

5.  As of July 25, 2005, DHL's website tracking information indicates that shipments to the following locations were delivered:

The Islamic Republic of Iran
C/O Foreign Minister Kamal Kharazzi
Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Teheran, Iran

The Iranian Ministry of Foreign Affairs
Ebn e Sina Street
Emam Khomeini Square
Teheran, Iran

Iranian Ministry of Information & Security
Pasadaran Avenue
Golestan Yekom
Teheran, Iran

Attached as "Exhibit B" to this Affidavit are copies of the DHL tracking slips found on the

DHL website.

6.      As of July 25, 2005, Federal Express' website and tracking information indicates that

shipments to the following locations were delivered:

Salam Iran
Embassy of the Islamic Republic of Iran
245 Metcalfe Street
Ottawa, ON
Canada, K2P 2K2
Facsimile: (613) 232-5712

Interests Section of the Islamic Republic of Iran
Embassy of Pakistan
2209 Wisconsin Avenue, N.W.
Washington, D.C. 20007
Facsimile: (202) 965-1073

United Nations
H.E. Dr. Mohammad Javad Zarif
Permanent Representative of The Islamic Republic of Iran
to the United Nations
622 Third Avenue
New York, NY 10017

Attached as "Exhibit C" to this Affidavit are copies of the Federal Express tracking slips found

on the Federal Express website. Delivery to the above-referenced facsimile numbers was made

as of July 15, 2005 through several faxes in batches of documents. Attached as "Exhibit D" to

this Affidavit are copies of the facsimile confirmation reports.

Signed this 25th day of July, 2005 under the Pains and Penalties of Perjury.

Georgia J. Asimakopoulos

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br><br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN<br><br>            Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>(a/k/a Iran, The Republic of Iran, Republic of Iran,<br>The Government of Iran, Iranian Government, and<br>Imperial Government of Iran),<br>THE IRANIAN MINISTRY OF INFORMATION<br>AND SECURITY,<br>AYATOLLAH ALI HOSEINI KHAMENEI,<br>ALI AKBAR HASHEMI-RAFSANJANI and<br>ALI FALLAHIAN-KHUZESTANI<br><br>            Defendants – Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY,<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,<br>BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,<br>SACKLER MUSEUM, SEMITIC MUSEUM, and<br>PEABODY MUSEUM OF ARCHAEOLOGY AND<br>ETHNOLOGY<br><br>            Trustee Process Defendants. | Case No.:<br>   1:05-MC-10079-GAO |

## AMENDED CERTIFICATE OF SERVICE

L://13412/000/Pld/17

I, Georgia J. Asimakopoulos, hereby certify as follows:

1.    On the 14th day of July, 2005, true and correct copies of the **(1) Summons and Process Receipt and Return to Trustee Process Defendants Harvard University, The President and Fellows of Harvard College, The Harvard University Art Museums, The Busch-Reisinger Museum, The Fogg Art Museum, The Semitic Museum, and The Peabody Museum of Archaeology and Ethnology** and the **(2) Summons and Process Receipt and Return to Trustee Process Defendant The Museum of Fine Arts,** (the "Summons and Return") in the matter of Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al., were served on The Islamic Republic of Iran and The Iranian Ministry of Information and Security (the "Defendants—Judgment Debtors"), via DHL courier service, at the following locations:

The Islamic Republic of Iran
C/O Foreign Minister Kamal Kharazzi
Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Teheran, Iran

Iranian Ministry of Information & Security
Pasadaran Avenue
Golestan, Yekom
Teheran, Iran

The Iranian Ministry of Foreign Affairs
Ebn e Sina Street
Emam Khomeini Square
Teheran, Iran

2.    True and correct copies of the Summons and Return were served on the Defendants—

Judgment Debtors, via Federal Express mail on the 14th day of July, 2005 and via facsimile on

the 15th day of July, 2005 at the following locations:

<div align="center">

Salam Iran
Embassy of the Islamic Republic of Iran
245 Metcalfe Street
Ottawa, ON
Canada, K2P 2K2
Facsimile: (613) 232-5712

Interests Section of the Islamic Republic of Iran
Embassy of Pakistan
2209 Wisconsin Avenue, N.W.
Washington, D.C. 20007
Facsimile: (202) 965-1073

</div>

3.    True and correct copies of the Summons and Return were served on the Defendants—

Judgment Debtors, via Federal Express mail on the 22nd day of July, 2005 at the following

location:

<div align="center">

United Nations
H.E. Dr. Mohammad Javad Zarif
Permanent Representative of the Islamic Republic of Iran to the United Nations
622 Third Avenue
New York, NY 10017

</div>

4.    Also enclosed with the Summons and Return were true and correct copies of the

following pleadings that previously have been filed in the above captioned matter:

1. Certification of Judgment for Registration in Another District
2. Plaintiffs' Motion for Order of Attachment by Trustee Process
3. Memorandum in Support of Plaintiff's Motion for Order of Attachment by Trustee Process
4. Certificate Regarding Trustee Process
5. Affidavit of David J. Strachman
6. Affidavit of Georgia Asimakopoulos
7. Stipulation

