# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JENNY RUBIN, et al.                          )
                                             )    Case No.: 1:05-MC-10079 (GAO)
     Plaintiffs — Judgment Creditors,    )
                                             )
v.                                           )
                                             )
THE ISLAMIC REPUBLIC OF IRAN,                )
et al.,                                      )
                                             )
     Defendants — Judgment Debtors,      )
                                             )
v.                                           )
                                             )
MUSEUM OF FINE ARTS, et al.,                 )
                                             )
     Trustee Process Defendants.         )

## MEMORANDUM IN SUPPORT OF THE MOTION OF THE MUSEUM OF FINE ARTS TO QUASH TRUSTEE PROCESS SUMMONS AND DISSOLVE ATTACHMENT

     In September 2003, Plaintiffs obtained a default judgment against the Islamic Republic of Iran ("Iran") and the other Judgment Debtors for injuries resulting from a terrorist attack that the Judgment Debtors were found to have sponsored. Because the Judgment Debtors have failed to pay the full amount of that judgment, Plaintiffs have named the Museum of Fine Arts ("MFA") as a trustee process defendant in this action, seeking to obtain the MFA's Iranian and Persian antiquities by writ of execution on the basis of speculation and "information and belief" allegations that those antiquities "may" be owned by Iran.

     This effort must fail. Even if the MFA did hold property owned by Iran (and it has already answered under oath that it does not), such property is immune from attachment pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* (2005), because Iran has never used the property for "commercial activity." *See* 28 U.S.C. § 1610(a). No other provisions of law permit Plaintiffs to evade the immunity provided by the FSIA.

As a result, Plaintiffs' attempt to collect their judgment from the MFA needlessly burdens the resources of the Court and the MFA, and this Court should quash the trustee process summons issued against the MFA and dissolve the accompanying attachment.

## STATEMENT OF FACTS

In September 2003 Plaintiffs succeeded in obtaining a $259 million default judgment against Judgment Debtors The Islamic Republic of Iran ("Iran") et al. in the U.S. District Court for the District of Columbia. *See* Mem. in Supp. of Pls.' Mot. for Order of Attach. by Trustee Process ("Pls.' Attach. Mem.") (including as Exhibit A *Rubin v. Islamic Republic of Iran*, 01-1655 (RMU) (D.D.C. Sept. 10, 2003) (order and judgment)). Plaintiffs alleged, and the court found, that Iran and the other Judgment Debtors sponsored a terrorist bombing that injured some Plaintiffs and caused the remaining Plaintiffs, parents of those injured in the blast, to suffer grief and expense. (*See id.*) Iran and the other Judgment Debtors have failed to pay the full amount of that judgment. (*Id.* at 2)

Plaintiffs have now sought to entangle the MFA in their controversy with Iran and the other Judgment Debtors. On March 28, 2005, Plaintiffs moved to subject the MFA to trustee process and to attach any property of Iran within the MFA's possession. In support of their motion, Plaintiffs alleged "on information and belief" that the MFA possesses antiquities that were originally excavated in Iran and that "may" be the property of Iran." (*Id.* at 3) In their motion, Plaintiffs did not assert any belief that the MFA holds properties belonging to any Judgment Debtor other than Iran.[1]

---

[1] In apparent atmospheric support of their motion, Plaintiffs also asserted that they have obtained a Citation to Discover Assets that may be owned by Iran in a proceeding initiated in the Northern District of Illinois (*id.* at 4), without informing the Court that the District Court in Illinois has ruled that any such assets could be attached only if Iran had waived its sovereign (continued...)

Iran and the other Judgment Debtors refused to accept service of Plaintiffs'

motion for attachment (Affidavit of Georgia Asimokopoulos (Ex. C to Pls.' Attach. Mem.)) and

therefore did not respond. On April 28, 2005, this Court granted Plaintiffs' attachment motion,

issuing a trustee process summons that required the MFA to disclose what "goods, effects, or

credits, if any, of the Judgment Debtors" it had in its possession and attached any such property.

(Summons to Trustee Process Def. Museum of Fine Arts) The MFA filed a verified response to

this summons, responding that it "has no goods, effects or credits of the Islamic Republic of Iran

or any other Judgment Debtor in its possession" and had no such properties in its possession at

the time of service of the summons. (Verified Response of MFA to Judgment Creditors'

Summons at 2 ("Verified Response")) The MFA also stated that if it had or has any such

properties in its possession, such properties are immune from attachment under the FSIA. (*Id.* at

3)

## ARGUMENT

1. **THE TRUSTEE PROCESS SUMMONS SHOULD BE QUASHED AND THE ATTACHMENT DISSOLVED IF THE ATTACHED PROPERTY IS NOT OWNED BY IRAN OR IS EXEMPT FROM EXECUTION**

Federal Rule of Civil Procedure 69 governs attempts in federal courts to obtain

property in satisfaction of judgments. It states that the "[p]rocess to enforce a judgment for the

payment of money shall be a writ of execution" and further provides that the procedure on

execution and in any supplementary proceedings "shall be in accordance with the practice and

procedure of the state in which the district court is held . . . except that any statute of the United

States governs to the extent that it is applicable." *Id.* Plaintiffs attempted to comply with this

---

immunity by itself using the properties for a commercial activity, a ruling directly relevant to this
proceeding. *See Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004)
(discussed *infra).*

requirement by using trustee process, a procedure defined by Massachusetts law, *see* Mass. Gen. Law ch. 246 § 1 *et seq.* (2005).

Under Rule 69, this Court may act to prevent Plaintiffs from pursuing a writ of execution via trustee process if Plaintiffs' claims must fail, by quashing the trustee process summons. *See Nowell v. Nowell*, 296 F. Supp. 640, 650 (D. Mass. 1968) (granting motion to quash because claims could not be "brought in this court"). Likewise, under Mass. Gen. Law ch. 223 § 114, an attachment in trustee process must be dissolved if the attached property is exempt from execution. *Auer v. Costa*, 23 F. Supp. 22, 23 (D. Mass. 1938) (property belonged to foreign government, not trustee, and was immune from attachment); *Toomey v. Toomey*, No. 1085, 1997 WL 672062, at *2 (Mass. App. Ct. Oct. 24, 1997) (lower court erred when it refused to dissolve attachment that was preempted by ERISA). Dissolving the attachment is also appropriate if the trustee has no goods, effects and credits of the judgment debtors. *Northeastern Malden Barrel Co. v. Binder*, 172 N.E.2d 123, 125 (Mass. 1961).

## 2.     EVEN IF THE MFA HELD PROPERTY OWNED BY IRAN (AND IT DOES NOT), ANY SUCH PROPERTY IS EXEMPT FROM ATTACHMENT UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

The MFA has filed a verified response to Plaintiffs' summons, stating that it does not possess any goods, credits, or effects belonging to Iran or any other Judgment Debtor. (Verified Response at 2) Further, to the best of the MFA's knowledge, none of the several antiquities held on loan from other institutions are owned by Iran. (*Id.*) Plaintiffs' bare assertions that some antiquities owned or held by the MFA were originally excavated in Iran do not provide any evidence that the MFA holds property owned by Iran, and Plaintiffs offer no basis beyond unelaborated allegations of "information and belief" to support their speculation that some such property "may" be owned by Iran.

Therefore, none of the MFA's property is subject to attachment by trustee process. Mass. Gen. Law ch. 246 § 20 (only "goods, effects, and credits of the defendant" may be attached); *Northeastern Malden Barrel*, 172 N.E.2d at 125 (dissolving attachment as unreasonable where trustee testified that it did not hold defendant's property).

More fundamentally, however, there is no need to determine whether the MFA holds any property that might somehow be owned by Iran. Even if the MFA did possess property belonging to Iran -- which is not the case -- that property would be immune from attachment under the FSIA.

A.     **The FSIA Prohibits Plaintiffs' Attempt to Attach Properties Allegedly Belonging to Iran, Because Iran Has Not "Used for a Commercial Activity" Any Property Held by the MFA**

The FSIA defines the boundaries for a foreign state's sovereign immunity from jurisdiction and attachment of its property in the courts of the United States. *See* 28 U.S.C. § 1602 *et seq.* The bedrock rule is that "the property in the United States of a foreign state shall be immune from attachment arrest and execution," unless a exception enumerated in the statute is met. 28 U.S.C. § 1609. The only exception to this rule potentially relevant to this proceeding is 28 U.S.C. § 1610(a)(7), which provides:

> The property in the United States of a foreign state . . . <u>used for a commercial activity</u> in the United States, shall not be immune from attachment in aid of execution . . . if:
> . . . .
> (7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7) . . . .

*Id.* (emphasis added).

The underlying default judgment here appears to fall within the category of actions described by section 1605(a)(7), which permits an American court to hear claims against a foreign state for sponsoring certain terrorist acts. But the threshold requirement that the

property must have been "used for a commercial activity" in the United States is not satisfied. The controlling test in determining whether property is used for commercial activity is "how the *foreign state* uses the property, not how private parties may have used the property in the past." *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 257 n.5 (5th Cir. 2002) (emphasis in original).

