UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN, et al. | ) |
|       Plaintiffs – Judgment Creditors, | ) |
|   v. | ) |
| THE ISLAMIC REPUBLIC OF IRAN, et al. | ) Case No.: 05-MC-10079 (GAO) |
|       Defendants – Judgment Debtors, | ) |
|   v. | ) |
| MUSEUM OF FINE ARTS, HARVARD UNIVERSITY, et al. | ) |
|       Trustee Process Respondents. | ) |

**TRUSTEE PROCESS RESPONDENTS HARVARD PARTIES' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Trustee Process Respondents Harvard University, the President and Fellows of Harvard College, Harvard University Art Museums, the Busch-Reisinger Museum, the Fogg Art Museum, the Sackler Museum, the Semitic Museum, and the Peabody Museum ("Harvard")[1] oppose the plaintiffs' Motion for Partial Summary Judgment as procedurally improper and legally unsound. The plaintiffs have imagined a "standing" problem where there is none. No legal doctrine prevents Harvard from alerting the Court to a binding and dispositive statute that exempts property in Harvard's possession from attachment. The Court can and should apply the

---

[1] Harvard University, Harvard University Art Museums, the Busch-Reisinger Museum, the Fogg Art Museum, the Sackler Museum, the Semitic Museum, and the Peabody Museum are not legal entities subject to suit. The President and Fellows of Harvard College is the legal entity that comprises the various named schools and museums and is the only proper party to this litigation. *See* Declaration of Ellen Fels Berkman ¶¶ 3-4 (filed June 27, 2005). Accordingly, all parties other than the President and Fellows of Harvard College should be dismissed from this proceeding.

1

relevant section of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1609. Harvard therefore requests that the Court deny the Motion for Partial Summary Judgment.

## BACKGROUND

On March 28, 2005, plaintiffs moved in this Court for an order of attachment by trustee process against Harvard, in order to collect on a default judgment they had obtained against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and three Iranian government officials.[2] Specifically, plaintiffs alleged "[u]pon information and belief" that Harvard or one of its museums possessed antiquities belonging to the Government of Iran. Memorandum in Support of Plaintiffs' Motion for Order of Attachment by Trustee Process at 3-4. Plaintiffs speculated that at least six antiquities on display at the Sackler Museum at Harvard University that relate to the ancient civilization at Persepolis "*may* be the property of Iran." *Id.* (emphasis added).[3] This Court issued a summons to Harvard on April 28, 2005.

On June 27, 2005, Harvard answered and moved to quash the summons and to dissolve the attachment by trustee process.[4] Harvard submitted declarations under penalties of perjury establishing that it possesses no antiquities belonging to the government of Iran or any of the other judgment debtors. Harvard also demonstrated that, even if (contrary to fact) Harvard were in possession of antiquities belonging to Iran, such antiquities were immune from attachment

---

[2] The underlying judgment was issued by the United States District Court for the District of Columbia on September 10, 2003. *See Rubin v. Islamic Republic of Iran*, No. 01-1655-RMU (Sept. 10, 2003) (default judgment).

[3] At no point prior to their institution of this proceeding did the plaintiffs approach officials of Harvard University or its museums to inquire whether Harvard possessed any property belonging to Iran. *See* Abrahams Decl. ¶ 8; Armstrong Decl. ¶ 8; Fisher Decl. ¶ 8 (each filed June 27, 2005). The plaintiffs do not even claim to have a good faith basis for asserting that Harvard possesses any property belonging to the Ministry of Information and Security or the three individual judgment debtors.

[4] *See* Motion of Harvard Parties to Quash Summons and to Dissolve Attachment by Trustee Process ("Motion to Quash").

US1DOCS 5262728v9

under the FSIA, since no exception to the FSIA applied in this case. The relevant provision of the FSIA, 28 U.S.C. § 1610(a)(7), requires that the property be used (1) by Iran (2) for a commercial activity in the United States to be subject to attachment.[5] Since neither statutory prong could be met, the antiquities could not be attached.

