# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN<br><br>          Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>(a/k/a Iran, The Republic of Iran, Republic of Iran,<br>The Government of Iran, Iranian Government, and<br>Imperial Government of Iran),<br>THE IRANIAN MINISTRY OF INFORMATION<br>AND SECURITY,<br>AYATOLLAH ALI HOSEINI KHAMENEI,<br>ALI AKBAR HASHEMI-RAFSANJANI and<br>ALI FALLAHIAN-KHUZESTANI<br><br>          Defendants – Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY,<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE, HARVARD UNIVERSITY ART MUSEUMS,<br>BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM,<br>SACKLER MUSEUM, SEMITIC MUSEUM, and<br>PEABODY MUSEUM OF ARCHAEOLOGY AND<br>ETHNOLOGY<br><br>          Trustee Process Defendants. | Case No.: 1:05-MC-10079 |

_____

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW
## IN OPPOSITION TO TRUSTEE PROCESS DEFENDANTS' MOTIONS TO QUASH

**Nature of This Memorandum**

In light of the substantial identity of arguments contained in the Motion of Harvard Parties' To Quash Summons And To Dissolve Attachment By Trustee Process and the Motion Of The Museum Of Fine Arts To Quash Trustee Process Summons And Dissolve Attachment, the plaintiffs respectfully believed that it would be most efficacious and economical for the Court if plaintiffs' Opposition to both motions were presented in the instant consolidated memorandum.

For the reasons stated below, the motions of the Trustee Process Defendants should be denied.[1]

## I.     THE ASSETS AT ISSUE ARE NOT IMMUNE FROM ATTACHMENT AND EXECUTION BY THE PLAINTIFFS

As their *sole* ground to quash the summonses and dissolve the attachment by trustee process in this matter, the motions filed by the Trustee Process Defendants assert that even if they are found to be holding assets of Iran, those assets are in any case immune from execution under the Foreign Sovereign Immunities Act (FSIA).  This assertion is completely erroneous and should be rejected for the following reasons:

### a.     The Assets at Issue Are Subject to Attachment and Execution Under § 201 of TRIA

---

[1] The motions to quash are premised on the contention that if the assets at issue in fact belong to Iran they are immune from execution under §§1609-1610 of the FSIA.  In their motion for partial summary judgment filed on July 25, 2005, plaintiffs assert that the Trustee Process Defendants do not have standing to assert Iran's affirmative defenses to execution under the FSIA.  Plaintiffs' motion for partial summary judgment is pending with this Court, as is the plaintiffs' motion for leave to file a reply to Trustee Process Defendants' oppositions to plaintiffs' motion for partial summary judgment.

The standing of Trustee Process Defendants to raise immunity defenses on behalf of Iran is a threshold issue, and therefore, on July 25, 2005 plaintiffs also filed a motion to stay the Trustee Process Defendants' motions to quash pending disposition of the motion for partial summary judgment.  Plaintiffs' motion to stay is also pending.

However, plaintiffs are filing this Consolidated Memorandum of Law in Opposition to Trustee Process Defendants' Motions to Quash in order to provide the Court with their contentions as to why relief requested by Trustee Process Defendants must be denied.  Nevertheless, plaintiffs respectfully believe both for reasons of judicial economy and substantive law that the disposition of the motions to quash should be deferred until *after* the disposition of the motion for partial summary judgment addressing the threshold issue of Trustee Process Defendants' standing to assert defenses under the FSIA on behalf of Iran.

The Harvard Parties confidently assert that "the *only* permissible grounds for attachment of the property of a foreign sovereign are the express exceptions to attachment immunity set forth in sections 1610 and 1611" of the FSIA.  Harvard Memo at 4 (emphasis in the original).  Likewise, the MFA claims that "The only exception to [immunity] potentially relevant to this proceeding is 28 U.S.C. § 1610(a)(7) …".  MFA Memo at 5.

This assertion is simply flat wrong.  In fact, § 201 of Title II of the Terrorism Risk Insurance Act of 2002 (Public Law 107-297; 116 Stat. 2322) ("TRIA") provides that:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to, execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

P.L. 107-297. Title II, § 201.[2]

The legislative purpose of the TRIA was described in a decision of the U.S. District Court for the District of Columbia:

> The TRIA was … specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." 148 Cong. Rec. H8728 (Nov. 13, 2002). As the statements of each of the original Senate and House sponsors of the provision make clear, the purpose of section 201 was to provide justice to terrorist victims, to hold terrorist states accountable for their crimes and to deter them from perpetrating acts of terrorism against American citizens in the future. *See* 148 Cong. Rec. S11527 (Nov. 19, 2002) (remarks of Senator Harkin); 148 Cong. Rec. S5510 (June 13, 2002) (remarks of Senate Allen); 148 Cong. Rec. H6134 (Sept. 10, 2002) (remarks of Congressman Fosella and Congressman Cannon).

Hill v. Republic of Iraq, 2003 WL 21057173 *2 (D.D.C. 2003).

---

[2] The exception "provided in subsection (b)" relates to diplomatic or consular property and is therefore not relevant to the instant matter.

