UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN, et al. | ) <br> ) <br> ) |
| Plaintiffs – Judgment Creditors, | ) <br> ) |
| v. | ) <br> ) |
| THE ISLAMIC REPUBLIC OF IRAN, et al. | ) <br> ) Case No.: 05-MC-10079 (GAO) |
| Defendants – Judgment Debtors, | ) <br> ) |
| v. | ) <br> ) |
| MUSEUM OF FINE ARTS, HARVARD UNIVERSITY, et al. | ) <br> ) <br> ) |
| Trustee Process Respondents. | ) <br> ) |

**TRUSTEE PROCESS RESPONDENTS HARVARD PARTIES'**
**REPLY BRIEF IN SUPPORT OF MOTION TO QUASH**

In its opening brief in support of its motion to quash, Harvard[1] demonstrated that, if (contrary to fact) any antiquities in its collections belonged to the Islamic Republic of Iran, then as a matter of law, plaintiffs could not attach those antiquities, because all of those objects would be immune from attachment under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1610.[2] Harvard further demonstrated that (a) plaintiffs cannot benefit from the "commercial activity" exception to attachment immunity under § 1610(a)(7), because that exception applies only when the property in question has been used for a commercial activity in the United States *by the foreign sovereign*, which has not occurred here; and (b) plaintiffs also cannot benefit from

---

[1] Trustee Process Respondent Harvard University, the President and Fellows of Harvard College, Harvard University Art Museums, the Busch-Reisinger Museum, the Fogg Art Museum, the Sackler Museum, the Semitic Museum, and the Peabody Museum. As previously explained, the President and Fellows of Harvard College is the only Harvard party properly before the Court.

[2] Plaintiffs have argued, in a motion for partial summary judgment, that Harvard lacks standing to invoke the immunity from attachment of property belonging to Iran under § 1610. Harvard has responded to that argument in its brief in opposition to the motion for partial summary judgment, and those arguments will not be repeated here.

1

the exception to sovereign immunity created by the Terrorism Risk Insurance Act of 2002 (TRIA), Pub. L. No. 107-297, *codified at* 28 U.S.C. § 1610 note, because that exception applies only to "blocked assets" of the sovereign in question, and the antiquities in Harvard's collections are not blocked assets.

In response, plaintiffs argue that (a) the exception to sovereign immunity in § 1610(a)(7) applies when any person, not just a foreign sovereign, uses the property in question for a "commercial activity," and (b) the antiquities in question do qualify as "blocked assets" under Department of Treasury regulations implementing the Algiers Accords that settled the dispute between the United States and Iran arising out of the seizure of the U.S. Embassy in Teheran. Each of these contentions is incorrect. Plaintiffs have misread the case law construing the "commercial activity" exception of § 1610(a)(7) as well as the statute itself, and have also wholly misapprehended the import of the regulations on which they rely. Accordingly, the Court should grant the motion to quash.[3]

**1.    The Plaintiffs Have Misread § 1610(a) in Particular, and Misunderstood the FSIA as a Whole**

As set forth in Harvard's opening brief (at 5-9), every court decision on point holds that the "commercial activity" exception to attachment immunity applies only when property has been used *by a foreign sovereign* for a commercial activity in the United States, and the Departments of State and Justice agree. Despite this adverse authority, plaintiffs argue that commercial use of a foreign sovereign's property by *any* third party—even, presumably, a party adverse to Iran, and even when Iran is not acting as a market participant—will render the property subject to attachment under § 1610(a). Pl. Opp. at 12. In making that argument,

---

[3] Harvard, as an educational and research institution, does not concede that any use that it might have made of the antiquities in question would qualify as "commercial activity," even assuming that the use of the property by any party other than the foreign sovereign would be relevant. The Court need not resolve that question for purposes of deciding the instant motion, however.

plaintiffs (a) invoke a contrived reading of the FSIA, (b) seek to discount the holdings of *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16 (D.D.C. 1999), and subsequent cases reaching similar conclusions, and (c) press an unreasonable reading of *Sesostris, S.A.E. v. Transportes Navales, S.A.*, 727 F. Supp. 737 (D. Mass. 1989), that has been rejected in another attachment proceeding brought by the same plaintiffs. These arguments fail.

