# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
JENNY RUBIN, )
DEBORAH RUBIN, )
DANIEL MILLER, )
ABRAHAM MENDELSON, )
STUART E. HERSCH, ) Case No.: 1:05-MC-10079
RENAY FRYM, )
NOAM ROZENMAN, )
ELENA ROZENMAN and )
TZVI ROZENMAN )
)
            Plaintiffs — Judgment Creditors, )
v. )
)
THE ISLAMIC REPUBLIC OF IRAN, )
THE IRANIAN MINISTRY OF INFORMATION )
AND SECURITY, )
AYATOLLAH ALI HOSEINI KHAMENEI, )
ALI AKBAR HASHEMI-RAFSANJANI and )
ALI FALLAHIAN-KHUZESTANI )
)
            Defendants – Judgment Debtors, )
v. )
)
MUSEUM OF FINE ARTS, a not-for-profit corporation )
(a/k/a Boston MFA), HARVARD UNIVERSITY, et al. )
)
            Trustee Process Defendants. )
_____)

## REPLY IN FURTHER SUPPORT OF PLAINTIFFS – JUDGMENT CREDITORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to the leave granted by the Court on November 4, 2005, plaintiffs hereby respectfully tender their Reply to the memoranda submitted by the Trustee Process Defendants in opposition to plaintiffs' motion for partial summary judgment.

    **a.**    <u>**Scope of the Dispute**</u>

At bottom, the dispute before the Court is actually quite narrow:

In <u>Verlinden B.V. v. Central Bank of Nigeria</u>, 461 U.S. 480 (1983), the Supreme Court expressly determined that "sovereign immunity is an affirmative defense that must be specially pleaded." <u>Id</u>. at 494 n. 20.

The plaintiffs, relying on <u>Verlinden</u> and its progeny, maintain that §§1609-1610 of the Foreign Sovereign Immunities Act ("FSIA") provide an affirmative defense that must be actively asserted – and can only be asserted – by the foreign state itself.

The Trustee Process Defendants, by contrast, argue that the holding in <u>Verlinden</u> and its progeny that sovereign immunity is an affirmative defense refers only to sovereign immunity from suit under §§ 1604-1605 of the FSIA, and not to sovereign immunity from attachment and execution under §§ 1609-1610 of the FSIA.  According to the Trustee Process Defendants, the immunity set forth at §§1609–1610 operates automatically to render property of a foreign sovereign immune from execution (or not).  Thus, they argue, either foreign state property is <u>objectively</u> immune, or it is not.  Immunity from execution is therefore not an affirmative defense that need be pleaded or asserted (by the foreign state or by anyone else), but rather an objective state of affairs that need only be pointed out to, or noticed by, the Court.  <u>See</u> Harvard Opposition ("Harvard") 3-5; Museum of Fine Arts Opposition ("MFA") 5.

As shown below, the Trustee Process Defendants' attempt to artificially reinterpret the express holding in <u>Verlinden</u> and its progeny, and to restrict that holding to immunity from suit only, is utterly without basis or merit.

**b.    The Language of §1609 Provides No Guidance Whatsoever As To Whether Immunity From Execution Is an Affirmative Defense**

The Trustee Process Defendants ask the Court to follow the "plain language" of §1609 and emphasize the fact that §1609 provides that "*the property in the United States of a foreign state shall be immune*" from attachment and execution.  Harvard 4-5; MFA 4.

According Trustee Process Defendants, this formulation ("the *property . . . shall be immune*") is significant for two reasons: (i) it focuses on the status of the property itself, rather than on the foreign state and; (ii) it is facially peremptory. Harvard 4-5.

Therefore, argue the Trustee Process Defendants, this language proves that §1609 does not provide an affirmative defense, but rather grants the property of a foreign state an objective legal status that binds the Court regardless of who raises the issue. Harvard <u>id</u>; MFA 5.

This argument fails on all counts:

Congress' use of peremptory language in a given provision is absolutely no indication that Congress did not intend that provision to provide an affirmative defense.  For example, most federal statutes of limitation use similarly peremptory language.  <u>See</u> <u>e.g.</u> 28 U.S.C. §1350(2)(c) ("*No action shall be maintained* under this section unless it is commenced within 10 years after the cause of action arose."); 45 U.S.C. §56 ("*No action shall be maintained* under this chapter unless commenced within three years from the day the cause of action accrued."); 18 U.S.C. §2335(a) ("a suit for recovery of damages under section 2333 of this title *shall not be maintained* unless commenced within 4 years after the date the cause of action accrued.") 15 U.S.C. §1711(a) ("*No action shall be maintained* under section 1709 of this title . . . more than three years after the date of signing of the contract of sale or lease . . . ").

Statutes of limitations are unquestionably affirmative defenses that are waived if not timely asserted and can only be asserted by the party affected.  Fed.R.Civ.P. 8(c); <u>W.S.A. Inc. v. ACA Corp.</u>, 1996 WL 551599 (S.D.N.Y. 1996) ("while [defendant] contends that the complaint is untimely as to [other defendants] it has no standing to raise the affirmative defense of statute of limitations on their behalf, nor may I consider its application sua sponte.").

Therefore, despite their peremptory language ("*No action shall be maintained*," *"a suit . . . shall not be maintained")* these provisions are no more than affirmative defenses that can be raised only by the particular defendant affected, and only if still timely.

Likewise, and most significantly here, §1605(f) of the FSIA provides that:

*No action shall be maintained* under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose.28 U.S.C. §1605(f) (emphasis added).

This provision is a statute of limitations.  Wyatt v. Syrian Arab Republic -- F.Supp.2d --, 2005 WL 2404152 (D.D.C. Sept. 30, 2005).

Thus, notwithstanding its clear peremptory command ("*No action shall be maintained*") §1605(f) of the FSIA is a mere affirmative defense that can be raised only by the foreign state which seeks to rely on §1605(f) (and not by any other party or the court sua sponte) and is waived if not asserted at the proper time.

Since Congress used peremptory language in the affirmative defense set forth at §1605(f) of the FSIA, the presence of similarly imperative language in §1609 of the FSIA cannot prove that it is not an affirmative defense, as Trustee Process Defendants seek to argue.

Also merit less is Trustee Process Defendants' claim that because the grammatical subject of §1609 is the property ("the property . . . shall be immune") and not the foreign state, §1609 does not provide the foreign state with an affirmative defense, but rather vests the property itself with an objective legal status.

In the first place, the grammatical subject of all the limitations provisions cited above is the "action" ("No action shall be maintained") or the "suit" ("a suit . . . shall not be maintained") and not the parties.  Thus, employing Trustee Process Defendants' own logic, the "actions" and the "suits" subject to these provisions should be barred regardless of who raises a limitations defense

since these provisions do not "require the presence of the [defendant] or give the [defendant] exclusive authority to invoke the statute … Nor is the statute styled as a 'defense' that belongs to a particular party."  Harvard 4.

Yet, in fact of course, the right and duty to assert the limitations provisions cited above belong exclusively to the party affected, since (like § 1609) those provisions are all affirmative defenses, notwithstanding their grammatical structure.

Moreover, Trustee Process Defendants' assertion that immunity from execution under the FSIA is an objective status – rather than the personal defense of the foreign state – is squarely contradicted by every court to have considered the issue:

> This focus on the foreign sovereign is not only the letter of the law but it makes sense from a policy perspective, *as immunity belongs to the foreign sovereign* and whether immunity is waived properly depends upon the actions of the foreign sovereign.

Rubin v. Islamic Republic of Iran, 349 F.Supp.2d 1108, 1113 (N.D. Ill. 2004) (emphasis added).

Likewise:

> [T]he FSIA preserved a distinction between two different aspects of foreign sovereign immunity: jurisdictional immunity – that is, a foreign sovereign's immunity from actions brought in United States courts – and immunity from attachment – a foreign sovereign's immunity from having its property attached or executed upon.

Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems, 385 F.3d 1206, 1218 (9th Cir. 2004) (emphasis added). See also Roeder v. Islamic Republic of Iran, 333 F.3d 228, 233-234 (D.C. Cir. 2003) (referring to sovereign immunity defenses as "defenses personal to the parties in default - Iran and its Ministry of Foreign Affairs.").

Thus, like jurisdictional immunity, so too immunity from attachment and execution is a "personal" defense that "belongs to the foreign sovereign."  Rubin, id.

In sum, the language of §1609 provide no guidance as to whether or not sovereign immunity is an affirmative defense, and so Trustee Process Defendants' attempt to cite the "plain language" of

§1609 as proof that that provision is not an affirmative defense – i.e. that <u>Verlinden</u> does not mean what it plainly says – fails in all respects. .[1]

     **c.**     **<u>Affirmative Defenses to Judgment Enforcement Are Common</u>**

Harvard concedes that "one party may not raise affirmative defenses to *liability*, such as the statute of limitations, that are personal to another party" (Harvard 12) but argues that this rule applies only to defenses to liability and that the sovereign immunity from execution (rather than liability) set forth in §1609 therefore cannot possibly be an affirmative defense personal to the foreign state. Harvard 12.

Here too, Harvard's argument is absolutely baseless, for several reasons.

First, the affirmative defenses enumerated in Fed.R.Civ.P. 8(c) and the many other affirmative defenses recognized in federal case law (and not listed in Rule 8(c)) include numerous defenses that have nothing whatsoever to do with liability.[2]  Indeed, many of these defenses are clearly applicable as defenses to judgment enforcement proceedings.[3]

---

[1] Trustee Process Defendants also attempt to interpret §1609 through the prism of Fed.R.Civ.P. 69, which provides that the procedure on execution and in supplementary proceedings to enforce a judgment "shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, <u>except that any statute of the United States governs to the extent that it is applicable.</u>"(emphasis added).

This argument is frivolous since (a) it assumes the answer to the very question at issue here, i.e. whether or not §1609 is an affirmative defense that must be raised by the foreign state, and (b) if §1609 were <u>not</u> an affirmative defense, as Trustee Process Defendants claim, it would preempt any contrary state law <u>irrespective</u> of Rule 69's "except that" provision, because it is well established that the FSIA is controlling in both federal and state courts and preempts state law.  Moreover, under Trustee Process Defendants' interpretation, any plaintiff holding a judgment against a foreign state could avoid the entire issue of Rule 69 simply by bringing enforcement proceedings in state court.

