# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| | ) |
| JENNY RUBIN, | ) |
| DEBORAH RUBIN, | ) |
| DANIEL MILLER, | ) |
| ABRAHAM MENDELSON, | ) |
| STUART E. HERSCH, | ) Case No.: 1:05-MC-10079 |
| RENAY FRYM, | ) |
| NOAM ROZENMAN, | ) |
| ELENA ROZENMAN and | ) |
| TZVI ROZENMAN | ) |
| | ) |
| Plaintiffs — Judgment Creditors, | ) |
| v. | ) |
| | ) |
| THE ISLAMIC REPUBLIC OF IRAN, | ) |
| THE IRANIAN MINISTRY OF INFORMATION | ) |
| AND SECURITY, | ) |
| AYATOLLAH ALI HOSEINI KHAMENEI, | ) |
| ALI AKBAR HASHEMI-RAFSANJANI and | ) |
| ALI FALLAHIAN-KHUZESTANI | ) |
| | ) |
| Defendants – Judgment Debtors, | ) |
| v. | ) |
| | ) |
| MUSEUM OF FINE ARTS, a not-for-profit corporation | ) |
| (a/k/a Boston MFA), HARVARD UNIVERSITY, et al. | ) |
| | ) |
| Trustee Process Defendants. | ) |

_____)

## NOTICE OF RELEVANT AUTHORITY
## IN FURTHER SUPPORT OF PLAINTIFFS' MOTIONS TO STAY

Currently before the Court are Plaintiffs' motions to stay the Trustee Process Defendants'

motions to quash summons and dissolve attachments, pending disposition of Plaintiffs' motion

for partial summary judgment establishing that the Trustee Process Defendants' have no standing

to raise Iran's sovereign immunity defense.

In their motions to stay, Plaintiffs argue that since Trustee Process Defendants' motions to quash are founded entirely on Iran's sovereign immunity defense, it would be a waste of time and resources for the Court and the parties to litigate the motions to quash until the Court has ruled on Plaintiffs' motion for partial summary judgment asserting that the Trustee Process Defendants have no standing to assert that sovereign immunity defense in the first place.

Plaintiffs are currently conducting parallel proceedings in the United States District Court for the Northern District of Illinois seeking to enforce their judgment against Iranian-owned antiquities held by the University of Chicago and the Field Museum.  Rubin et al. v. Islamic Republic of Iran et al., (No. 03-C-9370 N.D. Illinois).

Several discovery disputes are pending between the instant Plaintiffs and the Illinois garnishees, regarding claims by the garnishees that certain information sought by Plaintiffs is irrelevant as a matter of law because the property at issue is protected from execution by Iran's sovereign immunity.  These discovery disputes have spawned various motions.[1]

On July 27, 2005, the Plaintiffs filed a motion in the Illinois proceeding notifying the court that they intended to move for partial summary judgment establishing that the Illinois garnishees had no standing to assert Iran's immunity defense and arguing that disposition of the discovery disputes – which are based entirely on the garnishees' attempt to assert Iran's sovereign immunity defense – should be stayed until after disposition of the threshold standing question raised in the partial summary judgment motion.  See Exhibit A.

Thus, the motion to stay filed by the Plaintiffs in the Illinois proceeding makes an argument identical to that presented in Plaintiffs' motions to stay in this case: i.e., that the Court should not begin to address sovereign immunity claims made by third-party garnishees until it

---

[1] See Plaintiffs' motion to compel production of documents from citation third party respondents University of Chicago, The Oriental Institute and Gil Stein, Rubin v. Islamic Republic of Iran, (No. 03-C-9370 N.D. Illinois) dkt. # 69; Motion by Field Museum of Natural History for protective order, id. dkt. # 75.

has ruled on Plaintiffs' motion for partial summary judgment establishing that those garnishees have no standing to assert a sovereign immunity defense.

Plaintiffs subsequently filed their partial summary judgment motion in the Illinois proceeding (id. dkt. #95-96), and on November 18, 2005, the Illinois district court held a hearing on that motion, the outstanding discovery motions and Plaintiffs' motion to stay.

At that hearing, Magistrate Judge Ashman informed the parties that "we are only going to argue one matter here today and that is the motion for partial summary judgment, because depending on what the ruling on that is, that will affect the other motions" and issued an order staying the discovery proceedings as requested in Plaintiffs' motion to stay.  See Transcript of 11/18/05 hearing, at 2, Exhibit B; Minute entry staying discovery proceedings pending a ruling on Plaintiffs' motion for partial summary judgment, Exhibit C.

Thus, the Illinois federal court agreed with Plaintiffs that it should rule on Plaintiffs' argument that third-party garnishees lack standing to assert sovereign immunity defenses to execution, prior to entertaining any such sovereign immunity claims presented by the garnishees.

While the Illinois garnishees raised their sovereign immunity claims in the context of a discovery dispute, whereas the instant garnishees (Trustee Process Defendants) assert Iran's immunity in motions to quash, that difference is patently irrelevant; the underlying argument made by Plaintiffs and accepted by the Illinois court is identical to that made in the motions to stay before this Court.

Therefore, the decision of the Illinois federal court constitutes direct precedent in support of Plaintiffs' motions to stay pending in this Court.

JENNY RUBIN, et al

By their attorneys,


/s/ Georgia J. Asimakopoulos
Richard J. Grahn (BBO# 206620)
Georgia J. Asimakopoulos (BBO# 658232)
Looney & Grossman LLP
101 Arch Street, 9th Floor
Boston, MA 02110
(617) 951-2800


/s/ David Strachman, Esq. (GJA)
David Strachman, Esq., (BBO# 660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
Dated:  December 15, 2005          (401) 351-7700




## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2005 I served a copy of the within pleading upon Trustee
Process Defendants by electronic notice and/or mailing copies thereof via first class mail, postage
prepaid, properly addressed to the following:

Paul R.Q. Wolfson
(Counsel for Trustee Process Defendant, Harvard)
WILMER CUTLER PICKERING
HALE & DORR LLP
2445 M Street NW
Washington, DC  20037


Mark C. Fleming
(Counsel for Trustee Process Defendant, Harvard)
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA  02109

Timothy R. Shannon
(Counsel for Trustee Process Defendant, Harvard)
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, MA  02109


Robert J. Muldoon, Jr.
(Counsel for Trustee Process Defendant, MFA)
Sherin & Lodgen LLP
101 Federal Street
Boston, Massachusetts  02110
(617) 646-2000


William D. Iverson
Jason M. Knott
(Counsel for Trustee Process Defendant, MFA)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000


Courtney Amber Clarke, Esq.
(Counsel for Trustee Process Defendant, MFA)
Sherin & Lodgen LLP
101 Federal Street
Boston, Massachusetts  02110
(617) 646-2000


Jason M. Knott, Esq.
(Counsel for Trustee Process Defendant, MFA)
Covington & Burling
1201 Pennsylvania Avenue N.W.
Washington D.C. 20004-2401


/s/ Georgia J. Asimakopoulos
Georgia J. Asimakopoulos

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ENNY RUBIN, DEBORAH RUBIN, DANIEL MILLER, ABRAHAM MENDELSON, STUART E. HERSH, RENAY FRYM, NOAM ROZENMAN, ELENA ROZENMAN and TZVI ROZENMAN, | ) ) ) ) ) ) | |
| Plaintiffs – Judgment Creditors, | ) ) ) | |
| v. | ) ) | No. 03-CV-937 |
| THE ISLAMIC REPUBLIC OF IRAN, (a/k/a Iran, The Republic of Iran, Republic of Iran, The Government of Iran, Iranian Government, and Imperial Government of Iran), THE IRANIAN MINISTRY OF INFORMATION AND SECURITY, AYATOLLAH ALI HOSEINI KHAMENEI, ALI AKBAR HASHEMI RAFSANJANI and ALI FALLAHIAN KHUZESTANI | ) ) ) ) ) ) ) ) ) ) ) ) | Judge Blanche M. Manning<br><br>Magistrate Judge Martin C. Ashman |
| Defendants – Judgment Debtors. | ) ) | |
| v. | ) ) ) | |
| THE UNIVERSITY OF CHICAGO, a not-for-profit corporation a/k/a and/or d/b/a The Oriental Institute, GIL STEIN, and THE FIELD MUSEUM OF NATURAL HISTORY, | ) ) ) ) | |
| Citation Third Party Respondents | ) | |

## PLAINTIFFS' MOTION TO STAY DISCOVERY-RELATED PROCEEDINGS PENDING DETERMINATION OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ESTABLISHING THAT NO PERSON OTHER THAN IRAN MAY ASSERT IRAN'S SOVEREIGN IMMUNITY DEFENSES UNDER §§ 1609 – 1610 OF THE FSIA

For the reasons set forth below, Plaintiffs hereby move for entry of an order staying further briefing on and disposition of all pending discovery proceedings, pending disposition of Plaintiffs' Motion For Partial Summary Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity Defenses Under §§ 1609 – 1610 of the FSIA:

1.     Citation Respondents have filed numerous pleadings in this matter asserting that the property of Iran in their possession is immune from attachment and execution by the Plaintiffs pursuant to the sovereign immunity defenses set out in §§ 1609-1610 of the Foreign Sovereign Immunities Act ("FSIA").

2.     Citation Respondents have also sought, and continue to seek, to limit and/or prevent discovery in this matter, on the basis of their claim that the assets in question are immune from execution under §§ 1609-1610 of the FSIA.

3.     The instant Plaintiffs have brought parallel proceedings to enforce their judgment against Iran in the United States District Court for the District of Massachusetts, seeking to attach and execute against antiquities and artifacts owned by Iran and held by various institutions in the Boston area. Rubin et al. v. Islamic Republic of Iran et al. (Case No.: 1:05-MC-10079 D. Mass.).

4.     Like the instant Citation Respondents, the garnishees in the Massachusetts proceeding have sought to block Plaintiffs' enforcement efforts by asserting Iran's sovereign immunity defenses under §§ 1609-1610 of the FSIA.

5.     On July 25, 2005, the Plaintiffs filed in the Massachusetts proceeding a Motion for Partial Summary Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity Defenses Under §§ 1609 and 1610 of the FSIA.  (Motion and supporting Memorandum attached as Exhibit A).

6.     As discussed at length in the Memorandum filed in support of Plaintiffs' Motion for Partial Summary Judgment in Massachusetts (Exhibit A), the Second, Ninth and Eleventh Circuits and the United States District Court for the Northern District of Illinois (and apparently every other district court to have considered the question) have expressly held that a sovereign immunity defense to attachment and execution under §§ 1609 and 1610 of the FSIA can only be asserted by the foreign state itself.

7.       In other words, third parties, including the instant Citation Respondents, have no standing whatsoever to object to attachment and execution of the Iranian assets in their possession on grounds of sovereign immunity, nor can they object to discovery on those grounds.

8.       But for the provisions of Section I of Judge Manning's Standing Order, which require several preparatory steps prior to filing a motion for summary judgment, Plaintiffs would have filed a parallel motion for partial summary judgment in this Court, simultaneously with the filing of the partial summary judgment motion in Massachusetts.

9.       However, in accordance with Section I of the Standing Order, Plaintiffs have noticed a motion for leave to file a Motion for Partial Summary Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity Defenses Under §§ 1609 and 1610 of the FSIA. (Notice attached as Exhibit B).

10.      If the Motion for Partial Summary Judgment which Plaintiffs have sought leave to file is granted (which seems extremely likely given the overwhelming precedent in their favor including a decision of this Court) the sovereign immunity defenses asserted by the Citation Respondents will evaporate and the scope and substance of discovery in this matter will be radically transformed – and significantly narrowed – in several respects.

11.      First of all, of course, if Plaintiffs prevail on their Partial Summary Judgment Motion all of Citation Respondents' objections to discovery on sovereign immunity grounds, and the discovery disputes regarding those objections, will be entirely eliminated.  Thus, for example, the pending Motion for Protective Order filed by the Field Museum, which is based entirely on an assertion of Iran's sovereign immunity (and an erroneous reading of this Court's Memorandum Opinion and Order of November 20, 2004) and which Plaintiffs strongly oppose, will simply be mooted.  Likewise, the discovery disputes between Plaintiffs and the University of Chicago related to sovereign immunity issues (arising from the University's on-going efforts to assert Iran's

sovereign immunity in order to negate the "relevancy" of the discovery sought) will become moot.

12.    Secondly, if sovereign immunity is taken off the table, Plaintiffs will obviously have no need to pursue discovery and examine Citation Respondents' affiants regarding the amenability of the Iranian property at issue to execution under § 1610 of the FSIA and/or under § 201 of the Terrorism Risk Insurance Act ("TRIA").

13.    Determining whether the property is subject to execution under § 1610 of the FSIA or § 201 of TRIA is to a great extent a fact-dependant inquiry.  The papers submitted to date by Citation Respondents repeatedly argue that the property in question is not subject to execution under §1610 of the FSIA because it is purportedly not being used for a commercial activity by Iran within the meaning of that provision.  Plaintiffs disagree with this factual claim, and intend to prove the contrary *inter alia* through examination of Citation Respondents' affiants and other relevant discovery.  See Malewicz v. City of Amsterdam, 362 F. Supp. 2d 298 (D.D.C. 2005) (holding that loan of artwork by foreign state to U.S. museums for exhibition constitutes commercial activity under the FSIA).  Likewise, the University of Chicago asserts that the Iranian property it holds is not "blocked" property within the meaning of §201 of TRIA (and so not subject to execution under that provision) because it was allegedly included in property "unblocked" by Executive Order.  Plaintiffs strongly disagree with this factual assertion and (if their Partial Summary Judgment Motion is denied) intend to demonstrate through examination of the affiants and necessary discovery that the property at issue here was not included in the unblocked property, and is therefore subject to execution under §201 of TRIA.

14.    Clearly, there is no reason for the Court or the parties to waste time and resources conducting further discovery relating to sovereign immunity issues (including the still-to-be-conducted examinations of Citation Respondents' several affiants) and litigating the multitude of discovery disputes currently pending and certain to arise in respect to sovereign immunity, if this

Court follows the Second, Ninth and Eleventh Circuits (and a previous decision of this Court itself) and holds that the Citation Respondents have no standing to assert Iran's sovereign immunity defenses in the first place.

15.    If Plaintiffs' Motion for Partial Summary Judgment is granted, the only remaining issues in this proceeding will be questions of ownership regarding <u>some</u> of the property (there is no dispute regarding the Persepolis and Chogha Mish property), and discovery would then proceed in a far narrower scope, in respect to those questions of ownership.