8. Verified Response of Museum of Fine Arts to Judgment Creditors' Summons
9. Rule 7.1 Disclosure Statement of Trustee Process Defendant Museum of Fine Arts
10. Plaintiffs' Request for Production of Documents to the Museum of Fine Arts
11. Plaintiffs' Request for Production of Documents to Harvard University, President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archaeology & Technology
12. Trustee Process Respondents Harvard Parties' Answer in Response to Judgment Creditors Summons
13. Declaration of James A. Armstrong
14. Declaration of Luann Wilkins Abrahams
15. Declaration of Genevieve Fisher
16. Motion of Harvard Parties to Quash Summons and to Dissolve Attachment by Trustee Process
17. Memo of Law of Harvard parties in Support of Motion to Quash Summons and to Dissolve Attachment by Trustee Process with Exhibits A, B & C.
18. Declaration of Ellen Fels Berkman
19. Corporate Disclosure Statement of Trustee Process Respondents Harvard Parties
20. Assented to Motion of Plaintiffs for an Extension of time to Oppose Trustee Process Defendants' Motion to Quash Summons and to Dissolve Attachment by Trustee Process

/s/ Georgia J. Asimakopoulos
Georgia J. Asimakopoulos



| Ship | **Track** | Services | About DHL | Help |



**Track**

▸ Track by number
▸ Track by reference
▸ Get delivery signature
▸ Track DHL Same Day service

## Track results detail

### Tracking results detail for 8352761443

▸ Help

**Tracking summary**

| | | |
|---|---|---|
| Current Status | ✓ | **Shipment delivered.** |
| Delivered on | | 7/17/2005  8:54 am |
| Delivered to | | |
| Signed for by | | STAMP   What is this? |

## Log in to DHL

| User ID | |
| Password | |

☐ Remember my User ID

Log in ▶

▸ Forgot your Password?

### Tracking history

| Date and Time | Status | Location |
|---|---|---|
| 7/17/2005 8:54 am | Shipment delivered. | Tehran, Iran |
| 6:44 am | Arrived at DHL facility. | Tehran, Iran |
| 7/16/2005 10:34 pm | In transit. | Dubai, United Arab Emirates |
| 7/15/2005 8:55 am | In transit. | New York, NY |
| 7/14/2005 8:36 pm | Departing origin. | Boston, MA |
| 7:32 pm | Picked Up by DHL. | Public Drop Box |

| Ship From: | Ship To: | Shipment Information: |
|---|---|---|
| LOONEY & GROSSMAN LLP | | Ship date: 7/14/2005 |
| Boston, MA  021101117 | | Pieces: |
| United States | | Total weight: 2 lbs |
| | | Ship Type: Document |
| | | |
| Attention: | Attention: | Shipment Reference: 13412.000 |
| LOONEY & GROSSMAN LLP | | Service: International Express |
| | | Special Service: |
| | | Description: DOCS |

Tracking detail provided by DHL: 7/20/2005, 12:28:58 pm pt.

Track new shipment ▶

You are authorized to use DHL tracking systems solely to track shipments tendered by or for you to DHL. Any other use of DHL tracking systems and information is strictly prohibited.

### New to DHL?

Registration is quick and easy.And as a registered user,you'll have access to services and tools to help you ship your packages easily and efficiently.
▸ Register Now

### Questions?

We're here to help!
▸ Contact DHL

DHL Global | About DHL | Newsroom | Contact | Sitemap | Privacy Policy
Copyright © 2005 DHL International, Ltd. All Rights Reserved.



| Ship | **Track** | Services | About DHL | Help |

DHL USA Home    DHL Global



# Track results detail

## Tracking results detail for 8352761454

▶ Help

**Track**

▸ Track by number
▸ Track by reference
▸ Get delivery signature
▸ Track DHL Same Day service

## Tracking summary

| | | |
|---|---|---|
| Current Status | ✓ | **Shipment delivered.** |
| Delivered on | | 7/17/2005  8:54 am |
| Delivered to | | |
| Signed for by | | **STAMP**   What is this? |

**Log in to DHL**

User ID [        ]

Password [        ]

☐ Remember my User ID

Log in ▶

▸ Forgot your Password?

## Tracking history

| Date and Time | Status | Location |
|---|---|---|
| 7/17/2005 8:54 am | Shipment delivered. | Tehran, Iran |
| 6:45 am | Arrived at DHL facility. | Tehran, Iran |
| 7/16/2005 10:34 pm | In transit. | Dubai, United Arab Emirates |
| 7/15/2005 8:55 am | In transit. | New York, NY |
| 7/14/2005 8:36 pm | Departing origin. | Boston, MA |
| 7:32 pm | Picked Up by DHL. | Public Drop Box |

**Ship From:**
LOONEY & GROSSMAN LLP
Boston, MA  021101117
United States

**Ship To:**

**Shipment Information:**
Ship date: 7/14/2005
Pieces:
Total weight: 2 lbs
Ship Type: Document

Attention:
LOONEY & GROSSMAN LLP

Attention:

Shipment Reference: 13412.000
Service: International Express
Special Service:
Description: DOCS

Tracking detail provided by DHL: 7/20/2005, 12:21:53 pm pt.