As the MFA's verified response to the trustee summons makes clear, Iran has not used any property held by the MFA for commercial activity. The MFA has never communicated at all with Iran (or any other Judgment Debtor) concerning any property believed to have originated in Iran, much less had any communication concerning the ownership or use of any such items. (Verified Response at 2) Iran could not engage in "commercial activity" with regard to any property it might hypothetically own while having no relationship or communication with the MFA on that (or any other) topic.

**1.      The Courts Have Consistently Rejected Any Contention that a Third Party's Actions May Waive a Foreign State's Immunity Over Its Property**

Any argument by Plaintiffs that hypothetical "commercial activity" by the MFA, a third party unrelated to Iran, could waive Iran's sovereign immunity over any property that might (contrary to fact) be owned by Iran must fail. The uniform holdings of other courts that have addressed this issue are that such commercial activity by a third party cannot waive a foreign state's sovereign immunity over its property. Indeed, Plaintiffs have already litigated and lost this issue in an identical action against the Oriental Institute of the University of Chicago. *See Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004).

In *Rubin*, Plaintiffs argued that the Oriental Institute's publication of books describing its collections from the ancient Iranian cities of Persepolis and Chogha Mish was "commercial activity" such that no foreign sovereign immunity protected those collections. *Id.*

at 1110-11. The magistrate judge found that "the proper focus of the commercial activities inquiry" was not the Oriental Institute, "but Defendant Iran." *Id.* at 1112. As a result, he granted the Oriental Institute's motion for a protective order, barring discovery into the actions of the Oriental Institute. *Id.* at 1113. The district court judge affirmed this decision. *Rubin v. Islamic Republic of Iran*, 03-C-9370 (N.D. Ill. Mar. 18, 2005) (order overruling objections) (Exhibit A hereto).[2]

Other federal courts have also concluded that whether a property has been "used for commercial activity" turns on the actions of the foreign state, not third parties. For example, in *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc.*, 385 F.3d 1206, 1220-21 (9th Cir. 2004), the Ninth Circuit stated that Section 1610 only denies sovereign immunity where the foreign government acted "either directly, through the use of particular property, or indirectly, through the commercial activities of an agency or instrumentality." *See also Connecticut Bank*, 309 F.3d at 257 n.5. Likewise, in another case brought by terrorist victims, the U.S. District Court for the District of Columbia found that the interpretation of commercial activity for immunity from execution under the FSIA,

---

[2] The MFA may assert that any of its antiquities that might hypothetically be owned by Iran are exempt from attachment under 28 U.S.C. § 1610(a), and any contention that it does not have standing to do so is "irrelevant" in the context of an attachment proceeding. *See Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 233 (5th Cir. 2004) (a Texas garnishee could raise the issue of foreign sovereign immunity over the garnished property), *cert. denied*, 125 S.Ct. 1841 (2005). In the *Rubin* case, the magistrate judge properly recognized that the Oriental Institute had standing to raise the issue of sovereign immunity under the FSIA with regard to any attempted attachment of antiquities in its possession, and the *Rubin* plaintiffs -- who were represented by the same counsel as in this action (as well as Chicago counsel) -- did not challenge the Oriental Institute's standing when they asked the court (unsuccessfully) to vacate the ruling of the magistrate judge. *See* Pls. Obj. to Magistrate Judge's Mem. Opinion and Order, *Rubin*, 03-C-9370 (N.D. Ill.) (filed Dec. 17, 2004) (Exhibit B hereto).

like the provisions for waiver of jurisdictional immunity by commercial activity, "turns on the foreign state's actions." *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 23 (D.D.C. 1999).

These holdings correctly interpreted the Supreme Court's decision in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), in which the Court determined that for jurisdictional immunity, commercial activity occurs when "a foreign government *acts* . . . in the manner of a private player within [the market]." *Id.* at 614 (emphasis added). As the *Rubin* court found, "the U.S. Supreme Court's analysis in *Weltover, Inc.* applies to Section 1610(a) as well as 28 U.S.C. § 1605 [the jurisdictional immunity provision]." 349 F. Supp. 2d at 1113 n.1; *see also Flatow*, 76 F. Supp. 2d at 22 ("the Supreme Court's construction of the proper scope and meaning of 'commercial activity' under the FSIA guides this Court's analysis").

Plaintiffs may seek to rely, as they did in their unsuccessful effort against the Oriental Institute, on dicta in a case from this District, *Sesostris, S.A.E. v. Transportes Navales, S.A.*, 727 F. Supp. 737 (D. Mass. 1989). The *Sesostris* court denied a motion to dismiss made by a third party (BCI) that claimed it, not the defendant, owned an attached ship and could claim sovereign immunity. *Id.* at 743. BCI argued that it was a corporation owned by the Spanish government, and as such was an "agency or instrumentality of a foreign state" protected by sovereign immunity under 28 U.S.C. § 1610(b). *Id.* The *Sesostris* court denied BCI's motion to dismiss the attachment because it found that BCI had not shown that it actually owned the ship. *Id.* ("BCI's claims are not supported with factual evidence sufficient to grant its motion"). The court then commented that, even if BCI did own the ship Unamuno, the commercial use of the ship had waived any immunity. 727 F. Supp. at 744.

Plaintiffs previously argued in *Rubin* that this statement supported their assertion that a third party's commercial use could waive sovereign immunity. In *Sesostris*, however, BCI

asserted that it was an "agency or instrumentality" of the sovereign nation of Spain, and that in that capacity it had issued a mortgage for the ship Unamuno. Hence, in *Sesostris*, as BCI presented the facts, BCI had engaged in commercial activity properly attributed to the Spanish government, of which BCI claimed to be an agency or instrumentality. Any waiver of sovereign immunity therefore arose because of commercial activity by the "foreign sovereign" -- not the actions of an independent third party. *See Rubin*, 349 F. Supp. 2d at 1113 (rejecting plaintiffs' *Sesostris*-based arguments). In any event, the *Sesostris* court's statements as to commercial activity are pure dicta, *see id.*, and would not bind this Court, *see, e.g., Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 431 n.10 (1996), even if they were relevant to this case. Therefore, this Court should also reject any attempt to rely on *Sesostris*, just as the *Rubin* court did.

>    **2.    Any Possible Ambiguity Regarding the Meaning of Section 1610(a) is Resolved by the Legislative History of the FSIA, Which Shows That Congress Correctly Reasoned That Only Conduct by Foreign States Could Waive Sovereign Immunity Protecting Their Property from Attachment**

The plain language of Section 1610(a) is sufficient to resolve this proceeding.[3] Even if this provision, read in the context of other relevant provisions, could be regarded as ambiguous, the legislative history of the Foreign Sovereign Immunities Act confirms the correctness of the decisions holding that only commercial activity by a foreign sovereign can waive its normal sovereign immunity. *See Blum v. Stenson*, 465 U.S. 886, 896 (1984)

---

[3]    This is particularly so because the plain language of Section 1610(a) is confirmed by the structure and other provisions of the Act, such as the jurisdictional immunity provision addressed in *Weltover*, which may properly be considered by the Court in determining the proper meaning of Section 1610(a). *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole") (citation omitted).

("Where . . . the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear").

In the House Report on the FSIA, the Committee on the Judiciary recognized that "the traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution." H.R. Rep. 94-1487, at 27 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6626.[4]  The purpose of the FSIA was to "partially lower[] the barrier of immunity from execution" to "make this immunity conform more closely with the provisions on jurisdictional immunity in the bill." *Id.*  If a foreign state could lose its immunity from execution through the commercial actions of a third party, then its immunity from execution would <u>not</u> conform with the provisions on jurisdictional immunity, which require a foreign state to <u>act</u> commercially before its immunity is waived. *See Weltover*, 504 U.S. at 614 (interpreting definition of "commercial activity" in 28 U.S.C. § 1605).  Therefore, a holding in Plaintiffs' favor would directly contradict Congress's intent in passing the FSIA.

Further, in its discussion of Section 1610(a)(2), which is governed by the "commercial activity" provision that also forms part of Section 1610(a)(7), the House Report states that 1610(a)(2) "denies immunity from execution against property <u>used by a foreign state for a commercial activity</u>."[5]  H.R. Rep. 94-1487, at 28, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6626.  The legislative history is obvious: in passing the FSIA, Congress sought to "partially"

---

[4]    Committee Reports on a bill are the "authoritative source for finding the Legislature's intent," as they "represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Garcia v. United States*, 469 U.S. 70, 76 (1984) (quotations and citation omitted).

[5]    Section 1610(a)(2) was the provision interpreted by *Sesostris*. *See* 727 F. Supp. at 744.

lower the immunity bar so that foreign states could put their property at risk by themselves acting commercially, but did not provide that a third party could waive a foreign sovereign's immunity from attachment of its property.