On July 25, 2005, rather than opposing Harvard's Motion to Quash, the plaintiffs: (1) filed their Motion for Partial Summary Judgment; and (2) moved to stay briefing on the Motion to Quash "pending disposition of the Plaintiffs' Motion for Partial Summary Judgment."[6] In their Motion for Partial Summary Judgment, the Rubin parties have argued that "no person other than Iran" may assert the immunity from attachment the Iranian artifacts enjoy under 28 U.S.C. § 1609.[7] Harvard, the plaintiffs erroneously claim, lacks standing to alert the Court to a statutory provision governing the disputed property. *Id.*[8]

---

[5] *See* Memorandum of Law of Harvard Parties in Support of Motion to Quash Summons and to Dissolve Attachment by Trustee Process ("Harvard Mem. on Motion to Quash") at 5-8.

[6] Plaintiffs' Motion to Stay Trustee Process Defendants' Motion to Quash Summons and to Dissolve Attachment by Trustee Process Pending Determination of Plaintiffs' Motion for Partial Summary Judgment as to Trustee Process Defendants' Standing to Raise Iran's Sovereign Immunity Defense and Pending Completion of any Necessary Discovery at 4.

[7] *See* Plaintiffs' Motion for Partial Summary Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity Defenses Under §§ 1609 and 1610 of the FSIA ("Pl. Motion") at 5.

[8] The plaintiffs' piecemeal opposition to Harvard's Motion to Quash is procedurally improper. *See* Trustee Process Respondents Harvard Parties' Opposition to Plaintiffs' Motion to Stay Resolution of Motion to Quash Summons (filed herewith). Harvard's Motion to Quash squarely presented the issue of the immunity from attachment under § 1609 of any alleged Iranian property in Harvard's possession. The matter that the plaintiffs raise in their Motion for Partial Summary Judgment—Harvard's standing to raise that issue—could and should have been addressed in a timely opposition to Harvard's Motion to Quash. Instead, the plaintiffs have impermissibly singled out one aspect of the Motion to Quash and sought the Court's judgment on it alone. The plaintiffs no doubt still hope to file a full-fledged opposition brief that addresses the other issues covered in Harvard's Motion to Quash, if and when they fail here. The Court should require the plaintiffs to file their opposition forthwith and limit the number of pages for that opposition. *Cf.* Loc. R. 7.1(B)(4) ("Memoranda supporting or opposing allowance of motions shall not, without leave of court, exceed twenty (20) pages, double-spaced.").

**ARGUMENT**

1. **28 U.S.C. § 1609 Contains No "Standing" Requirement.**

The plaintiffs have imagined a "standing" issue where there is none. The plain language of 28 U.S.C. § 1609 refers to the amenability of *property* to attachment. The statute nowhere conditions its applicability on assertion by a particular party. The statute reads in relevant part:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act[,] the property in the United States of a foreign state *shall be immune* from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

28 U.S.C. § 1609 (emphasis added). Section 1609 clearly and straightforwardly places certain property beyond the reach of all attachment procedures. The statute does not require the presence of the sovereign or give the "foreign state" exclusive authority to invoke the statute. Indeed, it places no limits on who may establish the property as belonging to a foreign state and (therefore) immune from attachment. Nor is the statute styled as a "defense" that belongs to a particular party. Rather, it is "the property" that is immune. The plain text is clear that, if the property belongs to the "foreign state" (as the plaintiffs erroneously allege), the property "shall" be immune, unless one of the exceptions enumerated in § 1610 or § 1611 is applicable.

The plaintiffs' reading to the contrary is simply atextual. As noted, nothing in the statute requires the "foreign state" to identify the property or assert the statute. As important, and as explained below, the plaintiffs' repeated references to Iran's generic "sovereign immunity," *see, e.g.*, Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mem.")

---

The plaintiffs' Motion for Partial Summary Judgment was accompanied by numerous newspaper articles from 1997 and 1998 suggesting that "claims" had been raised against Harvard in the past. Pl. Motion at 3 n.1. Not one of the articles mentions Iran or Iranian artifacts. The articles bear no relevance to the plaintiffs' motion or to this case, and appear to have been submitted solely to cast aspersions on the Museum of Fine Arts and Harvard. Harvard respectfully requests that this Court strike or disregard this material as irrelevant.