To fulfill this purpose, Congress provided that §201 of TRIA would <u>override</u> the immunity from attachment and execution against assets of a foreign state contained in §§ 1609-1610 of the FSIA:

> <u>Section 201 of the TRIA states that "notwithstanding any other provision of law," the blocked assets of a terrorist party "shall be subject to execution or attachment in aid of execution."</u> As this Court has frequently recognized, "the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all previous laws." *Energy Transp. Group, Inc v. Skinner,* 752 F. Supp. 1, 10 (D.D.C. 1990); *see also Crowley Caribbean Transp., Inc. v. United States,* 275 U.S. App. D.C. 182, 865 F.2d 1281, 1283 (D.C. Cir. 1989) ("[a] clearer statement [than 'notwithstanding any other provision of law'] is difficult to imagine"). <u>Accordingly, by its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under ... the FSIA.</u> Indeed, any contrary construction of the TRIA would frustrate the statutory objective of ensuring that judgments rendered against terrorist states based upon terrorist acts "are to be enforced." 148 Cong. Rec. H8728 (Nov. 13, 2002) (conference report); *see also* 148 Cong. Rec. S11525 (Nov. 19, 2002) (remarks of Sen. Harkin) ("Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution.").

<u>Id</u>. (emphasis added).

Plaintiffs obtained their judgment against Iran on a claim for which Iran was not immune under 28 U.S.C. § 1605(a)(7). <u>Rubin v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258, 269-270 (D.D.C. 2003). Additionally, Iran is a foreign state designated as a state sponsor of terrorism, and plaintiffs' judgment was therefore entered against a "terrorist party" as defined in §201(d)(4) of TRIA. <u>Id</u>.

Indeed, in a recent decision <u>granting</u> the Rubin plaintiffs' motion under § 201 of TRIA for a writ of execution on an Iranian bank account in the District of Columbia (over the opposition of the United States) the District Court noted that:

> The Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub.L. No. 107-297, 116 Stat. 2322, allows plaintiffs to attach and execute against the "blocked assets" of defendants who are "terrorists, terrorist organizations, [or] State sponsors of terrorism." TRIA Title II § 201(a). . . .

4

> The parties do not dispute that the plaintiffs have obtained a judgment against a terrorist party, on a claim for which a terrorist party is not immune under 28 U.S.C. § 1605(a)(7).

Rubin v. Islamic Republic of Iran, 2005 WL 670770 *1-2 (D.D.C. 2005).[3]

Likewise, in an execution proceeding brought by the Rubin plaintiffs under §201 of TRIA in the U.S. District Court for the Northern District of Texas (Amarillo) against a property in Lubbock, Texas, owned by Iran,[4] the Justice Department notified the court that, "under the current legal framework, the United States is not in a position to interpose any objection to the seizure and sale of the property . . . ". Notice of the United States, filed in Rubin v. Islamic Republic of Iran, Civil No. 2-03MC-0014J, Exhibit A. Accordingly, the Amarillo federal district court ordered the sale of the property, and on January 4, 2005, the property was sold by the U.S. Marshal.[5] See Rubin supra, Docket # 12-15.

Thus, the Trustee Process Defendants' claim that § 1610(a) of the FSIA constitutes "the only permissible grounds for attachment of the property of a foreign sovereign" (Harvard Memo at 4) and "The only exception … potentially relevant to this proceeding" (MFA Memo at 5) is utterly baseless.[6] On the contrary, it is incontrovertible that plaintiffs are entitled to attach and execute their judgment against the blocked assets of Iran pursuant to §201 of the TRIA, notwithstanding the provisions of §§ 1609-1610 of the FSIA.

---

[3] Although the D.C. District Court granted plaintiffs' motion for a writ of execution, plaintiffs did not ultimately receive the funds in the account (approximately $9,000) because, as it turned out, the funds are subject to a prior lien.

[4] The property is described in the decision of the Fifth Circuit Court of Appeals in Hegna v. Islamic Republic of Iran, 376 F.3d 485 (5th Cir. 2004).

[5] Plaintiffs are of course grateful for any recovery. It should be noted, however, that the sum generated by sale of the Lubbock property was approximately $390,000. After deduction of the enormous out-of-pocket expenses incurred by plaintiffs at trial and during their collection proceedings, and after division among the nine plaintiffs, this sum yielded plaintiffs only very nominal amounts which constitute but a tiny fraction of even the post-judgment interest on their judgment and an infinitesimal fraction (about 1/500) of the original judgment itself.

[6] As "authority" for this statement Harvard cites De Letelier v. Republic of Chile, 748 F.2d 790, 793 (2nd Cir. 1984). Harvard Memo at 4. De Letelier is no authority at all, for the obvious reason that it was given 18 years prior to the passage of TRIA in 2002.

Nor is there any question that the assets at issue here are "blocked assets" within the meaning of TRIA:

Section 201(d)(2) of TRIA provides in relevant part that the term "blocked assets" means "any asset seized or frozen by the United States under … sections 202 and 203 of the International Emergency Economic Powers Act" ("IEEPA").[7]   In November 1979, the President issued Executive Order 12170 pursuant to §§ 202-203 of IEEPA. 44 FR 65729 (1979).  Executive Order 12170 froze all Iranian assets in the United States. See Hegna v. Islamic Republic of Iran, 376 F.3d 485, 488 n. 8, 493 n. 32 (5th Cir. 2004) ("In the midst of the Iranian revolution of 1979…The President froze all property and assets of the government of Iran that fell within or would fall within the jurisdiction of the United States.  Exec. Order No. 12170, 44 Fed.Reg. 65729 (Nov. 14, 1979)…The President froze Iranian property pursuant to the International Emergency Economic Powers Act.").