First, plaintiffs have sought to derive support from the fact that § 1610(a) does not in express terms provide that only the "commercial activity" *of a foreign sovereign* will result in loss of attachment immunity for foreign sovereign property, whereas § 1605(a)(2) expressly provides that a foreign sovereign is not entitled to immunity for an action arising out of the commercial activity "of the foreign state." Pl. Opp. at 13. But statutory language cannot be construed in a vacuum, and plaintiffs have overlooked both the purpose of the FSIA and the international-law background against which it was enacted.

The "commercial activity" exception to the FSIA was intended to embody prevailing principles of international law under which foreign sovereigns lost their immunity when the sovereigns entered the marketplace on a footing similar to that of private enterprises. Nothing in the background to the FSIA suggests that Congress, when it codified the commercial activity exception, was at all concerned about the situation in which parties *other than* foreign sovereigns might use property for commercial activities. The FSIA "largely codifie[d] the so-called 'restrictive' theory of foreign sovereign immunity," a policy adopted by the State Department in 1952 in response to state-owned enterprises' engaging in commercial activities. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992). The FSIA further responded to these commercial activities, *i.e. activities by the foreign sovereigns*, by carving out limited exceptions to the immunity that foreign sovereigns presumptively enjoyed from suit and attachment.

"[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614.

Moreover, contrary to plaintiffs' mistaken comparative reading of § 1605(a) and § 1610(a), the international-law background to the FSIA demonstrates that the immunity from attachment of a foreign sovereign's property is, if anything, broader than the foreign sovereign's immunity from suit. *See Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 255-56 (5th Cir. 2002) ("[T]he international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction . . . . [T]he FSIA's exceptions to executional immunity were indeed narrower than its exceptions to jurisdictional immunity."); *De Letelier v. Republic of Chile*, 748 F.2d 790, 799 (2d Cir. 1984) (describing the international community's special reluctance to permit attachments). Well-settled canons of statutory construction require that statutes be construed in a manner consistent with, rather than, in conflict with, international law. *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 124 S. Ct. 2359, 2366 (2004); *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). At a minimum, therefore, the FSIA's provision for removing immunity from attachment for "commercial activity" should be read no more broadly than the provision for removing immunity from suit for similar activity: only the commercial activity of the foreign sovereign itself will cause its property to lose its immunity from attachment.[4]

---

[4] This approach to attachment immunity under § 1610(a) is confirmed by Congress's statement of the purpose of the FSIA in 28 U.S.C. § 1602, which provides: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and *their commercial property* may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." (Emphasis added.) As Congress recognized, international law permits the attachment of the property of foreign sovereigns only in the case of "their commercial property." Only property that "they," *i.e.*, foreign states, use for a commercial activity could properly be called "their commercial property." Otherwise, the international law protection of sovereign property from attachment would be subject to the unpredictable actions of third parties.

US1DOCS 5323974v8

Second, plaintiffs offer no persuasive reason to disregard the several cases concluding that only a foreign sovereign's use of sovereign property for a commercial activity will result in a loss of attachment immunity. They are simply wrong to claim that *Flatow* misread the Supreme Court's decision in *Weltover*, and that subsequent decisions have followed the *Flatow* decision without analysis. Pl. Opp. at 13. On the contrary, neither the Fifth Circuit's decision in *Republic of Congo* nor the Northern District of Illinois' decision in *Rubin* simply adopted the approach of a particular passage in *Flatow*. Rather, both courts undertook their own, thorough examinations of § 1610(a) and reached sound conclusions about the proper construction of that provision. In *Republic of Congo*, the Fifth Circuit dedicated ten pages of analysis to §1610(a), in the midst of which it commented that "what matters under the statute is how the *foreign state* uses the property, not how private parties may have used the property in the past." 309 F.3d at 256 n.5. The Fifth Circuit further observed that "[i]f we were to allow a private party's commercial use of the property to count for §1610(a), we would erase the commercial/non-commercial use distinction for almost all of a foreign state's tangible property." *Id.* Likewise, in *Rubin v. Islamic Republic of Iran*, the Northern District of Illinois examined not only *Flatow*, but *Republic of Congo*, *Weltover*, and the purpose of the FSIA. 349 F. Supp. 2d 1108, 1112-13 (N.D. Ill. 2004). And the *Flatow* court looked not only to *Weltover* and § 1605 for guidance, but also to the text, history, and purpose of the FSIA. 76 F. Supp. 2d at 22-23. The Court should follow those well-reasoned opinions.[5]