Thus, the attempt to use the Federal Rules of Civil Procedure to construe §1609 (which applies, when asserted by the foreign state, in both state and federal courts) is therefore completely specious.

[2] <u>See</u> Wright and Miller, 5 Fed. Prac. & Proc. Civ.3d §1270:

> The list of nineteen affirmative defenses in Federal Rule 8(c) . . . is not intended to be exhaustive . . .
>
> [T]he following matters have been held by federal courts to be affirmative defenses under Rule 8(c) in nondiversity cases . . . : the defendant is a bona fide purchaser for value, breach of warranty as a justification for nonpayment, the applicability of a warranty disclaimer, the plaintiff's claim falls within an exemption from statutory coverage, the ownership by another of the property at issue in an action for condemnation of goods, the pleader is entitled to a set-off against the plaintiff's claim, the insufficiency of a claim for a tax refund, the barring effect of certain defenses to trademark

Thus, it comes as no surprise that courts frequently consider affirmative defenses to enforcement proceedings. See e.g. Teamsters Health and Welfare Fund of Philadelphia and Vicinity v. Net Const., 334 F.Supp.2d 751, 752 (E.D.Pa. 2004) (discussing "an affirmative defense to [a] writ of execution"); F.T.C. v. National Business Consultants, Inc., 376 F.3d 317, 322 (5th Cir. 2004) (considering limitations defense to judgment enforcement proceeding and noting that a "statute of limitations defense is an affirmative defense."); Brupbacher v. Raneri, 2000 WL 665560 (N.D.Tex. 2000) at 4 (where plaintiff seeks imposition of constructive trust in proceeding to enforce judgment, property holders permitted to "assert the affirmative defense that this claim is barred by limitations" and finding the claim barred); U.S. v. Pearson, 258 F.Supp. 686 (S.D.N.Y. 1966) (considering affirmative defenses to proceeding for enforcement of tax liens).

Probably the most obvious and outstanding example of a personal, affirmative defense that may be asserted by a judgment debtor in an enforcement proceeding (contrary to Harvard's assertions) are statute of limitations governing the enforcement of judgments. Obviously,

---

infringement actions, a trustee's objection to a creditor's claim on the ground that the creditor had received a voidable preference, the assertion of collateral source payments having been made to the plaintiffs, the defendant's conduct was justified because of the existence of a greater hazard, the defendant acted pursuant to a bona fide seniority system, the defendant was a buyer in the ordinary course, the challenged conduct was pursuant to or necessary for compliance with governmental regulations, the unconstitutionality of a statute relied upon by the plaintiff, the applicability of federal preemption, various forms of immunity, the relevance of after-acquired evidence, the existence of a statutory bar to recovery, the plaintiff's failure to exhaust available administrative remedies, the defendant acted with due diligence with regard to the alleged securities fraud, and vicarious liability for Title VII sexual harassment cases.

Id. (footnotes omitted).

[3] Affirmative defenses listed in Rule 8(c) relevant to enforcement proceedings include: accord and satisfaction; discharge in bankruptcy; estoppel; fraud; illegality; laches; payment; release; res judicata; statute of limitations; and waiver.

Affirmative defenses recognized in the case law relevant to enforcement proceedings include: ownership by another of the property at issue in an action for condemnation of goods; the pleader is entitled to a set-off against the plaintiff's claim; a trustee's objection to a creditor's claim on the ground that the creditor had received a voidable preference; the assertion of collateral source payments having been made to the plaintiffs; the unconstitutionality of a statute relied upon by the plaintiff; the applicability of federal preemption; various forms of immunity; the existence of a statutory bar to recovery and the plaintiff's failure to exhaust available administrative remedies. See Wright and Miller Id.

judgments against foreign states are subject to relevant statutes of limitations governing expiration of judgments.[4]  Thus, when persons (like the plaintiffs) holding judgments against Iran or other foreign states tarry in seeking to enforce their judgments beyond the statutory life of the judgment, Iran (and other foreign state judgment debtors) are entitled to assert a limitation defense – i.e. an affirmative defense – to enforcement.

It is thus absolutely clear (contrary to Harvard's theory) that personal affirmative defenses <u>are</u> available in enforcement proceedings, including enforcement proceedings against foreign states.  There is therefore no basis or reason whatsoever to construe the holding of the Supreme Court in <u>Verlinden</u> that "sovereign immunity is an affirmative defense that must be specially pleaded" as referring solely to immunity from liability.

The holding in <u>Verlinden</u> is unambiguous: sovereign immunity under the FSIA, both immunity from liability and immunity from execution, is an affirmative defense that must be specially pleaded.

### d.    The Decision in *Marcos* Is *Exactly* on Point

Trustee Process Defendants attempt to brush off as inapposite the decisions of the district court for the Southern District of New York and the Court of Appeals for the Second Circuit in <u>Republic of Philippines v. Marcos</u>, 634 F.Supp. 279 (S.D.N.Y 1986) <u>aff'd</u> 806 F.2d 344 (2nd Cir. 1986).  Harvard 91-10; FMA 11-12.

According to Harvard, <u>Marcos</u> involves only immunity from suit, and as putative "proof" of

---

[4] While Massachusetts does not appear to have a statute of limitations governing judgment enforcement, many, if not most states do. State statutes of limitations on enforcement of judgments can affect judgments entered under the FSIA in several ways. First, FSIA suits may be brought, and FSIA judgments enforced, in state courts.  Second, at least one federal court of appeals has held (and plaintiffs are not aware of contrary authority) that state limitations statutes governing judgments are applicable in federal court irrespective of whether the underlying federal judgment was entered under diversity or federal-question (e.g. FSIA) jurisdiction. <u>Consolidated Rail Corp. v. Yashinsky</u>, 170 F.3d 591, 594 (6th Cir. 1999).

The absence of a Massachusetts statute of limitation on judgment enforcement is of course irrelevant, since, for the purpose of proving the point here it is sufficient to demonstrate that this affirmative defense to execution is available to foreign states in at least some circumstances.

this claim points out that the "Second Circuit made no mention of 'attachment' or § 1609'". Harvard 9.

In fact, Trustee Process Defendants have got it <u>absolutely backward</u>.  At issue in <u>Marcos</u> was an injunction prohibiting transfer or encumbrance of <u>properties</u> allegedly owned by a foreign state official considered a "foreign state" under the FSIA.  It is well established that injunctions against <u>property</u> of a person or entity defined as a "foreign state" under the FSIA are governed by §§1609-1610 of the FSIA (exactly like attachments and executions against such property) even when such property injunctions are sought in the context of a plenary suit brought against the "foreign state" personally under §1605 of the FSIA.  <u>See</u> <u>e.g.</u> <u>S & S Machinery Co. v. Masinexportimport</u>, 706 F.2d 411, 418 (2nd Cir. 1983) <u>cert. denied</u>. 464 U.S. 850 (1983) (preliminary injunctions against property of "foreign state" are prohibited by §1609 of the FSIA unless one of the exemptions in §1610 applies since the "FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property."); <u>Stephens v. National Distillers & Chem. Corp.</u>, 69 F.3d 1226 (2nd Cir. 1996) (§1609 of the FSIA prevents all restraints that are the functional equivalent of attachments).

Since the Second Circuit itself expressly ruled in <u>S & S Machinery</u> in 1983 – three years prior to <u>Marcos</u> – that injunctions against property subject to the FSIA are governed by §§1609-1610 of the FSIA, the Second Circuit's holding in <u>Marcos</u> that only Marcos himself could assert an FSIA defense to the injunction against his property was therefore incontrovertibly referring to a defense under §§1609-1610.

<u>Marcos</u> is therefore perfectly on-point and apposite to the instant case, and constitutes dispositive authority in support of plaintiffs' position that a §§1609-1610 defense cannot be raised by a third party.

e.    **Trustee Process Defendants Misconstrue the Other Case Law Cited by Plaintiffs**

The Trustee Process Defendants attempt to distinguish away the other case law cited by plaintiffs by pointing out the obvious fact that most of those decisions did not directly address immunity from execution under §§1609-1610 of the FSIA.

But Trustee Process Defendants miss the point: the cases cited by plaintiffs unanimously hold that – except where subject-matter jurisdiction is implicated – sovereign immunity may be asserted only by the foreign state itself.

Since it is incontrovertible that immunity from liability under §§1604-1605 implicates subject-matter jurisdiction and so may be raised by anyone at anytime, what immunity could the case law cited possibly have been referring to – if not immunity from execution under §§1609-1610 – when it held that parties other than a foreign sovereign lack standing to raise the defense of sovereign immunity unless subject-matter jurisdiction is implicated?[5]

The answer is crystal clear: immunity from execution, which is the _only_ type of immunity that does not implicate subject-matter jurisdiction.

Moreover, this argument – that cases dealing with standing to assert immunity from liability under §§1604-1605 of the FSIA are inapposite to the question of standing to assert immunity from execution under §1609 – is illogical and was rejected as such by the court in National Union Fire Insurance Company v. The People's Republic of The Congo:

> Amoco argues that Marcos does not apply because it . . . did not concern §1610. Amoco views Marcos as a denial of standing to invoke immunity from suit under §1604 . . . Amoco's distinction makes no sense. No reason appears why persons who are not foreign states should have standing to urge immunity under §1609 but not under §1604.

---

[5] See e.g. Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279, 1290 (11th Cir. 1999) ("Parties other than a foreign sovereign ordinarily lack standing to raise the defense of sovereign immunity . . . When the court's jurisdiction rests on the presence of the foreign sovereign, however, the court may address the issue independently"); Didi v. Destra Shipping Co., Ltd., 1993 WL 232075 at 2 (E.D.La. 1993) (Noting that "a party other than the alleged foreign state generally does not have standing to assert the defense of sovereign immunity as it relates to that foreign state" but addressing the issue sua sponte because the court's subject-matter jurisdiction was implicated).

National Union Fire Insurance Company v. The People's Republic of The Congo, (N.D.Ill.