16.    Thus, the briefing on and disposition of all pending discovery proceedings should be stayed until determination of the threshold question of Citation Respondents' standing to assert Iran's sovereign immunity defenses.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an Order:

(1)    Staying further briefing on and disposition of all pending discovery proceedings pending disposition of the Plaintiffs' Motion for Partial Summary Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity Defenses Under §§ 1609 and 1610 of the FSIA; and

(2)    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

JENNY RUBIN, DEBORAH RUBIN,
DANIEL MILLER,  ABRAHAM MENDELSON,
STUART E. HERSH, RENAY FRYM, NOAM
ROZENMAN, ELENA ROZENMAN and TZVI
ROZENMAN

By:_____
    One of their attorneys

David J. Strachman
Robert S. Parker
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

Robert D. Cheifetz
Daniel A. Shmikler
Sperling & Slater, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
(312) 641-3200
(312) 641-6492 (fax)

**Exhibit A**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JENNY RUBIN, )
DEBORAH RUBIN, )
DANIEL MILLER, )
ABRAHAM MENDELSON, )
STUART E. HERSCH, ) Case No.: 1:05-MC-10079
RENAY FRYM, )
NOAM ROZENMAN, )
ELENA ROZENMAN and )
TZVI ROZENMAN )
)
          Plaintiffs — Judgment Creditors, )
)
v. )
)
THE ISLAMIC REPUBLIC OF IRAN, )
(a/k/a Iran, The Republic of Iran, Republic of Iran, )
The Government of Iran, Iranian Government, and )
Imperial Government of Iran), )
THE IRANIAN MINISTRY OF INFORMATION )
AND SECURITY, )
AYATOLLAH ALI HOSEINI KHAMENEI, )
ALI AKBAR HASHEMI-RAFSANJANI and )
ALI FALLAHIAN-KHUZESTANI )
)
          Defendants -- Judgment Debtors, )
)
v. )
)
MUSEUM OF FINE ARTS, a not-for-profit corporation )
(a/k/a Boston MFA), HARVARD UNIVERSITY, )
PRESIDENT AND FELLOWS OF HARVARD )
COLLEGE, HARVARD UNIVERSITY ART MUSEUMS, )
BUSCH-REISINGER MUSEUM, FOGG ART MUSEUM, )
SACKLER MUSEUM, SEMITIC MUSEUM, and )
PEABODY MUSEUM OF ARCHAEOLOGY AND )
ETHNOLOGY )
)
          Trustee Process Defendants. )
)

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ESTABLISHING THAT NO PERSON OTHER THAN IRAN MAY ASSERT IRAN'S SOVEREIGN IMMUNITY DEFENSES UNDER §§ 1609 AND 1610 OF THE FSIA

The Trustee Process Defendants have filed Responses to Plaintiffs' trustee process summonses, as well as a Motion to Quash Summons and to Dissolve Attachment By Trustee Process, which seek to extinguish this proceeding summarily on the grounds that Iran's assets are immune from attachment and execution under §§ 1609 – 1610 of the Foreign Sovereign Immunities Act ("FSIA").

Pursuant to Fed.R.Civ.P. 56(a), the Plaintiffs hereby move for entry of partial summary judgment against the Trustee Process Defendants establishing that no person other than the defendant, Islamic Republic of Iran ("Iran") has standing to assert Iran's sovereign immunity defenses to attachment and execution under §§ 1609 – 1610 of the FSIA.

The determination of whether anyone other than Iran may assert Iran's sovereign immunity defenses to attachment and execution is a purely legal question. There is no genuine issue as to any material fact to warrant a trial or fact-finding on this issue. Thus, Plaintiffs are entitled to partial summary judgment in their favor on this issue as a matter of law.

In support of this Motion, Plaintiffs rely upon the pleadings filed in this proceeding, the attached Memorandum, the *Affidavit of David J. Strachman,* the *Affidavit of Georgia J. Asimakopoulos* dated April 26, 2005, the *Affidavit of Georgia J. Asimakopoulos* dated July 25, 2005 and other Exhibits filed concurrently herewith.

## Concise Statement Of Material Facts Of Record
## As To Which The Plaintiffs Contend There Is No Genuine Issue To Be Tried.

Pursuant to Local Rule 56.1, Plaintiffs submit the following concise statement of material facts of record as to which they contend there are no genuine issues to be tried:

1.   Plaintiffs are American citizens who were harmed by a triple suicide bombing carried out by the terrorist group Hamas on September 4, 1997, at an outdoor

pedestrian mall in Jerusalem, Israel. <u>Rubin v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258 (D.D.C. 2003).

2.        Plaintiffs brought suit in the United States District Court for the District of Columbia ("D.C. Court") under 28 U.S.C. §1605(a)(7) against Iran and other parties for their provision of training and other material support and assistance to the Hamas terrorists who carried out the bombing attack. <u>Rubin v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258 (D.D.C. 2003)

3.        On September 10, 2003, the D.C. Court entered judgment under 28 U.S.C. §1605(a)(7) in favor of Plaintiffs and against Iran and the other defendants, jointly and severally, in the total amount of $71,500,000.00 in compensatory damages ("judgment"), and for punitive damages against all defendants except The Islamic Republic of Iran ("Iran"), in the amount of $187,500,000.00. The total owed on the judgment is $259,000,000.00. A copy of the judgment as registered in this Court is appended hereto as "Exhibit A".

4.        To date, the Plaintiffs have recovered $399,001.00 upon the judgment. Defendants have failed to pay the balance owed under the judgment. <u>See</u> Affidavit of David J. Strachman, ("Exhibit B").

5.        The amount of the judgment for compensatory damages due and unpaid is $71,100,999.00 excluding post-judgment interest.

6.        On February 10, 2005, the Plaintiffs registered their judgment with this Court, pursuant to 28 U.S.C. §1963. Docket No. 1.

7.        On March 28, 2005, the Plaintiffs filed a Motion for Order of Attachment by Trustee Process as to the Trustee Process Defendants listed in the caption above (collectively hereinafter: ("the Trustee Process Defendants").[1] Docket No. 2.

---

[1] Other claims against the Trustee Process Defendants have been raised in the past in respect to antiquities and

8.          On or about April 15, 2005, the Plaintiffs served Iran with documents evidencing the registration of their judgment against Iran in this Court along with the Motion for Order of Attachment by Trustee Process with the pleadings and exhibits thereon. See Affidavit of Georgia J. Asimakopoulos, ¶2, dated April 26, 2005, ("Exhibit D").

9.          On or about April 28, 2005, the Summonses to the Trustee Process Defendants were approved by and filed with the Court.

10.          On May 16, 2005, the Plaintiffs served the Summonses on the Trustee Process Defendants. Docket Nos. 6, 7.

11.          On June 3, 2005, Trustee Process Defendant the Museum of Fine Arts ("MFA") filed a Response to the trustee process summons asserting that any property of Iran in its possession is immune from execution pursuant to § 1610 of the FSIA. MFA Response at 3.

12.          On June 27, 2005, Trustee Process Defendants Harvard University, President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archaeology and Ethnology (hereinafter collectively "Harvard") filed a Response to the trustee process summons asserting that any property of Iran in its possession is immune from execution pursuant to § 1610 of the FSIA. Harvard Response at 2.

13.          On June 27, 2005, Harvard filed a Motion to Quash Summons and to Dissolve Attachment By Trustee Process ("Motion to Quash") seeking a dispositive ruling that any property of Iran in its possession is immune from execution under §§ 1609 – 1610 of the FSIA.

---

artifacts from other parts of the world. Descriptions of these efforts are attached collectively hereto as "Exhibit C".

14.     All Trustee Process Defendants are seeking to extinguish this proceeding summarily, on the grounds that Iran's assets are immune from attachment and execution under §§ 1609 – 1610 of the FSIA.

15.     On June 27, 2005, the Plaintiffs served upon all Trustee Process Defendants Requests for the Production of Documents in aid of execution in order to determine ownership of the Iranian antiquities. See Plaintiffs' Requests for the Production of Documents "Exhibit E".

16.     On or about the 14th, 15th and 25th day of July 2005, the Plaintiffs served copies of the Trustee Process Summonses to Harvard and the MFA and Process Receipt and Returns upon Iran. See Affidavit of Georgia J. Asimakopoulos, ¶2, dated July 25, 2005 ("Exhibit F").

17.     Trustee Process Defendants have not communicated with the government of Iran since the initiation of this proceeding, and have never been requested by Iran to assert legal defenses on Iran's behalf. *Memorandum of Law of Harvard Parties in Support of Motion to Quash Summons and to Dissolve Attachment by Trustee Process*, p. 17; *Verified Response of the Museum of Fine Arts* at 2.

## Local Rule 7.1(A)(2) Certification.

The undersigned counsel for the Plaintiffs certifies that he has conferred with counsel for the Trustee Process Defendants and has attempted in good faith to resolve or narrow the issues herein.

## Request for Oral Argument.

Plaintiffs respectfully request oral argument on this Motion, which Plaintiffs believes will assist the Court in its disposition hereof.

WHEREFORE, Plaintiffs pray that this Court:

(1)      Enter an order for partial summary judgment in favor of Plaintiffs and against the Trustee Process Defendants establishing that no person other than the defendant Islamic Republic of Iran has standing to assert Iran's sovereign immunity defenses to attachment and execution under §§ 1609 – 1610 of the FSIA; and

(2)      Grant Plaintiffs such other and further relief as the Court deems just and proper.


Respectfully Submitted,

Jenny Rubin, et al.


By their attorneys,

/s/ Richard J. Grahn
Richard J. Grahn, Esq., (BBO #206620)
Edward V. Colbert, III, Esq., (BBO #566187)
Georgia J. Asimakopoulos, Esq., (BBO #658232)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800


/s/ David J. Strachman, Esq.    (GJA)
David J. Strachman, Esq., (BBO #660136)
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700

Dated: July 25, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN,<br>DEBORAH RUBIN,<br>DANIEL MILLER,<br>ABRAHAM MENDELSON,<br>STUART E. HERSCH,<br>RENAY FRYM,<br>NOAM ROZENMAN,<br>ELENA ROZENMAN and<br>TZVI ROZENMAN,<br><br>   Plaintiffs — Judgment Creditors,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>THE IRANIAN MINISTRY OF INFORMATION<br>AND SECURITY,<br>AYATOLLAH ALI HOSEINI KHAMENEI,<br>ALI AKBAR HASHEMI-RAFSANJANI and<br>ALI FALLAHIAN-KHUZESTANI<br><br>   Defendants – Judgment Debtors,<br><br>v.<br><br>MUSEUM OF FINE ARTS, a not-for-profit corporation<br>(a/k/a Boston MFA), HARVARD UNIVERSITY, et al.<br><br>   Trustee Process Defendants. | Case No.: 1:05-MC-10079 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ESTABLISHING THAT NO PERSON OTHER THAN
IRAN MAY ASSERT IRAN'S SOVEREIGN IMMUNITY DEFENSES
UNDER §§ 1609 AND 1610 OF THE FSIA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................iii-iv

I.    BACKGROUND AND TRAVEL......................................................1-5

II.    ONLY IRAN HAS STANDING TO ASSERT A SOVEREIGN
IMMUNITY DEFENSE TO THIS ENFORCEMENT
PROCEEDING.........................................................................5-10

III.    PARTIAL SUMMARY JUDGMENT IS APPROPRIATE
AND IN THE INTEREST OF JUDICIAL
ECONOMY..........................................................................11-12

CONCLUSION.........................................................................12

## TABLE OF AUTHORITIES

Acree v. Republic of Iraq, 276 F.Supp.2d 95 (D.D.C. 2003) *rev'd on other grounds* 370 F.3d 41 (D.C.Cir. 2004)..............................................................8, 10

Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279 (11th Cir. 1999)...........................................................................................8, 10

Brown v. Medtronic, 852 F.Supp. 717 (S.D.Ind. 1994)...................................12

Caribbean Trading and Fidelity Co., 948 F.2d 111 (2nd Cir. 1991).....................11

Davis v. Bryan, 810 F.2d 42 (2nd Cir. 1987)................................................9

Didi v. Destra Shipping Co., Ltd., 1993 WL 8662 (E.D.La. 1993).......................8

FDIC v. Giammettei, 34 F.3d 51 (2nd Cir. 1994)..........................................12

Hulmes v. Honda Motor, 924 F.Supp. 673 (D.N.J. 1996)................................12

International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins. Co., 944 F.Supp. 886 (M.D. Fla. 1996). .....................................................12

Liberty Mutual Insurance Co. v. Greenwich Ins. Co., 286 F.Supp.2d 73 (D. Mass. 2003)..........................................................................................9

Malewicz v. City of Amsterdam, 362 F.Supp.2d 298 (D.D.C. 2005)....................5

Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc., 385 F.3d 1206 (9th Cir. 2004)..........................................................................................11

National Union Fire Insurance Company v. The People's republic of The Congo, (N.D.Ill. December 5, 1991) (No. 91-C3172)......................................8, 9, 11

New York Land Co. v. Republic of Philippines 634 F.Supp. 279 (S.D.N.Y. 1986)........................................................................................6, 7

Presbyterian Church of Sudan v. Talisman Energy, 244 F.Supp.2d 289 (S.D.N.Y.)......................................................................................8, 10

Republic of Philippines v. Marcos, 806 F.2d 344 (2nd Cir. 1986)......................7

Rhode Island Hospital Trust National bank v. Ohio Casualty Insurance Company, 789 F.2d 74 (1st Cir. 1986)...............................................................................9

Rubin v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003).................2

Rubin v. Islamic Republic of Iran, 2005 WL 670770 (D.D.C. 2005)....................5

Sesostris v. Transportes Navales, 727 F.Supp. 737 (D. Mass. 1989).....................5

Transmatic, Inc. v. Gulton Industries, Inc., 53 F.3d 1270 (Fed. Cir. 1995)..............................................................................................12

Tri-State Mint, Inc. v. Riedel Environmental Services, 29 F.3d 424 (8th Cir. 1994)..............................................................................................12

Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480 (1983).........................................................................................9, 10

Walker International Holdings Ltd. v. The Republic of Congo, 395 F.3d 229 (5th Cir. 2004), cert. denied 125 S. Ct. 1841 (2005)............................................11, 12

Walsh v. U.S., 31 F.3d 696 (8th Cir. 1994)..............................................12

Wilmington Trust v. United States Dist. Court, 934 F.2d 1026 (9th Cir. 1991)......................................................................................7, 8, 12

W.S.A. Inc. v. ACA Corp., 1997 WL 551599 (S.D.N.Y. 1996)..........................9

## CONSTITUTIONS, STATUTES AND RULES

28 U.S.C. §1602 et seq., Foreign Sovereign Immunities Act (FSIA)........................

...............................................................2, 4, 5, 6, 7, 10, 11, 13

28 U.S.C. §1963.........................................................................3

Federal Rules of Civil Procedure 69.......................................................4

Terrorism Risk Insurance Act §201.......................................................5

iv

## I.    BACKGROUND AND TRAVEL

The Plaintiffs are American citizens who were severely harmed by a triple suicide bombing carried out by the terrorist group Hamas on September 4, 1997, at an outdoor pedestrian mall in Jerusalem, Israel.

On July 31, 2001, Plaintiffs brought suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §1605(a)(7), in the United States District Court for the District of Columbia ("D.C. Court") against the Islamic Republic of Iran ("Iran") and other Iranian government defendants for their provision of training and other material support and assistance to the Hamas terrorists who carried out the bombing attack.    Section 1605(a)(7) of the FSIA creates subject-matter jurisdiction and abrogates the sovereign immunity of designated foreign state sponsors of terrorism (such as Iran) in civil actions for money damages "for personal injury or death that was caused by an act of torture, extra-judicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources…for such an act…".  28 U.S.C. 1605(a)(7).