Track new shipment ▶

You are authorized to use DHL tracking systems solely to track shipments tendered by or for you to DHL. Any other use of DHL tracking systems and information is strictly prohibited.

**New to DHL?**

Registration is quick and easy. And as a registered user, you'll have access to services and tools to help you ship your packages easily and efficiently.
▸ Register Now

**Questions?**

We're here to help!
▸ Contact DHL

DHL Global | About DHL | Newsroom | Contact | Sitemap | Privacy Policy
Copyright © 2005 DHL International, Ltd. All Rights Reserved.



**DHL**

Products/ eShipping    Tools    Information    Press    Careers    About DHL
Services

The Group    Investor
Relations

Contact    Site Map
Settings
Help

Tracking
Good Morning

Fast Track

DHL Air Waybill

▶ Go    More tracking options

▶ Search

▶ Web Shipping

▶ Book a Pick-up

▶ Tracking

▶ Order Supplies

▶ DHL Interactive

▶ Trade Automation Service

These are the results of your query

Times given are local to the service area in which the shipment checkpoint is recorded.

| Air Waybill Number | Origin Service Area | Destination Service Area | Status |
|---|---|---|---|
| 8352761465 | Boston, MA - USA | Tehran - Iran (Islamic Republic of) | Signed for by: YUNESI Shipment delivered July 24, 2005 11:57 ✓ |

**8352761465 - Detailed Report**

| Date | Time | Location Service Area | Checkpoint Details |
|---|---|---|---|
| July 14, 2005 | 19:32 | Boston, MA - USA | Shipment picked up |
| July 14, 2005 | 20:36 | Boston, MA - USA | Departing origin |
| July 15, 2005 | 08:55 | New York City Gateway, NY - USA | Departed from DHL facility in New York City Gateway - USA |
| July 16, 2005 | 22:34 | Express Logistics Centre, Dubai - United Arab Emirates | Departed from DHL facility in Express Logistics Centre, Dubai - United Arab Emirates |
| July 17, 2005 | 07:09 | Tehran - Iran (Islamic Republic of) | Arrived at DHL Facility |
| July 17, 2005 | 09:32 | Tehran - Iran (Islamic Republic of) | Address Information needed; contact DHL |
| July 17, 2005 | 11:13 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| July 18, 2005 | 07:17 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| July 19, 2005 | 07:12 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| July 20, 2005 | 09:14 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| July 21, 2005 | 08:20 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| July 23, 2005 | 07:20 | Tehran - Iran (Islamic Republic of) | Shipment on hold |
| July 24, 2005 | 08:25 | Tehran - Iran (Islamic Republic of) | With delivery courier |
| July 24, 2005 | 11:57 | Tehran - Iran (Islamic Republic of) | Shipment delivered |

Try a new search.

Deutsche Post ✪ World Net
MAIL EXPRESS LOGISTICS FINANCE

©2005   ▶ DHL International GmbH. All Rights Reserved



Search [          ] Go!

**Package / Envelope Services** | Office / Print Services | Freight Services | Expedited Services

Ship | **Track** | Manage My Account | International Tools

Track Shipments
# Detailed Results

🖨 Printable Version    ❓ Quick Help

You can also track:
- By TCN
- FedEx Trade Networks shipments
- By Email Track
- By FedEx Wireless Solutions

| | | | | |
|---|---|---|---|---|
| Tracking number | 832369763470 | Delivered to | Receptionist/Front Desk | |
| Signed for by | F.TELIZE | Service type | Priority Box | |
| Ship date | Jul 22, 2005 | Weight | 5.0 lbs. | |
| Delivery date | Jul 25, 2005 10:01 AM | | | |
| Status | Delivered | | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Jul 25, 2005 | 10:01 AM | Delivered | NEW YORK, NY | |
| | 6:45 AM | On FedEx vehicle for delivery | NEW YORK, NY | |
| | 6:29 AM | At local FedEx facility | | |
| Jul 23, 2005 | 9:21 AM | Arrived at FedEx location | MEMPHIS, TN | |
| | 7:47 AM | Departed FedEx location | NEWARK, NJ | |
| Jul 22, 2005 | 8:59 PM | Left origin | SOUTH BOSTON, MA | |
| | 5:01 PM | Picked up | SOUTH BOSTON, MA | |

Wrong Address?
Reduce future mistakes by using FedEx Address Checker.

Shipping Freight?
FedEx has LTL, air freight, surface and air expedited freight, multi piece package deliveries, and ocean freight.

[ Signature proof ]  [ Email results ]  [ Track more shipments ]

Subscribe to tracking updates (optional)

Your Name: [                    ]        Your Email Address: [                    ]

| Email address | Language | Exception updates | Delivery updates |
|---|---|---|---|
| [          ] | English | | ☐ |
| [          ] | English | | ☐ |
| [          ] | English | | ☐ |
| [          ] | English | | ☐ |

Select format: ⦿ HTML  ○ Text  ○ Wireless
Add personal message:

Not available for Wireless or non-English characters.