> **3.** **The United States Government, Which Has an Interest in the Proper Construction of Sovereign Immunity, Is Squarely of the View that Only Commercial Activity by the Foreign Sovereign Itself Is Relevant For Purposes of 28 U.S.C. § 1610(a)**

The United States filed a brief in the *Rubin* action supporting the Oriental Institute's construction of the statute. Statement of Interest of the United States, *Rubin v. Islamic Republic of Iran*, 03-C-9370 (N.D. Ill.) (filed July 28, 2004) (Exhibit C hereto). In that brief, the United States requested that the court dissolve the attachment against the Oriental Institute and determine the artifacts "exempt from execution" -- even "[a]ssuming that the artifacts are property belonging to the Government of Iran or to an agency or instrumentality of Iran." *Id.* at 2. Since the artifacts were "not used by Iran for any commercial activity whatsoever," the United States reasoned, "Section 1610(a) provides no support for plaintiffs' attempt to attach the artifacts." *Id.* at 12. The United States has an undeniable interest in the correct interpretation of provisions governing a foreign state's sovereign immunity, and this Court should follow its reasoned and sensible interpretation to avoid risking American loss of immunities abroad.

In sum, this Court should accept the reasoning of numerous courts, the statement of intent by the legislators who drafted the FSIA, and the formal position of the United States government, and grant the requested relief.[6]

---

[6]      Finally, if the Court were to find these sources insufficient to resolve this motion, principles of international law would provide additional support to the conclusion that only commercial activity by the foreign sovereign itself is relevant. *See Spector v. Norwegian Cruise Line Ltd.*, 125 S.Ct. 2169, 2173 (2005) (Ginsburg, J., concurring) (a statute "should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles (continued...)

3.    **NO OTHER PROVISIONS OF LAW PERMIT PLAINTIFFS TO RECOVER THE ATTACHED PROPERTY**

The Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (2002), also addresses the attachment of foreign property in connection with judgments recovered pursuant to 28 U.S.C. § 1605(a)(7)'s exception to jurisdictional immunity for state-sponsored terrorism.  Section 201(a) of the TRIA provides that "[n]otwithstanding any other provision of law, . . . the blocked assets of [a] terrorist party . . . shall be subject to execution or attachment in aid of execution . . . ."  *Id.*  A blocked asset of a "terrorist party" is "any asset seized or frozen by the United States under Section 5(b) of the Trading With the Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)."  TRIA, § 201(d)(2)(A).

The TRIA cannot aid Plaintiffs even if any of the antiquities owned by the MFA were, contrary to the facts, to be viewed as owned by Iran.  None of the properties held by the MFA are "blocked assets."  At one time, during the Iranian hostage crisis of 1979, nearly all of Iran's assets were blocked by executive order.  *See* Executive Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979); *see also* Statement of Interest of the United States at 7, Exhibit C.  When Iran and the United States resolved the hostage crisis in the Algiers Accords, however, the United States government resolved that nearly all of those properties (including the properties at issue

---

of international law"); *In re Republic of Philippines*, 309 F.3d 1143, 1151 (9th Cir. 2002) (remaining doubt as to the meaning of the FSIA was "resolved by looking to broader statements of international law").  Under principles of international law, a foreign state can only lose its sovereign immunity over its property if the foreign sovereign engages in "activities of the kind that may be carried on by private persons" -- in other words, if the foreign sovereign engages in commercial activities.  *See* Restatement (Third) of Foreign Relations Law of the United States § 451 (1987).

.

here) would be unblocked and could be returned to Iran upon request by that state. *See*

Executive Order 12281, 46 Fed. Reg. 7923 (Jan. 19, 1981) (permitting transfer of previously

blocked assets to government of Iran); *see also United States v. Sperry Corp.*, 493 U.S. 52, 56

(1989) (after Algiers Accords, "the United States undertook to . . . unblock Iranian assets in the

United States"); Statement of Interest of the United States at 9, Exhibit C ("the artifacts held by

the University of Chicago's Oriental Institute[] were no longer subject to blocking"). As

Executive Order 12281 makes clear, the MFA's properties are not blocked assets even if they

belong to Iran. Plaintiffs therefore may not use the TRIA to avoid Iran's sovereign immunity

over any of its property held by the MFA.

## CONCLUSION

For the foregoing reasons, this Court should quash the trustee process summons

issued to the MFA and dissolve Plaintiffs' attachment on any property held by the MFA.

Respectfully submitted,

Dated:  July 29, 2005

/s/ Courtney A. Clark /s/_____
Robert J. Muldoon, Jr. BBO#: 359480
Courtney A. Clark BBO#: 651381
SHERIN AND LODGEN LLP
101 Federal Street
Boston, MA  02110
Tel: (617) 646-2000
Fax: (617) 646-2222

William D. Iverson
Jason M. Knott
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 662-6000
Fax: (202) 778-5549

*Attorneys for Museum of Fine Arts*

# EXHIBIT A

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge Blanche M. Mannning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 9370 | **DATE** | March 18, 2005 |
| **CASE TITLE** | *Jenny Rubin, et al. v. The Islamic Republic of Iran, et. al.* | | |

**DOCKET ENTRY TEXT:**

    For the reasons set forth below, this Court OVERRULES Plaintiffs' Objections to the Magistrate Judge's Memorandum and Opinion and Order of November 30, 2004.

■[ For further details see text below.]

### STATEMENT

    This matter comes before this Court on Plaintiffs' Objections to Magistrate Judge Ashman's Order (issued on November 30, 2004, Docket No. 32) granting Citation Respondents' Motion for a Protective Order and denying Plaintiffs' Motion for Sanctions. Plaintiffs, who prevailed on a personal injury action against Defendant Iran, brought this action seeking assets from Citation Respondents – the University of Chicago. The assets in question include rare Iranian artifacts which Citation Respondents have been using for academic study. On June 24, 2004, this Court ordered Citation Respondents to produce documents relevant to Plaintiffs Citation request. This Court also entered an order referring this case to Judge Ashman for all non-dispositive matters.

    Citation Respondents subsequently moved for a protective order from Judge Ashman as to two sets of documents relating to artifacts which Citation Respondents contend are not relevant to Plaintiffs' case. After the matter was fully briefed, Judge Ashman granted the motion on the grounds that the items to which Plaintiffs sought discovery were not subject to forfeiture under the Foreign Sovereign Immunities Act ("FSIA") and thus not discoverable. In making this determination, Judge Ashman held that foreign property is immune from execution of judgments unless it is used by the foreign country for a commercial purpose. Plaintiffs now seek to have this Court overrule this decision.

| | Courtroom Deputy Initials: | RTS |
|---|---|---|

Case 1:03-cv-09370    Document 52    Filed 03/18/2005    Page 2 of 3

## STATEMENT

The district court's standard of review for a magistrate judge's decision is defined by 28 U.S.C. § 636(b)(1), which requires that the district court to "make a de novo determination of those portions of the [magistrate judge's] . . . recommendations to which objection is made." "A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id. Efficiency in judicial administration requires that all arguments be presented to the magistrate judge in the first instance. Anna Ready Mix, Inc. v. N.E. Pierson Constr. Co., 747 F. Supp. 1299, 1302-03 (S.D. Ill. 1990). The review procedure thus does not afford the opportunity to present new arguments not raised before the magistrate judge. Id. at 1303. With these principles in mind, the Court now turns to Plaintiffs objections.

Plaintiffs contend that Judge Ashman's decision was erroneous because he: (1) exceeded the scope of his referral; (2) did not give them an opportunity to brief the decisive issue; (3) improperly interpreted the FSIA; and (4) failed to address whether Citation Respondents acted as agents of Iran. After reviewing the relevant portion of the record, case law interpreting the FSIA, and Judge Ashman's well-reasoned decision, this Court finds that Plaintiffs' four contentions are without merit. First, motions regarding discovery are by their very nature non-dispositive. See, e.g., 28 U.S.C. 636(b)(1)(A); Adkins v. Mid-American Growers, Inc., 143 F.R.D. 171, 174 (N.D. Ill. 1992). Here, the fact that Judge Ashman interpreted the FSIA to determine if Plaintiffs' discovery request was relevant to this case, does not make it a dispositive motion because his decision does not terminate this case. While Judge Ashman's interpretation of the FSIA will certainly be relevant to this Court in a later motion to dismiss, it is not binding on this Court. Second, a review of Plaintiffs' Memorandum in Opposition to the Protective Order [Docker No. 27], reveals that Plaintiffs had an opportunity to, and in fact did, brief whether section 1610(a) of the FSIA applied to the assets in question. Third, after reviewing all of the cases and legislative history regarding the interpretation of section 1610(a), this Court finds that Judge Ashman did not err in holding that foreign property is immune from execution of judgments unless it is used by the foreign country for a commercial purpose. Finally, with respect to Plaintiffs' contention that Citation Respondents acted as agents of Iran, because Plaintiff did not raise this issue before Judge Ashman, they may not raise it now before this Court. See Roseborough v. Cottonwood Apartments, 1996 WL 490717, at *1 (N.D. Ill. Aug. 26, 1996).