4

at 5, are misplaced. Section 1609 governs immunity of property from attachment, not the analytically distinct question of the sovereign's immunity from suit. Both under international law and under the FSIA, immunity from attachment of property of a foreign state is significantly broader than sovereign immunity from suit. By misdirecting the Court toward the party, rather than the property, the plaintiffs have attempted to divert attention from the statutory language that controls this case. The Court should focus instead on the plain text of the relevant statute—which contains no special "standing" requirement.

2. **Authoritative Case Law And The Position Of The United States Government Reject Plaintiffs' Atextual "Standing" Requirement**

    A. **The Fifth Circuit Has Squarely Addressed This Issue And Found No "Standing" Limitation**

The only court of appeals that has directly addressed the "standing" of parties other than a foreign sovereign to assert the immunity of property from attachment under § 1609 has squarely rejected the plaintiffs' position. In *Walker International Holdings Ltd. v. Republic of Congo,* 395 F.3d 229 (5th Cir. 2004), *cert. denied,* 125 S. Ct. 1841 (2005), an oil exploration company filed motions to dissolve writs of attachment and garnishment against a debt it owed to the Republic of Congo, arguing, *inter alia*, that the funds were immune from attachment under 28 U.S.C. § 1610(a). *See id.* at 232. The Fifth Circuit upheld the trial court's determination that the monies were immune from attachment under the FSIA. *Id.* The Fifth Circuit explained that the plain language of the FSIA foreclosed the plaintiff's argument that only the Congo had standing to assert the funds' immunity from attachment:

> [W]e were unable to find any authority for the proposition that it is the sovereign's *exclusive* right to raise the issue of sovereign immunity under the FSIA. In fact, the very language of the FSIA makes clear that the [sovereign's] presence is irrelevant . . . . The FSIA sets parameters in which property may be attached: "the court may order the attachment or execution *only* as 'referred to in subsections (a) and (b).'" . . . Neither 28 U.S.C. § 1610(a) nor (b)

5

> requires the presence of the foreign sovereign or gives the
> sovereign exclusive standing to raise the waiver element.

*Id.* at 233 (citations omitted). The *Walker* court correctly concluded that the FSIA does *not* limit the application of § 1610 to instances where the foreign state itself invokes immunity under that provision.[9] Accordingly, nothing in the text of § 1609 prevented the Court from noting and applying the relevant immunity at the behest of an interested third party. *See id.*

**B.     The United States Has Taken a Position Consistent With The Fifth Circuit**

The United States Government has adopted a position consistent with *Walker*— and inconsistent with the plaintiffs' argument. The United States itself has asserted the immunity of Iranian assets from attachment under § 1609, even when Iran did not do so, and has also supported the assertion of § 1609 by private trustees. This position of the Executive Branch seriously undermines the plaintiffs' contention that Iran alone may assert the immunity of its assets under § 1609.

For example, in *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16 (D.D.C. 1999), the plaintiff sought to satisfy a default judgment against Iran by attaching various parcels of real estate in Washington, D.C., belonging to Iran, including the former Iranian embassy, of which

---

[9] Indeed, even where a foreign sovereign has *waived* the property's immunity from attachment, the attachment may nevertheless be barred under 28 U.S.C. § 1610(a). By its express terms, § 1610(a)(1) provides that only property used for *commercial activity* may be subject to attachment, even when the foreign state has expressly or implicitly waived immunity from attachment. Thus, the statute makes clear that waiver, by itself, is not sufficient to render sovereign property subject to attachment—the property must also independently satisfy the "commercial activity" prong of § 1610(a)(1), which requires that the property be used *by Iran* for commercial activity. This case is, if anything, an *a fortiori* case, for here Iran, which has not appeared in this Court, has made no express or implied waiver of any sovereign immunity that might inhere in the property in question.