Executive Order 12170 remains in force to this day[8], and all Iranian assets that were in the United States in 1979 remain frozen under IEEPA and are subject to attachment under TRIA as "blocked assets".  Indeed, the Rubin plaintiffs were granted writs of execution against the Lubbock property and the D.C. bank account under TRIA only because those assets have been in the United States since before 1979 and were – and remain – blocked under Executive Order 12170.

Since the assets at issue here have been in the United States since prior to 1979, they, too, were and remain "blocked" under Executive Order 12170 and are therefore subject to attachment and execution by the plaintiffs pursuant to § 201 of TRIA.

---

[7] See also e.g. Rubin v. Islamic Republic of Iran, 2005 WL 670770 *1 (D.D.C. 2005) ("A 'blocked asset' is 'any asset seized or frozen by the United States under ... sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702).' Id. § 201(d)(2)(A).").

[8] Successive Presidents have extended the effect of Executive Order 12170 until today. See e.g. Presidential Notice of November 9, 2004, "Continuation of the National Emergency With Respect to Iran", 69 FR No. 218 (2004).

The Trustee Process Defendants concede that all assets of Iran in the United States in 1979 were blocked under Executive Order 12170, but argue that any properties of Iran held by them were "unblocked" in 1981 under Executive Order 12281. See Harvard Memo at 19 ("Even if one were to assume (contrary to fact) that the antiquities in possession of Harvard on which the Rubin parties seek execution are the property of Iran, they were removed from the scope of the blocking orders by … Order" 12281); MFA Memo at 13 ("As Executive Order 12281 makes clear, the MFA's properties are not blocked assets even if they belong to Iran. Plaintiffs therefore may not use the TRIA to avoid Iran's sovereign immunity over any of its property held by the MFA.").

This argument fails because it completely ignores the Treasury regulation that implements – and defines the property that is subject to – Executive Order 12281:

As explained in a Statement of Interest submitted by the United States in a related proceeding and attached by Trustee Process Defendants as an exhibit to the instant motions, Executive Order 12281 was implemented by a Treasury regulation codified at 31 C.F.R. § 535.215. See Statement of Interest of the United States of America in Rubin v. Islamic Republic of Iran, No. 03-cv-9370 (N.D. Ill.) attached as Exhibit B to the Harvard Memo and Exhibit C to the MFA Memo, at 9.

It is well established that all Executive Orders, including of course Executive Order 12281, must be read in pari materia with their implementing regulations and that the definitions and terms set forth in the regulations are controlling.  See e.g. Consarc Corp. v. Iraqi Ministry, 27 F.3d 695, 701 (D.C. Cir. 1994) ("By section 1704 of the Emergency Powers Act the President may 'issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter.'… The President delegated his power to define the statutory terms to the Secretary of the Treasury, and OFAC exercises the delegated power on the Secretary's behalf. By these provisions OFAC has received the authority to administer the statute, so that we

must give effect to OFAC's regulations unless they contradict express statutory language or prove unreasonable."); <u>See also</u> <u>U.S. v. Lindh</u>, 212 F. Supp. 2d 541, 562-564 (E.D. Vir. 2002) (citing numerous authorities for this rule).

Curiously, the Trustee Process Defendants studiously avoid any mention of the implementing regulation for Executive Order 12281 codified at 31 C.F.R. § 535.215. A glance at § 535.215 explains the thunderous silence: § 535.215 makes absolutely pellucid that the property at issue is not subject to Executive Order 12281. Subsection (a) of § 535.215 provides as follows:

> Except as provided in paragraphs (b) and (c) of this section, all persons subject to the jurisdiction of the United States in possession or control of **properties, as defined in § 535.333 of this part**, not including funds and securities owned by Iran or its agencies, instrumentalities or controlled entities, are licensed, authorized, directed and compelled to transfer such properties held on January 18, 1981 as directed after that day by the Government of Iran, acting through its authorized agent. Such directions shall include arrangements for payment of the costs of transporting the properties, unless the possessors of the properties were required to pay such costs by contract or applicable law on January 19, 1981. Except where specifically stated, this license, authorization and direction does not relieve persons subject to the jurisdiction of the United States from existing legal requirements other than those based upon the International Emergency Economic Powers Act.

31 C.F.R. § 535.215(a) (emphasis supplied).

Thus, the <u>only</u> Iranian properties encompassed by § 535.215 and Executive Order 12281 are "***properties, as defined in § 535.333 of***" CFR part 31.

Subsection (a) of § 535.333 provides in relevant part as follows:

> The term properties as used in § 535.215 means all **uncontested and non-contingent** liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities, including debts.

31 C.F.R. § 535.333(a) (emphasis supplied).

Thus, the only "properties" encompassed by 31 CFR § 535.215 and Executive Order 12281 are "***uncontested and non-contingent liabilities and property interests***" of Iran.

Subsection § 535.333(c) defines which Iranian properties are considered "contested" and so excluded from the operation of § 535.215 and Executive Order 12281:

> Liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities may be considered contested only **if the holder thereof reasonably believes that Iran does not have title or has only partial title to the asset**.

31 C.F.R. § 535.333(c) (emphasis supplied).

Thus, properties that the holder thereof "reasonably believes" Iran does not have title to, or has only partial title to, are not "properties" encompassed by 31 CFR § 535.215 and Executive Order 12281.