Finally, *Sesostris* cannot help plaintiffs. Although plaintiffs seek to present that case as one in which the court concluded that a non-sovereign's use of foreign sovereign property for a

---

[5] Plaintiffs can gain no support from *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298 (D.D.C. 2005) (cited at Pl. Opp. at 11). The allegedly commercial activity in that case, lending artworks to a museum, was undertaken by the City of Amsterdam, a subdivision of the Kingdom of the Netherlands. *See id.* at 313. *Malewicz* therefore focused squarely on commercial activity *by a foreign sovereign*.

commercial activity resulted in the loss of attachment immunity under the FSIA, the case does not bear that reading. The allegedly state-owned bank in *Sesostris had* engaged in commercial activity, *i.e.*, financing the disputed ship. *See* Opening Br. at 11; *Sesostris*, 727 F. Supp. at 738, 740. By contrast, Iran has not made any commercial use of the property in question. As important, the *Sesostris* court mentioned § 1610(a) only in passing, noting only that the statute "appear[ed]" to apply. *Id.* at 744. The *Sesostris* court did not squarely address whether the property would have lost its immunity had it not been used *by the sovereign*. For that reason, the Northern District of Illinois specifically discounted *Sesostris* when it considered another attachment proceeding brought by these plaintiffs arising out of the same matter, and determined that any Iranian property was immune from attachment under § 1610(a). *See Rubin*, 349 F. Supp. 2d at 1113 ("[T]o the extent that Plaintiff's position is bolstered by *Sesostris* it is only by *Sesostris*' dicta, not its actual holding. Furthermore, . . . [in *Sesostris*] the foreign sovereign engaged in commercial activity.").

2. **The Iranian Antiquities In Harvard's Collections Are Not "Blocked Assets" Under The Terrorism Risk Insurance Act**

As explained in Harvard's opening brief (at 18-19), the Terrorism Risk Insurance Act does not provide a means by which the Rubin parties could attach Harvard's antiquities, even if the antiquities belonged to Iran (which they do not). Section 201(a) of the TRIA allows attachment only of the "blocked assets" of a "terrorist party." 116 Stat. 2322, 2337. Even if the antiquities were Iranian property and were blocked pursuant to Executive Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979), they were unblocked by Executive Order No. 12,281, 46 Fed. Reg. 7923 (Jan. 19, 1981). The latter Order was issued pursuant to the Algiers Accords as part of the United States' obligation to "arrange . . . for the transfer to Iran of all Iranian properties

US1DOCS 5323974v8

which are located in the United States . . . ." General Declaration ¶ 9 (Jan. 19, 1981), *available at* http://www.iusct.org/general-declaration.pdf.

Relying on Treasury Department regulations implementing the Algiers Accords and Executive Order No. 12,281, plaintiffs argue that the regulations unblocked only "'uncontested and non-contingent liabilities and property interests of the Government of Iran.'" Pl. Opp. at 8 (quoting 31 C.F.R. § 535.333(a) and citing § 535.215). Plaintiffs claim that, precisely because Harvard maintains that the antiquities in question belong to it, not Iran, Iran's alleged property interest in the antiquities cannot be considered "uncontested and non-contingent."

Plaintiffs overlook the fact that, in arguing that the antiquities in its collections would be immune from attachment under the FSIA, Harvard has assumed *arguendo* that those antiquities are the property of the Islamic Republic of Iran.[6] Of course, if plaintiffs failed to show that the antiquities in question belong to Iran, then the issue of foreign sovereign immunity (as well as the TRIA issue) would be entirely irrelevant; plaintiffs could have no basis for attachment of antiquities that do not belong to the judgment debtor. But even in the improbable event that plaintiffs *did* somehow establish that the antiquities belonged to Iran, then they also would be barred from attaching them by the FSIA, Executive Order 12,281, and the Treasury Department regulations. If Iran's ownership of those antiquities were established by the courts, then Iran's property interest in those antiquities would be "uncontested and non-contingent" under 31 C.F.R. § 535.333(a). The antiquities therefore would not be "blocked assets" in light of Executive Order No. 12,281 and 31 C.F.R. § 535.215(a), which expressly require that any property belonging to Iran be returned to Iran at its request. TRIA—which allows for attachment only of

---

[6] There is no record that the federal government believes that Harvard's well-known collection of antiquities includes blocked assets of the Iranian government. *See* Terrorist Assets Report, Calendar Year 2004, at 9, *available at* http://www.treas.gov/offices/enforcement/ofac/reports/tar2004.pdf ("The blocked Iranian Government assets . . . ($23.2 million) are principally diplomatic properties remaining blocked since the 1979-81 hostage crisis.").