December 5, 1991) (No. 91-C3172) at 10.[6]

    Moreover, Trustee Process Defendants have no answer to the explicit and dispositive

holding in National Union:

> The FSIA was enacted, among other things, in order to codify a restrictive theory of
> foreign state sovereign immunity. Verlinden 461 U.S. at 487-88. To the extent that §
> 1609 provides immunity, it was enacted for the benefit of foreign states. Amoco is
> not a foreign state. It has no standing to raise an immunity defense under those
> provisions. See The Republic of the Philippines v. Marcos, 806 F.2d 344 (2d Cir.
> 1986) . . .
>
> Since Amoco has no standing to raise an immunity defense under § 1609, it is not
> necessary to consider whether the mineral royalty payments it owes to the
> Convention are commercial property under § 1610.

National Union, Id. (emphasis added).[7]

    In the end, Trustee Process Defendants entire position boils down to reliance on Walker

International Holdings Ltd. v. The Republic of Congo, 395 F.3d 229 (5th Cir. 2004), which

overlooked Marcos and all the other contrary case law.

    **f.**    **The 5th Circuit's Holding in *Walker v. Congo* is Based on Its Earlier
              Misreading of § 1610(c) of the FSIA in *Connecticut Bank***

    The MFA's opposition brief provides an excellent analysis of the evolution of the

jurisprudence of the Fifth Circuit regarding §§ 1609-1610 of the FSIA which demonstrates

convincingly that Judge Garza's holding in Walker is derived directly from an underlying holding

made in Judge Garza's earlier decision in Connecticut Bank of Commerce v. Republic of Congo,

309 F.3d 240 (5th Cir. 2002). See MFA 7-9.

---

[6] In fact, as shown supra, the holding in Marcos relates to a claim of immunity under §1609, not §1604.

[7] Trustee Process Defendants also cite examples of other cases in which third parties asserted, and the courts applied
without discussion, the provisions of §1609, despite the absence of the foreign state judgment debtor from the execution
proceedings. Such cases are proof of nothing, since the judgment creditors therein did not contest the third parties'
standing to assert §1609.

In <u>Connecticut Bank</u> Judge Garza analyzed § 1610(c) of the FSIA and held that this provision:

> [P]rovides that the court may order the attachment or execution only as "referred to in subsections (a) and (b)." Subsections (a) and (b) spell out the exceptions to the general rule that a foreign sovereign's property is immune from execution or attachment.

<u>Connecticut Bank</u>, 309 F.3d at 250.

Thus, as the MFA cogently explains, in <u>Connecticut Bank</u> the Fifth Circuit held that § 1610(c) of the FSIA "requires a court to determine in every case whether the requirements for an exception set forth in Section 1610(a) and (b) have been satisfied …". MFA 9.

Two years later in <u>Walker</u>, as the MFA further shows, Judge Garza rejected the claim that only the foreign state judgment debtor has standing to raise a § 1609 defense because he had already ruled in <u>Connecticut Bank</u> that the <u>court itself</u> was required to determine whether the property at issue was amenable to attachment and execution under § 1610(a) or (b).  See <u>Walker</u> at 233, citing <u>Connecticut Bank</u> for the holding that "the court may order the attachment or execution *only* as 'referred to in subsections (a) and (b).'"

Thus, as the MFA's trenchant analysis demonstrates, the holding in <u>Walker</u> on which the Trustee Process Defendants rely is directly based on the prior holding in <u>Connecticut Bank</u> that § 1610(c) requires a court to independently determine whether the property in question meets the conditions of § 1610(a) and (b).

The problem with this entire conceptual edifice is that it has no foundation whatsoever. Section 1610(c) of the FSIA does *not* require a court to make any examination whatsoever regarding the applicability of § 1610(a) or (b) to the property whose attachment or execution is sought.  Section § 1610(c) reads as follows:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable

period of time has elapsed following the entry of judgment and the
giving of any notice required under section 1608(e) of this chapter.

28 U.S.C. § 1610(c).

The clear language of § 1610(c) commands the court to make one – and only one –
determination: whether "a reasonable period of time has elapsed following the entry of judgment
and the giving of any notice required under section 1608(e)" of the FSIA.  The purpose and
rationale behind this provision are clearly and thoroughly explained in the legislative history:

> Section 1610(c) prohibits attachment or execution under sections 1610(a) and (b)
> unless the court has issued an order for such attachment and execution. In some
> jurisdictions in the United States, attachment and execution to satisfy a judgment
> may be had simply by applying to a clerk or to a local sheriff. This would not afford
> sufficient protection to a foreign state. This subsection contemplates that the courts
> will exercise their discretion in permitting execution. Prior to ordering attachment
> and execution, the court must determine that a reasonable period of time has elapsed
> following the entry of judgment, or in cases of a default judgment, since notice of
> the judgment was given to the foreign state under section 1608 (e). In determining
> whether the period has been reasonable, the courts should take into account
> procedures, including legislation, that may be necessary for payment of a judgment
> by a foreign state, which may take several months; representations by the foreign
> state of steps being taken to satisfy the judgment; or any steps being taken to satisfy
> the judgment; or evidence that the foreign state is about to remove assets from the
> jurisdiction to frustrate satisfaction of the judgment.

H.R. REP. NO. 94-1487, at 30 (1976).

Significantly, the House Report does not say – does not even hint – that § 1610(c) requires
the court to examine whether the property in question is subject to one of the exceptions set forth at
§ 1610(a) or (b).  See also e.g. Ferrostaal Metals Corp. v. S.S. Lash Pacifico, 652 F.Supp. 420
(S.D.N.Y. 1987) (identifying "the statutory purpose of § 1610(c)" as allowing foreign states a
reasonable period of time to honor a judgment).

In sum, neither the clear language of § 1610(c) nor its legislative history indicates even in
the slightest that a court issuing an attachment or execution has any independent duty or mandate to
determine whether the property at issue satisfies § 1610(a) or (b).

Thus, respectfully, in reading this non-existent provision into § 1610(c), the Fifth Circuit has misread § 1610(c). Its reading is, respectfully, clearly wrong, and should not be followed by this Court.

As the MFA has adroitly shown, the <u>Connecticut Bank</u> interpretation of § 1610(c) is the foundation stone of <u>Walker</u>. Therefore, unless this Court adopts the wholly unsupported (and unsupportable) interpretation of § 1610(c) set out in <u>Connecticut Bank</u>, there is simply no logical reason for it to follow the derivative holding in <u>Walker</u> upon which Trustee Process Defendants rely. The Court should reject the <u>Connecticut Bank</u> interpretation of § 1610(c), and so reject <u>Walker</u>.

Indeed, if anything, § 1610(c) provides further support for plaintiffs' instant motion: Congress could easily have included in the text of § 1610(c) a few additional words requiring courts to determine whether the property sought to be attached or executed upon satisfies one of the exemptions set forth in § 1610(a) and (b). What could have been simpler? But Congress did not do so, precisely because sovereign immunity is an affirmative defense that must be asserted by the foreign state.

> **f.**     <u>**Neither International Law Nor Legislative Policy Disfavor a Holding That a Foreign State Must Raise Its Own Immunity Defenses**</u>

Trustee Process Defendants also argue that international law and the history and purpose of the FSIA militate against plaintiffs' position. Harvard 13-15; MFA 7, 14-15.

Specifically, the Trustee Process Defendants argue that immunity from execution is a more egregious affront to the sovereignty of a foreign state and so immunity from execution is broader than immunity from suit, and thus attaching the property of a foreign state must ipso facto be more difficult than asserting jurisdiction over the sovereign in an underlying action. <u>Id</u>.[8]

---

[8] The MFA expends much time attempting to convince the Court that plaintiffs are wrong because execution against foreign property must never be "easier" than bringing a plenary suit against a foreign state. This imaginary "easier" test is clearly invalid, since numerous provisions of the FSIA would fail it. In the first place, it is undisputed that a plenary

This entire argument is specious because it confuses two completely unrelated questions:

(1) Who can assert an immunity defense to execution?

(2) What is the scope of immunity from execution once properly asserted?

In other words, even assuming *arguendo* that the scope of immunity from execution under §§1609-1610 is in fact broader than the scope of immunity from suit under §§1604-1605, that fact in no way implies – much less necessitates – any conclusions whatsoever regarding <u>who</u> may legitimately invoke immunity under §§1604-1605.

Significantly, the Trustee Process Defendants fail to cite a single authority or precedent in support of their claim that international law allows any party to raise an immunity defense. Thus, even assuming that international law were relevant here, there is no reason whatsoever to construe the holding of the Supreme Court in <u>Verlinden</u> that "sovereign immunity is an affirmative defense that must be specially pleaded" as referring solely to immunity from liability.[9]

Trustee Process Defendants also attempt to base their policy arguments on pre-FSIA practice and history, but thereby only <u>strengthen</u> plaintiffs' case. Prior to the FSIA, our courts would determine the sovereign immunity of a foreign state on the sole basis of a "suggestion of

---

suit requires a plaintiff to establish subject matter jurisdiction while an enforcement proceeding does not. Likewise, the FSIA has strict requirements for service of process on foreign states in a plenary action, and no such restrictions or requirements in respect to judgment enforcement except as demanded by state law. So too, 28 U.S.C. § 1391(f) contains strict venue rules for actions against foreign states (potentially forcing a plaintiff to file suit in the District of Columbia as a default venue, irrespective of his domicile) while enforcement actions can be commenced in any federal or state court.

[9] In any case, our courts are bound exclusively by the provisions of the FSIA and controlling United States case law (such as <u>Verlinden</u>) interpreting those provisions:

> Customary international law comes into play only "where there is no treaty, and no controlling executive or legislative act or judicial decision." *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *see* J. GOLDSMITH & E. POSNER, THE LIMITS OF INTERNATIONAL LAW 77 (2005) ("political branches have the final say about whether and how [customary international law] applies in the United States and whether or not the United States will comply with it"). Never does customary international law prevail over a contrary federal statute. *See, e.g., Comm. of U.S. Citizens Living in Nicar. v. Reagan,* 859 F.2d 929, 939 (D.C.Cir. 1988); *United States v. Yousef,* 327 F.3d 56, 91 (2d Cir. 2003).

TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d 296, 302 (D.C. Cir. 2005).

immunity" submitted by the State Department.  Third parties did not have authority to assert the

immunity of foreign states.  The FSIA was specifically intended to remove this power from the

State Department:

> Congress intended the FSIA to supplant the earlier practice whereby a foreign
> sovereign would appeal to the State Department "to make a formal suggestion of
> immunity to the court." H.R. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976
> U.S.Code Cong. & Admin.News 6604, 6606. Congress transferred this decision to
> the courts. *Id.*

Wilmington Trust v. United States Dist. Court, 934 F.2d 1026, 1032-3 (9th Cir. 1991).

Thus, under Trustee Process Defendants' novel interpretation, in enacting the FSIA

Congress stripped the State Department of the authority to assert a foreign state's immunity, but

granted that authority to third party litigants who had never previously enjoyed it.   This

interpretation is thus meritless.

Harvard also argues that accepting plaintiffs' position "would effectively force foreign

sovereigns, against their will, to come into a United States court in order to protect their sovereign

interests" – i.e. their property. Harvard 15.

This argument fails for several reasons:

First of all, Harvard's argument here erroneously assumes that a foreign state can always be

sure that a helpful trustee process defendant or garnishee will assert its § 1609 defense on its behalf,

and granting plaintiffs' motion would prevent that.  But in fact, third party garnishees are often

unwilling or unable to assert an immunity defense, and foreign states are therefore often "forced"

against their will to come into a United States court in order to protect their property.

Secondly, Harvard completely fails to explain why "forcing" foreign states to choose

between defending their property and losing it to a judgment creditor is unthinkable.  The fact is that

in the vast majority of cases, foreign states do not leave defense of their property to a garnishee, and

enter our courts (unwillingly to be sure) to defend enforcement proceedings.  The federal and state

case law contains hundreds of examples of such contested enforcement proceedings against foreign states, and it is therefore pellucid that granting plaintiffs' motion will entail no new "affront" to foreign sovereignty.  Indeed, granting the instant motion will affect only the very small number of cases in which (a) the foreign state elects not to appear and (b) a third party seeks to assert a § 1609 defense.

Thus, there is simply no policy reason that requires interpreting §1609 as a defense that can be raised by third parties, in order to "protect" from "affront" able-bodied foreign states (such as Iran) which cannot be bothered to appear and defend their own property.[10]  Indeed, Iran is an active and experienced litigant in the courts of the United States:

> The Islamic Republic of Iran is an experienced litigant in the United States federal court system generally and in this Circuit. *See, e.g., Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C.Cir. 1994), cert. denied 513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 631 (1995); *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (D.C.Cir. 1990); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C.Cir. 1984); *Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329 (9th Cir. 1984), *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983).

Flatow v. Islamic Republic of Iran, 999 F.Supp. 1, 6 n. 1 (D.D.C. 1998) (emphasis added).

Likewise,

> Iran *chose* not to defend its actions in this Court, despite its long history of adjudicating claims in this Circuit. *See, e.g., McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C.Cir. 2001).

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 230 (D.C.Cir. 2003) (emphasis added, internal quotation marks omitted).

As just one example, Iran has been actively and aggressively litigating the McKesson matter (cited id. in Flatow and Roeder) for over fifteen years, and the most recent docket entry in that case

---

[10] Granting plaintiffs' motion would have no adverse effect on a foreign state that is actually unable to defend its interests and assert a § 1609 defense – if such a far-fetched scenario is even possible – because in such a case the court is empowered to allow such a defense to be raised by a third party under well-established proxy party rules.  See generally Powers v. Ohio, 499 U.S. 400 (1991).  Powers is clearly inapplicable here because in order for a proxy to be permitted to assert defenses of a third party "there must be some hindrance to the third party's ability to protect his or her interests." Id.

– which is docket entry # 790 – was made on September 13, 2005. <u>See</u> Pacer docket in <u>Foremost-McKesson v. Islamic Republic of Iran</u>, 1:82-cv-00220(RJL) (D.D.C.).

Moreover, Iran has vigorously fought judgment enforcement proceedings brought by other American victims of Iranian terrorism, who, like the instant plaintiffs, hold judgments entered under 28 U.S.C. §1605(a)(7). In the proceedings underlying <u>Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems</u>, 385 F.3d 1206 (9th Cir. 2004), Iran[11] successfully petitioned the District Court for the Southern District of California to confirm a $2.8 million arbitration award issued in its favor by the International Chamber of Commerce ("ICC"). After the district court confirmed the award, two groups of plaintiffs holding judgments against Iran under §1605(a)(7) arising from acts of Iranian-sponsored terrorism moved to attach Iran's ICC judgment. <u>In response, Iran moved the district court for a determination that its judgment was immune from attachment</u>. The district court denied Iran's motion with respect to one of the judgment-holders, <u>and Iran then appealed that decision</u> to the Court of Appeals for the Ninth Circuit. <u>Id</u>. 1210-1212.

Thus – as an incontrovertible empirical fact – Iran is perfectly capable of appearing and litigating in our federal courts, and defending itself from enforcement proceedings such as those currently before this Court.

Iran is fully aware of plaintiffs' underlying action and plaintiffs' judgment against it. <u>See</u> <u>Rubin v. Iran</u>, 281 F. Supp.2d 258, 261 (D.D.C. 2003) ("Despite being properly served with process pursuant to 28 U.S.C. §1608, the defendants failed to respond or appear . . . "); Letter from Department of State confirming service of plaintiffs' judgment on Iran, dated September 3, 2004,

---

[11] While the <u>Cubic Defense</u> proceedings were nominally brought on behalf of Iran's Ministry of Defense, it is well established that the governmental subdivisions of a sovereign state are legally indistinguishable from the state itself. <u>See e.g.</u> <u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228, 234, 235 n.4 (D.C.Cir. 2003) (holding that Iran's "Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent" and that Iran and its foreign ministry "are not legally distinct").

attached as Exhibit A. Likewise, plaintiffs have provided Iran with notice of the instant enforcement proceedings. See Affidavit of Georgia Asimakopoulos dated April 26, 2005, Exhibit D to the instant motion.

Moreover, Iran has begun actively defending plaintiffs' enforcement proceedings:

Plaintiffs have initiated proceedings to domesticate their judgment in Belgium, and pursuant thereto obtained an ex parte order from a Belgian court freezing several bank accounts belonging to Iran. On or about November 4, 2005, Iran appeared and filed papers in the Belgian court, seeking to unfreeze the accounts. Attached as Exhibits B and C are a copy of Iran's papers in the Belgian proceeding, and an English translation thereof.

Additionally, Iran instituted proceedings this spring in the High Court in London to prevent the auction house Christie's from selling antiquities originating in Persepolis. According to Christies, "The Court has ordered the fragment to be withdrawn from sale to enable Iran to put forward evidence in support of its claim." (Exhibit D, see also Exhibit E). Attached hereto as Exhibit F is the Islamic Republic of Iran's initial pleading or "Claim Form" and a Consent order filed in the High Court of Justice in Islamic Republic of Iran v. Christie, Manson & Woods Limited, Claim No. HQ05X01103. As indicated in the Claim Form, Iran's three counts include a claim for equitable relief, declaratory judgment and conversion.

Thus, it is perfectly clear that Iran's failure to appear in and defend the instant enforcement proceedings stems neither from any hindrance or inability to do so; rather, "Iran chose not to defend [itself] in this Court, despite its long history of adjudicating claims" in the federal courts. Roeder, id.

Iran has refrained from asserting a §1609 defense to this proceeding. True, it has also refrained entirely from appearing, but that does not detract from the fact that it has refrained from seeking to invoke §1609 of the FSIA (despite the fact that it is perfectly capable of doing so and has

done so in identical proceedings, as shown above). What possible "affront" to the sovereignty of Iran (or of any other foreign state) could possibly result when Iran (or other foreign state) is fully able to appear and defend its property, and yet elects of its own free will not to do so? Indeed, if there is any "affront" here, it is the rank disrespect shown by Iran to the judiciary of the United States by its refusal to even deign to appear and assert any defenses it may enjoy under the FSIA.[12]

### g.    The United States Has Not Asserted That Third Parties Have Standing to Assert Iran's Immunity Defenses

Harvard claims that the "United States Government has adopted a position consistent with Walker – and inconsistent with the plaintiffs' arguments" Harvard 6. This assertion is baseless. Notably, in Marcos the United States filed a statement of interest in support of the injunction on Marcos' property in which it not only did not take the position claimed by Harvard Field but (apparently[13]) supported the position of the appellees that Marcos alone had standing to assert a defense under §1609 of the FSIA. Marcos, 806 F.2d at 356-357.

Plaintiffs are not aware that the United States has ever taken the position that third parties are entitled to assert a § 1609 defense, and Harvard has provided no support for this claim.[14]

---

[12] Iran has an openly hostile and arrogant attitude toward the courts of the United States:

> The Islamic Republic of Iran also apparently attempted to evade service of process . . . When the service package was returned to counsel in June 1997, the package had been opened, the return receipt, which counsel had not received, had been completely removed, and the message "DO NOT USA" was written in English across the back of the envelope. This contumacious conduct bolsters the entry of a default judgment.

Flatow, 999 F.Supp. at 6 n.1. Essentially, the Trustee Process Defendants are asking the Court to immunize Iran from the natural consequences of its arrogant and contumacious refusal to appear in this Court, by allowing them to raise defenses on Iran's behalf while Iran thumbs its nose at our federal judiciary.

[13] Because the description of the United States' position regarding the FSIA defense contained in the decision of the Second Circuit is slightly vague, plaintiffs have made repeated, extensive efforts to obtain a copy of the United States' actual filings in Marcos, so far to no avail. Plaintiffs will continue their efforts and provide a copy of the Government's filings to the Court, if and when they succeed in obtaining them.

[14] Of course, while the legal opinion of the United States may be helpful to the Court in exploring immunity issues, it has no independent weight since "The FSIA shifted the responsibility to make determinations about foreign sovereign immunity from the State Department to the courts." Connecticut Bank of Commerce v. Republic of Congo, 309 F.3d 240, 252 (5th Cir. 2002) (citing Verlinden, 461 U.S. at 488).

Trustee Process Defendants also point to the fact that the United States has submitted a statement in other FSIA enforcement cases, as "proof" that a third party may assert a sovereign immunity defense.  Harvard 6-8; MFA 10-11.