Following a four-day evidentiary hearing conducted pursuant to 28 U.S.C. §1608, the D.C. Court found "clear and convincing evidence" that Iran and the other defendants provided terrorist training and other material assistance to the Hamas terrorists who executed the bombing attack.  The D.C. Court found Iran and the other defendants liable for the torts of battery, assault, and intentional infliction of emotional distress against the Plaintiffs.  Rubin v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003).

On September 10, 2003, the D.C. Court entered judgment in favor of Plaintiffs against Iran and the other defendants, jointly and severally, in the total amount of $71,500,000.00 in compensatory damages ("Judgment").  A copy of the judgment as

registered in this Court is appended to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit A".

To date, the Plaintiffs have recovered $399,001.00 upon the judgment. Defendants have failed to pay the balance owed under the judgment. See Affidavit of David J. Strachman appended to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit B". The portion of the Judgment for compensatory damages that remains due and unpaid is $71,100,999.00, excluding post-judgment interest.[1] Iran has refused to honor the Judgment.

On February 10, 2005, the Plaintiffs registered their Judgment in this Court pursuant to 28 U.S.C. §1963 and the Judgment therefore has "the same effect as a judgment of" this Court. Id.

On March 28, 2005, the Plaintiffs filed a Motion for Order of Attachment by Trustee Process, seeking to secure antiquities and artifacts held by the Trustee Process Defendants that, according to highly credible information received by Plaintiffs, remain the legal property of Iran.[2]

The documents evidencing the registration of the Judgment in this Court and the pleadings on Plaintiffs' Motion for Order of Attachment were served upon Iran and the other defendants on or about April 15, 2005. See Affidavit of Georgia J. Asimakopoulos,

---

[1] The D.C. Court also imposed punitive damages against all defendants except Iran in the amount of $187,500,000.00.

[2] As discussed in plaintiffs' Memorandum in support of their Motion for Order of Attachment by Trustee Process, most of these items came into the possession of the Trustee Process Defendants during the course of several excavations in Iran during the 1920's and 30's. Plaintiffs will demonstrate when this proceeding reaches the merits phase that these antiquities and artifacts were removed from Iran without Iran's permission or knowledge and therefore remain the property of Iran under applicable Iranian, international and domestic law. Similar claims against the Trustee Process Defendants have been raised in the past in respect to antiquities and artifacts from other parts of the world. Descriptions of these efforts are attached collectively to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit C".

dated April 26, 2005, attached to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit D".

After the Summonses to the Trustee Process Defendants were approved by and filed with the Court, the Plaintiffs served the Summonses on the Trustee Process Defendants on May 16, 2005.

On June 3, 2005, one of the Trustee Process Defendants, the Museum of Fine Arts ("MFA"), filed a Response to the trustee process summons.  In its Response, the MFA admits that the MFA holds antiquities and other property that originated in Iran, but claims that these items are not owned by Iran.[3]  The MFA's Response further asserts that even if this property does belong to Iran, it is immune from execution pursuant to § 1610 of the FSIA.  MFA Response at 3.

On June 27, 2005, the other Trustee Process Defendants, i.e. Harvard University, President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archaeology and Ethnology (hereinafter collectively "Harvard"), filed their Response to the trustee process summons.  Like the MFA, Harvard admits in its Response that it holds antiquities and other property that originated in Iran, but asserts that this property is not owned by Iran.[4]  Echoing the MFA, the Response filed by

---

[3] In light of the MFA's response, Plaintiffs served upon the MFA pursuant to Fed. R. Civ. P. 69 a request for the production of documents in aid of execution in order to determine the factual basis for the claims of ownership of these Iranian antiquities. A copy of the Plaintiffs' Request for Production of Documents is attached to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit E".

[4] In light of Harvard's response, Plaintiffs served upon Harvard pursuant to Fed. R. Civ. P. 69 a request for the production of documents in aid of execution in order to determine the factual basis for the claims of ownership of these Iranian antiquities. A copy of the Plaintiffs' Request for Production of Documents is attached to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit E".

13412/000/pld/13b                                    3

Harvard also claims that even if this property belongs to Iran, it is immune from execution pursuant to § 1610 of the FSIA. Harvard Response at 2.

In July 2005, the Plaintiffs served copies of the Trustee Process Summonses to Harvard and the MFA and Process Receipt and Returns upon Iran. See Affidavit of Georgia J. Asimakopoulos, ¶2, dated July 25, 2005, attached to Plaintiffs' Motion for Partial Summary Judgment as "Exhibit F".

On June 27, 2005, Harvard also filed a Motion to Quash Summons and to Dissolve Attachment By Trustee Process ("Motion to Quash"). By its Motion to Quash, Harvard seeks not only to quash the summons but also a dispositive ruling that the assets sought are immune from execution under §§ 1609 – 1610 of the FSIA.

In other words, both the MFA and Harvard are seeking to extinguish this proceeding summarily, on the grounds that Iran's assets are immune from attachment and execution under §§ 1609 – 1610 of the FSIA.

If it were necessary for Plaintiffs to respond to this immunity argument on the merits, they would demonstrate that the assets in question are subject to attachment and execution pursuant to both §201 of the Terrorism Risk Insurance Act ("TRIA") and §1610 of the FSIA. See e.g. Rubin v. Islamic Republic of Iran, 2005 WL 670770 (D.D.C. 2005) (writ of execution against Iranian property granted under §201 of TRIA); Malewicz v. City of Amsterdam, 362 F.Supp.2d 298 (D.D.C. 2005) (holding that exhibition of foreign state artwork by museums in the United States constitutes commercial activity under §1610 of the FSIA); Sesostris v. Transportes Navales, 727 F.Supp. 737, 744 (D.Mass. 1989) (commercial use by the foreign sovereign is not required under §1610).

Fortunately, however, both the Court and the parties will be spared the need to litigate the sovereign immunity claims raised by the Trustee Process Respondents (and the extensive briefing and arguments, and the complex decision and disposition, that litigation of those claims would entail) because, as shown below, as a matter of law only Iran has standing to assert its sovereign immunity defense in this proceeding.

Plaintiffs therefore now move for partial summary judgment establishing that no person other than Iran has standing to assert Iran's sovereign immunity under §§ 1609 – 1610 of the FSIA.

Taking the sovereign immunity claims off the table will dispose of Harvard's Motion to Quash in its entirety, and put to rest the immunity claims contained in the Responses filed by both Harvard and the MFA. Thus, once Plaintiffs' motion is granted, the sole question remaining in this proceeding will be the ownership of the property at issue. Entry of partial summary judgment on this matter will therefore significantly ease, expedite and simplify the conclusion of these proceedings, and so preserve significant judicial and party resources. [5]

## II.    ONLY IRAN HAS STANDING TO ASSERT A SOVEREIGN IMMUNITY DEFENSE TO THIS ENFORCEMENT PROCEEDING

It is well established throughout the federal circuits that a claim of sovereign immunity under the FSIA can only be asserted by the foreign state itself.

For example, in New York Land Co. v. Republic of Philippines 634 F.Supp. 279 (S.D.N.Y. 1986), the plaintiff obtained a preliminary injunction restraining assets of the defendants (former President of the Philippines, Ferdinand Marcos and his wife Imelda

---

[5]  Accordingly, the Plaintiffs are also filing currently herewith a motion to stay further briefing on the motion to quash pending disposition of the instant Motion for Partial Summary Judgment.

Marcos) controlled by third party trustees. The third parties moved to quash the injunction, asserting *inter alia* that the Marcoses were entitled to sovereign immunity under the FSIA. The United States District Court for the Southern District of New York summarily rejected this argument, finding that the third party trustees did not have standing to assert the Marcoses' sovereign immunity:

> The record holders of the Manhattan Properties raise the additional defenses that President Marcos is immune from suit under Philippine law (in particular a 1981 amendment to the Philippine Constitution) and is further protected by the Foreign Sovereign Immunity Act of 1976, 28 U.S.C. §§ 1602 *et seq.* Without reaching the merits of these defenses, it is sufficient to say that Mr. Marcos has not appeared in this action, and that <u>none of the appearing defendants is entitled to raise either defense on his behalf.</u>

> *Id.* at 290 (emphasis supplied).

The third-party trustees appealed, and the Second Circuit affirmed the holding of the district court that they were without standing to assert the Marcoses' sovereign immunity. <u>Republic of Philippines v. Marcos</u>, 806 F.2d 344, 360 (2nd Cir. 1986) ("Appellants ... claim that the Marcoses are entitled to sovereign immunity. We agree that appellants have no standing to assert this claim.").

The Ninth Circuit has also adopted this position. In <u>Wilmington Trust v. United States Dist. Court</u>, 934 F.2d 1026 (9th Cir. 1991), that Court explained its rationale for limiting claims of immunity to foreign states as follows:

> Congress intended the FSIA to supplant the earlier practice whereby a foreign sovereign would appeal to the State Department "to make a formal suggestion of immunity to the court." H.R. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6606. Congress transferred this decision to the courts. *Id.* <u>We hold that, based on the language of the statute and its legislative history, Congress intended requests for protection under the FSIA to originate from the foreign state party.</u>

Wilmington Trust v. United States Dist. Court, 934 F.2d 1026, 1032-3 (9th Cir. 1991) (emphasis supplied).

The Eleventh Circuit has adopted the same FSIA standing rule, expressly holding that, "[p]arties other than a foreign sovereign ordinarily lack standing to raise the defense of sovereign immunity." Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279, 1290 (11th Cir. 1999).

In addition to the Second, Ninth and Eleventh Circuits, it appears that every district court to have considered the question has followed the same rule. For example, in a recent decision, the United States District Court for the District of Columbia (which is the default venue for FSIA actions) held:

> The United States argues that its challenge to the Court's subject matter jurisdiction based on the defense of Iraq's restored sovereign immunity is a question of law that it has in common with the main action. Iraq's sovereign immunity, however, is not "the applicant's claim or defense." Instead, as is noted above, it is a defense that can be asserted only by Iraq.

Acree v. Republic of Iraq, 276 F.Supp.2d 95, 102 (D.D.C. 2003) rev'd on other grounds 370 F.3d 41 (D.C.Cir. 2004) (emphasis supplied). See also Presbyterian Church of Sudan v. Talisman Energy, 244 F.Supp.2d 289, 342 n. 42 (S.D.N.Y. 2003) ("Certainly, as a sovereign country, Sudan is potentially entitled to immunity under the Foreign Sovereign Immunities Act.... However, [defendant] lacks standing to raise an FSIA defense on Sudan's behalf."); Didi v. Destra Shipping Co., Ltd., 1993 WL 232075 at 2 (E.D.La. 1993) ("A party other than the alleged foreign state generally does not have standing to assert the defense of sovereign immunity as it relates to that foreign state."); National Union Fire Insurance Company v. The People's Republic of The Congo, (N.D.Ill. December 5, 1991) (No. 91-C3172) at 10 (attached hereto) (Third party

7

garnishee "has no standing to raise an immunity defense under" the FSIA on behalf of foreign state judgment debtor).[6]

In fact, there is nothing unusual about this rule. As the Supreme Court has explained, "sovereign immunity is an affirmative defense that must be specially pleaded." Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 494 n. 20 (1983) (quoting the House Report on the FSIA).

It is well established that affirmative defenses and personal defenses cannot be raised by third parties. Thus, for example, even though "a surety may generally raise the defenses available to its principal, this is not the case where such defenses are personal to the debtor or arise by operation of law." Liberty Mut. Ins. Co. v. Greenwich Ins. Co., 286 F.Supp.2d 73, 77 (D.Mass. 2003) (Noting the "inability of a third-party to raise a personal defense of a debtor"). *See also* Rhode Island Hospital Trust National Bank v. Ohio Casualty Insurance Company, 789 F.2d 74, 78-79 (1st Cir. 1986) ("a surety may not assert personal defenses of its principal, such as insanity, infancy, or duress, and also may not claim defenses that arise by operation of law, such as the statute of limitations."); W.S.A. Inc. v. ACA Corp., 1996 WL 551599 (S.D.N.Y. 1996) ("while [defendant] contends that the complaint is untimely as to [other defendants] it has no standing to raise the affirmative defense of statute of limitations on their behalf, nor may I consider its application sua sponte.") (citing Davis v. Bryan, 810 F.2d 42, 44 (2nd Cir. 1987)).

The sole exception to the rule that sovereign immunity may be asserted only by the foreign state itself, is when the presence of sovereign immunity – i.e. the absence of any of the exceptions to immunity enumerated in the FSIA – would negate the court's

---

[6] The Report and Recommendation in National Union apparently became final by operation of Fed.R.Civ.P. 72 since neither the docket nor the court file (which Plaintiffs examined) indicate that any objections were filed to it.

subject-matter jurisdiction. Since in such a case the court's subject-matter jurisdiction is in the balance, the court itself *sua sponte* must question whether the foreign state defendant is immune from suit, irrespective of whether the foreign state itself appears to defend the action. *See e.g.* Aquamar, 179 F.3d at 1290 ("When the court's jurisdiction rests on the presence of the foreign sovereign [in the case] the court may address the issue independently.) Verlinden, 461 U.S. at 494 n. 20 (Under § 1605 of the FSIA and 28 U.S.C. § 1330 "subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity. Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.") (citation omitted).[7]

However, the presence or absence of sovereign immunity can affect the court's subject-matter jurisdiction only in a plenary suit under §1605 of the FSIA (which is a jurisdictional provision) and thus sovereign immunity can be raised by someone other than the foreign state (i.e. by the court or another party) only in such a plenary suit.

By contrast, the immunities provided in §§1609-1610 of the FSIA, which govern attachment and execution of property of a foreign state, are not jurisdictional and cannot affect the Court's subject-matter jurisdiction:

---

[7] When the existence *vel non* of sovereign immunity impacts subject-matter jurisdiction, some courts have allowed parties other than the foreign state to raise the immunity issue. *See* Aquamar, 179 F.3d at 1290 ("Because federal jurisdiction depended upon PNB's presence, the fact that plaintiffs, rather than PNB, raised the issue of sovereign immunity did not foreclose the district court's inquiry.").

However, other courts have held that in such a case – i.e. even when subject-matter jurisdiction is a stake – only the court itself, and not other parties, may raise the immunity question. *See e.g.* Acree, 276 F.Supp.2d at 102 (denying a motion of the United States to intervene in order to assert Iraq's FSIA immunity since "Iraq's sovereign immunity. . . is a defense that can be asserted only by Iraq [and] the Court can address its subject matter jurisdiction *sua sponte* and has done so ..."); Presbyterian Church, 244 F.Supp.2d at 342 n. 42 (holding that Sudan's non-sovereign co-defendant "lacks standing to raise an FSIA defense on Sudan's behalf.")

[T]he FSIA preserved a distinction between two different aspects of foreign sovereign immunity: jurisdictional immunity – that is, a foreign sovereign's immunity from actions brought in United States courts – and immunity from attachment – a foreign sovereign's immunity from having its property attached or executed upon. *See Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002). The FSIA's structure demonstrates that it preserves the distinction between these two types of immunity. On the one hand, § 1604 establishes a default rule that a foreign sovereign will be immune from the jurisdiction of United States courts unless one of the exceptions set out in § 1605 applies; on the other hand, § 1609 provides that the property of foreign states and their instrumentalities will be immune from attachment and execution unless one of the exceptions set out in § 1610 applies.

Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems, 385 F.3d 1206, 1218 (9th Cir. 2004). *See also* National Union Fire Insurance Company at 8 ("We conclude . . . that the immunity rules in § 1609 and 1610 for execution upon foreign state property are not rules of subject matter jurisdiction."); *Cf.* Caribbean Trading and Fidelity Co., 948 F.2d 111, 115 (2nd Cir. 1991) ("[T]he applicability and effect of Section 1609 are not matters, like subject-matter jurisdiction, that may be raised at any time by a foreign state.")[8]

Therefore, since the immunity provided in §§ 1609-1610 is utterly irrelevant to the Court's subject-matter jurisdiction in the instant trustee process proceeding, Iran alone can assert that immunity. [9]

---

[8] Accordingly, § 1604 is entitled "immunity of a foreign state from jurisdiction" and § 1605 is entitled "general exceptions to the jurisdictional immunity of a foreign state." By contrast, §§ 1609 and 1610 neither mention subject matter jurisdiction nor reference the term "jurisdiction."

[9] The sole decision to the contrary appears to be Walker International Holdings Ltd. v. The Republic of Congo, 395 F.3d 229, 233 (5th Cir. 2004), *cert. denied* 125 S. Ct. 1841 (2005). Walker is extremely weak authority at best, in light of the surprising fact that the Fifth Circuit overlooked all the previous on-point case law and mistakenly believed it was writing on a *tabula rasa*. In the words of the Fifth Circuit: "Walker cites no authority and we were unable to find any authority for the proposition that it is the sovereign's *exclusive* right to raise the issue of sovereign immunity under the FSIA." *Id.*

Thus, whether due to a lack of proper briefing by appellant or otherwise, the Fifth Circuit simply missed the extensive authority from the Second, Ninth and Eleventh Circuits and from the federal district court cases referenced above, which expressly and uniformly held that third parties may not assert sovereign

13412/000/pld/13b

10

## III.   PARTIAL SUMMARY JUDGMENT IS APPROPRIATE AND IN THE INTEREST OF JUDICIAL ECONOMY

Summary judgment "is especially appropriate where the issues in dispute are purely legal . . ." Brown v. Medtronic, 852 F.Supp. 717, 718 (S.D.Ind. 1994). *See also* Walsh v. U.S., 31 F.3d 696, 698 (8th Cir. 1994) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); Tri-State Mint, Inc. v. Riedel Environmental Services, 29 F.3d 424, 426 (8th Cir. 1994) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); Hulmes v. Honda Motor, 924 F.Supp. 673 (D.N.J. 1996)(motion presenting only questions of law is ripe for summary adjudication).

The question of whether anyone other than Iran may assert Iran's sovereign immunity is a purely legal question about the standing to assert an affirmative defense. The federal courts commonly grant partial summary judgment disposing of a defendant's affirmative defense. *See e.g.* FDIC v. Giammettei, 34 F.3d 51, 54-55 (2nd Cir. 1994) (holding and citing precedents for the rule that summary judgment may be utilized to eliminate an affirmative defense, and affirming the district court's grant of partial summary judgment disposing of defendants' affirmative defenses); Transmatic, Inc. v. Gulton Industries, Inc., 53 F.3d 1270, 1274-1275 (Fed. Cir. 1995) (affirming district court's grant of partial summary judgment dismissing defendant's affirmative defense); International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins. Co.,

---

immunity defenses on behalf of foreign states. Had this unanimous prior authority been before it, the Fifth Circuit might well have concluded that Congress "intended requests for protection under the FSIA to originate from the foreign state party." Wilmington Trust, *supra* at 1032-3. In any case, since Walker does not even address, much less provide a rationale for diverging from, the wall-to-wall case law of the other circuits, it can have no real weight as precedent.

944 F.Supp. 886, 891 (M.D.Fla. 1996) ("partial summary judgment may be used by the Court to dispose of affirmative defenses.")

Obviously, it would be a glaring and egregious waste of precious time and resources, both for the Court and the parties, to litigate and determine the amenability of the assets held by the Trustee Process Respondents to execution under TRIA and the FSIA when Iran has not made any claim of immunity and no other party has standing to do so.

Plaintiffs' motion for partial summary judgment dispositively settling the question of who may raise a sovereign immunity defense in this case, is therefore well-founded and eminently appropriate.

## Conclusion

For the foregoing reasons, the Plaintiffs respectfully request that the Court enter partial summary judgment establishing that no party other than Iran has standing to assert Iran's foreign sovereign immunity defenses under 28 U.S.C. §§ 1609-1610.

Respectfully Submitted,

Jenny Rubin, et al.

By their attorneys,


/s/ Richard J. Grahn
Richard J. Grahn, Esq., BBO #206620
Edward V. Colbert, III, Esq., BBO #566187
Georgia J. Asimakopoulos, Esq., BBO #658232
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800


/s/ David J. Strachman
David J. Strachman, Esq., BBO #660136
McIntyre, Tate, Lynch & Holt
321 South Main Street, Ste. 400
Providence, RI 02903
(401) 351-7700


Dated: July 25, 2005

DOCKETED

DEC 6 - 1991

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA. )
                                                    )
                Plaintiff,              )       91 C 3172
                                                    )
        v.                                      )       Judge Norgle      Filmed on____
                                                    )
THE PEOPLE'S REPUBLIC OF THE        )       Magistrate Judge Weisberg
CONGO,                                       )
                                                    )
                Defendant.             )

Sent for Microfilming

DEC 6 - 1991

### Report and Recommendation on Pending Motions

On October 23, 1987 plaintiff National Union Fire Insurance Co. of Pittsburgh, Pa.
(NUFI) obtained a judgment by default against the Peoples Republic of the Congo (The Congo)
for $ 22,457,273.62 in a British court. The Congo had defaulted in repayment of a loan made
pursuant to a Credit Facility Agreement dated December 13, 1983. The background is
summarized in National Union Fire Insurance Co. v. Peoples Republic of The Congo, 729 F.
Supp. 936 (S.D.N.Y. 1989), recognizing and enforcing the judgment.

On May 22, 1991 NUFI registered the New York judgment in this district. On August
14, 1991 NUFI noticed a motion before the District Judge in New York for permission to
execute on the judgment as required by §1610(c) of the Foreign Sovereign Immunities Act
(FSIA), 28 U.S.C. §§1330, 1332(a)(4), 1441(d) and 1602-1611. On the same date NUFI
served Citations to Discover Assets on several parties in this district including Amoco Congo
Exploration Company, Amoco Congo Petroleum Company, Amoco Corporation and Amoco
Production Company (collectively, Amoco). As permitted by Illinois Supreme Court Rule
277(b) and Ill. Rev Stat. (1989) Ch. 110 ¶ 2-1402(a), made applicable by Fed. R. Civ. Proc.
69(a), the citations were signed by the Clerk of the court. They ordered Amoco to appear on
September 12, 1991 to be examined under oath concerning indebtedness due to the judgment
debtor. Judgment debtor was defined to include not only The Congo but also any of its

84

agencies or instrumentalities, specifically including Societe Nationale de Recherches et d'Exploitation Petrolieres (Hydro-Congo). The citations also ordered the production of documents and prohibited Amoco from making any transfer of property to the judgment debtor.

Amoco and The Congo each moved to vacate and quash the citations. They also moved for protective orders limiting any discovery by NUFI and vacating deposition notices and document demands subsequently served by NUFI. Extensive briefs and affidavits were filed. On October 9, 1991 Judge Norgle referred to this court all matters regarding these supplemental post-judgment proceedings pursuant to 28 U.S.C. § 636(b)(l)(A).1/

This court set November 1, 1991 for a hearing and ruling on all pending motions. Amoco subsequently noticed for that date an emergency motion to vacate or lift restraining orders or for an immediate ruling on its motion to vacate, stating objections to a proposed settlement between NUFI and The Congo. NUFI noticed for the same date before Judge Norgle its motion for entry of a Stipulated Turnover Order (Order) pursuant to a settlement agreement entered into by The Congo and NUFI dated as of October 14, 1991 as amended October 30, 1991 (Settlement Agreement). This court has been advised that the Order which is dated November 1, 1991 was entered in chambers by Judge Norgle based on his impression that all matters in controversy had been settled. Upon learning of Amoco's objections he stayed the Order until November 15, 1991 and on November 13, 1991 extended that stay until this court has ruled on pending motions and he has ruled on any objections to those rulings.

A further hearing was held on November 1, 1991. On November 8, 1991 the Amoco parties moved to vacate or amend the Order. NUFI and Amoco have filed briefs on the central issue raised by Amoco's objections to the Order, whether the court has subject matter jurisdiction and power to enter the Order.

---

1/ The referral order has an X in the box opposite local Rule 1.70 C 2 relating to non-dispositive pretrial matters but the referenced statement below is to "all matters regarding supplemental (post-judgment) proceedings." As this court stated at the hearing on November 8, 1991, Judge Norgle has confirmed our view that the order was intended to refer all supplemental proceedings, dispositive as well as non-dispositive.

On November 1, 1991, Judge Norgle granted the motion of counsel for The Congo to withdraw. NUFI has submitted a copy of a letter addressed to this court dated November 8, 1991 signed by the Delegate Minister For Mines And Energy and The Secretary of State For The Budget of the Republic of The Congo stating that the settlement with NUFI received the unanimous approval of the government as well as that of the Superior Council of The Republic of The Congo, its legislative body, and stating their wish to conclude this litigation with the settlement recently signed with NUFI.

At a hearing on November 26, 1991, arguments were heard on Amoco's objections to particular provisions of the Order. NUFI and Amoco were directed to submit an order revised in accordance with oral rulings delivered on that date.

Background

Amoco is engaged in a joint venture to explore for and sell Congolese oil pursuant to a May 25, 1979 agreement (the Convention) between the Congo, certain U.S. and Canadian oil companies (one of which later transferred its interest to Amoco) and Hydro-Congo. Berkman Affidavit, Exh. C. The Congo granted an exploration permit to Hydro-Congo for the benefit of the joint venture. The Convention exempts the companies in the joint venture (certain Amoco subsidiaries, Hydro-Congo and Kufpec, a Kuwaiti company) from all Congolese taxes except for mining royalties based on oil production and a corporate income tax. Arts. 6.01 and 7.01. Operations under the permit are also regulated by a Joint Operating Agreement (JOA) between the companies.

In § 8.8(b) of the Credit Facility Agreement The Congo, for itself and any Government Property located outside of the Congo, waived in any court in which proceedings related to the Agreement are commenced, sovereign immunity from suit, jurisdiction, pre-judgment or post-judgment attachment in aid of execution of a judgment, set-off and other legal process.

Under the FSIA, § 1604, subject to international agreements existing at the time the FSIA was enacted, a foreign state is immune from the jurisdiction of U.S. courts except as

3

provided in §§ 1605 to 1607. One of the exceptions is any case in which the foreign state has waived its immunity. Section 1605(a)(1). The District Court has undisputed subject matter jurisdiction under § 1330(a) and personal jurisdiction under § 1330(b) because of The Congo's waiver of immunity from jurisdiction in the Credit Facility Agreement.

The Settlement Agreement

The parties to the Settlement Agreement are The Congo, NUFI and American International Group (AIG). Provisions in which AIG agrees to assist The Congo in procuring financing do not concern us. Pertinent provisions of the Settlement Agreement are the following:

1. The Congo transfers to NUFI all of its right, title and interest in the Royalty Interest, defined as the first 50% of all monies due to The Congo as mineral royalties pursuant to the Convention. Sec. 1.02 and Schedule I.

2. The Congo agrees to join NUFI in notifying the parties to the Joint Operating Agreement of the sale of the Royalty Interest to NUFI and directing them to make all payments due to The Congo in respect of the Royalty Interest directly to The Congo. Sec. 1.03.

3. Upon the entering into effect of the Settlement Agreement, NUFI agrees to withdraw any and all pending legal attachments instituted by it anywhere in the world regarding assets of The Congo. Sec. 1.01(a).

4. Under § 9.11 as amended (a) the Settlement Agreement became effective as of its date, October 14, 1991 and (b) NUFI's obligation to withdraw the citations served upon Amoco is to be accomplished by the entry of an order by this district court substantially in the form of the Order, a copy of which is attached as Annex E to the Amendment dated October 29, 1991 (referred to in NUFI's motion papers as dated October 30, 1991).

The Order

The Order requires Amoco to pay over to NUFI all amounts owed or to be owed by

4

Amoco to The Congo in respect of the royalty interest, specifically including any amounts owed on behalf of Kufpec or Hydro-Congo. All such payments are to be applied against NUFI's outstanding judgment against The Congo. The Order states that it shall constitute a judgment lien on the royalty interests due to The Congo and, subject to the court retaining jurisdiction to enforce the parties' obligations under the Order, all proceedings on all citations to discover assets issued in this case are terminated.

The Issues

There were five issues raised by the motions to quash the citations issued to Amoco and the motions for protective orders filed by Amoco and The Congo.

1.  Are the restraining orders and prohibitions void because the citations were issued without a prior court order as required by § 1610(c)?

2.  Are the taxes and mineral royalty payments owed by Amoco to The Congo immune from attachment or execution under the FSIA?

3.  Are the citations improper because they restrain payments to and seek discovery about Hydro-Congo and other state-owned Congolese companies that are not the judgment debtor?

4.  Is Amoco in any event entitled to a set-off greater than the amount of NUFI's judgment?

5.  Is NUFI entitled to any discovery? If so, should that discovery be limited based on immunity, relevance and confidentiality concerns?

All of these issues are moot as to The Congo. By entering into the Settlement Agreement and stipulating to the entry of the Order, and by the letter addressed to this court dated November 8, 1991, the Congo has effectively withdrawn its motions to quash and for a protective order.

As to Amoco, Issue 1 is mooted by the Settlement Agreement and the Order. The Congo has withdrawn its objection based on § 1610(c) and Amoco has not raised that issue in

its objections to the Order.

As to Amoco, Issue 3 need not be addressed in view of the Settlement Agreement since the termination of the citation proceedings will leave Amoco free to make all payments due to Hydro-Congo and other state-owned Congolese companies.

As to Amoco, Issues 4 and 5 are also moot since Amoco has only claimed a set-off based on amounts due to Amoco from Hydro-Congo. No set-off has been claimed with respect to amounts due to The Congo. Upon termination of the citations NUFI's discovery requests will be withdrawn.

As to Amoco, Issue 2 is moot with respect to taxes due from Amoco to The Congo which are not affected by the settlement or the Order. This issue remains in dispute as to mineral royalty payments due to The Congo under Article VII of The Convention. Amoco's position is that those royalty payments are not property in the United States used for commercial activity in the United States as required by § 1610(a) and for that reason the court lacks subject matter jurisdiction or power to enter any order requiring Amoco to make such payments to NUFI.

<u>Jurisdiction and Standing Under the FSIA</u>

These are the pertinent provisions of the FSIA:

§ 1330 - **Actions Against Foreign States**

(a)    The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

§ 1604 - **Immunity Of A Foreign State From Jurisdiction**

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

§ 1605 - General Exceptions To The Jurisdictional Immunity Of A Foreign State

(a)   A foreign state shall not be immune from the jurisdiction of courts
      of the United States or of the States in any case--

      (1)   in which the foreign state has waived its immunity
            either explicitly or by implication, notwithstanding
            any withdrawal of the waiver which the foreign
            state may purport to effect except in accordance
            with the terms of the waiver;...