☐ By selecting this check box and the Submit button, I agree to these Terms and Conditions        Submit

Global Home | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2005 FedEx



Information Center | Customer Support | Site Map

Search _____ Go!

| Package/Envelope Services | Office / Print Services | Freight Services | Expedited Services |

| Ship | Track | Manage My Account | International Tools |

Track Shipments
## Detailed Results

🖨 Printable Version    ? Quick Help

You can also track:
- By TCN
- FedEx Trade Networks shipments
- By Email Track
- By FedEx Wireless Solutions

| | | | | |
|---|---|---|---|---|
| Tracking number | 832369763469 | Delivered to | Receptionist/Front Desk | |
| Signed for by | A.MAJIDY | Service type | Standard Box | |
| Ship date | Jul 14, 2005 | Weight | 5.0 lbs. | |
| Delivery date | Jul 15, 2005 10:05 AM | | | |
| Status | Delivered | | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Jul 15, 2005 | 10:05 AM | Delivered | | |
| | 8:10 AM | On FedEx vehicle for delivery | WASHINGTON, DC | |
| | 7:28 AM | At local FedEx facility | WASHINGTON, DC | |
| | 4:43 AM | At dest sort facility | DULLES, VA | |
| | 4:21 AM | Departed FedEx location | NEWARK, NJ | |
| Jul 14, 2005 | 9:03 PM | Left origin | SOUTH BOSTON, MA | |
| | 5:39 PM | Picked up | SOUTH BOSTON, MA | |

Wrong Address?
Reduce future mistakes by using FedEx Address Checker.

Shipping Freight?
FedEx has LTL, air freight, surface and air expedited freight, multi piece package deliveries, and ocean freight.

[ Signature proof ]    [ Email results ]    [ Track more shipments ]

Subscribe to tracking updates (optional)

Your Name: [_____]        Your Email Address: [_____]

| Email address | Language | Exception updates | Delivery updates |
|---|---|---|---|
| [_____] | English | | ☐ |
| [_____] | English | | ☐ |
| [_____] | English | | ☐ |
| [_____] | English | | ☐ |

Select format: ⦿ HTML  ○ Text  ○ Wireless
Add personal message:

Not available for Wireless or non-English characters.

☐ By selecting this check box and the Submit button, I agree to these Terms and Conditions

[ Submit ]

This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2005 FedEx

United States Home                                          Information Center | Customer Support | Site Map

# FedEx.

Search                                                                                                                     Go!

| Package / Envelope Services | Office / Print Services | Freight Services | Expedited Services |

| Ship | Track | Manage My Account | International Tools |

## Track Shipments
## Detailed Results

📄 Printable Version      ❓ Quick Help

You can also track:
- By TCN
- FedEx Trade Networks shipments
- By Email Track
- By FedEx Wireless Solutions

| | | | | |
|---|---|---|---|---|
| **Tracking number** | 791136385163 | **Destination** | OTTAWA, ON | |
| **Signed for by** | .JAVA | **Delivered to** | Receptionist/Front Desk | |
| **Ship date** | Jul 14, 2005 | **Service type** | FedEx 10kg Box | |
| **Delivery date** | Jul 15, 2005 10:47 AM | **Weight** | 1.0 lbs. | |

**Status**          Delivered

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Jul 15, 2005 | 10:47 AM | Delivered | OTTAWA, ON | |
| | 9:51 AM | On FedEx vehicle for delivery | OTTAWA, ON | |
| | 9:29 AM | At local FedEx facility | OTTAWA, ON | |
| | 9:28 AM | Int'l shipment release | OTTAWA, ON | |
| | 8:38 AM | At dest sort facility | OTTAWA, ON | |
| | 4:11 AM | Departed FedEx location | INDIANAPOLIS, IN | |
| | 12:49 AM | Arrived at FedEx location | INDIANAPOLIS, IN | |
| Jul 14, 2005 | 11:46 PM | Departed FedEx location | MEMPHIS, TN | |
| | 9:04 PM | Left origin | SOUTH BOSTON, MA | |
| | 5:39 PM | Picked up | SOUTH BOSTON, MA | |
| | 11:11 AM | Package data transmitted to FedEx | | |

Wrong Address?
Reduce future mistakes by using FedEx Address Checker.

Shipping Freight?
FedEx has LTL, air freight, surface and air expedited freight, multi piece package deliveries, and ocean freight.

| Signature proof | Email results | Track more shipments |

Subscribe to tracking updates (optional)

**Your Name:** _____        **Your Email Address:** _____

| Email address | Language | Exception updates | Delivery updates |
|---|---|---|---|
| _____ | English | | ☐ |
| _____ | English | | ☐ |
| _____ | English | | ☐ |
| _____ | English | | ☐ |

**Select format:** ◉ HTML  ○ Text  ○ Wireless
**Add personal message:**

Not available for Wireless or non-English characters.