Accordingly, this Court OVERRULES Plaintiffs' Objections to Magistrate Judge Ashman's Order of November 30, 2004.

# EXHIBIT B

**FILED**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### (Eastern Division)

DEC 1 7 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JENNY RUBIN,
DEBORAH RUBIN,
DANIEL MILLER,
ABRAHAM MENDELSON
STUART E HERSCH,
RENAY FRYM,
NOAM ROZENMAN,
ELENA ROZENMAN and
TZVI ROZENMAN

Case No.: 03-CV-9370
Judge Blanche M. Manning

RECEIVED

DEC 17 2004

Plaintiffs – Judgment Creditors

v.

THE ISLAMIC REPUBLIC OF IRAN,
(a/k/a Iran, The Republic of Iran, Republic of Iran,
The Government of Iran, Iranian Government, and
Imperial Government of Iran),
THE IRANIAN MINISTRY OF INFORMATION AND SECURITY,
AYATOLLAH ALI HOSEINI KHAMENEI,
ALI AKBAR HASHEMI-RAFSANJANI and
ALI FALLAHIAN-KHUZESTANI

Defendants – Judgment Debtors

v.

THE UNIVERSITY OF CHICAGO, a not-for-profit corporation
a/k/a and/or d/b/a The Oriental Institute
GIL STEIN

Citation Third Party Respondents

## PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S MEMORANDUM OPINION AND ORDER OF NOVEMBER 30, 2004

<u>**Preliminary Statement**</u>

This matter was referred to Magistrate Judge Ashman on July 16, 2004 for resolution of discovery disputes.

The parties resolved all of their disputes, with the exception of plaintiffs' request for information and documents related to the respondents' use of the Iranian antiquities held by them for the commercial production and sale of books and other publications.

Plaintiffs sought this information and these documents in support of their claim that the Iranian antiquities held by respondents are being used for a commercial purpose within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1610, are therefore subject to execution in this action. Respondents dispute that §1610 applies to these assets, and filed a motion for a protective order seeking to prevent disclosure of the information and documents requested. Plaintiffs opposed that motion.

On November 30, 2004, Magistrate Judge Ashman issued a Memorandum Opinion and Order ("Magistrate's Opinion") granting respondents' motion for a protective order and denying the plaintiffs the opportunity to discover the requested documents and information.

Plaintiffs respectfully object to and request that the Court reverse the Magistrate's Opinion, for the reasons below.

I.    **THE MAGISTRATE JUDGE'S INTERPRETATION OF §1610 IS DISPOSITIVE OF PLAINTIFFS' EXECUTION PROCEEDINGS UNDER THE FSIA ON THE MERITS AND THEREFORE EXCEEDED THE MAGISTRATE'S AUTHORITY**

Plaintiffs are seeking execution of the Iranian property held by respondents under §1610 of the FSIA, and the substantive dispute between the parties centers on whether that Iranian property is subject to execution under §1610.

2

Respondents argue that §1610 does not apply to the Iranian artifacts in their possession because (1) they have used the artifacts to publish books and articles strictly for scholarly and educational—not commercial—purposes and (2) Iran has not used the artifacts at all. Defs' Memo for Protective Order at 6-8.

Plaintiffs believe that Respondents' interpretation of §1610 is incorrect because (1) §1603(d) of the FSIA provides that the "commercial" character of the use made of the property is determined by its nature and not its purpose and publishing and selling books are commercial activities by their nature and (2) use of the property by the foreign state itself is not required under §1610. Plaintiffs' Memo in Opposition at 3-6.

Because the Court's referral to Magistrate Judge Ashman did not include dispositive matters, and because a ruling on the proper interpretation of §1610 would be dispositive of plaintiffs' execution claims under the FSIA, plaintiffs' Opposition to respondents' motion for a protective order did not brief or argue on the merits. On the contrary, plaintiffs specifically noted that this is a "merits" issue that would ultimately be resolved by the District Judge, and that for the purpose of resolving the discovery dispute the Magistrate Judge need only recognize the possibility that plaintiffs' interpretation of §1610 would ultimately prevail:

> The substantive question in dispute between the parties is whether the Iranian property held by Respondents is subject to execution pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. §1610. This substantive question will necessarily be resolved by Judge Manning on the parties' pleadings on the merits . . .
>
> Respondents are entitled to believe and argue that the case law supporting their position is correct and the decisions supporting plaintiffs' position are in error. Judge Manning, and possibly the Seventh Circuit, will ultimately settle this dispute.

> And that is precisely the point: this Court is not called upon to dispose of this dispute or even to weigh the respective strength of the arguments. The sole finding necessary for the Court to resolve the instant discovery dispute in favor of plaintiffs is that there is <u>some possibility</u> that plaintiffs will prevail.
>
> Since the legal issues in dispute have never been addressed by the Seventh Circuit (or a district court in this circuit) and since plaintiffs have pointed to case law in their favor, it is perfectly obvious that there is at the very least <u>some</u> possibility – if not a <u>strong</u> possibility – that plaintiffs' argument will prevail.
>
> Therefore, the information requested is by definition relevant, and must be provided.

Plaintiffs' Memo in Opposition at 3-6.

Though his referral did not include dispositive matters (and despite the lack of briefing) Magistrate Judge Ashman nevertheless proceeded to expressly rule on the proper interpretation of §1610. See Magistrate's Opinion at 8, 9 fn. 1.

There is no question that the Magistrate Judge's holding regarding the interpretation of §1610, is "dispositive" within the meaning of Fed.R.Civ.P. 72 and 28 U.S.C. §636. It is well established that a non-dispositive issue is one which is *"capable of determination without trial of the general issue"* and is *"severable from the main legal issues addressed at trial"* and *"does not in any case affect the substantive rights of the parties."* <u>Johnson v. Old World Craftsmen, Ltd.</u>, 638 F.Supp. 289, 291 (N.D.Ill. 1986)(citing <u>U.S. v. Flaherty</u>, 668 F.2d 566, 586 (1st Cir.1981).

The Magistrate Judge's holding completely extinguished plaintiffs' FSIA claims in this action, and that holding was therefore incontrovertibly "dispositive" within the meaning of Fed.R.Civ.P. 72 and 28 U.S.C. §636.

Since the Magistrate Judge's dispositive holding regarding §1610 and plaintiffs' FSIA claims exceeded the authority granted him in this Court's referral, it must be vacated.

Additionally, since the proper interpretation of §1610 is yet to be determined by the District Judge (after completion of discovery including examination of respondents' affiants and on a full briefing), and since there is no case law in this circuit controlling that interpretation, there is clearly at least a possibility that plaintiffs' interpretation of that provision will prevail and that the documents and information sought will thus be "relevant" in this action.  Therefore, respondents' motion for a protective order must be denied.

## II.  ALTERNATIVELY, THE MAGISTRATE JUDGE SHOULD HAVE GIVEN PLAINTIFFS AN OPPORTUNITY TO BRIEF THE INTERPRETATION OF §1610 ON THE MERITS

As noted, acting on their good-faith and strongly-held belief that the resolution of the parties' dispute about the interpretation of §1610 is a dispositive matter to be resolved by the District Judge, plaintiffs did not brief or argue that issue on the merits.

The Magistrate Judge nevertheless issued a ruling on that issue on the merits.

However, once he decided to do so,  plaintiffs should have been given advanced warning of his intention and permitted an opportunity to provide a thorough briefing.

Even if plaintiffs erred in their belief that this was a dispositive issue that the Magistrate Judge could not and would not decide, that error was in good faith, and the same considerations of justice and fair play that require a court intending to convert a motion to dismiss into a motion for summary judgment to provide a party with notice and an opportunity to supplement pleadings, should have been employed here.

III.    **ADDITIONALLY, PLAINTIFFS' ASSERTION THAT RESPONDENTS' USE OF THE PROPERTY IS ATTRIBUTALE TO IRAN UNDER AGENCY THEORY CANNOT BE DETERMINED WITHOUT ACCESS TO THE DOCUMENTS REQUESTED AND WITHOUT CROSS-EXAMINATION OF RESPONDENTS' AFFIANTS**

Plaintiffs have asserted that respondents' use of the Iranian property in question may be deemed as use by Iran, based on a theory of agency. Hence, the request for documents and information remaining in dispute is merely designed to discover the extent of the commercial use of the antiquities. This request was prompted because the respondents' serial response to the Citations included documents 129-135 which listed publications relevant to the antiquities. The plaintiffs have made merely a follow up inquiry seeking to discover the extent of the publication and the income generated from the items identified in documents 129-135.

The Respondents have admitted that for all intents and purposes they, in effect, were acting on behalf of Iran as its agent in publishing findings related to various archaeological projects. Without the facilities itself to analyze the materials uncovered in several digs, Iran outsourced to the respondents the backroom work of inventorying, studying, cataloguing, analyzing and publishing the findings. Respondents admit that Iran purposely allowed the temporary transfer of the objects to them for study and publication. See Stolper affidavit. Thus, Iran is effectively acting through respondents.