6

the United States had taken custody.[10] *See id.* at 18. The United States intervened and filed a submission asserting that the property was immune from attachment under § 1609—a position completely at odds with the plaintiffs' claim here that "no party but Iran" may raise the immunity of Iranian assets from attachment. The District Court agreed with the United States, and held that it "lack[ed] jurisdiction over the properties and accounts" because the property was immune from attachment under § 1609, *Flatow*, 76 F. Supp. 2d at 20, even though the immunity had been raised by "a non-agent third party," *i.e.* the United States. *Id.* at 23.

The United States took the same position in *Cicippio v. Islamic Republic of Iran*, Civil Action No. 96-1805 (D.D.C.). In *Cicippio*, the plaintiffs sought to attach Iranian funds held by an American bank in an effort to satisfy a judgment against Iran. The United States again intervened and moved to quash, arguing that the funds were immune from attachment under § 1609. *See* United States Memorandum of Points and Authorities in Support of Motion to Quash Plaintiffs' Writs of Attachment Delivered to Bank of America at 2-3, *Cicippio v. Islamic Republic of Iran*, Civil Action No. 96-1805 (D.D.C.) (Exh. A to Harvard Mem. on Motion to Quash) ("United States *Cicippio* Memorandum").

More recently, the United States filed a similar Statement of Interest in another case filed by these plaintiffs. In *Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill.), the Rubin parties have sought to satisfy the same judgment at issue in the instant case by attaching artifacts held by the University of Chicago's Oriental Institute. The United States filed a Statement of Interest arguing that the artifacts were "exempt from attachment" pursuant to §§ 1609 and 1610, notwithstanding the fact that Iran had not appeared in the case. *See* Statement of Interest of the

---

[10] The United States had taken custody of the Iranian Embassy pursuant to its "preserve and protect" responsibility under the Foreign Admissions Act, 76 F. Supp. 2d at 23, and held the monies generated from the lease thereof as "blocked" Iranian property, *id.* at 24.

7

United States of America at 12-13, *Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill.) (Exh. B to Harvard Mem. on Motion to Quash).

The Executive Branch's position in each of these cases is particularly significant to the proper construction of the FSIA, given the FSIA's grounding in international law and diplomatic relations. *See, e.g.*, United States *Cicippio* Memorandum at 3 ("Important foreign policy interests of the United States lie behind the blocking of Iranian assets and preservation of those assets free from encumbrances and attachments."). The Court should also give great weight to the Executive Branch's interpretation, as it is constitutionally charged with administering the nation's foreign policy. *Cf. American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (noting the Executive Branch's "'vast share of responsibility for the conduct of our foreign relations'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring))). Here, the Government's position is especially persuasive, given that it matches the outcome mandated by the plain language of § 1609 and reached by the Fifth Circuit in considering the issue.

### C.  The Cases On Which Plaintiffs Rely Are Inapposite

The plaintiffs make no effort to distinguish *Walker* or the U.S. Government's position. Rather, mentioning *Walker* only in a footnote, plaintiffs criticize that decision on the ground that it did not consider other cases that purportedly support their position. *See* Pl. Mem. at 10 n.9. Yet it is no surprise that *Walker* did not cite those cases, for none of them addresses the issue in *Walker* and in this case—namely the immunity of *property from attachment* under §§ 1609–1610. The plaintiffs' cases instead address the distinct issue of immunity of *sovereigns from suit*, which is governed by a different set of statutory provisions (§§ 1603–1605) and implicates a different set of policy considerations. *See, e.g.*, *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Sys., Inc.*, 385 F.3d 1206, 1218 (9th Cir.

8

2004) (stating that "the FSIA preserved a distinction between two different aspects of foreign sovereign immunity," namely "a foreign sovereign's immunity from actions brought in United States courts" and "immunity from attachment—a foreign sovereign's immunity from having its property attached or executed upon").