The Trustee Process Defendants have made abundantly clear to this Court that they believe that Iran does not have title to the properties of Iranian origin that are at issue here.

**Therefore, precisely because the Trustee Process Defendants contest Iran's ownership of these properties, these properties are not "properties, as defined in § 535.333 of this part" and so are excluded from the operation of Executive Order 12281 and 31 CFR § 535.215, and their status as blocked under Executive Order 12170 of 1979 remains wholly unchanged.[9] In short, these properties were blocked in 1979 and never "unblocked".[10]**

---

[9] Plaintiffs of course dispute Trustee Process Defendants' assertion that these properties do not belong to Iran, but § 535.333 makes clear that the holder's subjective belief – and not the objective legal status of the property as may ultimately be determined – is dispositive for the purposes of excluding the property from the operation of Executive Order 12281 and 31 CFR § 535.215.

Clearly, the written pleadings signed and submitted by Trustee Process Defendants' attorneys in the instant matter satisfy the requirement in § 535.333(c) that the holders' subjective belief be backed by the written opinion of an attorney.

[10] The Harvard Memo and the Statement of Interest cite Weinstein v. Islamic Republic of Iran, 299 F. Supp. 2d 63 (E.D.N.Y. 2004), as support for their claim that the property at issue here was unblocked. However, Weinstein is utterly inapposite to the facts of this case. The funds at issue in Weinstein were brought into the United States after 1981 and the plaintiffs there did not dispute that the funds were subject to both an executive order and a Treasury regulation licensing all Iranian property brought into the United States after 1981. Here by contrast, as demonstrated above, the Iranian assets have been in the United States since before 1979 and are not subject to any such executive order or Treasury license.

The instant plaintiffs also respectfully maintain that Weinstein (which was not appealed) was wrongly decided. The assumption underlying Weinstein was that assets cannot be both "blocked" and licensed at the same time. The instant plaintiffs maintain that all assets subject to an IEEPA blocking order (such as Executive Order 12170) are "blocked assets" within the meaning of TRIA, whether licensed or not. Plaintiffs position' is supported by both the language of TRIA and Treasury practice:

In sum, if (as plaintiffs intend to prove) the properties at issue do in fact belong to Iran, then those properties will subject to attachment and execution by plaintiffs in satisfaction of their judgment under § 201 of TRIA.

The Trustee Process Defendants' motions should therefore be denied.

### b.     Alternatively, the Assets at Issue Are Subject to Attachment and Execution Under § 1610(a) of the FSIA

---

First, § 201(d)(2)(B)(i) of TRIA excludes some licensed assets – but not others – from the "blocked assets" subject to execution. Section 201(d)(2)(B)(i) provides that the term "blocked assets" does not include property that:

> is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.).

In other words, only those assets which are subject to a license of the specific type described by §201(d)(2)(B)(i) are excluded from the category of "blocked assets". Assets which are subject to a license other than the specific type of license described by §201(d)(2)(B)(i) will not be excluded from the category of "blocked assets", and are subject to attachment and execution under §201(a) of the TRIA.

Moreover, if assets subject to an IEEPA blocking order are per se no longer deemed "blocked" once they are licensed, as Weinstein held, then Congress would not have needed to enact §201(d)(2)(B)(i) of TRIA at all. Thus, the construction in Weinstein, which renders §201(d)(2)(B)(i) of TRIA superfluous and unnecessary, is erroneous.

Furthermore, the assumption that assets cannot be simultaneously both blocked under IEEPA and licensed, flies in the face of the Treasury's own practice. While Treasury licenses are not in the public domain and are difficult to obtain, plaintiffs have received copies of Treasury licenses issued on January 24 and May 2, 2002, regarding assets of the Holy Land Foundation (HLF) blocked under IEEPA. Exhibits B and C. These licenses were filed as exhibits to a pleading submitted by the Treasury in Holy Land Foundation v. Ashcroft, C.A. 02-442(GK), and plaintiffs obtained them from the case file.

As is clear from their substance, these HLF licenses were issued in order to permit the transfer of funds to a client escrow account maintained by HLF's attorneys. In Section II of the January license and Section I(b) of the May license, the Treasury expressly refers to funds being transferred under the license as "blocked funds", and to the escrow account into which they were transferred, as a "blocked trust account". In other words, according to the Treasury itself, these funds are "blocked," notwithstanding the fact that their transfer and maintenance in the escrow account is licensed under these licenses. Additionally, Section III of the January license and Section II of the May license both define the action authorized by the license as the transfer of blocked property.

Clearly, the fact that the Treasury itself uses the term "blocked funds" within the very text of licenses allowing a disposition of those funds refutes the argument that assets cannot be both "blocked" and "licensed".

In any event, the "blocked/licensed" question is not before this Court, since the assets at issue here are not subject to Executive Order 12281 and 31 CFR § 535.215. The argument contained in this footnote is therefore made only in the alternative, i.e. in the unlikely event that the Court finds that the assets here are subject to Executive Order 12281 and 31 CFR § 535.215.