"blocked assets"—would not apply to those antiquities, and the antiquities would be immune from attachment under § 1610(a).

Put another way, the plaintiffs' TRIA argument must be rejected as a matter of law, for they can prove no set of facts under which the antiquities are both Iran's (and thus property with which they may satisfy their judgment against Iran) and blocked (and thus covered by TRIA and subject to attachment). Plaintiffs claim that they are able to prove a particular combination of ownership interests in the antiquities—ownership by Iran, contested by Harvard—that would qualify the antiquities as "blocked assets." However, even if they were able to do so, they would still have to demonstrate to this Court that the antiquities *actually* belong to the Government of Iran before they could attach the antiquities in satisfaction of their judgment. But if plaintiffs succeed in making *that* showing, they will necessarily demonstrate that the property is "uncontested," unblocked, and unavailable to them. Plaintiffs' argument is therefore self-defeating.

Plaintiffs' TRIA argument also fundamentally misapprehends the basis for the regulation on which they rely, 31 C.F.R. § 535.333(a). That regulation was promulgated as part of the implementation of the Algiers Accords as well as the establishment of the Iran-United States Claims Tribunal to adjudicate pending disputes over Iranian assets in the United States. *See generally United States v. Sperry Corp.*, 493 U.S. 52 (1989); *Dames & Moore v. Regan*, 453 U.S. 654 (1981). Before the signing of the Algiers Accords, all Iranian property in the United States was frozen by Executive Order No. 12,170 and could not be removed from the country by Iran. The Accords, Executive Order No. 12,281, and OFAC's implementing regulations allowed Iran to remove its property from the United States. By confining the definition of "properties" that were unblocked and therefore authorized for removal by Iran to property in which Iran's

8

interest was uncontested or non-contingent, § 535.333(a) merely recognizes that Iran should not, by self-help, be able unilaterally to remove property from the United States when some other party might still be pressing a claim against that property in the Tribunal; otherwise, the Tribunal's processes—which were established for the very purpose of "deciding claims of nationals of the United States against Iran," Claims Settlement Declaration, Art. II, ¶ 1, *available at* http://iusct.org/claims-settlement.pdf—would effectively be nullified.  But Iran has never claimed, in the Tribunal or elsewhere, that any antiquities in Harvard's collections belong to it, and so the regulation on which plaintiffs rely has no application to this case.

Accordingly, 31 C.F.R. § 535.333(c) provides no basis for a conclusion that the antiquities in Harvard's collections are subject to attachment under TRIA as "blocked assets." Because plaintiffs can point to no set of facts under which they could attach the antiquities in Harvard's collections, the summons should be quashed and the attachment by trustee process should be dissolved.

## CONCLUSION

For the foregoing reasons, the Motion of Harvard Parties' to Quash Summons And To Dissolve Attachment by Trustee Process should be granted.

US1DOCS 5323974v8

Respectfully submitted,

THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

By their attorneys,

 /s/ Paul R.Q. Wolfson
Paul R.Q. Wolfson (admitted *pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street N.W.
Washington, DC 20037
(202) 663-6000

Mark C. Fleming (BBO # 639358)
Timothy R. Shannon (BBO # 655325)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Dated: October 19, 2005

## CERTIFICATE OF SERVICE

I, Timothy R. Shannon, hereby certify that on October 19, 2005 I caused a true and accurate copy of the this document to be served on counsel for the plaintiffs:

Richard J. Grahn, Esq. (via Court electronic notification)
Edward V. Colbert III, Esq.
Georgia J. Asimakopoulos
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800

   /s/ Timothy R. Shannon
Timothy R. Shannon (BBO #655325)

US1DOCS 5323974v8