This argument is baseless because it completely misconstrues the nature of the United States' standing in those cases.  While the United States may have the right to file a statement of interest, or even intervene, in a proceeding that potentially violates a treaty obligation or a statutory right of the United States itself, the United States has no standing whatsoever to assert the sovereign immunity of a foreign state:

> As to the government's interest, plaintiffs suppose it is in providing Iran with a defense. That is incorrect. The government's interest is in upholding the Algiers Accords, an interest that would be impaired if plaintiffs obtained a judgment in violation of the Accords. We have already decided that the interest of the United States in meeting "its obligations under the executive agreement with Iran" entitled it to intervene as a defendant. See *Persinger [v. Islamic Republic of Iran],* 729 F.2d [835] 837 [(D.C. Cir. 1984)]. And because Iran failed to appear before the district court, the interest of the United States was not represented by the existing parties. …
>
> With this much settled, the error of plaintiffs' claim that the United States could not properly move to vacate the default judgment becomes apparent. *The United States was not asserting defenses personal to the parties in default - Iran and its Ministry of Foreign Affairs. The government entered the case to assert its own defenses under the Algiers Accords.*

Roeder v. Islamic Republic of Iran, 333 F.3d 228, 233-234 (D.C. Cir. 2003) (emphasis added).

Thus, where judgment execution against foreign state property is prohibited by a treaty or international agreement such as the Algiers Accords, the Vienna Conventions on Diplomatic Relations, the Vienna Convention on Consular Relations or the United Nations Headquarters Agreement, the United States may well have standing to oppose such execution as prohibited under the relevant treaty or agreement, and has intervened or filed statements of interest expressing such

opposition in numerous such cases (including the cases cited by Trustee Process Defendants, <u>Flatow</u> <u>v. Iran</u>[15] and <u>Cicippio v. Iran</u>).[16]

Likewise, the United States may have the right to intervene or file a statement of interest in execution proceedings against foreign state property that would violate <u>statutory rights of the United</u> <u>States itself</u> to control and/or block foreign state property under domestic legislation such as the Foreign Mission Act (FMA), the International Emergency Powers Act (IEEPA) or Treasury regulations issued pursuant to IEEPA.[17]

By contrast, and as the <u>Roeder</u> court emphasized, the United States <u>does not</u> have standing to assert "defenses personal to" the foreign state, i.e. defenses under the FSIA.  Indeed, the prime *raison d'être* of the FSIA was to "to supplant the earlier practice" whereby the Government asserted immunity on behalf of a foreign sovereign. <u>Wilmington Trust</u>, 934 F.2d at 1032-3.[18]

### h.    Trustee Process Defendants Citation to Massachusetts Law Is Baseless

Trustee Process Defendants' attempt to argue that Massachusetts law permits them to assert a § 1609 defense on Iran's behalf fails on several grounds:

---

[15] Contrary to the misleading impression created by Harvard's out-of-context claim that <u>Flatow</u> treated the United States as a "non-agent third party" for the purpose of raising a sec. 1609 defense (Harvard 7) the phrase "non-agent third party" was used by the <u>Flatow</u> court solely for the purpose of its "commercial use" analysis under sec. 1610

[16] None of the property at issue here is subject to, nor would execution against and turnover thereof violate, any international treaty or agreement.

[17] The property at issue here is of course not subject to the FMA.  Ironically, the Trustee Process Defendants argue that even if the properties at issue are owned by Iran they are <u>not</u> blocked under IEEPA blocking regime (and so not subject to execution under the Terrorism Risk Insurance Act), while the plaintiffs maintain that the properties are blocked and so subject to attachment and execution under TRIA. Thus, in any event, it is undisputed by all parties that execution against the property at issue here is not prohibited by the IEEPA blocking regime.

[18] While the United States might <u>claim</u> that it has such standing, plaintiffs are unaware of any authority in support of, and strongly contest, any claim of such standing by the United States. Thus, to the extent that Trustee Process Defendants can point to a case in which the United States filed a statement of interest purporting to oppose execution specifically under § 1609 of the FSIA, it was without standing to make such an argument.

Purely in the alternative, even assuming *arguendo* that the United States had some unique standing to assert a § 1609 defense, that would in no way imply that private parties such as the instant Trustee Process Defendants have similar standing.  In such a hypothetical scenario (i.e. if the Government did have such standing) preserving a careful distinction between the standing of the Government and that of private parties would be of crucial importance.  This is particularly so in the instant case, where the Trustee Process Defendants have asserted immunity arguments but the United States has not.

First, the unpublished decision relied upon by Trustee Process Defendants, <u>Toomey v. Toomey</u> 1997 Mass.App.Div. 181, 1997 WL 672062, is completely inapposite. <u>Toomey</u> does not deal with <u>an affirmative defense</u> to attachment, but with rather with a statutory protection from attachment of assets covered by provisions of ERISA that preempt state law. Since, unlike sovereign immunity, ERISA protections are not an affirmative defense, <u>Toomey</u> tells us nothing about who can raise an affirmative defense under Massachusetts law. Nor is there any <u>holding</u> whatsoever in <u>Toomey</u> about who may assert an ERISA defense (much less an affirmative defense); as noted above, decisions in which a plaintiff does not contest and a court does not rule on the standing of a garnishee to assert a defense of the defendant prove nothing about the existence of such standing, and certainly do not constitute <u>holdings</u>. Moreover, the defendant in the underlying action (the executrix Lois Toomey) was actively involved in the proceedings, and though she may not have filed the motion to dissolve the attachment, she did apparently participate in the appeal since the court refers to "defendants" in the plural: "Defendants argue as follows … We agree with the Defendants". <u>Id</u>. Additionally and importantly, Toomey involved a challenge to the state court's subject matter jurisdiction. "Defendants argue … that the Federal Court had jurisdiction in this area." <u>Id</u>. Since the court's subject-matter jurisdiction was challenged, the question of standing was irrelevant.

Second, the practice commentary relied upon by Trustee Process Defendants (Mass Prac. Series, Collection Law § 5:82 (3d ed.)) relies in turn entirely on <u>Toomey</u> as its sole authority, and is therefore of no more assistance to Trustee Process Defendants than <u>Toomey</u> itself.

Third, it is well-established that FSIA preempts state law and creates a uniform regime governing proceedings against foreign states in both federal and state court. Congress has determined, as <u>Verlinden</u> held, that sovereign immunity is an affirmative defense that must be asserted by the foreign state, and this rule preempts any contrary state law. Indeed, it

would defeat the congressional goals of uniformity and consistency that underpin the FSIA if the determination of who has standing to assert a defense under the FSIA were to be subject to the vagaries of 50 different state legal systems.   Therefore, even if Trustee Process Defendants could show that, in general, Massachusetts law permits trustee process defendants to assert the affirmative defenses of a judgment debtor (and no such showing has been made), that state law rule would perforce be preempted by Congress' determination that sovereign immunity may be raised only by the foreign state.

### i.    **Plaintiffs Also Request Oral Argument**

Plaintiffs respectfully join the MFA's request for oral argument.

### j.    **Conclusion**

Plaintiffs' motion for partial summary judgment should be granted.[19]

---

[19] Plaintiffs respectfully call the Court's attention to a misleading statement contained in the MFA's brief.  The MFA states that: "MFA agrees with Plaintiffs that there are no disputed facts material to MFA's Motion to Quash and Plaintiffs' Motion for Partial Summary Judgment" and then proceeds to ask that the Court determine "on the undisputed facts presented" that the Iranian assets at issue are immune from attachment. MFA 4.

MFA is being too clever by a half. As the MFA well knows, plaintiffs' statement of undisputed facts relates only to their own motion for partial summary judgment, and not to the MFA's motion to quash. Plaintiffs' strongly dispute the Trustee Process Defendants' factual claims and characterizations regarding the property at issue, and if plaintiffs' motion for partial summary judgment is denied, plaintiffs request discovery and further fact-finding in support of their position that this property is amenable to attachment and execution under both TRIA and § 1610.

JENNY RUBIN, et al

By their attorneys,


/s/ Georgia J. Asimakopoulos
Richard J. Grahn (BBO# 206620)
Georgia J. Asimakopoulos (BBO# 658232)
Looney & Grossman LLP
101 Arch Street, 9th Floor
Boston, MA 02110
(617) 951-2800


/s/ David Strachman, Esq. (GJA)
David Strachman, Esq., (BBO# 660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
Dated:  November 21, 2005          (401) 351-7700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2005 I served a copy of the within pleading upon Trustee Process Defendants by electronic notice and/or mailing copies thereof via first class mail, postage prepaid, properly addressed to the following:

Paul R.Q. Wolfson
(Counsel for Trustee Process Defendant, Harvard)
WILMER CUTLER PICKERING
HALE & DORR LLP
2445 M Street NW
Washington, DC  20037

Mark C. Fleming
(Counsel for Trustee Process Defendant, Harvard)
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA  02109

Timothy R. Shannon
(Counsel for Trustee Process Defendant, Harvard)
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA  02109

Robert J. Muldoon, Jr.
(Counsel for Trustee Process Defendant, MFA)
Sherin & Lodgen LLP
101 Federal Street
Boston, Massachusetts  02110
(617) 646-2000

William D. Iverson
Jason M. Knott
(Counsel for Trustee Process Defendant, MFA)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000

Courtney Amber Clarke, Esq.
(Counsel for Trustee Process Defendant, MFA)
Sherin & Lodgen LLP
101 Federal Street
Boston, Massachusetts  02110
(617) 646-2000


Jason M. Knott, Esq.
(Counsel for Trustee Process Defendant, MFA)
Covington & Burling
1201 Pennsylvania Avenue N.W.
Washington D.C. 20004-2401


/s/ Georgia J. Asimakopoulos
Georgia J. Asimakopoulos

EXHIBIT A



**United States Department of State**

*Washington, D.C. 20520*

September 3, 2004

Ms. Belinda Solomon
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re: **Jenny Rubin et al. v. The Islamic Republic of Iran et al.**
**C.A. No. 01-1655 (RMU) (Consolidated with 002328)**

Dear Ms. Solomon:

I am writing regarding the Court's request for transmittal of a default judgment and notice of default judgment to the Iranian Ministry of Foreign Affairs in the above referenced matter.