§ 1609 - Immunity From Attachment and Execution of Property Of A Foreign
        State

      Subject to existing international agreements to which the United
      States is a party at the time of enactment of this Act the property
      in the United States of a foreign state shall be immune from
      attachment arrest and execution except as provided in sections
      1610 and 1611 of this chapter.

§ 1610 - Exceptions To The Immunity From Attachment Or Execution

      (a) The property in the United States of a foreign state, as defined
      in section 1603(a) of this chapter, used for a commercial activity
      in the United States, shall not be immune from attachment in aid
      of execution, or from execution, upon a judgment entered by a
      court of the United States or of a State after the effective date of
      this Act, if --

      (1)   the foreign state has waived its immunity from
            attachment in aid of execution or from execution
            either explicitly or by implication, notwithstanding
            any withdrawal of the waiver the foreign state may
            purport to effect except in accordance with the terms
            of the waiver, or...

Amoco's arguments are,

1.    FSIA § 1610 is the sole statutory basis on which the Stipulated
      Turnover Order can issue. Argentine Republic v. Amerada Hess
      Shipping Corp., 488 U.S. 428, 434 (1989); Verlinden B.V. v.
      Central Bank of Nigeria, 461 U.S. 480, 489 (1983).

2.    Section 1610 does not confer jurisdiction to attach foreign state
      property unless the property is "in the United States" and "used
      for a commercial activity in the United States."

7

3. The mineral royalty payments due to The Congo under the Convention are not commercial property in the United States as required by § 1610.

4. Section 1610 expressly denies courts the power to attach or execute upon non commercial foreign state property not used for U.S. commercial activity.

NUFI responds: Amoco has no standing to assert The Congo's sovereign immunity. Amoco is a mere stake holder garnishee. It has standing to object to the Order only insofar as the Order would adversely affect Amoco.

Amoco insists that its attack on the Order is based on the court's lack of subject matter jurisdiction and power, matters which may be raised by any party or by the court sua sponte and at any time. We conclude however that the immunity rules in §§ 1609 and 1610 for execution upon foreign state property are not rules of subject matter jurisdiction. Immunity under § 1609 may be waived. It has been waived by The Congo.

First, the statute shows that when Congress meant jurisdiction it said so. Sections 1604 and 1605 provide for immunity from jurisdiction. The word jurisdiction does not appear in § 1609 or § 1610. If Congress viewed the immunity rules for foreign state property as jurisdictional, why didn't it say so?

Without some basis for viewing § 1609 immunity as jurisdictional, it is no answer to simply assert, as Amoco does repeatedly, that a lack of subject matter jurisdiction cannot be waived. On the face of the statute, §§ 1609 and 1610 merely provide rules dealing with the availability of certain remedies in litigation against a foreign state, rules which become applicable once the court has subject matter jurisdiction under § 1330(a).

Second. While as a general matter jurisdiction of a federal court cannot be conferred by agreement or waiver, that is not true of the FSIA. Jurisdiction under § 1330(a) and § 1605(a)(1) is expressly based on a waiver of immunity from jurisdiction by a foreign state. The Congo waived such immunity in the Credit Facility Agreement. By entering into the Settlement Agreement and agreeing to the Order it has also waived its immunity defense from

8

execution under § 1609. Amoco has not suggested any reason why a foreign state can waive immunity from adjudication, i.e., jurisdiction to try a case and enter a judgment against it, but cannot do the same thing when it comes to an agreed court order affecting its property.2/

Third. The cases cited by Amoco provide no support for its subject matter jurisdiction argument. In <u>Liberian Eastern Timber Corp. v. Republic of Liberia</u>, 659 F. Supp. 606, 609-10 (D.D.C. 1987) and <u>Birch Shipping Corp. v. Embassy of the United Republic of Tanzania</u>, 507 F. Supp. 311 (D.D.C. 1980), the foreign states resisted attachment or execution and the courts had to decide whether the requirements of § 1610(a) were met. Neither of those cases suggests that the requirements of § 1610 are jurisdictional. In <u>City of Englewood v. Socialist People's Libyan Arab Jamahiriya</u>, 773 F.2d 31 (3d Cir. 1985), the court found both immunity from adjudication and from execution under the FSIA. The court distinguished the two, specifically referring to § 1604 as a bar to jurisdiction but as to § 1609 merely finding the claimed "commercial activity" exception inapplicable. <u>Id.</u> at 36.

Fourth. In a recent ruling the Second Circuit Court of Appeals squarely held that an immunity claim under § 1609 may be waived. It was waived in that case by failure to timely raise it as required by a local court rule. <u>Caribbean Trading & Fidelity Corp. v. Nigerian National Petroleum Corp.</u>, No. 91-7445 (2d Circuit, October 30, 1991). The order there, which required the posting of some $10 million in security, may well have constituted an attachment of non-commercial property of a foreign state. See Judge Mahoney's concurring opinion. But the finding that § 1609 immunity had been waived made it unnecessary to consider the rules in § 1610. The court said, "the applicability and effect of Section 1609 are not matters, like subject-matter jurisdiction, that may be raised at any time by a foreign state." Slip op. at 8420.

_____

2/ <u>Verlinden</u> reserved decision on whether a foreign state could consent to suit under § 1605(a)(1) based on activities wholly unrelated to the United States. 461 U.S. at 490 n. 15. The question has not been raised by NUFI or Amoco. The problem, if there is one, is not presented here since this is a proceeding to enforce a money judgment against The Congo by reaching monies owed to The Congo by U.S. corporations.

9

The statute is clear. The cases support our interpretation. There is no need to analyze the snippets of legislative history cited by Amoco and NUFI. Suffice it to say, we have reviewed them and find them completely consistent with our conclusion.

The FSIA was enacted, among other things, in order to codify a restrictive theory of foreign state sovereign immunity. Verlinden 461 U.S. at 487-88. To the extent that § 1609 provides immunity, it was enacted for the benefit of foreign states. Amoco is not a foreign state. It has no standing to raise an immunity defense under those provisions. See The Republic of the Phillipines v. Marcos, 806 F.2d 344 (2d Cir. 1986).

Amoco argues that Marcos does not apply because it involved commercial property in the United States and did not concern § 1610. Amoco views Marcos as a denial of standing to invoke immunity from suit under § 1604. In fact, Marcos did not discuss any specific provision of the FSIA. The court merely stated its general conclusion that the individual defendants had no standing to assert a foreign immunity claim. Id. at 360. In any case, Amoco's distinction makes no sense. No reason appears why persons who are not foreign states should have standing to urge immunity under § 1609 but not under § 1604.

Since Amoco has no standing to raise an immunity defense under § 1609, it is not necessary to consider whether the mineral royalty payments it owes to the Convention are commercial property under § 1610.

Judicial Power

Apart from questions of subject matter jurisdiction, Amoco insists that no source has been identified for the court's claimed power to enter an order concerning a foreign state's property not used for commercial activity in the United States. But the source of that power is clear. Rule 69(a), Fed. R. Civ. Proc., expressly authorizes enforcement of a judgment for the payment of money by execution in supplementary proceedings conducted in accordance with local state practice and procedure. Enforcement of judgments against foreign state property is

10

limited by the immunity rule of § 1609 subject to the exceptions in § 1610. But The Congo has waived immunity under § 1609. Therefore the court is empowered, with the consent of The Congo, to implement the Settlement Agreement by entering the Order.

The Amended Order

Amoco does have standing to object to the Order insofar as it would prejudice Amoco by adversely modifying its obligations under its agreements with The Congo and the other parties to the Joint Operating Agreement or expose Amoco to some new liability or other risk. On November 22 Amoco filed a further memorandum in support of its motion to vacate and set aside, or to alter and amend, the Turnover Order entered against them, setting forth several requests for modifications in the Order. At the hearing on November 25, 1991 counsel for NUFI and Amoco stated they had agreed on several of the points listed in Amoco's latest brief. On matters remaining in dispute, the court delivered oral rulings and directed both sides to submit an amended turnover order prepared in accordance with those rulings. A copy of that amended order is attached, together with counsel's letter of transmittal dated December 4, 1991.


Conclusion

It is recommended that the Order dated November 1, 1991 be amended and superseded by entry of the amended turnover order attached hereto without any further stay.

Since the central issue we have addressed is one of subject matter jurisdiction, the rulings in this report are dispositive in nature and are therefore submitted in the form of a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure.

Under 28 U.S.C. § 636(b)(1) the parties have 10 days from the date of service hereof to file written objections to this Report and Recommendation with Judge Norgle. Failure to file such objections will normally waive the right to appeal the rulings set forth in this Report.

11

Egert v. Connecticut General Life Ins. Co., 900 F.2d 1032, 1039 (7th Cir. 1990).

Respectfully submitted,

Bernard Weisberg

United States Magistrate Judge

Date: December 5, 1991

cc:    All Attorneys of Record
       (See Attached Service List)

12

**Exhibit B**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JENNY RUBIN, et al ) | Case No.: 03-CV-9370 |
| ) | |
| Plaintiffs – Judgment Creditors, ) | Judge Blanche M. Manning |
| ) | |
| v. ) | |
| ) | |
| THE ISLAMIC REPUBLIC OF IRAN, et ) | |
| al., ) | |
| ) | |
| Defendants – Judgment Debtors. ) | |

## NOTICE OF MOTION

TO:  Matthew Allison                    Lawrence W. Newman
     Thomas A. Doyle                    Jacob M. Kaplan
     Baker & McKenzie                   Baker & McKenzie
     1 Prudential Plaza, Suite 3500     805 3rd Avenue, Floor 30
     130 East Randolph Drive            New York, NY 10022
     Chicago, IL 60601

     Thomas Walsh                       Thomas J. Cunningham
     U.S. Attorney's Office             R. Clay Bennett
     219 S. Dearborn Street, 5th Floor  Lord Bissell & Brook
     Chicago, IL 60604                  115 South LaSalle Street
                                        Chicago, Illinois  60603

     David J. Lanciotti
     Vice President and Counsel
     Chicago Title and Trust
     Chicago, Illinois  60601

PLEASE TAKE NOTICE that on September 8, 2005 at 11:00 a.m., or as soon thereafter

as counsel may be heard, we shall appear before the Honorable Blanche M. Manning in the

United States District Court for the Northern District of Illinois, Eastern Division, Room 2125,

pursuant to her Standing Order, present a Motion for Leave to File Motion for Partial Summary

Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity

Defenses Under §§ 1609-1610 of the FSIA.

Plaintiffs, by their attorneys,

_____

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

Robert D. Cheifetz
Sperling & Slater
55 West Monroe Street, Ste. 3200
Chicago, IL 60603
(312) 641-3200
(312) 641-6492 (fax)

## CERTIFICATE OF SERVICE

I, Daniel A. Shmikler, hereby certify that on July 26, 2005, I mailed a true and correct copy of the foregoing Notice of Motion to the below persons:

Matthew Allison
Thomas A. Doyle
Baker & McKenzie
1 Prudential Plaza, Suite 3500
130 East Randolph Drive
Chicago, IL 60601

Lawrence W. Newman
Jacob M. Kaplan
Baker & McKenzie
805 3rd Avenue, Floor 30
New York, NY 10022

Thomas Walsh
U.S. Attorney's Office
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604

Thomas J. Cunningham
R. Clay Bennett
Lord Bissell & Brook
115 South LaSalle Street
Chicago, Illinois 60603

David J. Lanciotti
Vice President and Counsel
Chicago Title and Trust
Chicago, Illinois 60601

Daniel A. Shmikler

## Motions

1:03-cv-09370 Rubin, et al v. Islamic Republic, et al **CASE CLOSED on 12/29/2003**

### United States District Court

### Northern District of Illinois - CM/ECF LIVE, Ver 2.4

Notice of Electronic Filing

The following transaction was received from Shmikler, Daniel entered on 7/26/2005 at 5:04 PM CDT and filed on 7/26/2005

| | |
|---|---|
| **Case Name:** | Rubin, et al v. Islamic Republic, et al |
| **Case Number:** | 1:03-cv-9370 |
| **Filer:** | Jenny Rubin |

**WARNING: CASE CLOSED on 12/29/2003**
**Document Number:** 81

**Docket Text:**
MOTION by Plaintiff Jenny Rubin for partial summary judgment *establishing that no person other than Iran may assert Iran's soverign immunity defenses under Sections 1609-1610 of the FSIA* (Shmikler, Daniel)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=7/26/2005] [FileNumber=1500222-0
] [400fa0f320129c843e09dff379bba625815d2aa862a63713dc11e78740b29bcadb9
913e0b42be63cd6fa1e163e9d1179758a16058e51beb8237a40ad283542bd]]

**1:03-cv-9370 Notice will be electronically mailed to:**

Simon A Fleischmann    sfleischmann@lordbissell.com, docket@lordbissell.com

Daniel A. Shmikler    dshmikler@sperling-law.com,

**1:03-cv-9370 Notice will be delivered by other means to:**

AUSA
United States Attorney's Office, NDIL
219 South Dearborn Street
Suite 500
Chicago, IL 60604

R. Clay Bennett
Lord Bissell & Brook
115 South LaSalle Street

Case 1:03-cv-09336BC   Document 58-2   Filed 12/27/2005   Page 48 of 49

31st Floor
Chicago, IL 60603

Rupa Bhattacharyya
United States Department of Justice
Federal Programs Branch
PO Box 883
901 East Street, N.W., Room 910
Washington, DC 20044

Robert David Cheifetz
Sperling & Slater
55 West Monroe Street
Suite 3200
Chicago, IL 60603

Thomas Anthony Doyle
Baker & McKenzie
130 East Randolph Drive
Suite 3200
Chicago, IL 60601

Robert S. Parker
McIntyre, Tate, Lynch & Holt
321 South Main Street
Suite 400
Providence, RI 02903

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main St.,
#400
Providence, RI 02903

## CERTIFICATE OF SERVICE

I, Daniel Shmikler, hereby certify that on July 27, 2005, I faxed a true and correct copy of the foregoing **Notice of Motion and Plaintiffs' Motion To Stay Discovery-Related Proceedings Pending Determination of Plaintiffs' Motion For Partial Summary Judgment Establishing That No Person Other Than Iran May Assert Iran's Sovereign Immunity Defenses Under §§ 1609 of The FSIA,** upon the below listed persons:

Matthew Allison
Thomas A. Doyle
Baker & McKenzie
1 Prudential Plaza, Suite 3500
130 East Randolph Drive
Chicago, IL 60601

Thomas Walsh
U.S. Attorney's Office
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604

David J. Lanciotti
Vice President and Counsel
Chicago Title and Trust
Chicago, Illinois 60601

Lawrence W. Newman
Jacob M. Kaplan
Baker & McKenzie
805 3rd Avenue, Floor 30
New York, NY 10022

Thomas J. Cunningham
R. Clay Bennett
Lord Bissell & Brook
115 South LaSalle Street
Chicago, Illinois 60603

Rupa Bhattacharyya
US Department of Justice
Federal Programs Branch
PO Box 883
901 East Street, N.W., Room 910
Washington, DC 20044