☐ By selecting this check box and the Submit button, I agree to these Terms and Conditions                                Submit

Global Home | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2005 FedEx

Confirmation Report — Memory Send

Time        : Jul-15-05  12:16pm
Tel line    : +6177371053
Name        : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 928 |
| Date | : | Jul-15 11:55am |
| To | : | 7787#13412*000#12029651073 |
| Document pages | : | 23 |
| Start time | : | Jul-15 11:55am |
| End time | : | Jul-15 12:09pm |
| Pages sent | : | 23 |
| Status | : | NG  DO |

Job number    : 928              *** SEND SUCCESSFUL  ***

## Looney & Grossman LLP
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

### FACSIMILE COVER SHEET

| | |
|---|---|
| TO:<br>Interests Section of the Islamic<br>Republic of Iran | FROM:<br>Georgia J. Asimakopoulos, Esq. |
| COMPANY:<br>Embassy of Pakistan | DATE:<br>July 14, 2005 |
| FAX NUMBER:<br>(202) 965-1073 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE:<br>SERVICE OF PROCESS<br>AND COPIES OF<br>PLEADINGS IN THE<br>FOLLOWING MATTER:<br><br>Rubin, et al., v. The Islamic Republic of<br>Iran et al., v. Museum of Fine Arts et<br>al. | FILE NO.:<br>13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail  ☐ Messenger  ☐ Overnight Mail  ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on the transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

## Confirmation Report — Memory Send

Time      : Jul-15-05  01:31pm
Tel line  : +6177371053
Name      : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 938 |
| Date | : | Jul-15 01:19pm |
| To | : | 7787#13412#000#12029651073 |
| Document pages | : | 18 |
| Start time | : | Jul-15 01:20pm |
| End time | : | Jul-15 01:31pm |
| Pages sent | : | 18 |
| Status | : | OK |

Job number    : 938              *** SEND SUCCESSFUL  ***

---

## Looney & Grossman LLP
### Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

### FACSIMILE COVER SHEET

| | |
|---|---|
| TO:<br>Interests Section of the Islamic<br>Republic of Iran | FROM:<br>Georgia J. Asimakopoulos, Esq. |
| COMPANY:<br>Embassy of Pakistan | DATE:<br>July 14, 2005 |
| FAX NUMBER:<br>(202) 965-1073 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE:<br>SERVICE OF PROCESS<br>AND COPIES OF<br>PLEADINGS IN THE<br>FOLLOWING MATTER:<br><br>Rubin et al., v. The Islamic Republic of<br>Iran et al., v. Museum of Fine Arts et<br>al. | FILE NO.:<br>13412.000 |

---

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐  Messenger ☐  Overnight Mail ☐  This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

---

******CONFIDENTIALITY NOTE******

The document accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

Confirmation Report — Memory Send

Time     : Jul-15-05  12:56pm
Tel line : +6177371053
Name     : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 930 |
| Date | : | Jul-15 12:03pm |
| To | : | 7787#13412*000#12029651073 |
| Document pages | : | 09 |
| Start time | : | Jul-15 12:16pm |
| End time | : | Jul-15 12:23pm |
| Pages sent | : | 09 |
| Status | : | OK |
| Job number | : 930 | *** SEND SUCCESSFUL *** |

---

# Looney & Grossman LLP
Attorneys at Law

101 Arch Street
Boston, MA 01110-1112
(617) 951-2800

Facsimile (617) 951-2819

## FACSIMILE COVER SHEET

TO:
Interests Section of the Islamic
Republic of Iran

COMPANY:
Embassy of Pakistan

FAX NUMBER
(202) 965-1073

FROM:
Georgia J. Asimakopoulos, Esq.

DATE:
July 14, 2005

TOTAL NO. OF PAGES INCLUDING COVER:

FILE NO.:
13412.000

RE:
SERVICE OF PROCESS
AND COPIES OF
PLEADINGS IN THE
FOLLOWING MATTER:

Rubin et al., v. The Islamic Republic of
Iran et al., v. Museum of Fine Arts et
al.

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

Confirmation Report — Memory Send

```
                                    Time      : Jul-15-05  12:56pm
                                    Tel line  : +6177371053
                                    Name      : LOONEY GROSSMAN L
```

| | | |
|---|---|---|
| Job number | : | 931 |
| Date | : | Jul-15 12:09pm |
| To | : | 7787#13412*000#12029651073 |
| Document pages | : | 24 |
| Start time | : | Jul-15 12:16pm |
| End time | : | Jul-15 12:30pm |
| Pages sent | : | 24 |
| Status | : | OK |

Job number    : 931                  *** SEND SUCCESSFUL  ***

## Looney & Grossman LLP
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

### FACSIMILE COVER SHEET

| TO: Interests Section of the Islamic Republic of Iran | FROM: Georgia J. Asimakopoulos, Esq. |
|---|---|
| COMPANY: Embassy of Pakistan | DATE: July 14, 2005 |
| FAX NUMBER (202) 965-1073 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER:  Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. | FILE NO.: 13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

*****CONFIDENTIALITY NOTE******

The document accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

## Confirmation Report — Memory Send

|       |                          |
|-------|--------------------------|
| Time  | : Jul-15-05  12:56pm     |
| Tel line | : +6177371053         |
| Name  | : LOONEY GROSSMAN L      |

| | | |
|---|---|---|
| Job number | : | 932 |
| Date | : | Jul-15 12:19pm |
| To | : | 7787#13412*000#12029651073 |
| Document pages | : | 28 |
| Start time | : | Jul-15 12:16pm |
| End time | : | Jul-15 12:38pm |
| Pages sent | : | 28 |
| Status | : | OK |

Job number     : 932          *** SEND SUCCESSFUL ***

---

## Looney & Grossman LLP
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile: (617) 951-2819

### FACSIMILE COVER SHEET

| TO: Interests Section of the Islamic Republic of Iran | FROM: Georgia J. Asimakopoulos, Esq. |
|---|---|
| COMPANY: Embassy of Pakistan | DATE: July 14, 2005 |
| FAX NUMBER: (202) 965-1073 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: | FILE NO.: 13412.000 |

Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al.