Plaintiffs' "agency" theory of usage cannot be resolved without access to the documents and information requested. These documents and information are likely to more fully describe the extent of the relationship by evidencing the commercial use, publication figures, sales revenues, and profits generated by respondents on behalf of Iran.

Moreover, plaintiffs intend to attempt to prove this theory through their cross-examination of respondents' affiants, which has not occurred yet. The documents and information in dispute are vital to the plaintiffs' ability to examine the affiants as to the nature and extent of the Iranian holdings and their use in the United States.

In other words, the Magistrate Judge erred in ruling that the documents requested were irrelevant, because the factual record (of which the documents themselves are an important part) is not yet complete. Accord State of Minn. v. U.S. Steel Corp., 438 F.2d 1380 (8th Cir. 1971)("the district court held that the interrogatory requires information that is not relevant as a matter of law and sustained the objection . . . however, we reverse the ruling of the trial court in sustaining objection to Interrogatory No. 6 on the limited basis that it may ultimately lead to or in fact may itself constitute relevant evidence . . . The parties agree that undue effort will not be required to answer Interrogatory No. 6. At this point we cannot say as a matter of law that the answers may not be relevant to the present actions.").

Therefore, the Magistrate's Opinion was erroneous and premature. Armed with the documents and information, plaintiffs will be able to properly conduct the previously ordered examinations of Gil Stein, Raymond Tindel and Matthew Stolper. Upon the completion of the examinations, conducted with the benefit of the information and documents requested, the full nature of the commercial use as well as the relationship between Iran and the respondents with respect to the antiquities be revealed. At that point, the record will be complete and the issue as to whether publication data is relevant will be ripe.

IV.    **ALTERNATIVELY, THE MAGISTRATE'S OPINION IS ERRONEOUS AS A MATTER OF LAW**

A.    **Standard of Review**

Even if this Court finds that the legal interpretation of §1610 was a non-dispositive issue within the authority of the Magistrate Judge, this Court reviews that interpretation—which is obviously a pure question of law—de novo:

> A magistrate judge's order can be reversed by the district court only if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *Bhan*, supra, 929 F.2d at 1414. *See also Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d Cir.1992) ("the phrase 'contrary to law' indicates plenary review as to matters of law"); Grimes v. City and County of San Francisco, 951 F.2d 236, 240 (9th Cir.1991) (discovery sanctions are non-dispositive pretrial matters that are reviewed for clear error under Rule 72(a)); *F.D.I.C. v. Fidelity & Deposit Company of Maryland*, 196 F.R.D. 375, 378 (S.D.Cal.2000) ("The 'clearly erroneous' standard applies to factual findings and discretionary decisions made in connection with non-dispositive pretrial discovery matters"); *Medical Imaging Centers of America, Inc. v. Lichtenstein*, 917 F.Supp. 717, 719 (S.D.Cal.1996) ("Section 636(b)(1) ... has been interpreted to provide for de novo review by the district court on issues of law").

Green v. Baca, 219 F.R.D. 485,488-489 (C.D. Cal. 2003).

As this court has previously stated:

> [T]he district judge . . . should not be hamstrung by the clearly erroneous standard. At its broadest, it is limited to factual findings; even the Third Circuit recognized that "the phrase 'contrary to law' indicates plenary review as to matters of law." Moreover, although an abuse-of-discretion attitude should apply to many discovery and related matters, it need not curtail the power of the district judge to make needed modifications in the magistrate judge's directives. Although a discovery ruling may not be dispositive, it can be extremely important.

Phillips v. Raymond Corp., 213 F.R.D. 521, 525 (N.D.Ill. 2003).

Moreover, the need for a thorough de novo review of the Magistrate Judge's legal holding is especially pronounced here, since there is no case law from this circuit interpreting the scope and application of §1610.

B.     **The Decision Was Erroneous**

Respondents object to the production of documents alleging that §1610 cannot apply to the Iranian artifacts in their possession because these artifacts have not been used by Iran for a commercial activity in the United States.   In support of this position, Respondents argue that they have used the artifacts to publish books and articles strictly for scholarly and educational purposes, and that Iran has not used the artifacts at all. Magistrate Judge Ashman agreed stating "the proper focus of the commercial activities inquiry, however, is not Citation Respondents but Defendant Iran." Opinion p. 8.

This interpretation of §1610 is incorrect.  Section §1603(d) of the FSIA expressly provides that the "commercial" character of the use made of the property is determined by its nature and not its purpose.  It is therefore irrelevant that the University is a non-profit corporation and that its purpose in using the Iranian collections to publish and sell books might have been to increase the fund of human knowledge.  Publishing and selling books are commercial activities by their nature, and the artifacts were therefore used for an activity of a commercial nature within the meaning of the FSIA.

While two courts have held that property subject to execution under §1610 must have been used by the foreign state, at least one other federal court has held that use by the foreign state is not required under §1610.   See Sesostris, S.A.E. v. Transportes Navales, S.A., 727 F. Supp. 737, 744 (D.Mass. 1989) (ship owned by foreign state would be subject to execution under §1610 on the basis of its previous use by non-state charter parties).

No court has ruled in a situation directly analogous to this case.  However, the holding in Sesostris is most appropriately comparable and should be adopted by this

Court. Therefore, the holdings cited by Magistrate Judge Ashman are in error in this context, and should be rejected.

The Magistrate Judge simply dismissed Sesostris without analyzing the relationship between §1610 and §1605. He relied on Flatow v. Islamic Republic of Iran, 76 F. Supp.2d 16 (D.D.C. 1999) and Connecticut Bank of Commerce v. Republic of Congo, 309 F.3d 240, 254 (5th Cir. 2002). Yet Connecticut Bank mainly relies on Flatow, with little independent analysis.

And the holding in Flatow that foreign state use is required under §1610 is founded erroneously on a Supreme Court case analyzing §1605 of the FSIA:

> [T]he Supreme Court's interpretation of "commercial activity" . . . specifically refer[s] to the foreign state's actions, *see Weltover*, 504 U.S. at 614, 112 S.Ct. 2160 (stating that "when *a foreign government acts*, not as a regulator of a market, but in the manner of a private player within it, the *foreign sovereign's actions* are commercial within the meaning of the FSIA") (emphasis added); *see also id.* (stating that "whether the particular *actions that the foreign state performs* (whatever the motive behind them) are the types of actions by which a private party engages in trade and traffic or commerce") (emphasis added).

Flatow at 23.

The reliance on Weltover and the analogy to §1605 are improvident: the language of §1605(a)(2) expressly refers to "commercial activity carried on in the United States by the foreign state." (emphasis added). By contrast, §1610 mentions only property "used for a commercial activity in the United States," and – very significantly – omits the words "by the foreign state" contained in §1605. Moreover, the fact that Congress chose to include the key words "by the foreign state" in §1605 and omit those same words from §1610 is further powerful evidence that Congress did not require foreign state use for executions under §1610.

Finally, the Magistrate Judge's analysis of <u>Sesostris, S.A.E. v. Transportes Navales, S.A.</u>, 727 F.Supp. 737 (D.Mass. 1989) is erroneous. Firstly, the statement in that decision relied upon by plaintiffs was not dicta, as the Magistrate Judge characterized it, but an alternative basis for decision and <u>an express holding</u>. <u>Id.</u> at 744. Secondly, the <u>Sesostris</u> court found that the property in question was used by third-parties, not by the putative foreign state. The court found that "Unamuno was used for the commercial activity described by the charter parties" and explained elsewhere that "Sesostris chartered the ships under two charter party agreements . . ." <u>Id.</u> at 744 and 738. The description of the facts of that case as presented by the Magistrate Judge therefore appears to be erroneous.

## V.    CONCLUSION

For the reasons stated above, plaintiffs respectfully request that the Court vacate Magistrate Judge Ashman's Memorandum Opinion and Order of November 30, 2004 and deny respondents' motion for protective order.

Respectfully submitted,

Timothy M. Murphy (6257595)
TIMOTHY M. MURPHY, P.C.
3758 W. Montrose Ave.
Chicago, IL 60618
(773) 463-1203

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700

11

(401) 331-6095 (fax)


<u>CERTIFICATION</u>

I hereby certify that on the _17ᵗʰ_ day of December, 2004, I mailed a true copy of the within to:

Matthew Allison
Thomas A. Doyle
Hillary P. Krantz
Baker & McKenzie
1 Prudential Plaza, Suite 3500
130 East Randolph Drive
Chicago, IL 60601
(fax 312-861-2899)

Lawrence W. Newman
Jacob M. Kaplan
Baker & McKenzie
805 3rd Avenue, Floor 30
New York, NY 10022
(fax 212-759-9133)

Thomas Walsh
U.S. Attorney's Office
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604
(fax 312-886-4073)

**FILED**

DEC 1 7 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### (Eastern Division)

JENNY RUBIN,
DEBORAH RUBIN,
DANIEL MILLER,
ABRAHAM MENDELSON
STUART E HERSCH,
RENAY FRYM,
NOAM ROZENMAN,
ELENA ROZENMAN and
TZVI ROZENMAN

Case No.: 03-CV-9370
Judge Blanche M. Manning

**RECEIVED**

DEC 17 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

                    Plaintiffs – Judgment Creditors

        v.