For example, in *Republic of the Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986), corporations holding title to New York properties at issue in a litigation between the Philippines and its former head of state were restrained from encumbering or transferring the properties "pending determination as to the true ownership of and entitlement to the parcels of land." *Id.* at 349. The corporations sought relief from the restraining order before the district court, arguing that the litigation would inevitably fail because the former head of state was immune "from suit" under the FSIA. *New York Land Co. v. Republic of Philippines*, 634 F. Supp. 279, 290 (S.D.N.Y. 1986). The Second Circuit affirmed the district court's grant of a preliminary injunction, holding that the case did not have to be dismissed under the FSIA because, *inter alia*, only the former head of state could assert his own immunity from suit. *See Republic of the Philippines*, 806 F.2d at 361.

The Second Circuit made no mention of "attachment" or § 1609. Indeed, no issue of immunity of property from postjudgment attachment could have arisen in *Republic of the Philippines*, given that there was no judgment in existence at the time that could have been satisfied through the attachment of assets. In addition, *Republic of the Philippines* involved the highly unusual situation in which a party was attempting to force sovereign immunity on a foreign state that did not want it: the plaintiff in that case was the foreign sovereign itself, the Philippines, which was seeking to recover property from its own former head of state. To have applied the FSIA's immunity-from-suit provision to dismiss a case brought by the very sovereign

9

to which the immunity belonged would have been absurd. *Republic of the Philippines* therefore has little relevance to this case.

The plaintiff's second major case, *Wilmington Trust v. United States District Court for the District of Hawaii*, 934 F.2d 1026 (9th Cir. 1991), is even less apt. In *Wilmington*, the buyer of a ship, using funds issued by the Finnish Guarantee Board ("FGB"), demanded a non-jury trial under the FSIA on the theory that it was using funds from a foreign state and could therefore demand a non-jury trial for that portion of the ship's value. *See id.* at 1027-28. The court rejected the argument, reasoning that requests under the FSIA must originate from a foreign state party. In that case, however, the buyer's assertion of the FSIA had nothing to do with immunity, either from suit *or* from attachment. *See id.* at 1032 n.9. Nor was the buyer a trustee of disputed funds. *See id.* at 1032-33. Rather, the buyer was attempting to secure a procedural benefit under the FSIA—bench trial—that is available only to a foreign sovereign.

Finally, the plaintiffs' third major case, *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279 (11th Cir. 1999), is also inapposite. In *Aquamar*, Ecuadorian shrimp farmers brought a civil action claiming that fungicides and herbicides produced or supplied by the defendant had killed the plaintiffs' shrimp. *Id.* at 1282. The defendants filed a third-party complaint against an Ecuadorian government agency. *Id.* The plaintiffs invoked the agency's immunity "from suit." *Id.* Although the Eleventh Circuit stated that parties other than a foreign sovereign ordinarily lack standing to "raise the defense of sovereign immunity [from suit]," it also concluded that courts have an obligation to raise *sua sponte* the issue of sovereign immunity from suit, and went on to find jurisdiction proper in that case on the ground that Ecuador had waived its immunity from suit. *Id.* at 1290.

10

*Aquamar* is distinguishable on several grounds. Centrally, *Aquamar*, like *Republic of the Philippines*, involved immunity from suit, not attachment. As discussed in Part 3 below, immunity from attachment is historically stronger and more difficult to waive than immunity from suit. *Aquamar,* like *Wilmington Trust*, did not involve a trustee. Rather, complete strangers to the Ecuadorian government attempted to raise the issue of sovereign immunity. In the instant suit, the putative trustee (Harvard) as the possessor (and, in actual fact, owner) of the property at issue has a far stronger claim than the shrimp farmers at issue in *Aquamar.*

The plaintiffs' remaining cases are similarly distinguishable on the ground that they involve immunity from suit, not immunity from attachment. In addition, in many of those cases, the issue of immunity was not directly before the court, and the court's observations were dicta. *See Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983) (discussing "the amenability of foreign nations to suit"); *Acree v. Republic of Iraq*, 276 F. Supp. 2d 95, 100-01 & n.5 (D.D.C. 2003) (discussing § 1605(a)(7) exception to immunity from suit), *rev'd*, 370 F.3d 41 (D.C. Cir. 2004); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 343 n.42 (S.D.N.Y. 2003) (stating that "[t]he issue of sovereign immunity is not squarely before the Court," yet noting in dicta that the defendant oil company lacked standing to raise immunity "from suit" under the FSIA); *Didi v. Destra Shipping Co., Ltd.*, No. 93-1851, 1993 WL 232075,