Plaintiffs respectfully believe that the amenability of the assets at issue to attachment and execution pursuant to TRIA has been incontrovertibly demonstrated above, and that assertion of an alternative ground for execution is essentially superfluous. Nonetheless, purely out of an abundance of caution, plaintiffs contend in the alternative that the property in question is subject to the exception to immunity set out at § 1610(a) of the FSIA. Section 1610(a) provides in relevant part that:

> The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, <u>used for a commercial activity</u> in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if –
>
>> (7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

28 U.S.C. § 1610(a) (emphasis added).

Section §1603(d) of the FSIA provides that the "commercial" character of the use made of the property of a foreign state is determined by its nature and not its purpose. It is therefore irrelevant that the Trustee Process Defendants are not commercial businesses, and their <u>purpose</u> in displaying the Iranian artifacts at issue might have been noncommercial. Display of items by museums is a commercial activity by its nature. <u>See</u> <u>Malewicz v. City of Amsterdam</u>, 362 F.Supp.2d 298 (D.D.C. 2005) (holding that exhibition of foreign state artwork by museums in the United States constitutes commercial activity under the FSIA)

Thus, the artifacts at issue were unquestionably used for an activity of a commercial nature within the meaning of the FSIA.

Nevertheless, Trustee Process Defendants' argue that § 1610(a) cannot apply to Iranian artifacts in their possession because § 1610(a) requires use by the foreign state itself and these artifacts have not been used by Iran itself for a commercial activity in the United States.

This interpretation of § 1610 is incorrect.  In <u>Sesostris, S.A.E. v. Transpodes Navales. S.A.</u>, 727 F. Supp. 737, 744 (D.Mass. 1989) this Court held that a ship owned by foreign state would be subject to execution under §1610 on the basis of its use by non-state charter parties.  This Court specifically stated that the "Unamuno was used for the commercial activity described by the charter parties" and explained elsewhere that "Sesostris chartered the ships under two charter party agreements ..." <u>Id</u>. at 744 and 738.

While the Trustee Process Defendants attempt to dismiss the ruling in <u>Sesostris</u> as mere dicta, an actual reading of the decision clearly shows that the ruling was made by this Court as an alternative basis for disposition of the case and as a holding. <u>Id</u>. at 744.

The Trustee Process Defendants seek to persuade this Court to abandon its own holding in <u>Sesostris</u> in favor of <u>Flatow v. Islamic Republic of Iran</u>, 76 F. Supp.2d 16 (D.D.C. 1999) and its progeny.  <u>Flatow</u> held as follows:

> [T]he Supreme Court's interpretation of "commercial activity" … specifically refer[s] to the foreign state's actions, *see [Republic of Argentina v.] Weltover*, 504 U.S. [607] at 614, 112 S.Ct. 2160 (stating that "when *a foreign government acts*, not as a regulator of a market, but in the manner of a private player within it, *the foreign sovereign's actions* are commercial within the meaning of the FSIA") (emphasis added); *see also id.* (stating that "whether the particular *actions that the foreign state performs* (whatever the motive behind them) are the types of actions by which a private party engages in trade and traffic or commerce") (emphasis added).

<u>Flatow</u> 76 F. Supp.2d at 23.

Two subsequent decisions of other courts, cited by Trustee Process Defendants, have adopted the holding in <u>Flatow</u>.  <u>See</u> <u>Connecticut Bank of Commerce v. Republic of Congo</u>, 309 F.3d 240, 256 (5th Cir. 2002) (adopting <u>Flatow</u> without analysis); <u>Rubin v. Islamic Republic of Iran</u>, 349 F.Supp.2d 1108 (N.D. Ill. 2004) ("This Court agrees with the holdings in *Connecticut Bank of*

*Commerce* and *Flatow* (cited above), and finds that the U.S. Supreme Court's analysis in *Weltover, Inc.* applies to Section 1610(a) as well as 28 U.S.C. § 1605.")[11]

Thus, all the cases cited by Trustee Process Defendants are based on the above-quoted passage from Flatow.

However, the analysis contained in Flatow suffers from a fundamental flaw. Flatow is based on an analogy to § 1605 of the FSIA as analyzed in the decision of the Supreme Court in Republic of Argentina v.Weltover. Flatow id. But that analogy is inapt, because the language of §1605(a)(2) expressly refers to "***commercial activity carried on in tile United States by the foreign state.***" (emphasis added). By contrast, § 1610 mentions only property "***used for a commercial activity in the United States,***" and — very significantly — omits the words "***by the foreign state***" contained in §1605.

The fact that Congress chose to include the key words "***by the foreign state***" in §1605 and omit those same words from §1610 is overwhelming evidence that Congress did not require foreign state use for executions under § 1610.

It simply defies all logic and reason to argue that Congress' careful inclusion of the phrase "***by the foreign state***" in § 1605, and its omission of that phrase from § 1610, was inadvertent or meaningless. Congress' intention could not have been clearer.

Therefore, the interpretation of § 1610 urged by the Trustee Process Defendants must be rejected because it "obscure[s] a clearly intentional difference in the way the two different

---

[11] While Trustee Process Defendants seek to make much of the Magistrate Judge's decision in Rubin, they neglect to inform this Court that in adopting the decision of the Magistrate Judge, the District Judge in Illinois made clear that that decision is interlocutory and does not constitute the law of the case:

> [T]he fact that Judge Ashman interpreted the FSIA to determine if Plaintiffs' discovery request was relevant to this case, does not make it a dispositive motion because his decision does not terminate this case. While Judge Ashman's interpretation of the FSIA will certainly be relevant to this Court in a later motion to dismiss, it is not binding on this Court.