The U.S. Embassy in Bern, Switzerland transmitted the default judgment and notice of default judgment to the Swiss Ministry of Foreign Affairs on July 22, 2004 for further transmission to the American Interests Section of the Swiss Embassy in Teheran, Iran. The American Interests Section of the Swiss Embassy in Teheran transmitted the default judgment and notice of default judgment to the Iranian Ministry of Foreign Affairs on August 3, 2004.

Certified copies of the U.S. and Swiss Embassies diplomatic notes and a copy of the documents transmitted are enclosed in accordance with the procedures established for the implementation of the Foreign Sovereign Immunities Act. If you have any questions regarding this matter, please do not hesitate to contact me at (202) 736-9115.

Sincerely,

William P. Fritzken
Attorney Adviser
Office of Policy Review and Interagency Liaison

Enclosures: As stated

CC:     Mr. David J. Strachman
        McIntyre, Tate, Lynch & Holt
        Suite 400
        321 South Main Street
        Providence, Rhode Island 02903

EXHIBIT B

4. Nov. 2005 12:45    MAITRE DE HASSELAIR                                    N°1816    P. 2

## Bruno CHRISTIANE
## HUISSIER DE JUSTICE
### 37/21, Avenue du Luxembourg - 4020 LIEGE

Tél : 04/223.55.37                                                      Fax : 04/223.52.00
AXA 704.0427647-31



Réf. Etude : B08825    A94 431-05

---

*OPPOSITION A SAISIE-ARRET*
*CONSERVATOIRE*
*AVEC CITATION EN MAINLEVEE*

---

L'AN 2005, le    TRES    NOVEMBRE

| Mc CHRISTIANE | |
|---|---|
| PPL/4 | 26.02 |
| Cop 1/1 | 46.80 |
| Fort | 1 |
| TOTAL | 73.82 |

### A LA REQUETE DE :

La REPUBLIQUE ISLAMIQUE D'IRAN, représentée par son Ambassadeur en BELGIQUE, dont les bureaux sont établis à 1150 Woluwé-Saint-Pierre, Avenue de Tervueren, 415, où elle élit domicile.

Ayant pour Conseil, Maître Issa AGHADJANI, Avocat, de résidence à 4000 LIEGE, rue du Snapeux, 21.

Je soussigné,

HUGUES HELLEBAUT
HUISSIER DE JUSTICE
SUPPLEANT EN REMPLACEMENT
DE JACQUES LAMBERT

Huissier de justice, de résidence à 1050 IXELLES, rue Renier Chalon, n° 46.

### AI SIGNIFIE ET DECLARE A :

1) Madame RUBIN Jenny, domiciliée aux Etats-Unis, à CA 90034 LOS ANGELES, Helm Avenue, 2410 (créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code judiciaire    COMME À HASSELAIR
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

2) Madame RUBIN Deborah, domiciliée aux Etats-Unis, à CA 90034 LOS ANGELES, Helm Avenue, 2410 (créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code judiciaire    la monsieur    Michel LEONARD, my objet de mes
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)    AS HASSELAIR
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

---

*2ème feuillet*

**3) Monsieur MILLER Daniel, domicilié aux Etats-Unis, à FL 33433 BOCA RATON, Tennyson Ct, 7871** (créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformement aux articles 33 à 35 du code judiciaire ~~COMME A L'ORIGINAL~~
préposé(e) à ce délégué(e),
(Ainsi me déclare qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

**4) Monsieur MENDELSON Abraham, domicilié aux Etats-Unis, à CA 90035 LOS ANGELES, Kirkside Rd, 9521** (créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code judiciaire
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

**5) Monsieur R. HERSCH Stuart, domicilié en Israël, Kiryat Arba, Ha Palmach St.** (créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code judiciaire
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

**6) Madame FRYM Renay, domiciliée en Israël, Kiryat Arba, Ha Palmach St.** (créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code judiciaire
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

2

4. Nov. 2005 12:45    MAITRE DE HASSELAIR                    N°1816    P. 4

*3ème Juillet*

7) Monsieur ROZENMAN Noam, domicilié en Israël, Jérusalem, 15 Naomi
(créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de
résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code
judiciaire
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

8) Monsieur ROZENMAN Tzvi, domicilié en Israël, Jérusalem, 15 Naomi
(créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de
résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code
judiciaire
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

9) Madame ROZENMAN Elena, domiciliée en Israël, Jérusalem, 15 Naomi
(créancier poursuivant)

Ayant élu domicile en l'étude de Maître Pierre DE HASSELAIR, Huissier de Justice de
résidence à 1060 SAINT-GILLES, Square Baron Alfred Bouvier, 6.

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code
judiciaire
préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

Que la partie requérante forme, par les présentes, OPPOSITION à la saisie-arrêt
conservatoire signifiée en date du 07.10.2005 par exploit enregistré du ministère de Maître
Pierre DE HASSELAIR, Huissier de Justice à BRUXELLES.

D'un même contexte, à pareilles date et requête que dessus, j'ai donné ASSIGNATION à la
partie signifiée

A COMPARAITRE LE

JEUDI DIX-SEPT NOVEMBRE PROCHAIN (2005), à 08.45 HEURES du matin, devant le JUGE
DES SAISIES PRES LE TRIBUNAL DE PREMIERE INSTANCE DE BRUXELLES, siégeant en la
chambre des saisie A, en la Salle 01.6, au PALAIS DE JUSTICE, place Poelaert, à 1000
BRUXELLES.

POUR :

3

*6ème feuillet*

Que la requérante s'oppose par la présente à la saisie-arrêt conservatoire (pièce 1) signifiée en date du 7 octobre 2005, par Monsieur l'Huissier de justice, Pierre DE HASSELAIR, au profit de ses clients susmentionnés auprès de la S.A. FORTIS BANQUE, à charge de la République Islamique d'Iran ;

Que Monsieur l'Huissier de justice a pratiqué la saisie-arrêt conservatoire en vertu d'un jugement par défaut du 10 septembre 2003, rendu par la Cour de district du district judiciaire de Columbia/Etats-Unis (pièce 2) contre la République Islamique d'Iran, la condamnant à payer à ses clients susmentionnés la somme totale de 71.500.000 $, soit 58.937.350 €, en principal, majorée d'une somme de 345,03 € pour les frais, soit un total de 58.837.702,02 € ;

Que suite à cette saisie-arrêt conservatoire, la S.A. Fortis Banque a bloqué les comptes bancaires numéros :
.compte à vue : 210-0331540-46 et
.compte d'épargne : 034-1318664-11,
appartenant à l'Ambassade de la République Islamique d'Iran ;
et aussi :
-la garantie bancaire de soumission n° 80507-00319-49 ;
-la garantie bancaire n° 80405-50118-25 ;

Attendu que sur base de la convention de Vienne du 18 avril 1961, approuvée par la loi du 30 mars 1968, sur les relations diplomatiques, l'Ambassade de la République Islamique d'Iran, ainsi que ses avoirs, sur base de l'article 25 de ladite convention, bénéficient de la protection diplomatique et ils sont protégés et inviolables ;

Que les sommes se trouvant sur les deux comptes bancaires bloqués et gelés sont des sommes qui servent et sont affectées et réservées au bon fonctionnement et à la continuité en tant que service public de l'Ambassade de la République Islamique d'Iran, soit à l'accomplissement des fonctions inhérentes à la souveraineté d'un Etat étranger, et non pour d'autres dépenses, telles que des activités économiques, commerciales ou à titre purement privé ;

Attendu que la saisie-arrêt conservatoire est pratiquée par des saisissants vivant en dehors du territoire belge et sans attachement en Belgique, et en vertu d'un jugement étranger, rendu par défaut, en date du 10 septembre 2003, par la Cour de district du district judiciaire de Columbia aux Etats-Unis, soit un jugement n'ayant aucune autorité vu le défaut de demande d'exequatur, conformément à la Convention de Bruxelles devant les tribunaux belges, ainsi que défaut d'autorisation préalable du Juge des saisies, de ce fait, il ne peut tenir lieu de soi-disant titre privé et valable au sens de l'article 1445 du Code Judiciaire pour la mise en œuvre d'une saisie conservatoire ;

Que de ces faits la saisie-arrêt conservatoire doit être levée ;

Qu'un Etat ne peut se passer de ses avoirs, lesquels lui sont nécessaires à l'exercice de sa souveraineté et à la continuité du service public qui en est le corollaire et que cette saisie a entraîné la mainmise et l'indisponibilité des avoirs, et a provoqué des préjudices graves dans le chef de l'Ambassade de la République Islamique d'Iran;

*Seine Vfeuiller*

Que l'illégalité et l'incompatibilité de la saisie pratiquée par un blocage immédiat et total de ses comptes bancaires, a sérieusement ébranlé et entraver le principe général de la continuité et du bon fonctionnement du service public et l'indépendance de l'Ambassade de la République Islamique d'Iran, à savoir un Etat étranger, bénéficiant d'une immunité d'exécution totale basée sur la nécessité d'assurer des relations pacifiques entre les Etats ;

Que l'action des saisissants est téméraire et vexatoire et de ce fait, ils doivent être condamnés, chacun personnellement, individuellement et solidairement au paiement de 5.000 € à titre de dommages et intérêts ;

Que la cause n'appelle que des débats succincts justifiant l'application de l'article 735 du Code Judiciaire et qu'elle sera en conséquence retenue à l'audience d'introduction ;

## PAR CES MOTIFS ET TOUS AUTRES A FAIRE VALOIR AU BESOIN ET ICI EXPRESSEMENT RESERVES :

Entendre dire la présente opposition recevable et fondée.

Entendre dire que la présente cause n'appelle que des débats succincts au sens de l'article 735 du Code Judiciaire, de sorte qu'elle pourra être retenue dès l'audience d'introduction.

Entendre dire nulle et de nul effet, la saisie-arrêt conservatoire signifiée en date du 07.10.2005 par le ministère de l'Huissier de Justice Pierre DE HASSELAIR, de résidence à BRUXELLES, au profit des parties citées, à charge de la République Islamique d'Iran, auprès de la S.A. FORTIS BANQUE qui a bloqué et gelé ses avoirs se trouvant sur les numéros de comptes bancaires suivants :

- compte à vue : 210-0331540-46,
- compte d'épargne : 034-1318664-11

et aussi :

- la garantie bancaire de soumission n° 80507-00319-49,
- la garantie bancaire n° 80405-50118-25.