_____
Daniel A. Shmikler

35 (Exhibit B)

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   JENNY RUBIN, et al.,            )
                                     )Docket No. 03 C 9370
 4                 Plaintiffs,       )
                                     )Chicago, Illinois
 5        v                          )November 18, 2005
                                     )11:00 a.m.
 6   THE ISLAMIC REPUBLIC OF         )
     IRAN, et al.,                   )
 7                                   )
                   Defendants        )
 8                                   )
                                     )
 9

10                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE MARTIN C. ASHMAN
11

12   PRESENT:

13   For the Plaintiff:      DAVID J. STRACHMAN
                             McIntyre, Tate, Lynch & Holt
14                           321 South Main Street
                             Providence, Rhode Island  02903
15

16   For Field Museum:       THOMAS J. CUNNINGHAM
                             Lord Bissell & Brook LLP
17                           115 South LaSalle Street
                             Chicago, Illinois  60603
18

19

20   (PROCEEDINGS TRANSCRIBED FROM ELECTRONIC RECORDING -
     PLEASE PROVIDE CORRECT SPEAKER IDENTIFICATION)
21

22

23

24   Court Reporter:         Lois A. LaCorte
                             219 South Dearborn
25                           Chicago, Illinois 60604
                             (312) 435-5558
```

2

35 (Exhibit B)

1     THE CLERK:  03 C 9370, Rubin v Islamic Republic of Iran.

2     MR. CUNNINGHAM:  Good morning, your Honor, Thomas

3  Cunningham for the Field Museum.

4     MR.  STRACHMAN:  Good morning, your Honor, David

5  Strachman for the plaintiffs.

6     MR. ALLISON:  Good morning, your Honor, Matthew Allison

7  for the University of Chicago respondents.

8     THE COURT:  Good morning.  We have more than one motion

9  and I have decided after reading the material that we are only

10  going to argue one matter here today and that is the motion

11  for partial summary judgment, because depending on what the

12  ruling on that is, that will affect the other motions.

13     So rather than argue them both and decide them both at

14  the same time, we are going to -- I'm going to stay all

15  further discovery until ruling on the motion for partial

16  summary judgment.  So with regard to that, movant, plaintiff's

17  motion for partial summary judgment.

18     MR.  STRACHMAN:  Thank you, your Honor.  I think in large

19  measure since there are rather complicated and technical

20  issues, we are going to rely on our briefs.

21     THE COURT:   Okay, yes.

22     MR. STRACHMAN:   And it involves some complicated

23  statutes and regulations that are very difficult to

24  manipulate.

25     THE COURT:   You can lay out these law books on the floor

3

1  and crawl around an entire big floor to see the references

2  from one to the other.  It is a little complicated.  Although

3  it's a simple issue, it's a complex answer.

Page 2

35 (Exhibit B)
4        MR. STRACHMAN:    That's correct, Judge, and there are
5    some things, though, that we wanted to bring to the court's
6    attention.  We did make three filings this week.  One was just
7    to correct a few clerical errors, typographical errors in one
8    of our briefs, and two and three were notices of related
9    pleadings which I think are crucial for the court to consider.
10   We filed them on Wednesday and Thursday and we had them
11   delivered to the court Thursday.
12       THE COURT:    Yes, I read it, having to do with the
13   country of Iran litigating elsewhere.
14       MR. STRACHMAN:    Exactly, and that's crucial because
15   the -- one of the issues, and I think this is the only issue
16   that I really wanted to address orally, is that under the
17   Powers case there is a three-part test to determine the nature
18   of this waiver -- or strike that -- the nature of this claim
19   for sovereign immunity.
20       But one thing that's glaringly missing from both of the
21   University of Chicago and the Field Museum's submissions is a
22   reference to a hindrance to Iran to come into this court and
23   to litigate its rights, and a lot of what their position is
24   based on is this sort of, in a sense this elephant in the room
25   that they don't head on address, and I think we do, and I

4

1    think the documents that we provided suggest that even more.
2        Yesterday, there was a hearing actually in Belgium with
3    respect to our registration of our judgment and attempt to
4    register it.  It's a very complicated procedure, I'm not an
5    expert on it, but while that procedure was going forward, our
6    lawyers in Belgium obtained an ex parte restraining
7    order/attachment against Iranian funds.  They sent it out to

35 (Exhibit B)

8   specific banks.  The banks came back and said yes, there were
9   significant bank accounts.

10      What's significant for this court is a document that Iran
11  filed.  It was filed on November 4th.  We received it on I
12  think Tuesday.  We literally got a quick translation.  It's
13  not the best translation, but it's a translation.

14      THE COURT:  So I saw.

15      MR. STRACHMAN:  It's a translation, and we wanted to get
16  it very quickly.  A professor in New York of Belgian origin
17  actually translated it very quickly for us.  But the
18  substance --

19      THE COURT:  Did a bad job.

20      MR. STRACHMAN:  Well, he did a quick job, Judge.

21      THE COURT:  Okay.

22      MR. STRACHMAN:  The substance of the pleading isn't as
23  important as the fact that Iran hired a lawyer, came into the
24  court and said the Rubin plaintiffs don't have the right to
25  attach these funds because of all these different reasons.

5

1   Ultimately, quite honestly, we agreed to lift the restraining
2   order because they were right, because in Belgium I understand
3   the rule to be under the Vienna convention, as the Vienna
4   convention is interpreted in Belgium, the bank accounts did
5   not have sufficient funds in them to allow an attachment.  If
6   they had significant funds -- each of three accounts I think
7   had a few hundred thousand Euro.  If they had millions of
8   dollars, then we would be able to attach them.  Because they
9   had basically operating money for diplomatic provisions, we
10  couldn't attach them.

Page 4

35 (Exhibit B)
11      So we worked out an arrangement, I think they went to
12   court yesterday, I haven't had a report as to what happened,
13   and basically retrieved it.  But the point is they came to
14   court, as they have done in the United States, as several
15   courts in this country have said, they are experienced
16   litigators, and we attached the 790 entry docket report in one
17   of the cases that they have been litigating for 15 years.
18   They litigate many cases.  They litigated in the 9th Circuit.
19   They litigated numerous other cases in very different contexts
20   and they describe the law of Iranian experience in the U.S.
21   federal courts is that quote, unquote, they are an experienced
22   litigator.  If they wanted to come into this court, they could
23   have come into this court.  They were noticed of our --
24      THE COURT:   Well, even if they're not experienced, it
25   really doesn't make any difference --

6

1      MR. STRACHMAN:   That's right.
2      THE COURT:   -- what experience they have.  You did, I
3   know that you did notify them of the pendency of these
4   citations.
5      MR. STRACHMAN:   We did, and we notified them --
6   obviously, we had to notify them of the original suit.  We had
7   to notify them --
8      THE COURT:   The original suit wouldn't necessarily give
9   them notice of a citation.
10      MR. STRACHMAN:   But the point is that all along the way
11   they have received some sort of notice and according to the
12   Foreign Sovereign Immunities Act, and Judge Rubino's order, we
13   had to notify them of the judgment as well.  Diplomatic means
14   were used to serve them.  DHL is also a recognized name.  They
Page 5

35 (Exhibit B)

15  were also served in an action that we had in Texas and the
16  judge in Texas, the federal court, ordered us to notify them
17  of a sheriff's sale, a marshal's sale actually, that we had
18  over a piece of property that they had out there.
19      So the court is right, whether experienced or
20  inexperienced --
21      THE COURT:    What I want to know for sure is have you in
22  accordance with the Act notified them formally of the pendency
23  of this citation?
24      MR. STRACHMAN:    It's our position that they don't need
25  to be notified.  There is nothing indicating that the

7

1  defendant has to be notified.  We thought they were -- there
2  was a little confusion, to be very honest, as to whether they
3  were sent the documents initially.  So to remedy that, to make
4  sure that everything was crystal clear, I did that again a
5  couple months ago, just to be crystal clear, and I sent a
6  package that was signed for.  And we have the DHL receipt and
7  we sent it to the court.

8      THE COURT:    And that package included the citations.
9      MR. STRACHMAN:    Included everything.  And I have a cover
10  letter that I provided to the court as well where I wrote all
11  of the citations and all of the substantive pleadings.  It was
12  a fairly hefty package.  So there is no hindrance for them
13  coming into the court.  But even more so, because for the very
14  same type of antiquities that are the subject of this case,
15  the Persepolis antiquities, the majority of them are from
16  Persepolis, Iran instituted as a plaintiff its own proceeding
17  in the High Court of Justice in England several months ago and

Page 6

35 (Exhibit B)

18   yesterday we received a copy of that pleading in English

19   where, the initial pleading, as I understand it, after

20   speaking with our counsel there is called a claim form.  That

21   claim form was given to us.  The other documents will be made

22   available, I have been told, in the next couple of days, the

23   subsequent pleadings.

24       But the initial pleading is called a claim form signed by

25   their counsel indicated that they are looking for a recovery

8

1   against Christie's for, it seems like it's one antiquity, if

2   you will, but an antiquity from Persepolis that Christie's was

3   about to sell.  We also provided to the court some Iranian --

4   before we had the claim form, we provided the court Iranian

5   accounts of what went on in the court and then we got the

6   claim form.

7       They're asking for three types of relief:  declaratory

8   judgment, effectively for the restitution, and also for

9   damages.  So that shows that specifically when it comes to

10  antiquities they are more than capable of retaining counsel to

11  go out and to perfect their rights.  The fact that they

12  haven't done so here does not mean that their surrogates or

13  proxies can come into court and say "We want to take up the

14  banner of Iran and we want to argue on Iran's behalf."  That

15  doesn't mean they can do that.  Powers says they can't do

16  that.  There is no hindrance at all from them doing it.  And

17  furthermore, there are many judgment debtors who may prefer

18  not to argue about a recovery against a specific asset and may

19  prefer for all kinds of reasons that a judgment creditor

20  satisfy its judgment without their intervention for all kinds

21  of reasons.

Page 7

## 35 (Exhibit B)

22      An attachment is made or a citation is made and then the
23  judgment creditor grabs the asset. They can walk away, Iran,
24  other entities, and say, "We haven't, we haven't paid them.
25  We don't pay American victims of terrorism. We haven't paid

9

1   any judgments," but meanwhile they're gone. And that's
2   occurred in several locations and several of these kinds of
3   cases, including this very case when we went to attach a piece
4   of property in Texas and the court said "You have got to
5   notify Iran again." We did. We waited a month, two months --
6   I think it was about two months between the notice and the
7   sale, and Iran took no position. And they could have. They
8   could have come in and they could have raised all kind of
9   different issues, but they didn't.

10      So now what we have is a very unique situation, an absent
11  defendant who has worked in concert at some point with two,
12  basically two museums. The two museums now say "Even though
13  Iran is not here, what we want to do is we want to make
14  defenses on their behalf. Coincidentally, they may help us,
15  but we want to come in and we want to argue on behalf of
16  Iran."

17      THE COURT:   No, I think you said in your papers they
18  have no interest. It's not going to help them because if they
19  have the right to possession that right would remain even if
20  the articles are sold at a for sale.

21      MR. STRACHMAN:   Right. We said that about one, and if I
22  could, that would bring me to the next point, the only other
23  point that I would like to make. And this is by way of some
24  background, but in rereading the pleadings I'm not sure it all

Page 8

35 (Exhibit B)
25   came out.  There are several different kinds of classes, if

 

10

1   you will, of antiquities that bring us, that bring the Rubin
2   plaintiffs to this forum.

3   First and foremost, 18 months ago we heard that the
4   University of Chicago was about to return several hundred of
5   these clay seals -- they had previously given some and they
6   were about to send some more over to Iran. It was widely
7   publicized. We stopped that with a citation proceeding. And
8   that's when we started. As we started, and as the documents
9   came in to us in dribs and drabs after we filed a series of
10   motions to compel and for contempt, and we came back four or
11   five times to get documents, we then learned -- and by the
12   way, that was what we refer to as the seal impressions, the
13   Persepolis seal impressions.

14   We find from the University of Chicago that they
15   acknowledge that there is another class that we didn't know
16   about, knew nothing about when we started this proceeding
17   called the Chogha Mish antiquities. Those Chogha Mish
18   antiquities they acknowledge belong to Iran. They have to go
19   back to Iran. They belong to Iran. We have no ownership
20   interest in them. The State Department has told us there is a
21   claim pending in the Iran claims tribunal, and at some point
22   we have to return them -- we will have to return them to Iran.
23   I forgot to say that the first set of items, the Persepolis
24   seal impressions, there is an allegation that there was a loan
25   and that the University of Chicago had these on sort of an

11

Page 9

35 (Exhibit B)

1  open-ended perpetual loan.  In the course of receiving
2  documents, we found documents that did substantiate some sort
3  of loan, fairly untraditional, but some semblance of I guess
4  what they could argue is a loan.  And that's, that's how we
5  made that -- that was the basis of our statement in our brief
6  that you just referred to, that if they have a right to
7  continue to use those pursuant to the loan, if they're awarded
8  to us or they're sold, they will be subject to that loan.  So
9  that's the two classes of items.

10  Then we have a third class, a third class, and it's
11  crucial I think to -- and I know the court wants to focus in
12  on this issue -- I think it's important to just look at the
13  other issue for a second.  The third, the third class is, is I
14  know of one specific antiquity and it's called a bronze band.
15  And we have a number for it.  We cite the number.  We provide
16  it in our pleadings.  A copy of both a picture of the item,
17  actually four items with one ID number and also with a little
18  card, different museums call them different things, but the
19  card next to the item in the showcase describing what it is,
20  that card says at the very top that the item came from Iran,
21  parentheses, question mark.  They don't know if it came from
22  Persepolis, question mark.  Further on, it describes a little
23  bit about that and it says in the 70s -- I'm paraphrasing, but
24  there is two or three sentences and I provided it to the
25  court -- it says we found this in the basement.  It was packed

12

1  exactly as it was when it was excavated, but there leaves no
2  doubt that it came from Persepolis.  This museum does not know
3  how it has this.  It has an antiquity it found and has no

Page 10

35 (Exhibit B)
4   document of ownership.  And in the antiquity world it's called
5   a provenance, they have no provenance.  At least they haven't
6   shown us a provenance and that's what we are asking for and
7   that's what we want to know.  We asked something like eight or
8   ten requests for production of documents and another dozen
9   interrogatories, fairly narrow and tailored.  So that's a
10  third class.

11      The fourth class of items is items that we believe, and
12  we have tried to identify them specifically, a number, that we
13  think they have absolutely no ownership interest in and they
14  can't document an ownership interest.  And here is the
15  two-minute background, Judge, on this.  It's important I think
16  to keep this, to have this.  When this dig occurred, the
17  University of Chicago and Dr. Ernst Herzfeld, who is the world
18  expert in dealing with Iranian antiquities in this part of
19  Iran, went, he did a dig.  He himself helped pass a law, the
20  Antiquities law in Iran, that said anything that's dug out --
21  we provide it all to the court in references -- but in general
22  it says anything that's dug up belongs to us, Iran.  That
23  wasn't satisfactory to the University of Chicago.

24      So what they did was they had an agreement.  And this was
25  a common type of agreement.  It's not nefarious in any way.

13

1   They have an agreement that said when they dig things up from
2   the ground -- and it was all done by University of Chicago
3   personnel -- we are going to have what's called in the field a
4   division, quote, unquote.  So they took all the documents,
5   they put them in these storage sort of hangars, if you will,
6   or tents and at some point they actually had divisions, you
7   get this, we get this.  And there was a little quibbling and

## 35 (Exhibit B)