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

---

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

Confirmation Report — Memory Send

Time      : Jul-15-05  12:57pm
Tel line  : +6177371053
Name      : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 933 |
| Date | : | Jul-15  12:23pm |
| To | : | 7787#13412*000#12029651073 |
| Document pages | : | 17 |
| Start time | : | Jul-15  12:16pm |
| End time | : | Jul-15  12:43pm |
| Pages sent | : | 17 |
| Status | : | OK |
| Job number | : 933 | *** SEND SUCCESSFUL  *** |

**Looney & Grossman LLP**
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

FACSIMILE COVER SHEET

TO: Interests Section of the Islamic
Republic of Iran

FROM:
Georgia J. Asimakopoulos, Esq.

COMPANY:
Embassy of Pakistan

DATE:
July 14, 2005

FAX NUMBER:
(202) 965-1073

TOTAL NO. OF PAGES INCLUDING COVER:

FILE NO.:
13412.000

RE:    SERVICE OF PROCESS
AND COPIES OF
PLEADINGS IN THE
FOLLOWING MATTER:

Rubin et al., v. The Islamic Republic of
Iran et al., v. Museum of Fine Arts et
al.

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

Confirmation Report — Memory Send

Time      : Jul-15-05  12:57pm
Tel line  : +6177371053
Name      : LOONEY GROSSMAN L

Job number        :  934

Date              :  Jul-15 12:30pm

To                :  7787#13412*000#12029651073

Document pages    :  47

Start time        :  Jul-15 12:16pm

End time          :  Jul-15 12:55pm

Pages sent        :  47

Status            :  OK

Job number  : 934            *** SEND SUCCESSFUL ***

## Looney & Grossman LLP
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

### FACSIMILE COVER SHEET

| TO: Interests Section of the Islamic Republic of Iran | FROM: Georgia J. Asimakopoulos, Esq. |
|---|---|
| COMPANY: Embassy of Pakistan | DATE: July 14, 2005 |
| FAX NUMBER: (202) 965-1073 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. | FILE NO.: 13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

# Confirmation Report — Memory Send

Time : Jul-15-05 01:14pm
Tel line : +6177371053
Name : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 936 |
| Date | : | Jul-15 12:59pm |
| To | : | 7777#13412*000#12029651073 |
| Document pages | : | 45 |
| Start time | : | Jul-15 01:00pm |
| End time | : | Jul-15 01:14pm |
| Pages sent | : | 45 |
| Status | : | OK |

Job number : 936 *** SEND SUCCESSFUL ***

**Looney & Grossman LLP**
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

FACSIMILE COVER SHEET

| | |
|---|---|
| TO: Interests Section of the Islamic Republic of Iran | FROM: Georgia J. Asimakopoulos, Esq. |
| COMPANY: Embassy of Pakistan | DATE: July 14, 2005 |
| FAX NUMBER: (202) 965-1073 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. | FILE NO.: 13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:
Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

*****CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

# Confirmation Report — Memory Send

```
Time     : Jul-15-05  10:21am
Tel line : +6177371053
Name     : LOONEY GROSSMAN L
```

| | | |
|---|---|---|
| Job number | : | 913 |
| Date | : | Jul-15 10:03am |
| To | : | 7777#13412*000#16132325712 |
| Document pages | : | 23 |
| Start time | : | Jul-15 10:03am |
| End time | : | Jul-15 10:10am |
| Pages sent | : | 23 |
| Status | : | OK |

Job number    : 913          *** SEND SUCCESSFUL  ***

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

---

The originals of the transmitted documents will also be sent by Federal Express Mail.

COMMENTS:

Regular Mail ☐  Messenger ☐  Overnight Mail ☐  This is the only form of delivery of transmitted documents.

The original of the transmitted documents will be sent by:

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

---

RE: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al.

SERVICE OF PROCESS
AND COPIES OF
PLEADINGS IN THE
FOLLOWING MATTER:

FILE NO.: 13412.000

FAX NUMBER: (613) 232-5712

TOTAL NO. OF PAGES INCLUDING COVER:

COMPANY: Embassy of the Islamic Republic of Iran

DATE: July 14, 2005

TO: Salam Iran

FROM: Georgia J. Asimakopoulos, Esq.