THE ISLAMIC REPUBLIC OF IRAN,
(a/k/a Iran, The Republic of Iran, Republic of Iran,
The Government of Iran, Iranian Government, and
Imperial Government of Iran),
THE IRANIAN MINISTRY OF INFORMATION AND SECURITY,
AYATOLLAH ALI HOSEINI KHAMENEI,
ALI AKBAR HASHEMI-RAFSANJANI and
ALI FALLAHIAN-KHUZESTANI

                    Defendants – Judgment Debtors

        v.

THE UNIVERSITY OF CHICAGO, a not-for-profit corporation
a/k/a and/or d/b/a The Oriental Institute
GIL STEIN

                    Citation Third Party Respondents

                    NOTICE OF FILING

PLEASE TAKE NOTICE that on the 17th day of December 2004, we filed with the Clerk of the U.S. District Court for the Northern District of Illinois, the attached PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S MEMORANDUM OPINION AND ORDER OF NOVEMBER 30, 2004

Plaintiffs, by their attorneys,

Timothy Murphy
3758 West Montrose Avenue
Chicago, IL 60618
(773) 463-1203
(773) 604-5138 (fax)

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

## CERTIFICATION

I hereby certify that on the ___17th___ day of December, 2004, I faxed and

mailed a true copy of the within to:

Matthew Allison
Thomas A. Doyle
Hillary P. Krantz
Baker & McKenzie
1 Prudential Plaza, Suite 3500
130 East Randolph Drive
Chicago, IL 60601
(Fax 312-861-2899)

Lawrence W. Newman
Jacob M. Kaplan
Baker & McKenzie
805 3rd Avenue, Floor 30
New York, NY 10022
(Fax 212-759-9133)

Thomas Walsh
U.S. Attorney's Office
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604
(Fax 312-886-4073)

# EXHIBIT C

**FILED**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

JUL 2 8 2004

Judge Blanche M. Manning
United States District Court

JENNY RUBIN, et al.,    )
                        )
        Plaintiffs,     )
                        )    Case No. 03-cv-9370
    v.                  )
                        )    Judge Blanche M. Manning
THE ISLAMIC REPUBLIC OF IRAN, et al.,    )
                        )    **DOCKETED**
        Defendants.     )
                        )    AUG 0 3 2004
_____)

### STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States of America files this Statement of Interest, pursuant to 28 U.S.C. § 517,[1]

in order to advise the Court of its views as to whether plaintiffs may seek to execute against the

judgment rendered in their favor against the Government of Iran in Jenny Rubin, et al. v. Islamic

Republic of Iran, et al., Civil Action No. 01-1655 (D.D.C.) (RMU), by attaching or otherwise

restraining the transfer of certain ancient Persian artifacts held by the University of Chicago's

Institute for Oriental Studies for purposes of academic research and study.

The United States deplores the acts of terrorism that gave rise to the injuries suffered by the

Rubin plaintiffs and has deep sympathy for their suffering. However, the government also has a

significant interest in ensuring that laws and regulations related to foreign economic sanctions are

properly construed by the courts, since this may have a far-reaching impact not only on how

sanctions programs are administered but, more broadly, on the conduct of the foreign relations of

the United States. Moreover, as explained in the attached declaration of Mark Clodfelter,

Assistant Legal Adviser for International Claims and Investment Disputes, U.S. Department of

---

[1] 28 U.S.C. § 517 authorizes the Attorney General to attend to the interests of the United
States in any proceeding in which the United States is not a party. The submission of a Statement
of Interest does not constitute an intervention in this action but is the equivalent of an amicus curiae
brief. See Flatow v. Islamic Republic of Iran, 305 F.3d 1249, 1252-53 & n.5 (D.C. Cir. 2002).



State ("Clodefelter Decl."), attached as Ex. A, one of the collections of artifacts subject to

plaintiffs' restraining notice is also the subject of a claim by Iran against the United States in

proceedings before the Iran-U.S. Claims Tribunal, and thus, the United States has a significant

interest in ensuring its proper disposition. For these reasons, the United States sets forth here what

it believes to be the correct explanation of the scope of Section 201 of the Terrorism Risk

Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, Title II, § 201, 116 Stat. 2322 (Nov. 26,

2002), and the attachment provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

§ 1610, as they relate to the artifacts at issue in these proceedings.[2]

Specifically at issue is whether the ancient Persian artifacts held by the University of

Chicago are subject to attachment or execution in plaintiffs' attempt to satisfy their judgment

against Iran. Assuming that the artifacts are property belonging to the Government of Iran or to an

agency or instrumentality of Iran,[3] as set forth below, they are not "blocked assets," and thus are

not subject to attachment under TRIA; nor are they subject to attachment under any other provision

of law. Plaintiffs' Citation Notice against the University of Chicago, accordingly, should be

dissolved, and the artifacts should be determined exempt from execution.

---

[2] For the Court's convenience, the text of TRIA is attached hereto as Ex. B.

[3] The University of Chicago explains that the National Museum of Iran and the Iranian Cultural and Heritage Organization own the reversionary interest in the artifacts once the University of Chicago has completed its research and study. See Affidavit of Matthew Stolper, appended to University of Chicago's Notice of Filing, dated June 16, 2004 ("Stolper Aff."), ¶ 9. The United States assumes herein, for purposes of argument only, that the National Museum of Iran and the Iranian Cultural Organization are "agencies or instrumentalities" of Iran as those terms are to be interpreted under TRIA and the FSIA, but takes no position on their actual status or upon the standards that might apply to determining their status. Because as explained herein, the artifacts are not "blocked assets" under TRIA, and are not otherwise subject to attachment under the FSIA, the issue of whether these entities are properly considered "agencies or instrumentalities" under either of these statutory schemes need not be reached. Moreover, because the issues discussed herein are dispositive of plaintiffs' Citation Notice, the United States does not reach, and takes no position on, other issues that might have been briefed by the parties.

-2-

**BACKGROUND**

1.     **Plaintiffs' Underlying Action Against Iran.**

Plaintiffs herein are the survivors of a terrorist attack orchestrated by Hamas in Jerusalem in 1997. Plaintiffs sued various defendants, including the Government of Iran, in United States District Court for the District of Columbia on July 31, 2001, alleging that Hamas was directly responsible for the attack, and that Iran was liable to plaintiffs for the attack because it provided material support to Hamas. Jurisdiction over plaintiffs' civil claims against Iran was based on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601 et seq., which provides the exclusive source of subject matter jurisdiction in federal courts over all civil actions against foreign states. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-35 (1989).[4] On March 6, 2002, the Clerk entered default against the Government of Iran, among others. On August 2, 2002, plaintiffs' case was consolidated for further proceedings with those of another group of plaintiffs making similar allegations arising out of the same incident. See Campuzano, et al. v. Islamic Republic of Iran, et al., Civil Action No. 00-2328 (RMU).

---

[4] In general, unless one of the FSIA's exceptions applies, foreign states enjoy immunity from the jurisdiction of the federal courts. See 28 U.S.C. § 1604. Section 1605(a) of the FSIA, as amended in 1996, sets forth one of these exceptions, and provides in pertinent part that a foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case

> . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support of resources . . . for such an act . . . engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency . . .

See 28 U.S.C. § 1605(a)(7). This exception to the immunity of a foreign state under the FSIA applies where the claimant or victim is a national of the United States, and where the foreign state has been designated as a state sponsor of terrorism under applicable law. Id. § 1605(a)(7). Iran has been designated as a state sponsor of terrorism since 1984. See Determination Pursuant to Section 6(i) of the Export Administration Act of 1979 – Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

On September 10, 2003, the United States District Court for the District of Columbia entered final judgment in favor of these plaintiffs – as well as the plaintiffs in <u>Campuzano</u> – finding that plaintiffs had established "by the requisite 'evidence satisfactory to the court' and by clear and convincing evidence, the court's subject-matter jurisdiction and the liability of the defendants for plaintiffs' personal injuries. . . . " Findings of Fact and Conclusions of Law, entered in <u>Campuzano,</u> No. 00-2328, at 22 (attached as Ex. C). The Court awarded the <u>Rubin</u> plaintiffs, collectively, $71.5 million in compensatory damages, and an additional $37.5 million each in punitive damages. <u>See</u> Order and Judgment, attached as Ex. D. Although the compensatory damages judgments were awarded against all defendants, jointly and severally, the punitive damages judgments were not awarded against Iran.