11

at *1-*2 (E.D. La. June 17, 1993) (discussing whether "any action against the Republic of Maldives is barred" by the FSIA and the § 1605(a)(7) exception to immunity from suit).[11]

Plaintiffs mistakenly rely (Pl. Mem. at 8) on suretyship cases stating that one party may not raise affirmative defenses to *liability*, such as the statute of limitations, that are personal to another party. Those cases are inapposite. At this stage in the proceedings, Iran's liability to the plaintiffs is not at issue. Rather, Harvard, though seeking ultimately to vindicate its own interests in the property at issue, is bringing to the Court's attention the fact that, even under plaintiffs' own (mistaken) theory that the property at issue belongs to Iran, that property may not be attached. If that property did belong to Iran, as plaintiffs hypothesize, it would be protected under domestic and international law against any order of attachment. The express terms of section 1609 make clear that attachment of such property is beyond the authority of any court in the United States.

Accordingly, this Court should follow the Fifth Circuit's well-considered and directly applicable reasoning in *Walker*, which is consistent with the position taken by the United States in other FSIA attachment cases. Plaintiffs' citation to inapposite case law under different statutory sections offers no reason to do otherwise.

---

[11] The plaintiffs discuss only one case that actually addressed immunity from attachment under § 1609: the unpublished decision of a Magistrate Judge in *National Union Fire Ins. Co. of Pittsburgh v. People's Republic of the Congo*, No. 91 C 3172 (N.D. Ill. Dec. 6, 1991). The *National Union* decision explicitly rested on the fact that the Congo had "waived" the immunity of attachment of its assets. *Id.* at 8. Although the decision stated that a private party could not raise "an immunity defense" under § 1609, it provided no reasoning for this conclusion other than a citation to *Republic of the Philippines*, which, as discussed above, did not concern § 1609 at all. *National Union* is far too thin a reed on which to base an interpretation of § 1609, particularly given the Fifth Circuit's contrary holding in *Walker* based on the statute's plain language and the United States Government's support of the right of parties other than foreign sovereigns to assert § 1609 immunity from attachment.

### 3. Harvard's Right To Assert Immunity Of Property From Attachment Is Consistent With Congress's Intent To Codify International Law

The legislative history of the FSIA makes clear that Congress intended to codify principles of sovereign immunity under international law.  *See* H.R. Rep. No. 94-1487, 94th Cong., 2d Sess., at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605.[12]  International law has long placed severe restrictions on attachment of foreign sovereign property.  The First Circuit has specifically noted that the FSIA was designed to preserve the strong presumption under international law against attachment of foreign sovereign property:

> In enacting the Foreign Sovereign Immunities Act, Congress placed *severe restrictions* on litigants' ability to attach the assets of a foreign state or its instrumentalities. 28 U.S.C. §§ 1609-11. Such attachments were said to have been a source of "significant irritation" and "serious friction in United States' foreign relations." H.R. Rep. No. 94-1487, 94th Cong., 2d Sess. 27 (1976), reprinted in (1976) U.S. Code Cong. & Ad. News 6604, 6626.

*Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 809 n.12 (1st Cir. 1981) (emphasis added).  "[T]he right to attachment has been considered the exception, rather than the norm, in suits by United States nationals against a foreign government." *Id.*

The Second Circuit has similarly stressed that attachment immunity was historically stronger, and applied in more cases, than immunity from suit.  In *De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984), the Second Circuit surveyed both the history of immunity from attachment and the international law context at the time Congress passed the FSIA.  *See id.*

---

[12] The federal courts of appeals uniformly have held that international law is relevant to the interpretation of the FSIA. *E.g.*, *Aquamar,* 179 F.3d at 1294) ("We may look to international law as a guide to the meaning of the FSIA's provisions. . . . Congress intended international law to inform the courts in their reading of the statute's provisions."); *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 497-98 (9th Cir. 1992) ("Congress intended the FSIA to be consistent with international law. . . ."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981) ("[C]urrent standards of international law concerning sovereign immunity add content to the 'commercial activity' phrase of the FSIA.").