Rubin v. The Islamic Republic of Iran, 2005 WL 783057 *1 (N.D.Ill. 2005) (emphasis added).

'commercial activity' exceptions from immunity – executional and jurisdictional – have been phrased by Congress". <u>Connecticut Bank of Commerce v. Republic of Congo</u>, 309 F.3d at 256-257.

The holding of this Court in <u>Sesostris</u> was therefore clearly correct and in accordance with the plain language of the FSIA.

## II.    CONCLUSION

The motions of the Trustee Process Defendants should be denied.

Respectfully Submitted,

Jenny Rubin, et al.

By their attorneys,

_/s/ Richard J. Grahn_____
Richard J. Grahn, Esq., (BBO #206620)
Edward V. Colbert, III, Esq., (BBO #566187)
Georgia J. Asimakopoulos, Esq., (BBO #658232)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800

/s/ David J. Strachman, Esq.          (GJA)
David J. Strachman, Esq., (BBO #660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI  02903
(401) 351-7700

Dated:  September 29, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2005, I served a copy of the foregoing pleading upon all parties hereto by mailing copies thereof via first class mail, postage prepaid, properly addressed to the following:

Paul R.Q. Wolfson
WILMER CUTLER PICKERING
HALE & DORR LLP
2445 M Street NW
Washington, DC 20037

Mark C. Fleming
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA 02109

Timothy R. Shannon
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA 02109

Courtney Amber Clark
SHERIN LODGEN LLP
101 Federal Street
Boston, MA 02110

Robert J. Muldoon, Jr.
SHERIN LODGEN LLP
101 Federal Street
Boston, MA 02110

William D. Iverson
COVINGTON & BURLING
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004

Jason M. Knott
COVINGTON & BURLING
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004

/s/ Georgia J. Asimakopoulos
Georgia J. Asimakopoulos

**EXHIBIT A**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

NOV 2 3 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JENNY RUBIN, et al.,                    )
        Plaintiffs,                     )
                                        )        Civil Action No. 2:03-MC-014-J
        v.                              )
                                        )
THE ISLAMIC REPUBLIC OF IRAN, et al.,)
        Defendants.                     )
_____)

## NOTICE OF THE UNITED STATES

In response to the Court's Order of September 24, 2004, the United States of America

hereby respectfully informs the Court that, under the current legal framework, the United States is

not in a position to interpose any objection to the seizure and sale of the property at issue in these

proceedings, i.e., the property located at 4904 21st Street, Lubbock, Texas.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

RICHARD B. ROPER
United States Attorney

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

RUPA BHATTACHARYYA (VA#38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
rupa.bhattacharyya@usdoj.gov

Dated: November 22, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2004, a copy of the foregoing Notice of the United

States was sent by facsimile and U.S. mail, first class, postage prepaid, addressed as follows:

**David J. Strachman, Esq.**
McIntyre Tate Lynch & Holt
321 South Main St
Suite 400
Providence, RI 02903
401/351-7700
Fax: 401/331-6095

**Stewart R. Werner, Esq.**
Werner Law Offices
801 S Fillmore
Suite 720
Amarillo, TX 79101
806/342-5480
Fax: 806/342-5302

RUPA BHATTACHARYYA
Senior Trial Counsel, Federal Programs Branch
Civil Division, U.S. Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
rupa.bhattacharyya@usdoj.gov

**EXHIBIT B**

# NEWCOMB EXHIBIT 11



**FILED**

MAY 3 1 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



**D  ARTMENT OF THE TREASURY**

WASHINGTON, D.C. 20220    LICENSE No. SDGT-22

**LICENSE**

(Granted under the authority of 50 U.S.C. §§ 1701 et seq., 22 U.S.C. § 287c, Executive Order 13224, and 31 C.F.R. Part 501.)

To: Freedman Boyd Daniels Hollander     Akin, Gump, Strauss, Hauer & Feld, L.L.P.
    Goldberg & Cline P.A.                c/o Wynn H. Segall, Esq.
    c/o John D. Cline, Esq.              1333 New Hampshire Avenue, NW
    20 First Plaza, Suite 700            Suite 400
    Albuquerque, NM 87102               Washington, DC 20036

    (Collectively, the "Licensees")

1. Based on the letter of January 9, 2002 from the Firm of Freedman Boyd Daniels Hollander Goldberg & Cline, P.A., on behalf of Holy Land Foundation (the "Application"), the transactions and activities delineated on the reverse hereof are hereby authorized.

2. This License is granted upon the statements and representations made in the Application, or otherwise filed with or made to the Treasury Department as a supplement to the Application, and is subject to the conditions, among others, that the Licensees comply in all respects with all regulations, rulings, orders and instructions issued by the Secretary of the Treasury under the authority of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the National Emergencies Act (50 U.S.C. §§ 1601 et seq.), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. § 287c), section 301 of title 3 of the United States Code, Executive Order 13224 of September 23, 2001, and the terms of this License.

3. The Licensees shall furnish and make available for inspection any relevant information, records, or reports requested by the Secretary of the Treasury, or any other duly authorized officer or agency.

4. This License expires on January 31, 2003, is not transferable, and is subject to the provisions of Executive Order 13224 of September 23, 2001, 31 C.F.R. Part 501, and any regulations and rulings issued pursuant thereto. This License may be revoked or modified at any time at the discretion of the Secretary of the Treasury.