Entendre dire, du fait que sur base de la Convention de Vienne du 18.04.1961, à laquelle la Belgique est partie, sur les relations diplomatiques, l'Ambassade de la République Islamique d'Iran, ainsi que ses avoirs, selon l'article 25 de ladite convention, sont couverts et bénéficient de la protection diplomatique et son inviolables ; et du fait que les montants se trouvant sur les deux comptes bancaires bloqués lui servent pour ses besoins de mission et de bon fonctionnement, et la continuité du service public de l'ambassade et non dans le cadre d'une activité économique, commerciale ou à titre purement privé, ainsi que pour défaut d'attache des saisissants avec la Belgique, il y a lieu de condamner les parties citées à donner sur le champ mainlevée de la saisie-arrêt conservatoire effectuée sur les deux numéros de comptes bancaires et les deux garanties bancaires mentionnés ci-dessus auprès de la S.A. FORTIS BANQUE, et dire pour droit qu'à défaut de ce faire, la décision à intervenir en tiendra lieu.

S'entendre condamner les parties citées, chacun personnellement et individuellement et de manière solidaire, au paiement de 5.000 Euros, pour préjudice grave et paralysant, à titre de dommages et intérêts pour action téméraire et vexatoire.

5

*berne et obtiquer feuillier*

Entendre dire que la partie requérante se réserve, de manière expresse, le droit de faire état d'autres réclamations de préjudices subis.

S'entendre les parties citées condamnées solidairement aux dépens y compris ceux prévus par l'article 1022 du Code Judiciaire.

Entendre dire les condamnations portables au domicile élu avec interdiction de recourir au cantonnement.

Et pour que la partie tiers-saisie n'en ignore, j'ai dénoncé et laissé copie du présent exploit à :

La Société Anonyme FORTIS BANQUE, inscrit(e) au R.C. (ou R.S.Civiles) de Bruxelles, sous le numéro 76.034, inscrit(e) dans la Banque Carrefour des Entreprises sous le numéro 0403.199.702, dont le siège social est établi à 1000 Bruxelles, Montagne du Parc n° 3

Où étant j'ai - je n'ai pas pu remettre la copie du présent exploit conformément aux articles 33 à 35 du code judiciaire

préposé(e) à ce délégué(e),
(Ainsi me déclaré qui ne signe pas mon original pour réception)
De sorte que j'ai - je n'ai pas fait application de l'article 38 du code judiciaire

Et pour que la partie signifiée n'en ignore, je lui ai laissé, la copie du présent exploit, le tout conformément à la Loi.

DONT ACTE - DATE QUE DESSUS - COUT :  392.90  EURO
en ce compris la mise au rôle
+ frais de recommandé(s) éventuel(s)

LAMBERT/
LOMBAERT
FF3/4    78.07
FF/5    140.58
VAC      9.39
PC       7.34
TPL      3.70
TIMB    55.00
ENR     25.00
        319.08
CFR     73.82
        392.90

HUGUES HELLEBAUT
HUISSIER DE JUSTICE
SUPPLEANT EN REMPLACEMENT
DE JACQUES LAMBERT

DRL    82.00

6

EXHIBIT C

Case #B08825

Opposition to the seizure

On the Request of:

The Islamic Republic of Iran, represented by its Ambassador in Belgium, office located at 1150 Woluwe-Saint Pierre, 415 Tervueren Avenue, where it resides.

Having for consul, Mr. Issa AGHADJANI, lawyer 21 Snapeux St., Liege, 4000.

I, the undersigned, Hugues Hellebaut, agent of justice, residing at 46 Reniver Chalon St., Ixelles, 1050.

Do signify and declare:

1) Mrs. Jenny Rubin, residing in the United States, at 2410 Helm Avenue, Los Angeles, California 90034,

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

2) Mrs. Deborah Rubin, residing in the United States, at 2410 Helm Avenue, Los Angeles, California 90034,

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

3) Mr. Daniel Miller, residing in the United States, at 7871 Tennyson Court, Boca Raton, Florida, 33433

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles

33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

4) Mr. Abraham Mendelson, residing in the United States, at 9521 Kirkside Rd., Los Angeles, California 90035

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

5) Mr. Stuart R. Hersch, residing in Israel, at Ha Palmach Street, Kiryat Arba, Israel

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

6) Mrs. Renay Frym, residing in Israel, at Ha Palmach Street, Kiryat Arba, Israel

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

7) Mr. Noam Rozenman, residing in Israel, at 15 Naomi, Jerusalem, Israel

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

8) Mr. Tzvi Rozenman, residing in Israel, 15 Naomi, Jerusalem, Israel

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

9)  Mrs. Elena Rozenman, residing in Israel, at 15 Naomi, Jerusalem, Israel

Having requested the review by Mr. Pierre de Hasselau, Agent of Justice, 6 Baron Alfred Bouvier Square, St. Gilles 1060.

Where I have – I have not been able to submit the present document conforming to articles 33 through 35 of the judicial code.

Such that I do – I do not apply Article 38 of the judicial code.

That the party states opposition to the seizure dated July 7, 2005 by the action registered by the agent of Mr. Pierre De Hasselain, Agent of Justice in Brussels.

I have given authority to the noted party in this context, so dated and requested by the following.

 Next Thursday, November 17, 2005, at 8:45 am, in front of the JUDGE NEXT TO THE COURT OF THE FIRST INSTANCE OF BRUSSELS, in the courtroom 01.6, at the COURTHOUSE, place Poelaert, Brussels 1000.

That the reappearance of the present of recuperating, stopping (exhibit 1) entered on the 7th of October, 2005, by Mr. l'Hussier of justice, Pierre DE HASSELAIR, for the benefit of his clients mentioned below of the S.A. FORTIS BANQUE, in charge of the Islamic Republic of Iran:

That Mr. Lussier in justice has put into practice the stop and seizure of a faulty judgment dated September 10, 2003, rendered by the district court of the District of Columbia of the United States (exhibit 2) against the Islamic Republic of Iran, condemning them to pay the aforementioned clients a total sum of $71,500,000, equal to 58,937,350 Euro in principal, with an additional sum of 345,03 Euro for the costs, thereby totalling 58,837,702,02 Euro:

Then following the stop and seizure, the S.A. Fortis Banque blocked the following bank account numbers:

bank account: 210-0331540-46
    savings account: 034-1318654-11
    belonging to the Embassy of the Islamic Republic of Iran:
    and also:

-the bank guarantee of application no. 80507-00319-49,
-the bank guarantee no. 80405-50118-25;

In consideration based on the Vienna Convention of April 18, 1961, to which Belgium subscribes, on diplomatic relations, the Embassy of the Islamic Republic of Iran, thus has the basis of Article 25 of the convention, are covered by and benefit from the diplomatic protection and are untouchable; and the fact that the amounts in the two blocked accounts are used for the purposes of running the embassy, continuing to serve the public and not for economic activities, commercial or purely private, and so for the default of attaching the seizure with Belgium, it is better to condemn the cited parties in the field with their arms up of the seizure effected upon the two bank account numbers and the two bank guarantees mentioned here concerning the S.A. FORTIS BANQUE, and to say for the right of default to make a decision to intervene when it will happen.

In condemning the cited parties, each personally and individually and on a manner of solidarity, a payment of 5,000 Euros, for serious and paralyzing prejudice, in the name of damages and interests for rash and vexatious action.

That the illegality and incompatibility of the seizure by immediate blockage of all bank accounts, has seriously shaken and interfered with the general principal of the continuity and good functioning of public service and the independence of the Embassy of the Islamic Republic of Iran, to know a foreign state, benefiting from immunity of total execution based on the necessity of assuring peaceful relations between states;

That the seizure is rash and vexatious and because of that, it must be condemned, each one personally, individually and in solidarity on the payment of 5,000 Euro, in the name of damages and interests;

That the cause does not call for the succinct debates justifying the application of Article 735 of the Judicial Code and the consequences will remain with audience of introduction;

BY THESE MOTIVES AND ALL THE OTHER NEEDED VALUES AND EXPRESS.
RESERVES:

To intend to present opposing admissibles.

To intend that the present cause does not call for succinct debates on the meaning of the article of the Judiciary Code, of the sort that can be made by the audience of introduction.

To intend nul and nul effect, the seizure signified in date of July 10, 2005, by Minister de L'Hussier of Justice Pierre DE HASSELAIR, residing in Brussels, for the profit of the cited parties, at the cost of the Islamic Republic of Iran, close to the S.A. FORTIS BANQUE that
        has block and frozen its assets found in the following bank accounts:

Bank account: 210-0331540-46
Savings account: 034-1318664-11

And also:

 -The Bank Guarantee of application no. 80507-00319-49,
 -The Bank Guarantee no. 80405-50118-25.

 To intend, on fact based on the Vienna Convention of April 4, 1961, to which Belgium
subscribes, on diplomatic relations, the Embassy of the Islamic Republic of Iran, referring to its
assets, according to Article 25 of said convention, are covered and benefit from diplomatic
protection and are untouchable; and the fact that the sums found in two blocked bank accounts
are used for the purposes of running the embassy, continuing to serve the public and not for
economic activities, commercial or purely private, and so for the default of attaching the
seizure with Belgium, it is better to condemn the cited parties in the field with their arms up
of the seizure effected upon the two bank account numbers and the two bank guarantees
mentioned here concerning S.A. FORTIS BANK, and to say for the right of default to make a
decision to intervene when it will happen.

In condemning the cited parties, each personally and individually and on a manner of solidarity, a
payment of 5,000 Euros, for serious and paralyzing prejudice, in the names of damages and
interests for rash and vexatious action.

To intend that the party involved reserves, in express manner, the right to make other claims
of prejudice.

To intend that the condemned parties cited together with foreseen costs according
to Article 1022 of the Judiciary Code.

To Intend that the portable condemnations at the chosen residence with prohibition
of recourse.

And to the partie one-third seized not to ignore, I denounced and left a copy of the present
exploit at:

The Society Anonymous FORTIS BANQUE, written at R.S. Civiles of Brussels, under the
number 76.034, written in the Bank Carrefour des Enterprises under the number
0403.199.702, where the establishment is at 1000 Brussels, Park Mountain, no.3

Whereas I have – I have not been able to submit a copy of the present undertaking conforming to
articles 33 through 35 of the judiciary code.