```
 8    there is some cultural history to it, but basically, the
 9    University of Chicago took a lot of things and probably -- and
10    we are saying legitimately, we're not arguing about those
11    things -- and they now have them in their museum.  So we are
12    saying show us one of the things that you have that you got in
13    those divisions, which we have nothing to do with because you
14    got them legitimately, and show us what's left like, for
15    instance, that bronze band.  You don't have any document
16    showing, by your own admission, that you own that.  The
17    document that shows what they got by their own admission, by
18    their own books, the court said they didn't have to produce
19    the books to me in a discovery order sometime ago.  I went and
20    bought the books and recorded some of the books, and some of
21    the books say by their -- by their own archeologists say, to
22    paraphrase, a field report, that's what it's called, a field
23    report, is what they got and what they divided.  That was a
24    record of what happened.  Show us the field reports because
25    the field reports are going to say they rightfully own items 1
```
                                                                      14


```
 1    through 10,000, match them up, no problem.  We are not
 2    interested in them, we have no claim, we admitted that many
 3    months ago, but everything outside of 1,000, everything that
 4    you can't show in that field report is not yours.  And they
 5    actually have some title, unless they bought them from some
 6    other source.
 7         THE COURT:   Let me interrupt you.  You have been going
 8    on for the past five, ten minutes.  The issue that I want to
 9    focus on is a narrow issue.
10         MR. STRACHMAN:   Right.
```

35 (Exhibit B)
11      THE COURT:    Can these museums invoke the sovereign
12   immunity or that is to say the immunity that may attach to
13   these, any properties without deciding which properties are
14   which, the generic theory, you might say.

15      MR. STRACHMAN:   Right.

16      THE COURT:    So I don't really care at this point about
17   whether they have title and who has title and did somebody
18   steal something and all of that.  If the ruling comes out one
19   way, we might very well have to get into that and if the
20   ruling comes out the other way, we won't.  All I want to do
21   is -- there is a motion for partial summary judgment on a
22   legal issue.  So I'm not going to make any factual findings
23   whatsoever.

24      MR. STRACHMAN:   No, I just thought it's important for
25   the court in focusing on this and understanding the context of

15

 1   this, because the context is significant, it's significant
 2   because this is not, you know, what the sort of reading
 3   between the lines statement, some of the very caustic
 4   statements in some of the briefs.  This is not a fishing
 5   expedition.  We know what's there and there are issues there
 6   and they're solid and they're admitted.

 7      Now, there are some things we don't know and we have
 8   acknowledged that many months ago.  So there are these
 9   different classes and that's how these immunities and the
10   non-immunities is going to be applied in the context of these
11   antiquities.

12      With that I would rest on what's in our brief.  Thank
13   you.

14      THE COURT:   Okay.  Who wants to go next?
                         Page 13

35 (Exhibit B)

15        MR. ALLISON:    If I might, your Honor, I look forward to
16   the opportunity to address what Mr. Strachman was discussing
17   in the last several minutes of his presentation and our belief
18   that this is not the proper forum in which they can allege
19   that we have to prove our ownership of these items, but I want
20   to --

21        THE COURT:    We are not about to prove ownership of
22   items.

23        MR. ALLISON:    Right, we are here today to talk about the
24   Foreign Sovereign Immunities Act and plaintiff's motion for
25   partial summary judgment.    And first, I'll -- well, at the

16

1    conclusion I'll address what Mr. Strachman discussed in his
2    presentation, which was the sole issue of whether the third
3    prong of the Powers test, which deals with generic third-party
4    invocation of affirmative defenses, is applicable.

5         And I note the pleadings that he filed earlier this week.
6    But that argument is really putting the cart before the horse,
7    because that argument assumes that the Foreign Sovereign
8    Immunities Act is a defense to which some concept of standing
9    attaches and that the citation respondents need to have that
10   standing in order to invoke Rule 1609.

11        Respectfully, our briefs show that this is not a standing
12   issue in any way.    We are here under Rule 69, by which the
13   plaintiff seeks to attach the property of what it claims to be
14   Iran.    And Rule 69 says that it's subject to any applicable
15   federal statutes, of which Rule 1609 is such a federal
16   statute, and reads:    "The property of the foreign state shall
17   be immune except as provided in 1610 and 1611," which are the

                           35 (Exhibit B)
18  exceptions to foreign sovereign immunity.  There is nothing in
19  the language of 1609 that requires the foreign sovereign be
20  present in order to assert this.
21      THE COURT:   So it's your position that anyone can assert
22  the immunity?
23      MR. ALLISON:   That's correct, and that it's --
24      THE COURT:   Can we have some bystanders in the
25  courtroom, can they come up and say "Hey, that property is

                                                          17


 1  immune, Judge"?
 2      MR. ALLISON:   Clearly not, because they're not parties
 3  to this litigation, but parties to this litigation --
 4      THE COURT:   What gives you rights superior to somebody
 5  else?  Why is it that they can't, because they're not parties
 6  to the litigation -- what you're saying is they don't have
 7  standing, right?
 8      MR. ALLISON:   Well, I'm saying they're not --
 9      THE COURT:   That's why they can't assert it, because
10  they don't have standing to do it.
11      MR. ALLISON:   As not a party to the litigation.
12      THE COURT:   I'm wondering why a bystander listening to
13  this can't assert the immunity from attachment on this
14  property.
15      MR. ALLISON:   Well, because they're not a participant to
16  the litigation.  To the extent they were or wanted to file a
17  friend of the court type brief, I would say this, they could
18  be --
19      THE COURT:   Why can't they just walk up and say "Judge,
20  I have been listening to this.  I happen to know that that
21  property is immune."  Because they have no standing, right?
                          Page 15

35 (Exhibit B)

22   They're not a part of the lawsuit.

23       MR. ALLISON:   They're not a party to the lawsuit.

24       THE COURT:   So they have no standing.

25       MR. ALLISON:   We have no standing.  We have a party to

18

1   the lawsuit --

2       THE COURT:   Does that give you standing --

3       MR. ALLISON:   Yes.

4       THE COURT:   -- to assert immunity on behalf of somebody

5   else?

6       MR. ALLISON:   Yes, because it's not an issue of

7   standing.  You have an obligation as the court to determine

8   whether or not the property is or isn't immune.  The Supreme

9   Court in Verlinden specifically says regardless of whether the

10  sovereign is or is not there, the court has the obligation to

11  determine whether or not sovereign immunity exists.  And it

12  makes sense to look at this sort of --

13      THE COURT:   That's sort of in the context of

14  jurisdiction, right?

15      MR. ALLISON:   Well, in the context of jurisdiction, the,

16  a party, a sovereign party could waive its immunity to suit.

17  There is an argument that I think is quite strong that under

18  1610, regardless of whether a sovereign has waived his

19  immunity to suit, the property remains immune from attachment

20  and can only be attached as permitted under 1610 and 1610(a)

21  and (b), which are the two exceptions from immunity.

22  Basically, as the plaintiffs have said it, they can come in

23  and attach the property of a foreign sovereign and then say

24  unless the foreign sovereign is here, no one, you know, this

Page 16

35 (Exhibit B)
25  property I can take and the court is supposed to turn a blind

19

1   eye to the immunity principles that underlie the Foreign
2   Sovereign Immunities Act and basically say since the sovereign
3   is not here, you get it and essentially create a system where
4   although Congress has created the Foreign Sovereign Immunities
5   Act to limit the foreign sovereign's obligation to come to a
6   U.S. court, you have to come to the U.S. court to invoke that
7   sovereign immunity.  Otherwise, you waive it.  It doesn't make
8   any sense.

9       The only case that's directly on point that's addressed
10  this issue is the Walker case out of the 5th Circuit that
11  specifically says in the context of a property attachment
12  proceeding, anybody can raise the issue of whether or not --
13      THE COURT:   According to that logic, my legendary
14  bystander can come wandering in here and say, "Judge, let me
15  interrupt for a minute.  That property is immune."
16      MR. ALLISON:   Well, you wouldn't let him interrupt
17  because he is not properly before the court here as a
18  participant.
19      THE COURT:   He has no standing.
20      MR. ALLISON:  Yes, but that's standing as a party to the
21  case.
22      THE COURT:   If he came in here with a petition to say "I
23  want to interplead just to let the court know that this
24  property is immune," would the court allow that?
25      MR. ALLISON:   I don't know.

20

35 (Exhibit B)

 1      THE COURT:   Should the court allow that?  I want to know
 2  your position on it.

 3      MR. ALLISON:   The court should allow that.  The court
 4  should allow it.

 5      THE COURT:   So anybody that wanders in and decides that
 6  they want to inform the court that certain property is immune
 7  under this Act ought to have the right to do so.

 8      MR. ALLISON:   Yes.

 9      THE COURT:   Whether it's you or anybody else.

10      MR. ALLISON:   Yes, because it's in furtherance of the
11  court's independent obligation to determine whether or not the
12  property is or is not subject to immunity.  You have that
13  obligation whether or not we were here or not.

14      THE COURT:   What if the country of Iran has decided
15  look, I don't really care about these particular things here
16  in Chicago, in fact, let them take that, we will get credit --
17  the value of that will be credit against the judgment and they
18  won't go after the stuff we really want to protect which is in
19  Belgium or England or New York or Texas or somewhere else.
20  Don't they have that option?

21      MR. ALLISON:   Sure.  Iran could, if they wanted to, come
22  in and say "We don't have any objection to the attachment of
23  this material," and that would be an affirmative waiver of
24  their property immunity rights.  They haven't done that here,
25  and you can't assume in the absence of having come in to

21

 1  affirmatively assert them that they intend to waive them.
 2  That's not how the Foreign Sovereign Immunities Act is
 3  intended to work.  The Foreign Sovereign Immunities Act

Page 18

35 (Exhibit B)
 4  specifically says the property is immune unless it's subject
 5  to these exceptions, commercial activity or other exceptions.
 6      So the plaintiff comes in and says this is subject to the
 7  commercial activity exception, and then you have to say okay,
 8  well, nobody is here to counter that, the plaintiffs are here
 9  to say commercial activity, but in the absence of the actual
10  sovereign being here to say that's not correct, we have to
11  assume it is, and nobody else can say anything about whether
12  commercial activity does or doesn't apply.
13      That's simply not how 1610 is set up under the specific
14  language that says the property shall be immune except under
15  these circumstances. So it's not an issue of standing, it's
16  an issue of whether or not the property is or isn't immune,
17  and under Rule 69, which incorporates the Foreign Sovereign
18  Immunities Act, it is immune. So it's not a question of
19  whether or not we have the right to come and say this property
20  is or isn't immune. It is or isn't immune as a matter of law,
21  not depending on who is here to say that.
22      THE COURT:   Well, and that stems from, I think you have
23  argued, or I forget which argued which, from the actual
24  wording. The wording says the property is immune, it doesn't
25  say the country is immune. It says the property is immune.

22

 1      MR. ALLISON:   That's exactly right.
 2      THE COURT:   I don't know if you can compare Illinois
 3  law, but in Illinois the property -- there is a $7,500
 4  homestead exemption. If people don't come to the court and
 5  say "Hey, I live here," that exemption won't be applied.
 6  Somebody has to tell the court and it has to be the homeowner,
 7  although the wording says there is a homestead exemption on
                        Page 19

8   the property. There are also exemptions on personal property
9   here in Illinois, pictures and whatever, all kinds of personal
10  property exemptions. There is a whole procedure -- I looked
11  it up. There is a whole procedure where there is a trial
12  right of property, where the property owner can make a claim
13  for an exemption. They're now called the plaintiff; the
14  creditor is called the defendant. They have a trial right of
15  property and the homeowner has the burden of proof. I think
16  there is an old case that says that.

17       So even though the statute imposes the exemption on the
18  property, and not on the individual, so what you're saying I
19  guess is that Illinois statutes, it doesn't really make any
20  difference, they're doing it in a different way.

21       MR. ALLISON:   That's what I'm saying, your Honor. I'm
22  not familiar with the Illinois attachment, but I will make the
23  following points about that. There, according to your
24  recitation of it, the burden is on the homeowner to prove the
25  exemptions to attachment.

23

1        THE COURT:   There is an old 1890 case that says that.
2        MR. ALLISON:   Here the property is immune from
3   attachment and it's the burden of the plaintiff to prove that
4   one of the exceptions to attachment apply and under his theory
5   of how --

6        THE COURT:   Is there any law that talks about whose
7   burden it is?

8        MR. ALLISON:   Yes, the burden of proving the commercial
9   activity exception is on the party asserting the commercial
10  activity exception.

35 (Exhibit B)
11     THE COURT:     Well, but how about the burden of proving
12  the exemption in the first place?
13     MR. ALLISON:     When the exemption exists, the property
14  shall be immune.  And we all agree that with respect to the
15  two collections that are the only ones we believe
16  appropriately to the proceeding, the Chogha Mish and the
17  Persepolis, which we came to the court on day one and said we
18  have two collections that belong to Iran, we believe they're
19  entitled to immunity and started this process going forward.
20     THE COURT:     Right, and I already ruled regarding the
21  commercial.
22     MR. ALLISON:     And you have ruled about the scope of the
23  commercial activity exception already and under plaintiff's
24  theory that ruling would now have to be eviscerated because it
25  was improperly given down because we didn't have standing to

24

1   present that argument and you apparently didn't have the power
2   to make it in the absence of Iran being here.  That's simply
3   not the way the Foreign Sovereign Immunities Act is intended
4   to work.
5        One final point on that is plaintiffs admit, as they have
6   to under Verlinden, that for purposes of jurisdictional
7   immunity the court has to consider it whether or not the
8   plaintiff is or isn't there.  There is a slew of case
9   precedent cited in both of our briefs that says the Foreign
10  Sovereign Immunities Act was intended to keep in effect the
11  dichotomy between jurisdiction, immunity to suit and property
12  immunity and maintain the fact that courts have typically been
13  much more hostile to the attachment of a foreign sovereign's
14  property than they were even to hauling the foreign sovereign
Page 21

15   into suit.  And under the plaintiff's theory, although the
16   court still has to consider whether or not the FSIA applies to
17   determine whether a sovereign can be subject to suit, if we're
18   before the court to talk about a foreign sovereign's property,
19   the court can't consider the foreign sovereign immunity issues
20   unless that sovereign is actually there.

21      I know we created this to encapsulate when and when not a
22   sovereign has to appear before the court, but plaintiff's
23   argument would make it a prerequisite in order to obtain the
24   immunity presented by these statutes, the foreign sovereign
25   would actually have to come and say "Here, under the statutes

25

1   we are immune."  The language of the statute doesn't require
2   that.  The history behind the Foreign Sovereign Immunities Act
3   doesn't support that and the process of this case and numerous
4   cases where courts have rendered rulings on foreign sovereign
5   immunity issues without the presence of the sovereign there
6   makes that argument inapplicable.

7      THE COURT:   This dichotomy that you're talking about,