## FACSIMILE COVER SHEET

Facsimile (617) 951-2819

Looney & Grossman LLP
Attorneys at Law
101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

# Confirmation Report – Memory Send

Time : Jul-15-05 10:22am
Tel line : +6177371053
Name : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 914 |
| Date | : | Jul-15 10:07am |
| To | : | 7777#13412*000#16132325712 |
| Document pages | : | 18 |
| Start time | : | Jul-15 10:03am |
| End time | : | Jul-15 10:19am |
| Pages sent | : | 18 |
| Status | : | OK |

Job number : 914 *** SEND SUCCESSFUL ***

**Looney & Grossman LLP**
Attorneys at Law
101 Arch Street
Boston, MA 02110-1112
(617) 951-2800
Facsimile (617) 951-2819

## FACSIMILE COVER SHEET

TO: Salam Iran
FROM: Georgia J. Asimakopoulos, Esq.
COMPANY: Embassy of the Islamic Republic of Iran
DATE: July 14, 2005
FAX NUMBER: (613) 232-5712
TOTAL NO. OF PAGES INCLUDING COVER:
FILE NO.: 13412.000
RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER:

Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al.

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:
Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:
The originals of the transmitted documents will also be sent by Federal Express Mail.

*****CONFIDENTIALITY NOTE******
The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

# Confirmation Report – Memory Send

Time : Jul-15-05 10:22am
Tel line : +6177371053
Name : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 915 |
| Date | : | Jul-15 10:09am |
| To | : | 7777#13412*000#16132325712 |
| Document pages | : | 09 |
| Start time | : | Jul-15 10:03am |
| End time | : | Jul-15 10:21am |
| Pages sent | : | 09 |
| Status | : | OK |

Job number : 915 *** SEND SUCCESSFUL ***

**Looney & Grossman LLP**
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

FACSIMILE COVER SHEET

| | |
|---|---|
| TO: Salam Iran | FROM: Georgia J. Asimakopoulos, Esq. |
| COMPANY: Embassy of the Islamic Republic of Iran | DATE: July 14, 2005 |
| FAX NUMBER: (613) 232-5712 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. | FILE NO.: 13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail

*****CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

# Confirmation Report – Memory Send

Time : Jul-15-05 11:21am
Tel line : +6177371053
Name : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 916 |
| Date | : | Jul-15 10:29am |
| To | : | 7777#13412*000#16132325712 |
| Document pages | : | 24 |
| Start time | : | Jul-15 10:30am |
| End time | : | Jul-15 10:40am |
| Pages sent | : | 24 |
| Status | : | OK |

Job number : 916 *** SEND SUCCESSFUL ***

**Looney & Grossman LLP**
Attorneys at Law
101 Arch Street
Boston, MA 02110-1112
(617) 951-2800
Facsimile (617) 951-2819

## FACSIMILE COVER SHEET

| | |
|---|---|
| TO: Salam Iran | FROM: Georgia J. Asimakopoulos, Esq. |
| COMPANY: Embassy of the Islamic Republic of Iran | DATE: July 14, 2005 |
| FAX NUMBER: (613) 232-5712 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. | FILE NO.: 13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:
Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

*****CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

## Confirmation Report — Memory Send

```
                              Time      : Jul-15-05  11:22am
                              Tel line  : +6177371053
                              Name      : LOONEY GROSSMAN L
```

| | | |
|---|---|---|
| Job number | : | 917 |
| Date | : | Jul-15 10:32am |
| To | : | 7777#13412#000#16132325712 |
| Document pages | : | 28 |
| Start time | : | Jul-15 10:32am |
| End time | : | Jul-15 11:04am |
| Pages sent | : | 28 |
| Status | : | OK |
| Job number | : 917 | *** SEND SUCCESSFUL  *** |

******CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman
LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the
individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure,
copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error,
please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via
the U.S. Postal Service. Thank you.

---

Looney & Grossman LLP
Attorneys at Law
101 Arch Street
Boston, MA 02110-1112
(617) 951-2800
Facsimile (617) 951-2819

## FACSIMILE COVER SHEET

| | |
|---|---|
| FROM: | Georgia J. Asimakopoulos, Esq. |
| TO: | Salam Iran |
| DATE: | July 14, 2005 |
| COMPANY: | Embassy of the Islamic Republic of Iran |
| FAX NUMBER: | (613) 232-5712 |
| TOTAL NO. OF PAGES INCLUDING COVER: | 28 |
| FILE NO.: | 13412.000 |
| RE: | SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted documents. ☐

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail

# Confirmation Report – Memory Send

Time : Jul-15-05 11:22am
Tel line : +6177371053
Name : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 918 |
| Date | : | Jul-15 10:34am |
| To | : | 7777#13412*000#16132325712 |
| Document pages | : | 17 |
| Start time | : | Jul-15 10:32am |
| End time | : | Jul-15 11:21am |
| Pages sent | : | 17 |
| Status | : | OK |

Job number : 918 *** SEND SUCCESSFUL ***

**Looney & Grossman LLP**
Attorneys at Law

101 Arch Street
Boston, MA 02110-1112
(617) 951-2800

Facsimile (617) 951-2819

**FACSIMILE COVER SHEET**

| | |
|---|---|
| TO: Salam Iran | FROM: Georgia J. Asimakopoulos, Esq. |
| COMPANY: Embassy of the Islamic Republic of Iran | DATE: July 14, 2005 |
| FAX NUMBER: (613) 232-5712 | TOTAL NO. OF PAGES INCLUDING COVER: |
| RE: SERVICE OF PROCESS AND COPIES OF PLEADINGS IN THE FOLLOWING MATTER: Rubin et al., v. The Islamic Republic of Iran et al., v. Museum of Fine Arts et al. | FILE NO.: 13412.000 |

Note: If you have a question or problem regarding this fax, please call: (617) 951-2800

The original of the transmitted documents will be sent by:

Regular Mail ☐ Messenger ☐ Overnight Mail ☐ This is the only form of delivery of transmitted document.