Plaintiffs now seek to collect on their judgment by restraining the transfer of ancient Persian artifacts held by the University of Chicago's Oriental Institute, presumably on the theory that, whatever their present custodianship, these artifacts belong to the Government of Iran and thus may be executed against in satisfaction of their judgment. <u>See</u> Citation Notice, Ex. E. In support of this effort, plaintiffs rely specifically on Section 201 of TRIA and Section 1610 of the FSIA. <u>See</u> Amended Plaintiffs' Urgent Motion for Contempt Sanctions Against Citation Third Party Respondents, Docket No. 8, filed June 18, 2004, at 3.

### 2.    The Artifacts Held by the University of Chicago.

According to the submissions filed by the parties, the artifacts held by the University of Chicago are comprised of two distinct collections: the Persepolis Fortification Texts and the Chogha Mish materials, both belonging to the National Museum of Iran ("Museum") and the Iranian Cultural Heritage Organization ("Organization"). <u>See</u> Affidavit of Raymond Tindal, appended to University of Chicago's Notice of Filing, dated June 16, 2004 ("Tindal Aff."), ¶ 3.

The Persepolis Texts were recovered by archeological excavations in 1933, and have been held by the University of Chicago on a long-term loan since their discovery. See Stolper Aff. ¶¶ 8-9; see also Protocol, dated January 5, 2004, attached as Ex. F. Portions of these Texts have been returned to Iran on three occasions: in 1948, in 1954, and most recently, in 2004. Id. ¶ 10. Apparently with the acquiescence of the Museum and the Organization, see Stolper Aff. ¶ 9; Protocol, Ex. F, additional materials from the Persepolis Texts collection remain in the custody of the University of Chicago and are subject to further study. The Chogha Mish artifacts were excavated at a different location in Iran in the early 1960's. See Clodfelter Decl., Ex. A, ¶ 4; Tindal Aff. ¶ 4. A portion of these artifacts were returned to Iran in 1970, but additional artifacts from this collection remain in the custody of the Oriental Institute. Clodfelter Decl. ¶ 5. Both collections of artifacts are held solely for scholarly research, and have not been made the subject of any commercial use or activity. Tindal Aff. ¶ 8; Stolper Aff. ¶ 16.

With respect to the second of these two collections, the Chogha Mish collection, Iran has filed a claim against the United States in the Iran-U.S. Claims Tribunal, alleging that the United States had breached its obligations to arrange for the return of Iranian property to Iran following the signing of the Algiers Accords which ended the Iranian Hostage Crisis in 1981. Clodfelter Decl. ¶¶ 4, 6. In 1990, the United States made clear that it was prepared to negotiate arrangements for the transfer of the remaining Chogha Mish artifacts. Id. ¶ 6. In 2001, Iran requested that the artifacts be transferred to the Hague – where the Iran-U.S. Claims Tribunal is located – and discussions between the United States and Iran regarding the details of the transfer are pending. Id.

## ARGUMENT

Plaintiffs' attempts to restrain, attach, or execute against the Persian artifacts held by the University of Chicago must be rejected because neither TRIA nor the FSIA – the two statutes upon which plaintiffs specifically rely – provide any authority for plaintiffs' Citation Notice. Specifically, the artifacts in question are not "blocked assets" as defined by TRIA, and therefore, are not available for attachment under that statute. Moreover, because the artifacts are held by the University of Chicago solely for purposes of research and study, and are not used by Iran for commercial activity in the United States, they are also not available for attachment under the FSIA. Because there is no other vehicle by which the property of a foreign sovereign might be attached or subjected to execution by a civil plaintiff, these artifacts should be found to be wholly exempt from the citation issued by plaintiffs.

## I.    THE ARTIFACTS ARE NOT "BLOCKED ASSETS" OF IRAN.

The Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002), see Ex. B, addresses the attachment of foreign property in connection with judgments obtained under Section 1605(a)(7) of the FSIA against terrorists, terrorist organizations, and State sponsors of terrorism. Section 201(a) of TRIA authorizes the attachment of certain "blocked assets" as compensation for victims of terrorism as follows:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under Section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA, Section 201(a) (emphases added). TRIA defines "blocked asset" as

(A) any asset seized or frozen by the United States under Section 5(b) of the

Trading with the Enemy Act or under sections 202 and 203 of the International
Emergency Economic Powers Act (50 U.S.C. 1701; 1702).

TRIA § 201(d)(2)(A) (emphases added).  As described herein, the artifacts held by the University

of Chicago do not constitute blocked assets as defined by TRIA.  For this reason, plaintiffs find no

support in TRIA for their attempt to restrain, attach, or otherwise execute against these artifacts.

The International Emergency Powers Act ("IEEPA") – referenced in TRIA's definition of

"blocked assets" – is the principal statutory authority under which the President has imposed

various sanctions programs against foreign states, including Iran.  Since the passage of IEEPA in

1977, the President has had broad authority in times of declared national emergency to

"investigate, regulate, direct and compel, nullify, void, prevent or prohibit" (among other actions)

a wide variety of interests and transactions concerning "any property in which any foreign country

or national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).

The first U.S. sanctions with respect to Iran were imposed under this statutory scheme on

November 14, 1979, when, in response to Iran's seizure of the U.S. Embassy in Tehran and the

taking hostage of 52 U.S. citizens, President Carter issued Executive Order 12170, 44 Fed. Reg.

65729 (Nov. 14, 1979), attached as Ex.G, in which he declared a national emergency and ordered

blocked all property of the Government of Iran.[5]

To implement Executive Order 12170 and subsequent Executive Orders involving Iranian

interests in the United States,[6] the Office of Foreign Assets Control ("OFAC") of the U.S.

---

[5] Specifically, Executive Order 12170 states "I hereby order blocked all property and
interests in property of the Government of Iran, its instrumentalities and controlled entities and the
Central Bank of Iran, which are or become subject to the jurisdiction of the United States or which
are or come within the possession or control of persons subject to the jurisdiction of the United
States.

[6] The President's blocking order freezing Iranian assets was followed by Executive Order
12205, which imposed additional specific prohibitions on trade and financial transactions.  45

-7-

Department of the Treasury – the component of the federal government responsible for

implementing foreign sanctions programs – promulgated the Iranian Assets Control Regulations

("IACR"). 45 Fed. Reg. 24432 (Apr. 9, 1980), codified at 31 C.F.R. Part 535. The IACR states,

in pertinent part, that "[no] property subject to the jurisdiction of the United States or which is in

the possession or control of persons subject to the jurisdiction of the United States in which on or

after the effective date Iran has any interest of any nature whatsoever may be transferred, paid,

exported, withdrawn or otherwise dealt in except as authorized." 31 C.F.R. § 535.201.

On January 19, 1981, Iran and the United States resolved the hostage crisis with the signing

of the Algiers Accords. See Declaration of the Government of the Democratic and Popular

Republic of Algeria ("General Decl.") (available at the website for the Iran-U.S. Claims Tribunal,

www.iusct.org), attached as Ex. H. Under the Algiers Accords, the United States agreed, inter

alia, to "restore the financial position of Iran, insofar as possible, to that which existed prior to

November 14, 1979," and further agreed "to commit itself to ensure the mobility and free transfer

of all Iranian assets within its jurisdiction." General Decl. ¶ A; see also id. ¶ 9 (memorializing

U.S. commitment to "arrange . . . for the transfer to Iran of all Iranian properties which are located

in the United States. . . ").

For the purposes of implementing the commitments made in this agreement, the President

issued several Executive Orders directing the marshaling and transfer of the majority of once-

blocked assets to Iran and to escrow accounts to facilitate settlement of claims involving Iran

under a claims settlement process provided for in the Algiers Accords. See, e.g., E.O. 12276, 46

Fed. Reg. 7913 (Jan. 19, 1981) ("Direction Relating to Establishment of Escrow Accounts"); E.O.

12277, 46 Fed. Reg. 7915 (Jan. 19, 1981) ("Direction to Transfer Iranian Government Assets");

---

Fed. Reg. 24099 (Apr. 7, 1980).

E.O. 12278, 46 Fed. Reg. 10895 (Jan. 19, 1981) ("Direction to Transfer Iranian Government

Assets Overseas"); E.O. 12279, 46 Fed. Reg. 7919 (Jan. 19, 1981) ("Direction to Transfer Iranian

Government Assets Held by Domestic Banks"); E.O. 12280, 46 Fed. Reg. 7921 (Jan. 19, 1981)

("Direction to Transfer Iranian Government Financial Assets Held by Non-Banking Institutions").

Included among these orders was Executive Order 12281, 46 Fed. Reg. 7923 (Jan. 19,

1981) (titled "Direction to Transfer Certain Iranian Government Assets"; referred to herein as

"Transfer Directive"), attached as Ex. I. The Transfer Directive directs that

> All persons subject to the jurisdiction of the United States in possession or control
> of properties, not including funds or securities, owned by Iran or its agencies,
> instrumentalities, or controlled entities, are licensed, authorized, directed and
> compelled to transfer such properties, as directed after the effective date of this
> Order by the Government of Iran, acting through its authorized agent.