13

at 798. The *De Letelier* court noted the international community's special reluctance to permit attachments of property belonging to foreign states, even in cases in which the foreign state was properly subject to jurisdiction. *See id.* The court concluded that Congress intended to lift immunity from attachment only "in part," and that it did not intend to reverse completely the historical and international antipathy against executing against a foreign state's property, even in cases where a judgment could be had on the merits. *Id.* at 799. The *De Letelier* court attributed the differences in phrasing between the immunity-from-suit and immunity-from-attachment provisions in the FSIA to the international community's special reluctance to permit attachments. *See id.*

The Fifth Circuit has also stressed the strong presumption, rooted in history and international law, against attachment of foreign sovereign property. In *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002), the Fifth Circuit noted that at the time the FSIA was passed, "the international community viewed execution against a foreign state's property as a *greater affront to its sovereignty than merely permitting jurisdiction* over the merits of an action." *Id.* at 255-56 (emphasis added). "[T]he FSIA's exceptions to executional immunity were indeed *narrower* than its exceptions to jurisdictional immunity." *Id.* at 256 (emphasis added and citation omitted).

Most recently, the Ninth Circuit likewise recognized that "the structure of the [FSIA] makes clear that it preserved the traditional distinction between the two forms of immunity." *Ministry of Defense & Support*, 385 F.3d at 1219. The Ninth Circuit accordingly held that a waiver of the Iranian Ministry of Defense's immunity from suit in United States courts "did not also constitute a waiver of its immunity from having its property attached." *Id.*

14

In light of Congress's intent to codify international law broadly immunizing foreign sovereign property from attachment, this Court should not impose an atextual standing requirement that would frustrate this intent. The plaintiffs' argument—that no party other than a foreign sovereign could assert that foreign sovereign property was immune from attachment—would effectively force foreign sovereigns, against their will, to come into a United States court in order to protect their sovereign interests. But that rule, in and of itself, would constitute an affront to the dignity of a foreign sovereign, which generally is immune from the process of any other nation's court unless it waives its immunity or undertakes some activity (such as commercial activity) generally considered by the international community to be not entitled to immunity. The international community's expectations and the United States' foreign policy considerations remain the same whether the property's immunity from attachment is invoked by the foreign sovereign or by a third party: a United States court may not attach foreign sovereign property unless the conditions of § 1610 are satisfied.

**4.    Massachusetts Law Also Allows Trustee Process Defendants To Assert That Attached Property Is Exempt From Attachment**

In addition, Massachusetts law permits Harvard to raise immunity from attachment under the FSIA. *See* Fed. R. Civ. P. 69(a) (proceedings shall be "in accordance with the practice and procedure of the state in which the district court is held, … except that any statute of the United States governs to the extent that it is applicable"); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002) ("In attachment actions involving foreign states, federal courts thus apply Fed. R. Civ. P. 69(a), which requires the application of local state procedures.").

Under Massachusetts law, "[a] party may move for dissolution of an attachment by trustee process on the ground that the property attached was exempt from attachment." 48 Mass.

15

Prac. Series, Collection Law § 5:82 (3d ed.); *see also Toomey v. Toomey*, 1997 Mass. App. Div. 181, 1997 WL 672062, at *1 (1997) (dissolving attachment based on trustee process defendant's argument that funds were not subject to attachment due to ERISA preemption).  Accordingly, under Massachusetts law, a trustee process respondent such as Harvard may raise any argument that would be available to the judgment debtor—here, Iran—that property belonging to the judgment debtor but in the possession of the trustee process respondent is exempt from attachment.

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Partial Summary Judgment should be denied.

Respectfully submitted,

THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By their attorneys,


 /s/ Paul R.Q. Wolfson
Paul R.Q. Wolfson (admitted *pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street N.W.
Washington, DC 20037
(202) 663-6000

Mark C. Fleming (BBO # 639358)
Timothy R. Shannon (BBO # 655325)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Dated: August 29, 2005

16