5. This License does not excuse compliance with any law or regulation administered by the Office of Foreign Assets Control or another agency (including reporting requirements) applicable to the transactions herein licensed, nor does it release Licensees or third parties from civil or criminal liability for violation of any law or regulation.

    Issued by direction and on behalf of the Secretary of the Treasury:

                    OFFICE OF FOREIGN ASSETS CONTROL

                    By _____  1/24/02

                        R. Richard Newcomb
                        Director

Attention is directed to 18 U.S.C. § 1001 and 50 U.S.C. § 1705 for provisions relating to penalties.

LICENSE No. SDGT-22                          Page 2 of 2

SECTION I - LICENSEES: The Firm of Freedman Boyd Daniels Hollander Goldberg & Cline, P.A. (the "Firm") is hereby authorized to receive legal fees and reimbursement of expenses from Holy Land Foundation ("HLF") in connection with the Firm's representation of HLF before the Treasury Department's Office of Foreign Assets Control ("OFAC"), and other U.S. government agencies and/or courts, regarding OFAC's designation of HLF as a Specially Designated Global Terrorist organization and with HLF's efforts to obtain the release of assets blocked at the direction of OFAC.

SECTION II - AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.: Akin, Gump, Strauss, Hauer & Feld, L.L.P. is hereby authorized to release up to $100,000 of blocked funds held in the Akin, Gump, Strauss, Hauer & Feld, L.L.P. trust account held at Citibank, in the name of HLF, and to transfer such amount to a blocked trust account at Wells Fargo Bank, 6400 Uptown Boulevard, NE, Albuquerque, NM, in the name of the Firm (Trust Account No.                in connection with the legal services described in SECTION I, above.

SECTION III - WARNING: (a)  Except as authorized in Section II, above, this License does not authorize the transfer of any blocked property, the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against blocked property.

(b)  Nothing in this License authorizes the receipt of payment of fees or reimbursement of expenses in connection with services other than those delineated in Section I above.

SECTION IV - REPORTING REQUIREMENTS:  (a) The Licensees are subject to the recordkeeping and reporting requirements of, inter alia, 31 C.F.R. 501.601 and 501.602, including the requirement to maintain records concerning the transactions undertaken pursuant to this License for a period of five years.

(b)  In the event of litigation or similar proceedings, it is a condition of this License that the Licensees submit copies of all pleadings, motions, memoranda, exhibits, stipulations, correspondence, and proposed orders or judgments (including any proposed final judgment or default judgment) submitted to the court or decision-making body, and of all orders, decisions, opinions, or memoranda issued by the court or decision-making body, to: Chief Counsel's Office, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Annex, Washington, D.C. 20220, within ten days of filing, submission, or issuance.

(c)  In the event of litigation or similar proceedings, it is a further condition of this License that the Licensees report by immediate telephone call or facsimile transmission to the Chief Counsel's Office, Office of Foreign Assets Control (tel: 202/622-2410; fax: 202/622-1911), the scheduling of any hearing or status conference in legal proceedings whenever it appears that a court or decision-making body may issue an order or judgment or / default judgment or is considering or may decide any pending motion dispositive of the merits of an action or of any claim raised in an action.

SECTION V - FILING REQUIREMENT: In the event of litigation or other legal proceedings, it is a further condition of this License that a copy of this License be submitted to the relevant court or any other decision-making body or forum.

####

**EXHIBIT C**

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

LICENSE No. SDGT-75

Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or
Support Terrorism

## LICENSE

(Granted under the authority of 50 U.S.C. §§ 1701 et seq., 22 U.S.C. § 287c, Executive Order 13224, and 31 C.F.R. Parts 501 and 595.)

| | |
|---|---|
| Freedman Boyd Daniels Hollander Goldberg & Cline P.A.<br>20 First Plaza, Suite 700<br>Albuquerque, NM 87102<br>Attn: John Cline, Esquire | Holy Land Foundation for Relief and Development<br>c/o Freedman Boyd Daniels Hollander Goldberg & Cline P.A.<br>20 First Plaza, Suite 700<br>Albuquerque, NM 87102 |
| Akin, Gump, Strauss, Hauer & Feld, L.L.P.<br>1333 New Hampshire Avenue, N.W., Suite 400<br>Washington, DC 20036 ("Licensee")<br>Attn: Wynn H. Segall, Esquire | Citibank NA<br>425 Park Avenue<br>New York, NY 10043<br>Attn: Robin J. Powell, Vice President |

(collectively, the "Licensees")

1. Based on a letter dated April 5, 2002, from the Firm of Freedman Boyd Daniels Hollander Goldberg & Cline, P.A., on behalf of the Holy Land Foundation for Relief and Development to the Office of Foreign Assets Control (the "Application"), and information otherwise available to the Office of Foreign Assets Control, the transactions and activities delineated on the reverse hereof are hereby authorized.

his License is granted upon the statements and representations made in the Application, or otherwise filed with or made to the Treasury Department as a supplement to the Application, and is subject to the condition, among others, that the Licensee(s) comply in all respects with all regulations, rulings, orders and instructions issued by the Secretary of the Treasury under the authority of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the National Emergencies Act (50 U.S.C. §§ 1601 et seq.), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. § 287c), section 301 of title 3 of the United States Code, Executive Order 13224 of September 23, 2001, and the terms of this License.

3. The Licensee(s) shall furnish and make available for inspection any relevant information, records, or reports requested by the Secretary of the Treasury, or any other duly authorized officer or agency.