Offered by this delegate
      (And so to declare they have not signed my original on receipt)

And such that I have – I have not applied Article 38 of the judiciary code.

And so that the noted party shall not ignore, I have left it for him, the copy of my present undertaking, all conforming with the law.

So acted upon – tariff to file: 392.90 Euro and this includes the enactment and cost of eventual recommendations.

EXHIBIT D



News
Iran News
Iran Sports News
News Archive

Sites

Home
Interesting Sites
Iran Travel
Iran Business Source
Iranian Calendar

Ads by Gooooogle

Persian Rugs
Save Big On
Persian Rugs
Crazy Prices - See
& Buy Here
www.faster-results.com

All the Persian
Rugs
All the Persian Rug
Savings! Persian
Rug Shoppers
Start Here
Persian.Rugs.AlltheBrand

Iran Breaking
News
Stories You Won't
Find Elsewhere.
Fee Based Service
for Professionals
www.einnews.com/iran

Cheap Flights to
Iran
Get Free Airfare
Quotes for your
cheap tickets from
US to Iran
www.cheaptravelnetwork.

## Payvand's Iran News ...

5/30/05

## Iran blocks sale of Persian artifact in London

London, May 30, IRNA-Iran has started proceedings at the High Court
in London to stop Christie's auction house selling an ancient limestone
artifact from Persepolis, worth more than Pnds 300,000 (Dlrs 540,000).

"The court has ordered the fragment to be withdrawn from sale to
enable Iran to put forward evidence in support of its claim.

Christie's is happy to comply because, as a responsible auctioneer," a
spokesman for the London auction house said.

High Court papers show Iran issued legal proceedings against Christie's
to prevent the piece being sold at an auction entitled "Faces from the
Ancient World: A European Private Collection" on April 20.

According to the Daily Telegraph Monday, additional court papers filed
earlier this month show the auction house was replaced as the
defendant by a person named as Denyse Berend, who is believed to be
the owner.

The 22 cm. by 30 cm. limestone relief is said to feature the bearded
head of a Persian guardsman wearing a feathered headdress, and is
thought to have come from the Apadana palace, built by Xerxes I (486-
465 BC) in Iran's ancient capital of Persepolis.

The Christie's spokesman insisted that the auction house "strictly
adheres to any and all local and international laws with respect to
cultural property and patrimony of art." "Christie's will not sell any work
of art we know or have reason to believe has been stolen," he said but
suggested that there was no basis for Iran's claim to the artifact
because it had previously been sold in London prior to the 1979 Islamic
Revolution.

"We have not been shown any evidence to support the claim and are
surprised that Iran raised no objection when the fragment was sold
publicly at another auction house in 1974," the spokesman was quoted
saying.

He said Iran claims the fragment was "taken out of Iran at some time
around 1931, immediately after legislation was brought in regulating the
export of such objects".

Iran blocks sale of Persian artifact in London



**Persian Mystics**

The sale is expected to be blocked until Iran presents evidence for its legal action, which is unlikely to be heard in court until next year.



The March of the Ten Thousand

© Copyright 2005 NetNative
(All Rights Reserved)

EXHIBIT E

 

The Wine of Wisdom
Mehi Aminrazavi

Privacy Information

News

Iran News
Iran Sports News
News Archive

Sites

Home
Interesting Sites
Iran Travel
Iran Business Source
Iranian Calendar

Ads by Goooooogle

Discount Airfares
to Iran
Cheap Airline
Tickets to Teheran.
Save on Economy
and Business
class.
www.bt-store.com


Iranian Chat
Browse for Iranian
Personals Free &
Secure Sign Up! -
aff
CupidJunction.com


Iranian
interference
in affairs of the
Northern neighbor
Confession of a
politician
www.axisglobe.com


Cheap Tickets to
Iran
Up to 50% off fares
on major airlines
even for last minute
trips
www.asaptickets.com

## Payvand's Iran News ...

4/23/05

## Documents of Iran's Ownership of the Achaemenid Soldier Submitted to London's Court

Tehran, Apr. 20 (CHN) – To prove Iran's ownership of the Achaemenid relief whose sale on Christie's was halted by a London's court order, a documentary film and pictures of the excavations carried out in Xerxes Palace of Persepolis in 1933 and a complete report of the archeaology team working there were submitted to the London court by the ICHTO Committee for Retrieval of Historical Artifacts.



The limestone relief which shows an Achaemenid soldier belongs to an eastern stairway of the Xerxes Palace of the Achaemenid capital of Persepolis, registered as a World Heritage Site. Christie's auctioneer of London was to accept bids for the relief on its today sale, with an estimated price of 200,000 to 300,000 pounds, but the legal complaint by the Iranian Cultural Heritage and Tourism Organization (ICHTO) urged a London court to put a halt to its presentation.



**Persian Mystics**

According to director of the Committee for Retrieval of Historical Artifacts, Mohammad Abdol Alipour, the documentary film, pictures, and documents of the excavations submitted to the London's court via Internet will clarify the date of the excavations which plays an important role in the case.

Sto

The Xerxes (Apadana) palace was not discovered until 1933, and therefore the relief fragment should have been plundered out of Iran after this date; on the other hand, based on a law passed in 1930, each and every ancietn object that is unearthed in Iran is a possession of the governement. Therefore the piece certainly is an Iranian heritage that should be returned to its homeland.

"The relief enjoys structural featues that prove its being part of the eastern stairway of Apadana, and specialized studies can easily prove the date of its being detached from its original location," explained Abdol Alipour, adding that Iran is ready to provide more documents, if asked by the London court, in the one week time that it has been provided with for the provision of necessary documents.



Crimson Gold

© Copyright 2005 NetNative
(All Rights Reserved)

**Hotels In Iran**
Hotel Photos, Info & Virtual Tours
Find the Hotel You Want at
Expedia!

**Hotels In Iran**
Planning a trip? Find cheap hotels,
attractions, user reviews & maps!

**Watch TV Online?**
Over 12500+ Live Streams Radios
and TV from your PC

**Airfare Savings**
Global Airfare Disco
Savings Over Comp

Ad:

EXHIBIT F

*P to issue, provided
C's address is stated
as c/o Withers LLP,
their sols.
B.Y
19.4.05*



# Claim Form

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

| | for court use only |
|---|---|
| Claim No | HQ05 X01103 |
| Issue Date | 19 April 2005 |



Claimant(s)

THE ISLAMIC REPUBLIC OF IRAN

Tehran, Iran

*c/o Withers LLP
16 Old Bailey
London EC4M 7EG*

Defendant(s)

~~1)  CHRISTIE, MANSON & WOODS~~ *LIMITED*

~~2)  CHRISTIE'S INTERNATIONAL UK LIMITED~~

Brief details of claim

1)   Delivery up of the Claimant's property in the possession of the Defendants, being lot 64 in the Defendants' auction catalogue entitled "Faces from the Ancient World; A European Private Collection; Wednesday 20 April 2005" and comprising a limestone fragment from the Persepolis complex in Iran.

2)   A declaration that the Claimant is the owner and entitled to possession of the said property.

3)   Alternatively, damages for conversion and interest thereon pursuant to section 35A of the Supreme Court Act 1981.

Value

Exceeds £300,000 (three hundred thousand) pounds

| Defendant's name and address | CHRISTIE, MANSON & WOODS *LIMITED* ~~CHRISTIE'S INTERNATIONAL UK LIMITED~~ 8 King Street London SW1Y 6QT | | £ |
|---|---|---|---|
| | | Amount claimed | Exceeds 300,000 |
| | | Court fee | 1,700 |
| | | Solicitor's costs | To be Assessed |
| | | Total amount | Exceeds 300,000 |

The court office at **ROYAL COURTS OF JUSTICE, STRAND, LONDON WC2A 2LL**

is open between 10 am and 4 pm Monday to Friday.  When corresponding with the court, please address forms or letters to the

Court Manager and quote the claim number.

N1 Claim form (CPR Part 7) (01.02)
document number: LN99999/1-L-634641/1

Crown Copyright. Reproduced by Withers LLP

| | Claim No | |
|---|---|---|

Does, or will, your claim include any issues under the Human Rights Act 1998?    ☐ Yes    ☒ No

**Particulars of Claim** (to follow)

**Statement of Truth**

The Claimant believes that the facts stated in these details of claim are true.
I am duly authorised by the Claimant to sign this statement.

Full name     Jeremy William le Messurier Scott

Name of Claimant's solicitor's firm     Withers LLP

Signed     _Jemy ——— Scott_          position or office held     Principal
Claimant's solicitor

| Withers LLP | Claimant's or Claimant's solicitor's address to |
| 16 Old Bailey | which documents or payments should be sent if |
| London EC4M 7EG | different from overleaf including (if appropriate) |
| DX: 160 London/Chancery Lane | details of DX, fax or e-mail. |
| Tel: 020 7597 6000 | |
| Fax: 020 7597 6543 | |
| Ref: JWS/ | |

ASSIGNED MASTER          FOSTER.
ALL CORRESPONDENCE TO BE ADDRESSED TO THE COURT MANAGER

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

BEFORE MR JUSTICE HALLET

Tuesday 25th April 2005

BETWEEN:



THE ISLAMIC REPUBLIC OF IRAN

Claimant

- and -

CHRISTIE, MANSON & WOODS LIMITED

Defendant

---

### CONSENT ORDER

---

BY CONSENT

IT IS ORDERED THAT

1. The Claimant's application to continue the Order made on 19 April 2005 be adjourned to Tuesday 3 May 2005.

2. The injunction granted by paragraph 1 of the said Order be continued until the conclusion of the hearing on 3 May 2005 on the terms set out in the said Order.

3. Costs reserved.

L/635331

Claim no. HQ05X01103

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

Tuesday 26th April 2005

BETWEEN:

THE ISLAMIC REPUBLIC OF IRAN

Claimant

- and -

CHRISTIE, MANSON
& WOODS LIMITED

Defendant

---

CONSENT ORDER

---

Withers LLP
16 Old Bailey
London
EC4M 7EG
Ref: JWS
Tel: 0207 597 6000
Claimant's Solicitors