8   you can sue in this case, for example, you can sue the
9   sovereign nation because that's one, under one of the
10   exceptions to that statute.  You can sue the sovereign nation,
11   you can get a judgment, but you can't collect it against any
12   of their property unless they agree, right?

13      MR. ALLISON:   Unless you can prove that it's subject to
14   the commercial activity exception or some other exception.
15   And they're allowed to make that.  That's what this debate is
16   ultimately going to be about when we finally get to the merits
17   of the dispute, is whether or not these two collections which

35 (Exhibit B)
18 belong to Iran are subject to attachment. We say they're not.
19 They haven't been used for commercial activity. My colleague
20 respectfully says they are, they have been, or we have another
21 issue, they're attachable under TRIA. We are going to get to
22 that issue of whether or not the FSIA does or doesn't apply
23 and whether the TRIA does or doesn't apply, but what plaintiff
24 wants to do now is short-circuit that and say we don't even
25 have to consider whether the Foreign Sovereign Immunities Act

26

1 applies because nobody can talk about the Foreign Sovereign
2 Immunities Act unless Iran is here talking about that on their
3 own behalf. The United States government disagrees with that
4 contention. The language of the statute doesn't support that
5 contention.
6     THE COURT:   We don't know -- I read the United States
7 statement and it doesn't hit the issue of standing and all of
8 that. It just --
9     MR. ALLISON:   It hits the issue of foreign sovereign
10 immunities and perhaps I'm overly inferring, but if the
11 government believes it can step in and talk about the Foreign
12 Sovereign Immunities Act on behalf of a foreign state, that
13 would seem to support their concurrence with the concept that
14 it is not only the foreign sovereign who can come in and talk
15 about it.
16     THE COURT:   Anybody.
17     MR. ALLISON:   Otherwise, they would be sitting on
18 their --
19     THE COURT:   Anybody, including the United States of
20 America.
21     MR. ALLISON:   So we believe that it's not an issue of
                        Page 23

22    standing and we don't have to get to the third-party's right
23    to assert affirmative defenses.  But if we get there, the
24    issue the plaintiff has is that Iran, there is no hindrance
25    from Iran to come here and defend itself.  I can't debate that

27

 1    Iran has appeared in Belgium and apparently appeared in London
 2    to make some arguments about certain property.  They have not
 3    come here.  They have not come to the United States courts
 4    where they're subject to a $300 million default judgment to
 5    make the arguments that they could make about this property.
 6    A hindrance I don't think is only a physical hindrance
 7    preventing them from traveling, but as the Supreme Court said,
 8    the court needs to consider whether or not the party may
 9    possess little incentive to set in motion to argue its process
10    needed to vindicate their own rights.  If the issue is whether
11    or not Iran could come here and assert their defense, I can't
12    speak to what Iran could or couldn't do.  Iran has not come
13    and chosen to do that and their choice is not a failure of
14    this third prong, which is not intended solely to be could
15    they physically come here or could they not, but to consider
16    the contextual issues, including whether Iran may choose to
17    subject itself to a U.S. court.
18        Any of the proceedings referenced in this most recent
19    submission refer to jurisdictions outside the United States
20    and thus I don't think are applicable to a consideration of
21    whether or not the third-party standing doctrine is invoked
22    here.
23        But I don't want the court to get caught up in
24    third-party standing because we don't ever need to get there

25  because the FSIA is not a standing issue, but a matter of law

28

1  that the court is obligated to determine whether or not we are
2  asserting it or not.

3      And now I'll defer to Mr. Cunningham, who I know has some
4  points.

5      MR. CUNNINGHAM:   And your Honor, the only thing that
6  I'll add to all this discussion is simply underscore the
7  points Mr. Allison made about the court's obligation to sua
8  sponte consider whether or not the property in issue here is
9  exempt or not.

10     You have to look at Verlinden.  Verlinden in my view very
11  clearly answers that question.  Verlinden says Mr. Strachman
12  is the only party who is standing here before you.  Your Honor
13  must consider whether or not there is sovereign immunity
14  present or not before your Honor can act.  He is suggesting
15  that's changed merely by virtue of the fact that Mr. Allison
16  and I are standing here giving you our positions on sovereign
17  immunity, and that doesn't make any sense, doesn't make any
18  sense that your Honor would examine whether or not sovereign
19  immunity exists or doesn't exist in our absence but merely
20  because we are here bringing it to your Honor's attention that
21  you should not look at it, close your eyes to it.  It doesn't
22  make any sense.

23     THE COURT:   So do you agree that you need not have
24  interests identical or aligned with the country of Iran in
25  order to assert this immunity?

29

35 (Exhibit B)

1      MR. CUNNINGHAM:   Well, it's a metaphysical question that
2   you have asked about the bystander in the courtroom and
3   whether they could raise it to your Honor.

4      THE COURT:   Right.

5      MR. CUNNINGHAM:   What I'm suggesting is, with all
6   respect, your Honor, it doesn't matter.  Your Honor must
7   consider it.  It doesn't matter where it comes from.

8      THE COURT:   It doesn't matter whether -- your position
9   is it doesn't matter whether your position or your interests
10  are aligned with Iran or not.  Anyone can bring it to the
11  attention of the court.  Courts generally are not, don't use
12  initiative.  Somebody tells the court something and the court
13  acts on it.  So what you're telling me is just because you're
14  not identically aligned with the interests of Iran doesn't
15  mean that you can't assert that defense on behalf of Iran.

16     MR. CUNNINGHAM:   If your Honor receives an anonymous
17  letter saying this property is exempt --

18     THE COURT:   Okay.

19     MR. CUNNINGHAM:   -- if your Honor reads that and is
20  persuaded by it and is convinced by it, my argument is this
21  court doesn't have the power to turn it over to Mr. Strachman.

22     THE COURT:   I got you.

23     MR. STRACHMAN:   If I could respond for just a minute.

24     THE COURT:   Please.

25     MR. STRACHMAN:   Because I think there is a new

30

1   opportunity here for billing because I think they can bill
2   Iran for these arguments because -- and I'm serious because
3   the issue is like this.

35 (Exhibit B)
 4       THE COURT:    All they can do is get a judgment against
 5   them if they don't pay.

 6       MR. STRACHMAN:    The Foreign Sovereign Immunities Act was
 7   created so that the government cannot come into court now as a
 8   party and state what its interest is and try to prevent
 9   certain activities.  And we flesh this out in our brief.  They
10   no longer have the ability.  So -- and that's why the Foreign
11   Sovereign Immunities Act was created, so that the Tate letter
12   was repealed, everything is under the Foreign Sovereign
13   Immunities Act.  The government has a right under a separate
14   statute unrelated to this entire proceeding, which they
15   utilize in every single jurisdiction, and I'm familiar with
16   many opportunities that they have -- many times they have done
17   that.  They come in and they say this is our statement of
18   interest, because the government as a sovereign has some
19   interest. It's not a party.  It's not a party.  It can't raise
20   defenses.

21       So what we have here is two museums coming in as
22   third-party creditors, banks, if you will, the third-party
23   holding the stake saying "You know what?  I can do what the
24   government is precluded from doing and what the Foreign
25   Sovereign Immunities Act specifically said the government

                                                              31


 1   can't do."  That's why it was created and that's exactly --
 2       THE COURT:    What about Verlinden and what about his
 3   anonymous letter?  It comes to me, I take a look at it, hey,
 4   this property is immune.  Do I have an independent obligation
 5   to make that, to ascertain that?
 6       MR. STRACHMAN:    It's an affirmative defense that they
 7   have the right to raise, and apparently said one of my brothers
                          Page 27

 8  thinks the only affirmative defenses are those listed in the
 9  federal statute.  There are a zillion of them.  Many of them
10  have to do with third-party creditors.  Illinois law, as we
11  cited, specifically says both the case that your Honor
12  referenced and the Illinois practice book says, says that they
13  don't have that right to do that.  And I think if the court
14  rules that they do, the court will be saying for the first
15  time, there will be no ruling like this that says what the
16  government was precluded from doing in 1976 when they created
17  the Foreign Sovereign Immunities Act, third-party creditors or
18  third-party holders, if you will, they're not even creditors,
19  can now do.

20      THE COURT:  What about the Verlinden case?

21      MR. STRACHMAN:  The -- look at the Marcos case.  It's
22  particularly apropos because in that case, in the middle of
23  the case -- right at the beginning of the case, they went in
24  and they tried to get a restraining order and the court said
25  whether it's a restraining order or attachment doesn't matter,

32

 1  they can't raise that defense.  And I think there is another
 2  thing that's glaringly missing from this discussion, and we
 3  all know why.  It's another elephant in the room, and that is
 4  the TRIA statute, Section 201.  Section 201 says specifically
 5  judgment creditors of terror sponsoring states can go out in
 6  certain circumstances and go out and grab these assets.
 7  That's why we did it in Texas.  That's why we did it in
 8  Washington with respect to a couple bank accounts.  That's why
 9  many other judgment creditors have done the same thing.  There
10  are not hundreds, but there are several real instances of

Page 28

35 (Exhibit B)
11  people doing this on these judgments, because Iran doesn't
12  show up and it is an affirmative defense and we have an
13  adversary proceeding. We don't have a proceeding, an unfair
14  proceeding where all of a sudden anybody can just raise a
15  defense on behalf of somebody else, which, by the way,
16  happens, just so happens to help these two judgment creditors
17  specifically. They're not writing as friends of the court or
18  as a think tank coming to the court and saying this is the
19  state of law as we see it or this is what should happen. They
20  benefit from that. They're using it as a sword.
21      THE COURT:    How do they benefit from that?
22      MR. STRACHMAN:    Because they're saying that we have to
23  go away, and if we go away, then no one sees what happens with
24  all of these different assets they have been holding for
25  70 years, the ones we think we can get that they acknowledge

33

1  belong to Iran, and the other classes that I have talked
2  about. And that would effectively say go away. And as the
3  court identified, it would eviscerate the whole point of
4  1605 cases. Why would you sue a terror sponsoring nation if
5  we interpret the Foreign Sovereign Immunities Act because they
6  can't get anything anyway unless they happen to have a
7  commercial, you know, a commercial bank account, which they
8  don't, because all the terror sponsoring nations have been
9  absent from the United States for decades. So it creates an
10  absurdity.
11      And I urge the court to not follow this sort of blind,
12  this sort of dead end path of not recognizing that the subject
13  matter jurisdiction that a court must consider and can
14  consider and the federal courts consider sua sponte with
Page 29

15  respect to the immunity issue, because that's a matter of the
16  authority of the court. We don't need all this learning, if
17  you will, the learning from the decisions to do that. We know
18  that from other situations. We know that federal courts have
19  to guard their jurisdiction. You can't confer subject matter
20  jurisdiction.

21      THE COURT:   The Seventh Circuit guards that jurisdiction
22  proudly and always.

23      MR. ALLISON:   Vigorously.

24      THE COURT:   Vigorously.

25      MR. STRACHMAN:   We can't just walk into the courts, and

34

1   the courts have a responsibility and all the cases say, and
2   they say independent analysis. What do we need is learning
3   for in the context of these cases. The whole body of
4   jurisprudence comes about with respect to the attachment
5   provisions because it's obvious that we don't need it for
6   the -- for a plenary suit because it exists today for
7   200 years that way. We need it because it applies now to the
8   attachment section. That's exactly what happened in Marcos.
9   That's exactly the Marcos case. And this sort of feels, you
10  know, the dichotomy or this false sort of law that my brothers
11  adamantly try to lead the court down is just wrong. There is
12  no precedent for it and the 5th Circuit, that seems to be the
13  only precedent, rather, says we find no precedent in the
14  entire country. How could that be? They're all in our
15  briefs. They just -- I don't know if they forgot them, I
16  don't know if they don't cite them, they didn't read them.
17  But they're all there. And we cited every one that we could

Page 30

35 (Exhibit B)

18  find.  So for some reason there is an aberrant decision in the
19  5th Circuit.  Every other jurisdiction, and most importantly
20  the Marcos case, is in line with our position.  Thank you.
21      THE COURT:  Okay, I'll give you 30 seconds.
22      MR. ALLISON:  Quickly, the reason the Walker decision
23  said there was no precedent on point is because the precedent
24  cited in the plaintiff's brief is all inapplicable to this
25  situation.  It's not about the property of a foreign

35

 1  sovereign.  Real briefly, my brother correctly stated that
 2  prior to the enactment of the FSIA it was the government's
 3  decision about what cases could or could not go forward
 4  against foreign sovereigns.  In order to prevent the political
 5  issues that went along with that, Congress enacted the Foreign
 6  Sovereign Immunities Act to bring discipline to the issue of
 7  when a foreign sovereign is subject to suit and when a foreign
 8  sovereign's property is subject to attachment.

 9      Under the plaintiff's argument, now the issue of when a
10  foreign sovereign's property is subject to attachment, that
11  statute doesn't mean anything unless the sovereign itself is
12  there to assert it.  Respectfully, there is nothing in the
13  statute that requires that, and under the history and purpose
14  behind the FSIA, that simply makes no sense.

15      Thank you.

16      THE COURT:  Anything further?

17      MR. CUNNINGHAM:  The only thing I have to say, your
18  Honor, is that Walker is the only case in this country that
19  addressed these issues.  It's the only case.  And when Mr.
20  Strachman says it's aberrant, it's not aberrant.  There is not
21  a body of case law that goes the other way, and that's one

35 (Exhibit B)

22    aberrant case.  It's the only one that's addressed these
23    issues.
24         THE COURT:   It's the only one.  Of course we are not
25    bound by the 5th Circuit.

36

1          MR. CUNNINGHAM:  It's a very persuasive opinion.  And the
2     other cases that Mr. Strachman mentioned all involve immunity
3     from liability, not immunity from attachment.  We feel that
4     that is a significant distinction.
5          THE COURT:   Okay.  Thank you very much.  The subject is
6     interesting and was briefed beautifully and argued beautifully
7     and there is nothing that I admire better than that.  Thank
8     you.  The matter will be taken under advisement.  You will be
9     notified by mail.
10         MR. ALLISON:   And that notification will include some
11    discussion about the next motion and when we can --
12         THE COURT:   Yes, right, on the assumption that...
13         MR. STRACHMAN:   Thank you, Judge.
14         MR. ALLISON:   Thank you, your Honor.
15         *                    *                    *
16         I certify that the above was transcribed from electronic
17         recording to the best of my ability.
18
19
20
21
22
23
24

Page 32

35 (Exhibit B)

25

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – <span style="color:red">CM/ECF LIVE, Ver 2.5</span>
### Eastern Division

Jenny Rubin, et al.

                    Plaintiff,

v.                                  Case No.: 1:03–cv–09370

                                  Hon. Blanche M. Manning

The Islamic Republic of Iran, et al.

                    Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, November 18, 2005:

      MINUTE entry before Judge Martin C. Ashman :Oral argument held regarding motion for partial summary judgment [95]. Plaintiffs' motion for partial summary judgment [95] is taken under advisement. Ruling to be made by mail. All further discovery is stayed until ruling on plaintiffs' motion for partial summary judgment.No notice required, advised in open court.(is, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.