COMMENTS:

The originals of the transmitted documents will also be sent by Federal Express Mail.

*****CONFIDENTIALITY NOTE******

The documents accompanying this facsimile transmission contain information from the law firm of Looney & Grossman LLP which may be CONFIDENTIAL AND PRIVILEGED. The information is intended to be for the use of the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately and return the original message to us at the above address by First Class Mail via the U.S. Postal Service. Thank you.

## Confirmation Report – Memory Send

| | |
|---|---|
| Time | : Jul-15-05 09:43am |
| Tel line | : +6177371053 |
| Name | : LOONEY GROSSMAN L |

| | |
|---|---|
| Job number | : 910 |
| Date | : Jul-15 09:25am |
| To | : 7777#12412*000#16132325712 |
| Document pages | : 46 |
| Start time | : Jul-15 09:25am |
| End time | : Jul-15 09:43am |
| Pages sent | : 46 |
| Status | : OK |

Job number : 910 *** SEND SUCCESSFUL ***

Museums, and many others that are not on display, or that have yet to be classified, that were, upon information and belief, excavated in Iran, and may be the property of Iran.

**Collection Efforts In Other U.S. Courts**

In addition to this action, plaintiffs' efforts to collect the outstanding amount of $71,100,999.00 for compensatory damages by attaching antiquities that are property of Iran have included the domestication of the judgment, on or about December 29, 2003, in the United States District Court for the Northern District of Illinois ("Illinois action"). In the Illinois action, the court issued a Citation to Discover Assets (the "citation"), that allowed the plaintiffs to discover Iranian assets in the possession and/or control of the University of Chicago, also known as The Oriental Institute. The citation also prohibits the Oriental Institute from making any transfer or disposition of property belonging to, or which may be acquired by, or become due to, Iran as judgment debtors. A copy of the citation is appended hereto as "Exhibit B." The MFA has on display at least two antiquities that are on loan from the University of Chicago, namely the "Miniature Ewer Vessel" and the "Lion and Bull in Combat." The provenance/ownership history of the "Miniature Ewer Vessel" indicates that it was excavated during the "University of Chicago – MFA Persepolis Expedition of 1937."

In addition to this action and the Illinois action, plaintiffs have commenced a lawsuit in Pennsylvania seeking to satisfy their judgment through Iranian antiquities located at the University of Pennsylvania Museum and the Philadelphia Museum of Art. The MFA has at least seven antiquities whose provenance/ownership history indicates they were excavated in the "University Museum, Philadelphia – MFA Persian Expedition."

## Confirmation Report – Memory Send

Time : Jul-15-05 09:57am
Tel line : +6177371053
Name : LOONEY GROSSMAN L

| | | |
|---|---|---|
| Job number | : | 911 |
| Date | : | Jul-15 09:28am |
| To | : | 7777#13412*000#16132325712 |
| Document pages | : | 44 |
| Start time | : | Jul-15 09:43am |
| End time | : | Jul-15 09:57am |
| Pages sent | : | 44 |
| Status | : | OK |

Job number : 911 *** SEND SUCCESSFUL ***

00069230.DOC /

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JENNY RUBIN, DEBORAH RUBIN, DANIEL MILLER, ABRAHAM MENDELSON, STUART E. HERSCH, RENAY FRYM, NOAM ROZENMAN, ELENA ROZENMAN and TZVI ROSENMAN,

Plaintiffs — Judgment Creditors,

v.

THE ISLAMIC REPUBLIC OF IRAN, (a/k/a Iran, The Republic of Iran, Republic of Iran, The Government of Iran, Iranian Government, and Imperial Government of Iran), THE IRANIAN MINISTRY OF INFORMATION AND SECURITY, AYATOLLAH ALI HOSEINI KHAMENEI, ALI AKBAR HASHEMI-RAFSANJANI and ALI FALLAHIAN-KHUZESTANI,

Defendants — Judgment Debtors,

v.

MUSEUM OF FINE ARTS, a not-for-profit corporation (a/k/a Boston MFA), HARVARD UNIVERSITY, PRESIDENT AND FELLOWS OF HARVARD COLLEGE, HARVARD UNIVERSITY ART MUSEUMS, BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM, SACKLER MUSEUM, SEMITIC MUSEUM, and PEABODY MUSEUM OF ARCHAEOLOGY AND ETHNOLOGY,

Trustee Process Defendants.

Case No.: 1:05-MC-10079

RULE 7.1 DISCLOSURE STATEMENT OF TRUSTEE PROCESS DEFENDANT MUSEUM OF FINE ARTS