Id. (emphasis added). As a result of this order, and the implementing regulation issued by OFAC,

31 C.F.R. § 535.215, nearly all previously-blocked properties, including those at issue here,

namely, the artifacts held by the University of Chicago's Oriental Institute, were no longer subject

to blocking under the Iranian Assets Control Regulations, but instead could be transferred at any

time upon the request of the Government of Iran.

United States persons who engage in certain transactions relating to Iranian properties

located in the United States, however, remain subject to the Iranian Transactions Regulations

("ITR"), see 31 C.F.R. Part 560, which implement a number of Executive Orders which were

promulgated years after the signing of the Algiers Accords and the lifting of most of the blocking

prohibitions. See, e.g., Executive Order 13059, 62 Fed. Reg. 162 (Aug. 2, 1997). These

Executive Orders and the ITR prohibit a wide range of commercial and financial transactions with

Iran, including for example, the exportation of goods to Iran. See 31 C.F.R. § 560.204;

see generally Weinstein v. Islamic Republic of Iran, 299 F. Supp. 2d 63, 68 (E.D.N.Y. 2004)

(appeal pending) (describing these Executive Orders and the Iranian Transactions Regulations).
These restrictions – part of a trade embargo initiated in 1987 and significantly broadened in 1995
– do not result in the blocking of any assets, but instead are an exercise of the President's power
under IEEPA to regulate transactions with foreign countries.

The effect of the Transfer Directive issued in 1981 to implement the Algiers Accords was
to remove the artifacts at issue here from the scope of the Iranian blocking orders. See Weinstein,
299 F. Supp. 2d at 67 ("Pursuant to the Algiers Accords, most Iranian assets were unblocked.").
Thus, these artifacts are no longer "blocked assets" as described in TRIA. To the contrary –
unlike those assets that fall within TRIA's definition of blocked assets which are seized or frozen
by the President's exercise of his IEEPA authority – the properties subject to the Transfer
Directive are neither seized nor frozen. Rather, they are subject to being transferred to Iran, at any
time, at the direction of the Iranian Government. Indeed, with respect to the Choga Mish
collection, as described above, Iran has directed the return of the artifacts and the United States
and Iran are actively engaged in discussions concerning the transfer of these artifacts in the course
of resolving claims brought by Iran before the Iran-U.S. Claims Tribunal. See Clodfelter Decl.
¶¶ 4, 6. Similarly, Iran recently accepted the return of a portion of the Persepolis Texts collection,
see Stolper Aff. ¶ 10.[7] Additional artifacts from the Persepolis Texts collection remain in the
custody of the University of Chicago, pursuant to the continuing acquiescence and direction of Iran.

-----

[7] Although OFAC issued a license on March 8, 2004, authorizing this transfer to take
place, see Ex. J, the license evidences only that certain transactions, such as the exportation of
goods to Iran, require authorization. See, e.g., 31 C.F.R. § 560.204. The issuance of the license
does not suggest that the artifacts are blocked under the Iranian Assets Control Regulations, 31
C.F.R. Part 535. In fact, the license explicitly references 31 C.F.R. Part 560, the Iranian
Transactions Regulations, not part 535, the regulations relating to the blocking regime. See id.;
see also Weinstein, 299 F. Supp. 2d at 74 ("the Court rejects plaintiffs' argument . . . that the term
"blocked assets'" [within the meaning of TRIA] includes all assets "regulated" or "licensed" under
IEEPA by OFAC").

See Stolper Aff. ¶ 9; Protocol, Ex. F.

Because these artifacts fall outside of TRIA's definition of blocked assets, they are not subject to attachment under that Act. Accordingly, to the extent plaintiffs rely upon TRIA to provide the legal authority for their citation, the artifacts should be determined to be exempt from attachment.

## II.    THE ARTIFACTS ARE NOT SUBJECT TO ATTACHMENT UNDER THE FSIA.

Apart from TRIA, the Foreign Sovereign Immunities Act provides the exclusive source of subject matter jurisdiction in federal courts over all civil actions against foreign states, including efforts to seek to attach or execute against the assets of a foreign sovereign. See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-35 (1989); see also Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d 16, 20 (D.D.C. 1999) ("the property of a foreign state in the United States is immune from attachment or execution, unless an exception under [the FSIA] provides otherwise"). Two relevant provisions of the FSIA define the manner in which foreign state assets might be attached to satisfy a judgment entered against a foreign state under 28 U.S.C. § 1605(a)(7): Section 1610(a) and Section 1610(f). Neither of these provisions, however, provides these plaintiffs a vehicle through which to seek attachment of the artifacts at issue in these proceedings.

### A.    Section 1610(a) Provides No Authority for Attachment of the Artifacts.

When the Foreign Sovereign Immunities Act was amended in 1996 to add Section 1605(a)(7) allowing civil suits to proceed against designated terrorist states for specified acts, the FSIA authorized execution against the property of foreign states only if it was "used for

-11-

commercial activity in the United States." 28 U.S.C. § 1610(a)(7).[8]

The artifacts at issue in these proceedings do not fall within the terms of this attachment provision. As attested to by officials from the University of Chicago, the artifacts at issue here have been maintained for decades in the custody of an academic institution solely for the purposes of scholarly research and study. See Tindel Aff. ¶ 8; Stolper Aff. ¶ 16; see also Protocol, Ex. F (describing University of Chicago's continued retention of the artifacts for the purpose of "study and research of the tablets"). They are not used by Iran for any commercial activity whatsoever. See Flatow, 76 F. Supp. 2d at 22 (for purposes of section 1610(a), "to determine whether a foreign state's actions are commercial, courts must examine 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the types of actions by which a private party engages in trade and traffic or commerce.'") (emphasis omitted) (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)). Thus, Section 1610(a) provides no support for plaintiffs' attempt to attach the artifacts.

B.    Section 1610(f) Provides No Authority for Attachment of the Artifacts.

In 1998, Congress amended the FSIA to allow for the collection of a judgment against a terrorist state under Section 1605(a)(7) by attachment of "any property with respect to which financial transactions are prohibited or regulated pursuant to," inter alia Section 5(b) of the

---

[8] In relevant part, this section provides as follows:
The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if– . . . (7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.
28 U.S.C. § 1610 (emphasis added). "Foreign state," for purposes of this provision, is defined to include the state's political subdivisions and agencies or instrumentalities. See 28 U.S.C. § 1603(a).

Trading with the Enemy Act, 50 U.S.C. App. § 5(b), or Sections 202 and 203 of the International

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, 1702. This provision was

codified in the FSIA at 28 U.S.C. § 1610(f)(1)(A). At the same time, however, Congress

authorized the President to waive the requirements of Section 1610(f)(1)(A), see 28 U.S.C.

§ 1610(f)(3), and the President immediately did so on the ground that this provision "would

impede the ability of the President to conduct foreign policy in the interests of national security and

would, in particular, impede the effectiveness of such prohibitions and regulations on financial

transactions." See Presidential Determination No. 99-1, 63 Fed. Reg. 59201 (Oct. 21, 1998).[9]

The effect of the President's waiver of Section 1610(f)(1)(A) was to bring the state of the law

with respect to the attachment of property of foreign states under the FSIA back to the status quo

ante, which as described in Part A, supra, provides no support for plaintiffs' attempt at attachment.

See Flatow, 76 F. Supp. 2d at 27 (as a result of the President's waiver, "Section 1610(f)(1) is

without operative effect and cannot authorize the attachment plaintiff seeks"). Thus, Section

1610(f) also provides no support for plaintiffs' attempt to attach the artifacts held by the University

of Chicago.

## CONCLUSION

For the reasons stated herein, there is no source of law that authorizes plaintiffs' attempt to

collect on their judgment against the Government of Iran by attaching or otherwise seeking to

execute against the ancient Persian artifacts held by the University of Chicago. These artifacts,

accordingly, should be determined to be exempt from attachment.

---

[9] The President renewed this waiver in Presidential Determination No. 2001-03, 65 Fed.
Reg. 66483 (Oct. 28, 2000).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

PATRICK FITZGERALD
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

RUPA BHATTACHARYYA
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave, N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

Dated: July 27, 2004

-14-

# CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2004, a copy of the foregoing Statement of Interest of the

United States was served by overnight mail on counsel of record addressed as follows:

Timothy M. Murphy, Esq.
TIMOTHY M. MURPHY, P.C.
3758 West Montrose
Chicago, IL 60618

David J. Stachman, Esq.
McINTYRE, TATE, LYNCH & HOLT
321 South Main Street, Suite 400
Providence, RI 02903

Thomas A. Doyle, Esq.
Hillary P. Krantz, Esq.
BAKER & McKENZIE
130 East Randolph Drive
Chicago, IL 60601

Lawrence W. Newman
Jacob M. Kaplan
BAKER & McKENZIE
805 Third Avenue
New York, NY 10022

RUPA BHATTACHARYYA
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

# SEE CASE FILE FOR EXHIBITS