4. This License expires May 31, 2003, is not transferable, and is subject to the provisions of Executive Order 13224 of September 23, 2001, 31 C.F.R. Part 501, and any regulations and rulings issued pursuant thereto. This License may be revoked or modified at any time at the discretion of the Secretary of the Treasury. If this License was issued as a result of willful misrepresentation on the part of the applicant or his duly authorized agent, it may, at the discretion of the Secretary of the Treasury, be declared void from the date of its issuance, or from any other date.

5. This License does not excuse compliance with any law or regulation administered by the Office of Foreign Assets Control or another agency (including reporting requirements) applicable to the transactions herein licensed, nor does it release Licensee(s) or third parties from civil or criminal liability for violation of any law or regulation.

Issued by direction and on behalf of the Secretary of the Treasury:

OFFICE OF FOREIGN ASSETS CONTROL,

By _____    5/2/02

R. Richard Newcomb
Director

Attention is directed to 18 U.S.C. § 1001 and 50 U.S.C. § 1705 for provisions relating to penalties.

LICENSE No. SDGT-75

**SECTION I - AUTHORIZATION: (a)** Subject to the conditions stated herein, the firm of Freedman Boyd Daniels Hollander Goldberg & Cline, P.A. (the "Firm") is hereby authorized to receive legal fees and reimbursement of expenses from Holy Land Foundation ("HLF") in connection with the Firm's representation of HLF before the Treasury Department's Office of Foreign Assets Control ("OFAC"), and other U.S. government agencies and/or courts, regarding OFAC's designation of HLF as a Specially Designated Global Terrorist organization and with HLF's efforts to obtain the release of assets blocked at the direction of OFAC.

**(b)** Citibank NA, Washington, DC (the "Bank") and Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin Gump") are hereby authorized to release up to $100,000 of blocked funds held at the Bank in the name of Akin, Gump, Strauss, Hauer & Feld, L.L.P. as escrow agent for the Holy Land Foundation for Relief and Development (the "Escrow Account"), and to transfer such amount to a blocked trust account at Wells Fargo Bank, 6400 Uptown Boulevard, NE, Albuquerque, NM, in the name of the Firm (Trust Account No.          ), in payment of the legal services and expenses authorized in Sections I(a) of this License. The Bank is further authorized to debit the Escrow Account for service charges associated with making the payments authorized by this License. The Bank and Akin Gump may rely on assertions of the Firm that the fees and expenses paid are in accordance with the terms of this License.

**SECTION II - WARNING:** Except as authorized in Section I, above, this License does not authorize the receipt of payment from any blocked account, the unblocking of blocked property, the transfer of any blocked property, the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against blocked property.

**SECTION III – GENERAL REPORTING REQUIREMENTS:** The Licensees are subject to the recordkeeping and reporting requirements of, *inter alia*, 31 C.F.R. 501.601 and 501.602, including the requirement to maintain records concerning the transactions undertaken pursuant to this License for a period of five years.

**SECTION IV – REPORTING REQUIREMENTS FOR COUNSEL: (a)** It is a condition of this license that the Firm submit monthly reports providing information on the legal services provided as authorized in Section I above. Such reports shall include copies of invoices for services provided to HLF, along with a description of the invoiced services, redacted, if required, to protect attorney-client confidentiality. The first such report is to be received by the Office of Foreign Assets Control no later than June 30, 2002. In the event that no transactions occur or no payments are received during a reporting period, a statement is to be filed to that effect. Reports are to be delivered to: Compliance Programs Division, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Treasury Annex, Washington, D.C. 20220, and are to reference this License No. SDGT-75.

**(b)** In the event of litigation or similar proceedings, it is a condition of this License that the Firm submit copies of all pleadings, motions, memoranda, exhibits, stipulations, correspondence, and proposed orders or judgments (including any proposed final judgment or default judgment) submitted to the court or decision-making body, and of all orders, decisions, opinions, or memoranda issued by the court or decision-making body, to the Chief Counsel, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Treasury Annex, Washington, D.C. 20220, within ten days of filing, submission, or issuance.

**LICENSE No. SDGT-75**

(c) In the event of litigation or similar proceedings, it is a further condition of this License that the Firm report by immediate telephone call or facsimile transmission to the Chief Counsel, Office of Foreign Assets Control (tel: 202/622-2410; fax: 202/622-1911), the scheduling of any hearing or status conference in legal proceedings whenever it appears that a court or decision-making body may issue an order or judgment or default judgment or is considering or may decide any pending motion dispositive of the merits of an action or of any claim raised in an action.

**SECTION V - REPORTING REQUIREMENTS OF BANK:** It is a further condition of this License that the Bank submit monthly account statements with respect to the Escrow Account showing all credits and debits to the Escrow Account. The first such report is to be received by the Office of Foreign Assets Control no later than the close of business on June 30, 2002. Thereafter, reports are to be received no later that 30 days after the month for which they are being filed. Copies of the statements with respect to the Escrow Account are to be mailed to: Compliance Programs Division, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Treasury Annex, Washington, D.C. 20220, and are to reference this License number, SDGT-75.

**SECTION VI- FILING REQUIREMENT:** In the event of litigation or other legal proceedings, it is a further condition of this License that a copy of this License be submitted to the relevant court or any other decision-making body or forum.

**************************************************************************************